# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
YANG RENBIN, ROBERT ANGELINE,          :   2:20-cv-04457-ES-CLW
COREY HAYS, AND ALEXANDRE TAZI,        :
Individually and On Behalf of All Others   :   **ECF Case**
Similarly Situated,                        :   **Electronically Filed**
                                                    :
                                                    :
            Plaintiffs,                             :
                                                    :
v.                                                  :
                                                    :
                                                    :
GSX TECHEDU INC., LARRY XIANGDONG   :
CHEN, NAN SHEN, XIN FAN, YIMING HU,    :
MING LIAO, CREDIT SUISSE SECURITIES    :
(USA) LLC, DEUTSCHE BANK SECURITIES,   :
INC., BARCLAYS CAPITAL, INC., BOFA      :
SECURITIES, INC., CLSA LIMITED, AND     :
GOLDMAN SACHS (ASIA) L.L.C.,            :
                                                    :
            Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW OF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ...........................................................................1

    A.    GSX's Business.................................................................5

    B.    GSX's Public Offerings .......................................................5

    C.    After GSX's ADS Price Triples, a Short-Seller Attacks ......................6

    D.    Another Short Seller Attacks GSX in April 2020,
        Alleging the Same Misconduct as the Grizzly Report..........................7

    E.    Commencement of this Action in April 2020.....................................8

    F.    Despite this Lawsuit and Continuing Short-Seller Attacks,
        GSX's ADS Price Skyrockets from $30.00 to $130.00........................8

    G.    GSX's ADS Price Declines Sharply in August and October 2020
        After Analysts Downgrade the Stock for Unrelated Reasons...............9

    H.    Plaintiffs File the Amended Complaint.............................................10

ARGUMENT ....................................................................................................11

I.    PLAINTIFFS FAIL TO PLEAD ANY MISREPRESENTATION..............12

    A.    GSX's Financial Statements Were Not Misleading...........................12

        1.    Plaintiffs Fail to Plead That The Alleged Conduct
            Rendered GSX's Financial Statements Misleading.................13

        2.    Plaintiffs' Claims About GSX's Conduct  Are
            Unsupported by Well-Pled Allegations ...................................16

    B.    GSX's Other Statements Are Likewise Not Misleading ...................25

II.    PLAINTIFFS FAIL TO PLEAD SCIENTER ................................................28

    A.    Plaintiffs Fail To Allege Motive and Opportunity .............................28

    B.    Plaintiffs Fail To Allege Conscious Misbehavior or Recklessness ....30

    C.    Plaintiffs' Theory Is Not More Cogent or Compelling
       Than Competing Inferences of Non-Fraudulent Intent .......................32

III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ...............................32

IV.    PLAINTIFFS DO NOT STATE A CONTROL PERSON CLAIM .............35

V.    PLAINTIFFS LACK STANDING FOR SECURITIES ACT CLAIMS......35

    A.    Plaintiffs Cannot Assert Any Section 11 Claims ................................35

    B.    Plaintiffs Cannot Assert Any Section 12(a)(2) Claims .......................37

VI.    PLAINTIFFS DO NOT ALLEGE THAT THE UNDERWRITERS
    WERE NEGLIGENT IN FAILING TO UNCOVER THE ALLEGED
    MISSTATEMENTS ...................................................................................38

CONCLUSION ..................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Adolor Corp.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009)..........................................................32

*In re Anadigics, Inc., Securities Litigation*,
No. CIV.A. 08-5572 MLC, 2011 WL 4594845 (D.N.J. Sept. 30, 2011)......28

*In re Arbinet-thexchange, Inc.*,
No. 05-4404 (JLL), 2006 WL 3831396 (D.N.J. Dec. 28 2006)....................39

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................13

*In re Bio-Technology General Corp. Securities Litigation*,
380 F. Supp. 2d 574 (D.N.J. 2005)..............................................................31

*California Public Employees' Retirement System v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ..................................................................*passim*

*In re Cancer Genetics, Inc. Securities Litigation*,
No. 2:18-cv-05612-ES-SCM, 2020 WL 3276740 (D.N.J. Feb. 26,
2020) .........................................................................................................13, 28

*In re Century Aluminum Co. Securities Litigation*,
749 F. Supp. 2d 964 (N.D. Cal. 2010)..........................................................38

*Chan v. New Oriental Education & Technology Group Inc.*,
No. CV-16-9279 (KSH) (CLW), 2019 WL 2865452 (D.N.J. July 3,
2019) .........................................................................................................22, 23

*In re China Valves Technology Securities Litigation*,
979 F. Supp. 2d 395 (S.D.N.Y. 2013)..........................................................27

*In re Constar International Inc. Securities Litigation*,
585 F.3d 774 (3d Cir. 2009) .........................................................................37

*In re Countrywide Financial Corp. Securities Litigation*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008).....................................................39, 40

*De Vito v. Liquid Holdings Group, Inc.*,
      No. 15-6969 (KM) (JBC), 2018 WL 6891832 (D.N.J. Dec. 31, 2018) ........36

*Dura Pharmaceuticals, Inc. v. Broudo*,
      544 U.S. 336, (2005)..................................................................................33

*In re FleetBoston Financial Corp. Securities Litigation*,
      253 F.R.D. 315 (D.N.J. 2008) ....................................................................35

*Galati v. Commerce Bancorp, Inc.*,
      220 F. App'x 97 (3d Cir. 2007).............................................................13, 16

*In re Galena Biopharma, Inc. Securities Litigation*,
      336 F. Supp. 3d 378 (D.N.J. 2018).............................................................32

*In re Galena Biopharma, Inc. Securities Litigation*,
      No. CV 17-929, 2019 WL 5957859 (D.N.J. Nov. 12, 2019)............13, 16, 28

*Goldsmith v. Weibo Corp.*,
      No. CV 17-4728 (SRC), 2018 WL 2733694 (D.N.J. June 7, 2018) .............26

*GSC Partners CDO Fund v. Washington*,
      368 F.3d 228 (3d Cir. 2004) .......................................................................30

*In re Hertz Global Holdings, Inc. Securities Litigation*,
      No. CV 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017)......................29

*In re Intelligroup Securities Litigation*,
      527 F. Supp. 2d 262 (D.N.J. 2007).................................................30, 31, 34

*Jasin v. Kozlowski*,
      No. 1:04-cv-2188, 2010 WL 4536973 (M.D. Pa. Nov. 3, 2010) .................37

*In re KBC Asset Management N.V.*,
      572 F. App'x 356 (6th Cir. 2014)...............................................................34

*Kuriakose v. Federal Home Loan Mortgage Corp.*,
      897 F. Supp. 2d 168 (S.D.N.Y. 2012).........................................................34

*In re Lehman Bros. Securities & Erisa Litigation*,
      Nos. 10 Civ. 6637(LAK), 09 MD 2017(LAK), 2013 WL 3989066
      (S.D.N.Y. July 31, 2013).......................................................................21, 23

iv

*Long Miao v. Fanhua Inc*,
　442 F. Supp. 3d 774 (S.D.N.Y. 2020) ..................................................... *passim*

*Loos v. Immersion Corp.*,
　762 F.3d 880 (9th Cir. 2014) ...................................................................35

*Meyer v. Green*,
　710 F.3d 1189 (11th Cir. 2013) ...............................................................35

*National Junior Baseball League v. Pharmanet Development Group*,
　720 F. Supp. 2d 517 (D.N.J. 2010).......................................................*passim*

*In re Nice Systems, Ltd. Securities Litigation*,
　135 F. Supp. 2d 551 (D.N.J. 2001)..........................................................18

*In re Omnicom Group, Inc. Secs. Litigation*,
　597 F.3d 501 (2d Cir. 2010) ....................................................................34

*Oran v. Stafford*,
　226 F.3d 275 (3d Cir. 2000) ....................................................................29

*In re PXRE Group, Ltd., Securities Litigation*,
　600 F. Supp. 2d 510 (S.D.N.Y. 2009) ......................................................31

*Rahman v. Kid Brands, Inc.*,
　736 F.3d 237 (3d Cir. 2013) ....................................................................28

*Sapssov v. Health Management Associates, Inc.*,
　608 F. App'x 855 (11th Cir. 2015)...........................................................33

*Schaffer v. Horizon Pharma PLC*,
　No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018)..........23

*Tanaskovic v. Realogy Holdings Corp.*,
　No. CV 19-15053 (SRC), 2021 WL 211049 (D.N.J. Jan. 21, 2021) ......14, 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007)................................................................................32

*In re Wachovia Equity Securities Litigation*,
　753 F. Supp. 2d 326 (S.D.N.Y. 2011) ......................................................39

*Winer Family Trust v. Queen*,
503 F.3d 319 (3d Cir. 2007) ......................................................................6, 12

## STATUTES

15 U.S.C. § 77k(c) ............................................................................................39

15 U.S.C. § 78u-4(b)(2) .....................................................................................1

## RULES

Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure .....................1

Defendants GSX Techedu Inc. ("GSX" or the "Company"), Ming Liao and Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Barclays Capital Inc., BofA Securities, Inc., CLSA Limited, and Goldman Sachs (Asia) L.L.C. (collectively, the "Underwriters," and together with GSX and Mr. Liao, the "Defendants"[1]) respectfully submit this memorandum of law in support of their joint motion to dismiss the Amended Class Action Complaint (ECF No. 22, the "Complaint" or "AC") pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").

## PRELIMINARY STATEMENT

In a Complaint that is long on generalized speculations, but short on the particularized facts necessary to state a claim under the securities laws, Plaintiffs rely almost entirely upon the conclusory and contradictory claims of various self-interested short-sellers. GSX is a Chinese educational company that offers a wide array of K–12 courses through an online live large-class format. (AC ¶ 2.) As of the filing of this Motion, GSX's stock is up approximately 500% compared to its June 2019 initial public offering ("IPO"). Since February 2020, however, short-sellers have speculated that GSX's success is attributable not to organic growth

---

[1]   To Defendants' knowledge, none of the remaining named defendants—Larry Xiangdong Chen, Nan Shen, Xin Fan and Yiming Hu (collectively, with Ming Liao, the "Individual Defendants")—has been served.

following a recent spike in demand for online education, but to inflated enrollment figures and revenues, and to "brushing" orders using automated bots and other artificial means.  Despite the Company's unequivocal denials of these claims and the continued success of GSX's business and stock, Plaintiffs allege claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on the theory that GSX is "mostly a fake company."  (AC ¶ 4.)  Plaintiffs challenge the financial results and statements regarding GSX's business strategy and success in its June and November 2019 offering documents and in all of its quarterly and annual filings as a public company.  Each of these claims fail as a matter of law.

*Plaintiffs Fail To Allege Any Misstatement.*  Plaintiffs fail to plead any facts, much less particularized facts, demonstrating that any Defendant made a materially misleading statement, which is fatal to all claims against all Defendants.  Plaintiffs fail to establish any connection between their allegations of misconduct—*i.e.*, that GSX falsified its enrollment numbers and other indicators of demand for its services—and any specific statements made during the Class Period.  Plaintiffs do not allege the amount by which GSX's revenues were allegedly inflated or the expenses incurred.  Indeed, under Plaintiffs' own theory, the alleged scheme resulted in GSX generating no net revenue while incurring real expenditures.  Plaintiffs offer no explanation for how GSX stood to financially gain from such an alleged scheme.

Moreover, the linchpin of Plaintiffs' case—that over 70% of GSX's online users are bots—rests entirely on a short seller's flawed analysis of a fraction of GSX's courses in 2020 that concluded that tens of thousands of users who did not exhibit any "bot" behavior were not real students.  Similarly, while Plaintiffs' rely on allegations attributed to seven confidential witnesses ("CWs"), they do not allege facts demonstrating that these sources were in a position to know the information attributed to them.  All that Plaintiffs are left with are the speculative claims originally made in reports issued by self-interested short-sellers.  Plaintiffs' inability to identify with particularity any allegedly misleading statement made by any Defendant requires dismissal of the Complaint.

*Plaintiffs Fail To Allege Scienter.*  Plaintiffs' Exchange Act claims also fail because Plaintiffs do not plead facts giving rise to the requisite strong inference of scienter.  Their conclusory assertions regarding the Individual Defendants' motives are unaccompanied by any well-pled allegation that the timing or terms of the relevant transactions were in any way suspicious.  Nor can Plaintiffs establish conscious misbehavior or recklessness, as the Complaint is devoid of any facts demonstrating Individual Defendants' knowledge of or access to information contradicting GSX's public statements.

*Plaintiffs Fail To Allege Loss Causation.*  Additionally, Plaintiffs' Exchange Act claims independently fail because Plaintiffs have not pled loss causation.  The

3

Complaint cites two short-seller reports that Plaintiffs claim revealed the "truth" about the alleged fraud. But neither constitutes a "corrective disclosure," as both simply repackage claims made in an earlier short-seller report that did not precipitate any drop in GSX's share price. GSX's stock price only dropped after headwinds hit China's online education market, five months after this lawsuit was filed.

***Plaintiffs Lack Standing For Their Securities Act Claims.*** Plaintiffs lack standing for all of their Securities Act claims as to all Defendants. Three of the four Plaintiffs did not buy any GSX ADSs pursuant or traceable to the IPO or the secondary public offering ("SPO") in November 2019, as required to bring a Section 11 claim based on those offerings. Instead, their purchases were admittedly made in the open market after the SPO, such that it is functionally impossible to determine if the shares they bought originated from the IPO or the SPO. The remaining Plaintiff—Lead Plaintiff Renbin—claims to have purchased pre-SPO shares pursuant or traceable to the IPO, but he later sold those shares for a profit and thus also has no standing to bring a Section 11 claim. Similarly, because all four Plaintiffs bought their shares in the open market—rather than directly from the Underwriters in either offering—they have no standing to bring Section 12(a)(2) claims.

***Plaintiffs Fail to Allege the Underwriters Could Have Discovered the Purported Misstatements.*** The Securities Act claims against the Underwriters must also be dismissed because Plaintiffs have failed to plead that the Underwriters were

4

negligent or otherwise could have discovered the alleged misstatements at the time of the IPO or SPO.  Plaintiffs claim that GSX's revenue, profit and income data for 2017 and 2018 were misstated.  Yet, this data was subject to audit by GSX's outside auditor, Deloitte Touch Tohmatsu Certified Public Accounts LLP ("Deloitte") as disclosed and incorporated in the offering documents.  In April 2020, months after the IPO and SPO, Deloitte failed to detect any impropriety and Plaintiffs do not otherwise allege that any of these audits were improper.  Given these expertized statements, there is no way that the Underwriters could have discovered the alleged misstatements if Deloitte could not do so.

The Complaint should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS

### A.    GSX's Business

GSX is a Chinese company that offers online education classes to students in China.  (AC ¶ 2.)  GSX's core expertise is in providing K–12 educational and after-school tutoring courses through an online live large-class format.  (*Id.*)  GSX's revenues depend in large part on recruiting new students and generating paid enrollments.  (*Id.* ¶ 48.)  Revenues generated from K–12 enrollments accounted for over 80% of GSX's total net revenues throughout the Class Period.  (*Id.* ¶ 62.)

### B.    GSX's Public Offerings

On June 6, 2019, GSX conducted an IPO of 19.8 million American Depositary Shares ("ADSs") at $10.50 per share, and filed an accompanying Prospectus and

Registration Statement describing its business and historical financial results. (*See* Ex. A, IPO Reg. Stmt.) In the following months, GSX's ADS price stayed relatively flat, averaging around $13.00. (*See* Ex. B, Stock Chart.)[2]

Approximately six months after the IPO, GSX conducted an SPO and filed an accompanying Prospectus and Registration Statement. (AC ¶ 403; Ex. C, SPO Reg. Stmt.) GSX did not issue any new shares. (AC ¶ 403.) Instead, five of GSX's ten largest pre-IPO shareholders sold their positions into the public market. (*Id.*) The SPO was completed on November 20, 2019, at $14.00 per share. (*Id.*) Since then, GSX's ADSs have never traded below the SPO price. (*See* Ex. B, Stock Chart.)

### C.    After GSX's ADS Price Triples, a Short-Seller Attacks

In the three months following the SPO, GSX's ADS price tripled to a high of $45.42 on February 24, 2020. (*See* Ex. B, Stock Chart.) The day after that peak, short-seller Grizzly Research LLC published a report attacking GSX, titled "Brushed Student Counts and Cooked Books: Why We Believe GSX Techedu is the Worst Publicly Traded Education Company." (AC ¶ 255; Ex. D, Feb. 25, 2020 Grizzly Rep.) According to Plaintiffs, the 60-page report "detail[s] the extent to which GSX

---

[2]    Exhibits referenced herein are attached to the Certification of Scott D. Musoff, dated January 29, 2021. Pincites for all exhibits reference the original pagination at the bottom of the page. All citations and internal quotations marks are omitted, and all emphases in quotations are added, unless otherwise indicated. In ruling on a motion to dismiss, the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

has brushed its enrollment figures, overstated its revenues, and engaged in undisclosed related-party transactions." (AC ¶ 255.)

The Company initially chose not to respond to the Grizzly Report because it is "full of irrelevant and false allegations and a lack of basic accounting knowledge." (*Id.* ¶ 335.) However, after a wave of similar short-seller attacks against other Chinese companies, GSX held a special investor call on April 9, 2020 to address the Grizzly Report and other issues. (*Id.*; Ex. E, Apr. 9, 2020 Investor Call Tr., at 4.) During the call, GSX's CFO explained that "[a] majority of the data sourced by Grizzly are not accurate, reliable or applicable to our business model" and Grizzly's "methodology in reading the data is extremely flawed." (AC ¶ 333; Ex. E, Apr. 9, 2020 Investor Call Tr., at 5.)

###### D.    Another Short Seller Attacks GSX in April 2020, Alleging the Same Misconduct as the Grizzly Report

Mere days after the special investor call, a second short seller, Citron Research, published another attack on GSX, titled "GSX Techedu – The Most Blatant Chinese Stock Fraud since 2011." (AC ¶¶ 366–67; Ex. F, Apr. 14, 2020 Citron Rep.) The Citron Report alleges the same misconduct as the Grizzly Report.

GSX's CEO responded on social media: "This is the first time in my life that I have encountered such absurdities and great errors in a row." (AC ¶ 390.) He went on to criticize the report as "complete nonsense" that "fabricated the fact that 70% of GSX revenue was fabricated." (*Id.*) Finally, he stated unequivocally: "GSX has

7

never tolerated brushing." (*Id.* ¶ 391.)  The Company also issued a press release that "firmly denied the false and ungrounded allegations raised in a report by Citron Research." (AC ¶ 341; Ex. G, Apr. 15, 2020 Press Release, at 1.)

### E.    Commencement of this Action in April 2020

Three days after the Citron Report, this Action was commenced. (*See* ECF No. 1.)  The complaint asserted claims under Sections 10(b) and 20(a) of the Exchange Act against GSX, its CEO, and its CFO on behalf of all persons who purchased or otherwise acquired GSX securities between June 6, 2019 (the IPO), and April 13, 2020 (the Citron Report).  (*Id.* ¶ 1.)  The complaint alleged that "Defendants made false and/or misleading statements and/or failed to disclose that . . . GSX overstated its profitability, revenue, student enrollment figures, teacher qualifications, and teacher selection process." (*Id.* ¶ 4.)  The complaint claimed the "truth" was revealed by the Grizzly and Citron reports.  (*Id.* ¶¶ 40-45, 50-53.)  On the day the complaint was filed (April 17, 2020), GSX's ADSs closed at $33.59 per share—down 26% from its peak immediately prior to the Grizzly Report, but still more than triple the IPO price less than a year earlier.  (*See* Ex. B, Stock Chart.)

### F.    Despite this Lawsuit and Continuing Short-Seller Attacks, GSX's ADS Price Skyrockets from $30.00 to $130.00

On May 6, 2020, GSX held its Q1 2020 earnings call, where Company executives again denied the short-seller reports, including specifically the allegations of enrollment brushing.  (AC ¶ 393; Ex. H, Q1 2020 Earnings Call Tr., at 14.)  Two

8

weeks later, a third short seller, Muddy Waters Capital LLC, published yet another report attacking GSX.  (AC ¶ 369; Ex. I, May 18, 2020 Muddy Waters Rep.)  The Muddy Waters Report charged the same misconduct as the prior Grizzly and Citron Reports, with an emphasis on brushing allegations.  (*Id*.)  Once again, the Company swiftly responded with a press release that "refuted the false allegations" in the Muddy Waters Report point-by-point.  (Ex. J, May 19, 2020 Press Release, at 1.)

As an article in Forbes noted, "Short sellers absolutely hate this stock."  (Ex. K, Kenneth Rapoza, *China's 'Better Than Tesla' Stock Is A Scam, Short Sellers Say*, Aug. 2020, Forbes at 1 (cited in AC ¶ 374).)  Yet, despite the unrelenting short-seller attacks and the filing of this lawsuit, GSX's stock continued to soar.  On August 6, 2020, GSX's ADS price closed at $131.27—quadruple its price at the time of the Muddy Waters Report three months earlier and a more than tenfold increase since the IPO at $10.50 per share.  (*See* Ex B, Stock Chart.)

### G.    GSX's ADS Price Declines Sharply in August and October 2020 After Analysts Downgrade the Stock for Unrelated Reasons

Five months after this lawsuit was filed, GSX's soaring stock price was finally tempered by causes unrelated to Plaintiffs' claims.  On August 7, 2020, an analyst from Citi Research "downgrad[ed] GSX's ADSs from 'Buy' to 'Sell,' adjusting the one-year target price to $115 per ADS, citing concerns about the potentially adverse impacts of U.S. and Chinese regulatory changes on GSX's business."  (AC ¶ 371.)  GSX's ADS price fell by nearly 20% to close at $106.99.  (*See* Ex B, Stock Chart.)

9

On September 2, 2020, GSX announced that the SEC had contacted the Company and requested certain financial and operating records dating from January 1, 2017.  (AC ¶ 379.)  The Company stated that it was cooperating with the SEC, and that it had previously "engaged third party professional advisers to conduct an internal independent review into these reports' key allegations."  (Ex. L, Sept. 2, 2020 Press Release at 6.)  GSX's ADSs fell by 12% to close at $83.28.  (AC ¶ 380.)

On October 21, 2020, Credit Suisse downgraded GSX's ADSs from "Neutral" to "Underperform," lowering the one-year target price to $71 per ADS.  (*Id.* ¶ 381; Ex. M, Oct. 21, 2020 Credit Suisse Analyst Rep.)  The report cited increasing competition in the online education sector and questioned the Company's "focus on normal-price summer program[]s" in the prior months.  (*Id.*)  Credit Suisse projected GSX's Q3 2020 adjusted net profit would fall to negative ¥793 million—a 1,191% quarter-over-quarter decline and a 4,038% year-over-year decline.  (*Id.*)  GSX's ADSs fell by 30.8% to close at $71.23 per share on October 21, 2020.  (AC ¶ 383.)

**H.    Plaintiffs File the Amended Complaint**

Plaintiffs filed the operative amended complaint on November 2, 2020.  The Complaint asserts the same theory of fraud as the original complaint, but adds claims under Sections 11 and 12(a)(2) of the Securities Act based on the same alleged facts.  It also adds the Underwriters.  The vast majority of Plaintiffs' allegations are copied nearly verbatim from the short-seller reports mentioned above and numerous others.

10

On the day the Complaint was filed, GSX's ADSs closed at $65.51 per share—roughly double the price when this Action was filed and up more than 500% since the IPO.  (*See* Ex. B, Stock Chart.)

On November 23, 2020, the Company announced that its "internal independent review" was "ongoing," and that "based on the agreed scope and procedures that the professional advisers have performed so far, the Company has not been advised of findings that the Company believes would have a material adverse financial impact on the Company's reported financial performance."  (Ex. N, Nov. 23, 2020 Form 6-K, at 6.)

## ARGUMENT

All of Plaintiffs' claims are subject to heightened pleading requirements under Rule 9(b) and the PSLRA.[3]  *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004).  Rule 9(b) provides that "the circumstances constituting fraud or mistake shall be stated with particularity."  *Id.*  "This particularity requirement has been rigorously applied in securities fraud cases" and requires specification of "the who, what, when, where, and how: the first paragraph of any newspaper story."  *Id.*  The PSLRA "imposes another layer of factual particularity to allegations of securities fraud" and requires that Plaintiffs "specify

---

[3]  Plaintiffs' fundamental inability to allege any element of their claims against any Defendant fails to satisfy even Rule 8's lower pleading bar.

each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Moreover, because all of Plaintiffs' Securities Act claims are "indisputably immersed in unparticularized allegations of fraud," they too "sound in fraud" and are subject to Rule 9(b)'s requirements. *Id.* at 160.[4]

## I.   PLAINTIFFS FAIL TO PLEAD ANY MISREPRESENTATION[5]

### A.   GSX's Financial Statements Were Not Misleading

Plaintiffs claim that GSX's financial statements during the Class Period were misleading because they did not disclose Plaintiffs' conclusory allegation that most of GSX's online users were "fake" accounts created by bots, employees, and third parties.[6] (*See* AC ¶¶ 265–326, 331–334, 343–48, 355–60.) But Plaintiffs fail to

---

[4]   The Court should disregard Plaintiffs' obvious attempt to avoid their higher pleading standard by including a cursory "one-sentence disavowment of fraud" that does not "divorce the [Section 11] claims from their fraudulent underpinnings." *Chubb*, 394 F.3d at 160.

[5]   Plaintiffs allege that all Defendants are "liable for the contents and dissemination of the IPO and SPO" offering materials. (AC ¶¶ 434, 445.) But they do not, because they cannot, identify a specific statement that the Underwriters made relating to either the IPO or SPO (*Id.* ¶¶ 257-360). This improper group pleading fails to satisfy the rigorous standard of Rule 9(b) and cannot sustain Plaintiffs' claims against the Underwriters. *Winer*, 503 F.3d at 337.

[6]   The Complaint also alleges that three pre-IPO statements were misleading. (AC ¶¶ 257–64.) But these "fall outside of the defined Class Period" and thus are

allege that such a scheme even existed, much less plead any particularized facts connecting the alleged brushing scheme to GSX's financial results.[7]

### 1.   Plaintiffs Fail to Plead That The Alleged Conduct Rendered GSX's Financial Statements Misleading

Even accepting *arguendo* Plaintiffs' claim that GSX created "fake" accounts, the Complaint should be dismissed because it fails to adequately allege that such conduct rendered GSX's financial statements misleading.  "Factual recitations of past earnings, so long as they are accurate, do not create liability under" the securities laws. *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007).  To state a claim, Plaintiffs must specify the precise ways in which the alleged conduct impacted GSX's financials, including "particulars regarding the amount by which [financials] were distorted" and "the data, or source of data, used to arrive at its calculations." *Chubb*, 394 F.3d at 153–54; *see also In re Galena Biopharma, Inc. Sec. Litig.*, No. CV 17-929, 2019 WL 5957859, at *15 (D.N.J. Nov. 12, 2019) (dismissing complaint that failed to "detail by how much the [fraudulent] prescriptions increased" and "how the increase impacted . . . earnings").

The Complaint falls far short of adequately alleging the requisite nexus between the alleged conduct and GSX's financial statements.  Plaintiffs contend that,

---

inactionable as a matter of law. *In re Cancer Genetics, Inc. Sec. Litig.*, No. 2:18-cv-05612-ES-SCM, 2020 WL 3276740, at *3 (D.N.J. Feb. 26, 2020) (Salas, J.).

[7]   In ruling on a motion to dismiss, the Court need not credit conclusory statements or legal conclusions.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007).

because over 70% of GSX's online class participants are allegedly "fake" accounts, 70% of enrollments reported in GSX's financial statements and "over half of its total revenues throughout the Class Period" were falsified.  (AC ¶¶ 63–64.)  But Plaintiffs do not allege any facts, much less particularized facts, to connect the alleged conduct with the financial data they challenge in GSX's financial statements.  *See Tanaskovic v. Realogy Holdings Corp.*, No. CV 19-15053 (SRC), 2021 WL 211049, at *13 (D.N.J. Jan. 21, 2021) (plaintiff cannot plead a misstatement by "merely repeat[ing] the same conclusory allegation throughout the Amended Complaint").

Plaintiffs do not plead any facts to show that the alleged false accounts were included in the enrollment figures reported in GSX's financial statements.  To satisfy their burden, Plaintiffs must plead "the amount by which" the alleged conduct distorted GSX's financials.  *Chubb*, 394 F.3d at 153–54.  However, Plaintiffs do not allege that the purported "bots" paid for classes, were reflected in GSX's enrollment figures, or contributed to revenue in any way—as opposed to, for example, being used only for marketing purposes—let alone explain "the amount by which" GSX's financial statements were falsified.[8]

---

[8]    This failing is unsurprising, considering the Complaint does not identify a single source "that would reasonably have knowledge supporting the allegations that [GSX's] financial statements were false."  *Chubb*, 394 F.3d at 153.  Neither Plaintiffs' purported expert nor any of their CWs is alleged to have any knowledge regarding GSX's financial reporting practices.

14

Similarly, Plaintiffs fail to offer any theory on whether or how the allegedly fake accounts created by GSX employees to induce "a panic sale" affected its financials. (AC ¶ 114.) Plaintiffs neither allege that such transactions were reflected in GSX's financial statements, nor provide any information on how many employees allegedly took part in such sales tactics, how many classes were purchased, or any other information necessary to gauge the potential impact on GSX's financials, if any. Plaintiffs' allegation that GSX paid third-party firms to enroll "fake" students in GSX classes suffers from the same flaw. Although Plaintiffs assert in conclusory fashion that GSX reported these "fake" enrollments as "revenues" and reported commissions paid to these third parties as "sales and marketing expenses," (*id.* ¶ 106), Plaintiffs do not allege the amount that GSX's revenues were allegedly inflated or the expenses incurred. This is no surprise in light of Plaintiffs' concession that GSX's alleged conduct created a net loss for the Company (as it generated zero actual revenue but involved real expenditures). (*Id.* ¶¶ 111, 223–28.) There is no plausible explanation as to why GSX would have engaged in such financially ruinous behavior.

Separately, GSX's routine statements attributing growth to increased enrollments are inactionable puffery and do not give rise to a duty to disclose that the Company's "success was due primarily to its falsified enrollments." (*Id.* ¶¶ 268–69, 276–77, 282–83, 288–89, 298–99, 302–03, 308–09, 313–14; 317–18, 321–22,

15

343–44, 355–56.) *Galena*, 2019 WL 5957859, at *15. So, too, are GSX's statements touting its "online live large-class format" and "focus on operational efficiency." (AC ¶ 266.) *Galati*, 220 F. App'x at 102 (statements regarding "dramatic deposit growth" and "unique business model" are inactionable puffery).

Even if such statements were actionable (they are not), Plaintiffs once again fail to connect the alleged conduct with the statements at issue. Plaintiffs cannot establish that GSX's success was attributable to falsified enrollments because they do not assert any facts demonstrating that the conduct inflated GSX's reported enrollment or financial figures. *See Galena*, 2019 WL 5957859, at *15.

### 2. Plaintiffs' Claims About GSX's Conduct Are Unsupported by Well-Pled Allegations

The Complaint also should be dismissed because Plaintiffs fail to plead particularized facts sufficient to support their claim that the majority of GSX's business was fabricated. Plaintiffs do not purport to have any personal knowledge of this matter. Thus, in assessing Plaintiffs' second and third-hand allegations, the Court must examine "the detail provided by the . . . sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Chubb*, 394 F.3d at 147. Allegations, like Plaintiffs' here, "that do not comply with the particularity requirements [should be] disregarded." *Id.* at 145.

16

The majority of the Complaint simply parrots the purported findings of various short-sellers with "an obvious motive to exaggerate the infirmities of the securities in which they speculate."[9]  *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  Plaintiffs did nothing more than rehash such reports without any independent corroboration.  These half-baked allegations must be disregarded because the Court has "little assurance that the factual contentions have any evidentiary support."  *Id.* at 804.  Similarly, the allegations attributed to Plaintiffs' CWs should be disregarded because Plaintiffs fail to adequately allege that the CWs were in a position to know such information.

### (a)    Plaintiffs Fail to Allege Particularized Facts To Show That 70% of GSX Online Users Are Bots

Plaintiffs do not plead facts to support the claim at the heart of their Complaint: that "more than 70% of GSX user logins are bots." (AC ¶ 96.) Plaintiffs admit this claim is lifted from the May 18, 2020 Muddy Waters Report.  (*Id.* ¶ 69.)  In assessing "factual attributions to short-seller reports to satisfy pleading requirements in a securities fraud complaint," courts exercise "similar caution and

---

[9]  Such "motive[s] to exaggerate" are particularly pronounced here.  *Fanhua*, 442 F. Supp. 3d at 801.  Since the first short-seller report was issued in February 2020, short-sellers' losses have mounted, causing several to issue additional reports to further disparage GSX in hopes that its ADS price would fall—all to no avail thus far. (Ex. O, Jing Yang & Xie Yu, *One of the Year's Worst Short Bets Defies Scathing Reports and an SEC Investigation*, The Wall Street Journal, Oct. 2020 at 2.)

17

care as with respect to attributions to CWs." *Fanhua*, 442 F. Supp. 3d at 801. Plaintiffs' allegations "bear none of the indicia of reliability." *Id.* at 803.

First, the Complaint does not even attempt to allege that Muddy Waters had a sufficient basis to conclude that over 70% of all GSX users are bots. *See id.* (sources must be described with sufficient particularity to "indicate a high likelihood that they actually knew facts underlying their allegations"). Muddy Waters' conclusion is purportedly based on its review of 200 K-12 courses purchased between January and March 2020—a mere fraction of the total number of courses offered by GSX in the Class Period.[10] (Ex. I, May 18, 2020 Muddy Waters Rep., at 2, 14.) *See In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577–78 (D.N.J. 2001) (that some customers experienced a product defect, "especially without any allegation as to the relative fraction of [defendant's] total business they comprised, does not equal 'widespread' failure of the product and cannot support a fraud claim"). The analysis is simply irrelevant to Plaintiffs' claims based on the IPO and SPO documents because all purchases reviewed by Muddy Waters concern transactions that took place after the IPO and SPO, and thus offer no basis to conclude that any GSX users

---

[10]  Muddy Waters claims that it surveyed 200 GSX courses, including 29 instructors and 371 tutors. (Ex. I, May 18, 2020 Muddy Waters Rep., at 14, 23.) As of December 31, 2019, GSX had 232 instructors and 3,736 tutors. (Ex. P, 2019 Form 20-F, at 35.) Even assuming that GSX did not hire any new instructors or tutors between the end of 2019 and May 2020, when Muddy Waters published its report, Muddy Waters' sample represents only 12% of GSX instructors and 9% of tutors.

during the periods relevant to the offerings were bots.  In any event, Muddy Waters did not explain how it selected the classes for the survey, or provide sufficient information to determine whether its sample was representative of the Company's course offerings.  (*See* Ex. I, May 18, 2020 Muddy Waters Rep., at 17-20.)  In the absence of such basic information, Plaintiffs ask this Court simply to take Muddy Waters and Plaintiffs at their word—the definition of conclusory pleading.

Second, Muddy Waters did not have a sufficient basis to conclude that 70% of users in its limited sample were bots.  Rather, the Complaint demonstrates that many, if not most, of the users that Muddy Waters characterized as "bots" are not alleged to have exhibited any "bot" behavior at all.  For example, Muddy Waters allegedly identified 5,472 users as "Same-Second, Different-Week" phenomenon, which it claims is evidence of "bot" behavior.  (AC ¶ 75.)  Nevertheless, it lumped an additional 23,073 users as "bots" (*Id.* ¶ 77) simply because they purportedly logged onto a class at the same time as a "bot," or used the same IP address as alleged "bots."[11]  (*Id.* ¶¶ 75–79, 91; Ex. I, May 18, 2020 Muddy Waters Rep., at 5–10.)

Third, the Complaint does not contain any "independent factual allegations" to "corroborate [Muddy Waters'] statements."  *Fanhua*, 442 F. Supp. 3d at 803.

---

[11] Muddy Waters also included "linked" users in calculating the number of "Student-with-Teacher-IP Joiners," "Burst Joiners," and "Early Joiners." (AC ¶¶ 78-93; Ex. I, May 18, 2020 Muddy Waters Rep., at 5–10.)  Hence, tens of thousands of so-called "linked" joiners were included within the 70% of users Muddy Waters determined were "bots."

Plaintiffs' transparent attempt to substantiate Muddy Waters' conclusions with the imprimatur of their purported "expert" Dr. Knoblock is revealed by their own admission that Dr. Knoblock "took the facts and data as stated in [the short-seller] reports to be true." (AC ¶ 67.)  The Complaint does not allege that Dr. Knoblock even had access to the underlying data that Muddy Waters used in its survey, much less assessed and corroborated it to form an independent view of the relevant materials.  Dr. Knoblock's blind acceptance of Muddy Waters' conclusions[12] cannot plausibly support Plaintiffs' claim that he corroborated or "independently concluded" anything about the short-seller report.  (*Id.* ¶ 4.)  Because the quality of the analysis hinges on the quality of the underlying data, the only "independent" analysis Dr. Knoblock could have done was to check Muddy Waters' math.

Finally, Plaintiffs' failure to undertake any meaningful or independent investigation of the short-seller reports "suggests the lack of the reasonable inquiry required on plaintiff's counsel's part before signing and certifying a complaint" and "necessarily raises doubt as to whether the other factual representations [borrowed from] short-seller's report[s] . . . can be credited."  *Fanhua*, 442 F. Supp. 3d at 804.  In *Fanhua*, the court held that plaintiff's "failure to recognize and engage with the

---

[12]  This includes conclusions that a certain percentage of its sample—including the so-called "linked" joiners described above, who did not exhibit any purported "bot" behavior—were "Same-Second, Different-Week Joiners," "Student-with-Teacher-IP Joiners," "Burst Joiners" and "Early Joiners." (AC ¶¶ 74–93.)

20

dubious reliability of the short-seller reports," as evidenced by their reproduction of "incorrect facts," cast doubt on the reliability of the complaint as a whole. *Id.* Similarly, here, Plaintiffs' wholesale reliance on Muddy Waters' report impermissibly outsources counsel's professional obligations to a third party who, unlike Plaintiffs' counsel, owes no duty of candor to the Court. *Id.* The problem is compounded by the absence of any meaningful vetting by Plaintiffs' counsel, as evidenced by the Complaint's replication of obvious and demonstrable translation errors in Muddy Waters' report. (*See infra* Section I.B). This Court need not and should not accord the Complaint the same level of deference as a complaint based on allegations that were independently verified by Plaintiffs' counsel's own investigation. *See In re Lehman Bros. Sec. & Erisa Litig.*, Nos. 10 Civ. 6637(LAK), 09 MD 2017(LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).

> **(b)    Plaintiffs Cannot Rely on "Confidential Witnesses" with Whom They Have Not Spoken and Who Lack the Knowledge Attributed to Them**

The allegations attributed to the CWs also fail because the Complaint does not plead facts to indicate the confidential sources' "bas[e]s of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, . . . the coherence and plausibility of the allegations, and similar indicia." *Chubb*, 394 F.3d at 147. First, the CWs are not described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information

21

alleged." *Id.* at 146.  Plaintiffs must allege "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp.*, 720 F. Supp. 2d 517, 538 (D.N.J. 2010) (citation omitted).  "Each source must meet the pleading requirements; the sheer volume of confidential sources cited cannot compensate for . . . inadequacies." *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, No. CV-16-9279 (KSH) (CLW), 2019 WL 2865452, at *9 (D.N.J. July 3, 2019) (citation omitted).  "Where these requirements are not met, courts must ignore the insufficiently described witness' statements." *Pharmanet*, 720 F. Supp. 2d, at 539.

Here, all allegations attributed to the CWs should be ignored because Plaintiffs do not plead how or when the CWs learned the information attributed to them or that the information was based on firsthand knowledge.  *Id.* at 540 (allegations "are speculative and conclusory" where plaintiffs "fail[ed] to allege the sources of . . . information"); *Chan*, 2019 WL 2865452, at *10.  Moreover, most of the CWs are not alleged to have been in a position that made them privy to the information attributed to them.[13]  Finally because many CWs left prior to or early in

---

[13]  For example, Plaintiffs do not even attempt to describe CW-3's position or duties. (AC ¶ 109.)  CW-1 and CW-2 (both former engineers) are not alleged to have been in positions to know about the actions of GSX's teaching staff or

the Class Period, they cannot be relied upon to establish GSX's conduct during the Class Period.[14]  *See Chan*, 2019 WL 2865452, at *11; *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *8 (S.D.N.Y. Jan. 18, 2018) (disregarding CWs who left early in the Class Period).

Second, many CW allegations present significant reliability concerns, as "[t]here is no suggestion that counsel in this action has spoken with these [CWs] or even knows who they are." *Lehman*, 2013 WL 3989066, at *4.  The allegations of CW-2, CW-3 and CW-5 are pulled from various short-seller reports. (*See* Ex. I, May 18, 2020 Muddy Waters Rep., at 11–13; Ex. Q, Apr. 30, 2020 Citron Rep., at 3–5; Ex. D, Feb. 25, 2020 Grizzly Rep., at 24–27.)  Worse still, the short-sellers themselves copied CW-5's account from an anonymous online forum. (Ex. D, Feb. 25, 2020 Grizzly Rep., at 24.)  This Court need not and should not "credit uncorroborated statements of CWs who are sourced secondhand"—indeed, ***thirdhand***, in the case of CW-5—"with whom plaintiffs' counsel have not themselves interacted." *Fanhua*, 442 F. Supp. 3d at 800.  Apart from a generic statement that Plaintiffs' counsel interviewed "numerous" CWs, the Complaint

---

contractors. (*Id.* ¶¶ 97, 100–01, 106–07.)  None of the CWs alleged to know about GSX's financial reporting or bookkeeping practices. (*Supra* I.A.2(b).)

[14]  For example, Plaintiffs do not allege when CW-2 was employed by GSX, stating only that she worked at GSX in 2015—***four years before the IPO***. (AC ¶ 101.)  CW-7 also left prior to the Class Period, and CW-6 left early in the Class Period after only 45 days with GSX. (*Id.* ¶¶ 136, 140.)

23

gives no clue as to **which** of them counsel interviewed and makes no distinction as to what they told counsel firsthand, and what counsel simply copied-and-pasted from short-seller reports.  (AC at 2.)

Third, many of the CWs' actual statements do not say what Plaintiffs claim they say, or are contradicted by other CWs' statements.  For example, while CW-2 allegedly said that GSX has very "few students," both CW-4 and CW-6 state that each GSX tutor "took care of more than 200 students" **each**.  (*Id.* ¶¶ 102, 120, 136.) Similarly, while CW-2 allegedly said that GSX paid its teachers to create fake accounts that made up the majority of students in a given class, CW-4 complained that she was under constant pressure to "make a profit" by "converting" real customers from cheaper promotional courses to regularly-priced courses.[15]  (*Id.* ¶¶ 107, 116–17.)  Plaintiffs cannot have it both ways by arguing, on the one hand, that "GSX is mostly a fake company" made up of mostly "fake student users," and, on

---

[15]  Similarly, Plaintiffs allege that CW-3 stated that her employer, an alleged brushing firm, "accounted for approximately 40% of all enrollments in GSX's K-12 courses."  (AC ¶ 109.)  But in fact, CW-3 only stated that per teacher, "we generally did about 40%."  She did not say how many teachers she worked for, let alone how many of GSX's total users were allegedly fakes created by her firm. (Ex. Q, Apr. 30, 2020 Citron Rep., at 4.)  Plaintiffs also omit several of CW-3's statements that foreclose their claim that "management . . . knew," (AC ¶ 6), including that "[w]e work with [GSX] employees **not** the management" and "[b]rushing has been halted because of COVID."  (Ex. Q, Apr. 30, 2020 Citron Rep., at 3.)  Because China began to impose health and safety restrictions arising out of the COVID-19 pandemic in January 2020, CW-3's statement implies that her employer did not work for GSX for most of the Class Period.

24

the other hand, that GSX students were so numerous and enrollment was growing so rapidly that teachers' capacities to discharge their duties were stretched to the breaking point. (*Id.* ¶¶ 4, 117, 120.) *See Chubb*, 394 F.3d at 153 (disregarding CW allegations where another CW account is cited "for [a] contrary speculation").

## B. GSX's Other Statements Are Likewise Not Misleading

Plaintiffs' other allegations are also fatally flawed and cannot save their claims. Plaintiffs cite two job posts in an attempt to show that GSX openly recruits engineers to operate "cell phone bot network equipment." (AC ¶¶ 144–51.) But these job posts have nothing to do with bots. Rather, the translations that Plaintiffs copy-and-paste from yet another short-seller report are verifiably incorrect. (*See* Ex. R, May 28, 2020 Muddy Waters Rep., at 5–6.) The Chinese term 刷机 used in the job posts refers to "flashing" or "rooting," *i.e.*, modifying a device to permit software installation (Exs. S & T). (AC ¶¶ 147–48.) Such modifications serve a multitude of legitimate purposes, including the installation of specialized teaching software that GSX uses to deliver online instruction to a large number of students. Indeed, the Complaint admits that GSX instructors and tutors teach classes and communicate with students using their mobile devices, but inexplicably asserts, with no supporting facts, that an online educational company "has no need" to install specialized software to be able to broadcast content to mobile devices. (*Id.* ¶¶ 123, 150.) Far from establishing fraud, these allegations confirm Plaintiffs' counsel's failure to

25

conduct a reasonable inquiry.   As in *Fanhua*, Plaintiffs' counsel reproduced translation errors from Muddy Waters' report that did not even comport with Plaintiffs' ***own*** allegations that "brushing" in Chinese is the single-character word 刷 (*see* AC ¶ 149 n.6), not the two-character term 刷机 used in the job posts and, has an entirely different meaning.   *See Fanhua*, 442 F. Supp. 3d at 804; *see also Goldsmith v. Weibo Corp.*, No. CV 17-4728 (SRC), 2018 WL 2733694, at *9 (D.N.J. June 7, 2018) ("A securities fraud claim based on purported statements that a defendant did not actually make fails, necessarily, to state a claim upon which relief can be granted.").[16]

Nor is GSX's fast growth rate indicative of fraud.  Plaintiffs repeatedly state that GSX's growth rate is "not believable," but they fail to explain why, pointing only to the growth rates of GSX's competitors.  (AC ¶¶ 174–79.)  But this apples-to-orange comparison ignores that (i) unlike its competitors, GSX is a 100% online platform; and (ii) health and safety restrictions during the COVID-19 pandemic caused an unprecedented spike in demand for online learning.

Plaintiffs also fail to state a claim on the basis of GSX's other statements.  First, GSX's statements regarding instructor compensation are not misleading.

---

[16] Plaintiffs' other allegations describing purported "bot" behavior add nothing, as they simply recycle short-seller claims without any independent investigation. (AC ¶¶ 152–73.)  The same defect infects Plaintiffs' other references to surveys, website traffic, and other supposed indicia of popularity.  (*Id.* ¶¶ 209–22.)

Plaintiffs do not allege facts to support their conclusory allegation that "instructors and tutors were required" to create false accounts "as conditions precedent to receiving their base salaries and compensation bonuses." (*Id.* ¶¶ 292–93, 319–20.) Similarly, Plaintiffs fail to demonstrate that GSX's statements about its "rigorous interview process" for instructors were misleading, since the alleged facts all relate to GSX's hiring process for ***tutors***, not instructors. (*Id.* ¶¶ 185–90, 327–28.)

Second, Plaintiffs fail to allege a single material related-party transaction that GSX improperly omitted from its disclosures. (*Id.* ¶¶ 337–38.) Instead, they claim that GSX failed to disclose certain "contractual employment arrangements" with its Variable Interest Entities ("VIEs"). (*Id.*) But GSX ***did*** disclose that "Contractual Arrangements with Our VIE and its Shareholders" were related-party transactions. (Ex. A, IPO Reg. Stmt., at 144.)

Third, Plaintiffs fail to allege why "the differences between the Company's filings with the SAIC and with the SEC cannot be explained by differences between the generally accepted accounting principles of China and the United States." (AC ¶ 340.) *See In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 411 (S.D.N.Y. 2013) ("plaintiffs fail sufficiently to allege that the filing discrepancies were not due to differences in Chinese and U.S. accounting standards").

Finally, GSX's denials of the short-seller reports (AC ¶¶ 329–30, 335–36, 341–42, 349–54) are not actionable absent well-pled allegations showing those

denials were false.  *See In re Galena Biopharma, Inc. Sec. Litig.*, No. CV 17-929, 2019 WL 5957859, at *10 ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing." (citation omitted).)

## II.    PLAINTIFFS FAIL TO PLEAD SCIENTER

Plaintiffs' Section 10(b) claim also fails because they do not plead particularized "facts giving rise to a strong inference" of scienter.  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013) (citation omitted).  "[T]o qualify as a strong inference, the facts alleged must be cogent and compelling in light of other explanations." *In re Cancer Genetics, Inc. Sec. Litig.*, No. 2:18-cv-05612-ES-SCM, 2020 WL 3276740, at *3 (D.N.J. Feb. 26, 2020).  "Scienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud." *In re Anadigics, Inc., Sec. Litig.*, No. CIV.A. 08-5572 MLC, 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011).  Plaintiffs fail on both counts.

### A.    Plaintiffs Fail To Allege Motive and Opportunity

Plaintiffs reference two alleged motives: (i) GSX's CEO, Defendant Chen, received a "personal line of credit" when GSX secured a Margin Loan Facility; and (ii) non-party shareholders "sold their positions" in the SPO and "walked away with a profit." (AC ¶¶ 400-403.)  Neither theory suffices to plead motive and opportunity.

28

Plaintiffs assert that Mr. Chen "issue[d] materially false and misleading information" about GSX to "inflate the price of the ADSs" in order to secure a $50 million dollar margin loan. (*Id.* ¶ 402.) But they allege no facts to suggest there was anything suspicious about the timing or terms of the loan. Plaintiffs do not allege that the purported fraud had any impact on the value of Mr. Chen's privately-held Class B shares that were pledged as collateral for the margin loan (as opposed to the publicly-traded ADS, which, in turn, reference Class A shares). Plaintiffs also fail to allege how the loan was obtained, what collateral was required or how it was valued, what diligence was completed prior to securing the loan or any other details regarding the issuance of the loan, except its amount and date. (*Id.* ¶ 401.)

Plaintiffs' allegation that non-party "corporate insiders" profited also fails. (*Id.* ¶ 403.) Plaintiffs do not allege, let alone with particularity, that any of the Individual Defendants participated in or benefited from the SPO. Nor is there any allegation that the "corporate insiders" who did benefit had any involvement in, or knowledge of, the purported fraud. *See Oran v. Stafford*, 226 F.3d 275, 289–90 (3d Cir. 2000) (affirming dismissal of claims partly because defendants' scienter cannot be inferred from others' trades). Plaintiffs also fail to allege facts showing the timing supports an inference of scienter. They contend that the alleged fraud began well before the SPO and continued long after. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. CV 13-7050, 2017 WL 1536223, at *22 (D.N.J. Apr. 27, 2017) (no

29

scienter where insider stock sales occurred below stock price's high points), *aff'd*, 905 F.3d 106 (3d Cir. 2017).

**B.      Plaintiffs Fail To Allege Conscious Misbehavior or Recklessness**

Without an established motive, the "strength of the circumstantial allegations [of recklessness] must be correspondingly greater."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004).  "[I]t is not enough for plaintiffs to merely allege that defendants 'knew' . . . or . . . 'must have known' their statements were false."  *Id.* at 239.  "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 286 (D.N.J. 2007) (citation omitted).  Plaintiffs' conclusory allegations here do not come close to the particularity required.

Plaintiffs allege no particularized facts showing any of the Defendants knew of the purported fraud.  For example, none of the CWs identified any non-public information contradicting GSX's public statements that the Individual Defendants knew or had access to.  Nor do the CWs assert that they ever communicated directly with any of the Individual Defendants or confronted them with information contradicting the alleged misstatements.  *See Pharmanet*, 720 F. Supp. 2d at 555 (no scienter where "in over fifty paragraphs of statements made by [CWs], not one

30

witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants").

Plaintiffs point to statements by some Individual Defendants denying the short-seller reports (AC ¶ 6), but this shows only that they were aware of the reports. It provides no support for the inference that they believed the reports' allegations or knew that GSX's financials were false.  Moreover, many of the alleged denials occurred before the start of the putative Class Period and the IPO (*Id.* ¶¶ 385–387) and thus have no bearing on scienter.  *See Intelligroup*, 527 F. Supp. 2d at 286.

Plaintiffs are left to argue that they must have known "because of their positions with GSX, and their access to material information." (AC ¶¶ 21, 404, 435.) But courts in this Circuit have repeatedly rejected such conclusory allegations as a basis for inferring scienter.  *See, e.g.*, *Pharmanet*, 720 F. Supp. 2d at 556.  Nor can Plaintiff rely on the "core business" doctrine absent "other individualized allegations that [Defendants] had knowledge of the facts at issue." *Id.*  Similarly "it is well established that 'the size of the fraud alone does not create an inference of scienter.'" *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) (citation omitted).[17]

---

[17] Plaintiffs also assert that "the knowledge or recklessness of *other* senior employees . . . is also imputed to GSX." (AC ¶ 404.)  But "[m]ere allegations of knowledge on the part of subordinates do not provide a sufficient basis for imputing knowledge to executives." *In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 596 (D.N.J. 2005).

31

### C.     Plaintiffs' Theory Is Not More Cogent or Compelling Than Competing Inferences of Non-Fraudulent Intent

A "strong inference" of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  In assessing whether scienter has been adequately alleged, "the court must account for plausible opposing inferences" which "involves a comparative inquiry that evaluates how likely is one conclusion as compared to others, in light of the pleaded facts." *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 388 (D.N.J. 2018).

Even if the Complaint did give rise to an inference of scienter, Plaintiffs' theory "does not make sense on the facts alleged, let alone present a cogent or compelling" theory of scienter.  *In re Adolor Corp.*, 616 F. Supp. 2d 551, 572 (E.D. Pa. 2009).  It would be economically irrational for GSX to fund its own supposedly fake "revenue" by fronting enrollment fees plus commissions to teachers, tutors, and third parties.  The more compelling inference is the non-fraudulent one: GSX accurately and timely disclosed issues bearing on their internal controls and internal and external investigations, which have not revealed any fraud.  (*See* Ex. N, Nov. 23, 2020 Form 6-K, at 6.)  Plaintiffs have failed to allege scienter.

## III.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Separately, Plaintiffs' Section 10(b) claims also fail because there is no causal link between the alleged misstatements and any purported loss.  Plaintiffs must plead

32

loss causation, "*i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, (2005). To plead loss causation, it is insufficient to allege a price decline following an announcement of negative information. *Id.* at 345-48. Plaintiffs must plead facts demonstrating that the price decline immediately followed a "corrective disclosure" that revealed the "truth" about a prior misstatement. *Id.* While Plaintiffs identify several corrective disclosure dates, they fail to connect any of the alleged revelations of the purported fraud with any of the alleged drops in ADS price. (*See* AC ¶¶ 361–383.)

Plaintiffs rely on two short-seller reports as corrective disclosures—the Citron and Muddy Waters Reports—yet neither could have revealed the purported fraud. According to Plaintiffs, the Grizzly Report first described "the extent to which GSX has brushed its enrollment figures, overstated its revenues, and engaged in undisclosed related-party transactions." (*Id.* ¶ 255.) Yet Plaintiffs do not claim the Grizzly Report was a corrective disclosure—presumably because it did not precipitate any drop in the value of GSX's ADS. (Ex. B, Stock Chart.) Regardless, Plaintiffs cannot plead around their own allegations that the subsequent Muddy Waters and Citron Reports simply repeated the same core allegations as the Grizzly Report. (AC ¶¶ 367, 369.) Because they did not reveal any new information to the market, these subsequent reports cannot constitute a corrective disclosure. *See Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015)

33

("New information is necessary to show loss causation"); *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 362 (6th Cir. 2014); *Pharmanet*, 720 F. Supp. 2d at 561.

Moreover, Plaintiffs Angeline, Hays and Tazi should be dismissed entirely because they acquired all of their ADS ***after*** the publication of the Grizzly Report when the alleged fraud was, even on Plaintiffs' theory, fully "revealed."[18]  (*See* ECF Nos., 6-6, 22-1, 22-2.)  Indeed, Plaintiff Tazi acquired all ADSs after the Grizzly, Citron ***and*** Muddy Waters Reports and thus did not and could not have suffered any conceivable loss based on the alleged misstatements.  (*Id.*)

Plaintiffs' remaining hodgepodge of causation allegations fare no better. Analyst reports downgrading GSX's ADS for reasons unrelated to the alleged fraud are not corrective disclosures.  *See, e.g.*, *Intelligroup*, 527 F. Supp. 2d at 325–27 (no loss causation where alleged corrective disclosures addressed issues other than the cause of injury alleged by plaintiffs); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 177 (S.D.N.Y. 2012).  Similarly, blog posts suggesting GSX could announce disappointing financials (AC ¶ 382) did not reveal any prior misrepresentations.  *See In re Omnicom Grp., Inc. Secs. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed

---

[18]  To the extent Plaintiffs claim GSX's 2019 Form 20-F is a corrective disclosure, this, too, is deficient.  There are no non-conclusory allegations showing investors understood the "increased costs" reported in the Form 20-F to reveal some fraud.  *See Pharmanet*, 720 F. Supp. 2d at 561.

facts does not constitute a corrective disclosure of anything but the journalists' opinions."). GSX's announcement of an SEC investigation (AC ¶¶ 7, 379) likewise was not a corrective disclosure. *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market"); *Tanaskovic*, 2021 WL 211049, at *14; *Meyer v. Green*, 710 F.3d 1189, 1201 (11th Cir. 2013). Plaintiffs' conclusory assertion that investors "understood this investigation to concern the fraud" does not alter this conclusion. (AC ¶ 379.) Finally, and perhaps most egregiously, Plaintiffs' claim that a ***different*** Chinese company's announcement that it—***not*** GSX—was being investigated by the SEC was a corrective disclosure. (*Id.* ¶ 377.) But this announcement had absolutely nothing to do with GSX, much less revealed GSX was allegedly committing fraud.

## IV.    PLAINTIFFS DO NOT STATE A CONTROL PERSON CLAIM

Because Plaintiffs fail to plead primary liability under Section 10(b), their claim for control person liability under Section 20(a) also fails. *See Chubb*, 394 F.3d at 159 n.21 (lack of predicate violation compels dismissal of 20(a) claim).

## V.    PLAINTIFFS LACK STANDING FOR SECURITIES ACT CLAIMS

### A.    Plaintiffs Cannot Assert Any Section 11 Claims

Section 11 restricts standing to a "narrow class of persons consisting of those who purchase securities that are the direct subject of the prospectus and registration statement." *In re FleetBoston Fin. Corp. Secs. Litig.*, 253 F.R.D. 315, 347 (D.N.J.

2008).  The requirement to "trace" shares directly is "a product of Congress' decision to balance the low-burden substantive proof by high burden standing requirement." *Id.*  While tracing can be accomplished relatively easily in cases with one offering, the process becomes "more complicated" where, as here, "a company has issued shares under more than one registration statement." *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969 (KM) (JBC), 2018 WL 6891832, at *15 (D.N.J. Dec. 31, 2018). This is because shares from the later offering are comingled with fungible shares from the earlier offering, making it functionally impossible to tell which offering they came from.  Courts routinely dismiss Section 11 claims in multiple-offering cases for failing to satisfy the tracing requirement.  *See, e.g., id.* at 18.

Here, none of Plaintiffs allege any loss on shares acquired pursuant or traceable to the IPO.  Plaintiffs Angeline, Hays and Tazi did not purchase any ADSs until after the SPO, rendering all of their shares untraceable to either offering.  (*See* ECF Nos. 6-6, 22-1, 22-2.)  All but five of Lead Plaintiff Renbin's purchases also were made after the SPO, which likewise renders them untraceable.  (*See* ECF No. 7-2.)  As for the five purchases Renbin made before the SPO—the only purchases that could potentially support standing for a Section 11 claim based on the IPO—he suffered no damages on those shares.  Each of those purchases was made above the IPO price of $10.50 and all of those shares were later sold for a profit.  (*See id.*)

36

Plaintiffs also lack standing based on the SPO. No Plaintiff claims to have bought ADSs directly in the SPO, and ADSs acquired after the SPO cannot be traced. In any event, Plaintiffs have not alleged any damages under Section 11 because the ADSs never subsequently traded below the SPO price of $14.00. (Ex. B, Stock Chart.) *See In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009) (for a Section 11 claim, "the measure of damages is set as the difference between the price paid for a security purchased pursuant to the registration statement, and the price at the time suit was filed or the security was sold").

## B. Plaintiffs Cannot Assert Any Section 12(a)(2) Claims

Plaintiffs' Section 12(a)(2) claims also fail because Plaintiffs do not allege that they purchased their ADSs directly from the Underwriters in the IPO or SPO.[19] *Jasin v. Kozlowski*, No. 1:04-cv-2188, 2010 WL 4536973, at *9 (M.D. Pa. Nov. 3, 2010) (Section 12(a)(2) more restrictive than Section 11 because it "can only be brought by traders who purchase shares directly from a public offering.").

---

[19] As to CLSA and Goldman Sachs (Asia) L.L.C., Plaintiffs' allegations also fail because neither Defendant is alleged to have been a registered broker dealer in the United States nor sold any ADSs to any U.S.-based investors. (*See also* Ex. A, IPO Reg. Stmt. at 174.) Additionally, BofA Securities, Inc. and Goldman Sachs (Asia) L.L.C. did not participate in the IPO (AC ¶¶ 26, 28), and CLSA Limited and Barclays Capital Inc. did not participate in the SPO (*id.* ¶¶ 25, 27). They are not proper defendants with respect to claims based on the offerings in which they did not participate.

Plaintiffs Angeline, Hays and Tazi admit they purchased their shares after the SPO. (*See* ECF Nos. 6-6, 22-1, 22-2.) Although the Complaint alleges that Lead Plaintiff Renbin "purchased 1,500 ADSs from Deutsche Bank directly in the IPO for $12.50 per ADS," (AC ¶ 12) his sworn certification of trading records shows that the purchase occurred on August 26, 2019—more than two and a half months after the IPO. (ECF No. 7-2.) Moreover, the IPO price was $10.50 (*see* Ex. A, IPO Reg. Stmt., at 1), not $12.50 as Renbin paid. Because none of the Plaintiffs purchased their shares directly from the Underwriters, none has standing to assert a Section 12(a)(2) claim. *See In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976-77 (N.D. Cal. 2010) (dismissing for lack of standing where plaintiffs purchased shares were bought at a different price and on a different date than the offering).

## VI.    PLAINTIFFS DO NOT ALLEGE THAT THE UNDERWRITERS WERE NEGLIGENT IN FAILING TO UNCOVER THE ALLEGED MISSTATEMENTS

The Complaint on its face fails to plead, as it must, that the Underwriters were negligent in failing to uncover the alleged misstatements. Indeed, Plaintiffs do not plead any facts sufficient to show that it was even remotely possible for the Underwriters to uncover the alleged misstatements at the time of the IPO or SPO. While issuers face strict liability under the Securities Act, to state a claim against an offering's underwriters, Plaintiffs must allege facts showing the underwriters were at least negligent in failing to uncover the purported misrepresentations. *In re*

*Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 367-68 (S.D.N.Y. 2011). Underwriters are thus subject to the "standard of reasonableness . . . required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c). Liability may only be imposed for information known or reasonably discoverable on the effective date of the registration statement at issue. *See In re Arbinet-thexchange, Inc.*, No. 05-4404 (JLL), 2006 WL 3831396, at *4 (D.N.J. Dec. 28 2006). It is appropriate to dismiss Securities Act claims on a motion to dismiss in situations like this, where the plaintiff can prove no set of facts that support its claim. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1181-82 (C.D. Cal. 2008) (complaint precluded claims of accounting fraud against underwriters).

Plaintiffs include generic statements in the Complaint that the Underwriters were negligent in failing to uncover the alleged misstatements before the IPO or SPO (*e.g.*, AC ¶¶ 437, 439, 446), but they fail to offer a single non-conclusory allegation to support this claim. Plaintiffs' assertion is also contradicted by their own theory that the individuals who orchestrated the purported fraud went to great lengths to conceal its existence. (*See id.* ¶¶ 224-254.) Indeed, even GSX's outside auditor, Deloitte, was unable to detect any trace of impropriety in April 2020 (Ex. P, 2019 Form 20-F, at F-2), months after the IPO and SPO, rendering facially implausible any claim that the Underwriters' failure to do so one year earlier constituted negligence. Plaintiffs do not name Deloitte as a defendant or contend that its audit

39

was improper.  Nor do Plaintiffs offer any plausible allegation as to why the alleged false statements were knowable to the Underwriters months before Deloitte's audit identified no impropriety.

Moreover, while the Plaintiffs fail to connect the alleged misconduct to any of GSX's financial statements (*see supra* Part I), Plaintiffs cannot premise their claims against the Underwriters on GSX's audited financial statements incorporated by reference into the offering documents, (*see, e.g.*, AC ¶¶ 266, 294).  Deloitte conducted audits of GSX's 2017 and 2018 full year financial statements and issued opinions thereon.  It is well settled that underwriters may rely on expertised portions of a registration statement.  *See* 15 USC § 77k(b)(3)(C); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1175, 1182 ("underwriters may reasonably rely on auditors' statements").

Because Plaintiffs do not and cannot allege that the Underwriters were negligent in failing to uncover the alleged misstatements at the time of either offering, the claims against the Underwriters must be dismissed.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint with prejudice.

40

DATED:     January 29, 2021

Respectfully submitted,

/s/ Craig A. Domalewski
Craig A. Domalewski
**DUGHI, HEWIT &
DOMALEWSKI, P.C.**
340 North Avenue
Cranford, New Jersey 07016
(908) 272-0200
cdomalewski@dughihewit.com

David G. Januszewski *(pro hac vice)*
Herbert S. Washer *(pro hac vice)*
Sheila C. Ramesh *(pro hac vice)*
Adam S. Mintz *(pro hac vice)*
**CAHILL GORDON &
REINDEL LLP**
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Counsel  for Defendants Credit Suisse
Securities (USA) LLC, Deutsche Bank
Securities Inc., Barclays Capital Inc.,
BofA Securities, Inc., CLSA Limited,
and Goldman Sachs (Asia) L.L.C.*

/s/ Scott D. Musoff
Scott D. Musoff
Robert A. Fumerton *(pro hac vice
pending)*
Michael C. Griffin *(pro hac vice
pending)*
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Counsel for Defendants GSX
Techedu Inc. and Mr. Ming Liao*