POMERANTZ LLP
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York   10016
Telephone:   (212) 661-1100
Email:       avan@pomlaw.com

*Counsel for Lead Plaintiff*

— additional counsel on signature page —

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YANG RENBIN, ROBERT ANGELINE, COREY HAYS, AND ALEXANDRE TAZI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>GSX TECHEDU INC., LARRY XIANGDONG CHEN, NAN SHEN, XIN FAN, YIMING HU, MING LIAO, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES, INC., BARCLAYS CAPITAL, INC., BOFA SECURITIES, INC., CLSA LIMITED, AND GOLDMAN SACHS (ASIA) L.L.C.,<br><br>Defendants. | **Case No. 2:20-CV-04457-ES-CLW**<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................1

II.    FACTUAL BACKGROUND.................................................................4

    A.    GSX and its Business .................................................................4

    B.    GSX's Enrollment Figures and Revenue Were Largely Fabricated.....5

        1.    Expert Analysis Shows that 70% of GSX's Students Are Fake.5

        2.    GSX Builds Infrastructure To Support Brushing .......................7

        3.    GSX Employees and Contractors Admit to the Fraud...............8

        4.    There Are No Competitive Advantages that Explain GSX's Explosive Growth Relative to its Competitors ..........................9

        5.    Objective Data Show that GSX is a Relatively Unknown Education Provider in China........................................................9

        6.    GSX Hides Its Fraud-Related Expenditures ...........................10

    C.    Disclosure of GSX's Fraud Caused its Stock Price to Fall, Damaging Investors ...............................................................11

III.    STANDARD ON MOTION TO DISMISS ..................................................11

IV.    ARGUMENT:  PLAINTIFFS PLEAD NUMEROUS MATERIAL MISREPRESENTATIONS ................................................................12

    A.    The Complaint Extensively Alleges that Defendants Inflated the Company's Revenues by over Fifty Percent......................................13

    B.    The Complaint Adequately Alleges that Defendants Inflated the Company's Student Enrollment by Use of Bots and Brushing...........17

    C.    Statements from Numerous Confidential Witnesses Corroborate Dr. Knoblock's Analysis ...............................................................22

    D.    Numerous Additional Allegations Concerning the Company's Implausible Economic Growth, Lack of Name-Recognition, Perfectly Linear Enrollment Growth and Red-Flag Job Postings Cement the Conclusion that GSX's Falsified Its Enrollments and Revenue ........26

    E.    The Complaint Adequately Alleges that Defendants Misrepresented Teacher Compensation, Related Party Transactions and the Veracity of Research Reports........................................................................29

i

V.      ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER ..........................................................................................31

VI.     ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION ........................................................................................36

VII.    ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED SECONDARY VIOLATIONS.................................................................40

VIII.   CONCLUSION...............................................................................40

ii

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AC** | Amended Class Action Complaint (Nov. 2, 2020) [Dkt. 22] |
| **Amended Complaint** | Amended Class Action Complaint (Nov. 2, 2020) [Dkt. 22] |
| **Class** | (As defined in ¶ 88 of the Amended Complaint) |
| **Class Period** | (As defined in ¶ 1 of the Amended Complaint) |
| **Company** | GSX Techedu Inc. |
| **Defendants** | GSX Techedu Inc., Larry Xiangdong Chen, Nan Shen, Ming Liao, Xin Fan, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Barclays Capital, Inc., BOFA Securities, Inc., CLSA Limited, and Goldman Sachs (Asia) L.L.C. |
| **Defs.' Mem.** | Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Amended Class Action Complaint (Jan. 29, 2021) |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **GSX** | GSX Techedu Inc. |
| **Motion** | Joint Motion and Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Amended Class Action Complaint (Jan. 29, 2021) |
| **Plaintiffs** | Yang Renbin, Robert Angeline, Corey Hays, Alexandre Tazi |
| **SEC** | United States Securities and Exchange Commission |
| **Section 10(b)** | Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) |
| **Section 20(a)** | Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allergan Generic Drug Pricing Sec. Litig.*,
No. CV 16-9449, 2019 WL 3562134 (D.N.J. Aug. 6, 2019) ........................37, 39

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................19

*In re Bradley Pharm., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006).....................................................................39

*In re Celgene Corp. Sec. Litig.*,
No. CV 18-4772, 2019 WL 6909463 (D.N.J. Dec. 19, 2019)..........11, 12, 19, 20

*City of Detroit v. SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009) .................................................................39

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
No. CV 16-6509, 2018 WL 3772675 (D.N.J. Aug. 8, 2018) ........................25, 26

*Dudley v. Haub*,
No. CV 11-5196, 2013 WL 1845519 (D.N.J. Apr. 30, 2013)...........................36

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) ..............................................................................37

*Fan v. StoneMor Partners LP*,
927 F.3d 710 (3d Cir. 2019) ..............................................................................31

*In re Galena Biopharma Inc.*,
No. CV 17-929, 2019 WL 5957859 (D.N.J. Nov. 12, 2019) .............................16

*In re Galena Biopharma, Inc. Sec. Litig.*,
No. CV 17-929, 2021 WL 50227 (D.N.J. Jan. 5, 2021)....................................39

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ..............................................................................19

*Gillon v. Bernstein*,
218 F. Supp. 3d 285 (D.N.J. 2016)....................................................................21

iv

*He v. China Zenix Auto Int'l Ltd.*,
 No. CV 18-15530, 2020 WL 3169506 (D.N.J. June 12, 2020) .......................... 36

*In re Hertz Glob. Holdings Inc.*,
 905 F.3d 106 (3d Cir. 2018) .................................................................... 12

*Hull v. Glob. Digital Sols., Inc.*,
 No. CV 16-5153, 2017 WL 6493148 (D.N.J. Dec. 19, 2017) ..................... 38, 39

*Institutional Invs. Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009) ............................................................. *passim*

*Lea v. TAL Educ. Grp.*,
 837 F. App'x 20 (2d Cir. 2020) .......................................................... 35

*McCabe v. Ernst & Young, LLP*,
 494 F.3d 418 (3d Cir. 2007) .......................................................... 36, 39

*McIntire v. China MediaExpress Holdings, Inc.*,
 38 F. Supp. 3d 415 (S.D.N.Y. 2014) .................................................. 29

*In re Mylan N.V. Sec. Litig.*,
 No. 16 Civ. 7926, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...................... 15

*In re Par Pharm. Sec. Litig.*,
 No. CV 06-3226, 2009 WL 3234273 (D.N.J. Sept. 30, 2009) ............... 23, 25, 26

*Phillips v. Cty. of Allegheny*,
 515 F.3d 224 (3d Cir. 2008) .......................................................... 11

*Benak ex rel. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
 435 F.3d 396 (3d Cir. 2006) .......................................................... 38

*Ret. Sys. v. Chubb Corp.*,
 394 F.3d 126 (3d Cir. 2004) .......................................................... 16

*S. Ferry LP v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) .......................................................... 35

*In re Schering-Plough Corp./Enhance Sec. Litig.*,
 No. CV 08-397, 2009 WL 2855457 (D.N.J. Sept. 2, 2009) ............................ 35

v

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ................................................................29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..................................................................................11, 31

*United States v. Hassanshahi*,
    195 F. Supp. 3d 35 (D.D.C. 2016).....................................................................27

*United States v. Rivera-Rosario*,
    300 F.3d 1 (1st Cir. 2002)................................................................................27

**Statutes**

Securities Act ....................................................................................................2

Securities Exchange Act ..............................................................................4, 40

**Rules**

Fed. R. Civ. P. 12(b)(6)....................................................................................11

**Other Authorities**

Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 1999 WL 625156
    (Sec. & Exch. Comm'n Aug. 19, 1999) ............................................................19

## I.    PRELIMINARY STATEMENT

The allegations of the Complaint are astonishing.  During the Class Period, GSX, an online education company based in China, systematically falsified over 70% of its enrollment and over 50% of the Company's revenues.  In over 150 pages of detail, based on an extensive independent investigation in the U.S. and China and interviews with numerous confidential witnesses, the Complaint sets forth how GSX has a team of engineers who steal online identities, use them to set up false student accounts, use GSX's own funds to "buy" courses to inflate revenues, and operate tens of thousands of mobile phones to simulate student logins and class activity.  In short, about 70% of GSX is a Potemkin village.

The evidence of this deplorable fraud is ample.  Dr. Craig Knoblock, an expert at USC in computer science, reviewed a sample of student login data taken from over 200 GSX courses over a period of months, and found that the vast majority of user logins exhibit machine-like patterns that can only be explained as resulting from the activity of "bots," software designed to execute routines like course purchases or class logins.  Numerous confidential witnesses confirmed one after another that GSX uses thousands of cell-phone operated bots to falsify student enrollment accounts, revenues and login activity.  Numerous other outward signs likewise suggest GSX is mostly fake:  surveys show virtually no one in China has heard of GSX, wholly unlike its ostensible peers of comparable size;

1

GSX's implausible economic growth is completely inexplicable by comparison to its competitors; GSX's enrollment growth during certain periods is perfectly linear and clearly artificial; and GSX openly issues job postings for engineers who can "jailbreak" phones to install bot software.  If these allegations are true (they are, and they must be accepted as such for the pupose of this motion), there is simply no question that GSX is a collossally fraudulent enterprise.

Faced with a paradigmatic statement of securities fraud,[1] Defendants take the only approach open to them:  they ask the court to ignore the well pleaded allegations of the complaint.  This the court cannot do.  Defendants' approach takes two general forms.  *First*, Defendants ignore well pleaded allegations that directly refute their central arguments (to say nothing of the reasonable inferences the court must draw from these allegations in Plaintiffs' favor).  But, of course, ignoring allegations does not make them go away.  *Second*, Defendants argue that the court should ignore certain other allegations because, according to Defendants, they are based on equity research analysts' reports ("short sellers") or on unreliable confidential witnesses.  Defendants are wrong on both accounts.  Plaintiffs did not rely on a single subjective conclusion from any research analyst—Plaintiffs based

---

[1] Plaintiffs respectfully concede that, for technical reasons, the Complaint does not adequately plead claims under Sections 11, 12 or 15 of the Securities Act against any Defendant and that Defendants Xin Fan, Yiming Hu, Ming Liao, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Barclays Capital, Inc., BofA Securities, Inc., CLSA Limited, and Goldman Sachs (Asia) L.L.C. therefore may properly be dismissed from the Action.

the allegations in the Complaint on their extensive independent investigation, and they referenced reports from research analysts only for objective data, which no court known to Plaintiffs has ever found to be inappropriate.  Likewise, Plaintiffs provide the title, job description and employment dates for every single witness, and so easily satisfy the Third Circuit standard for reliability of confidential witnesses.  And contrary to Defendants' baseless accusations, Plaintiffs heard the accounts of confidential witnesses straight from the horses' mouth:  Plaintiffs interviewed six of the seven confidential witnesses, and viewed a video recording of an interview of the seventh.

For these reasons and others, Defendants' specific arguments that the Complaint fails to plead fraud fail.  Defendants argue first that the Complaint fails to allege that GSX's falsification of student enrollment resulted in falsification of revenue.  Defendants simply ignore the statements by multiple confidential witnesses that state exactly that.  They also ignore multiple additional statements that GSX used bots to purchase courses, a step that makes no sense if GSX did not aim to falsify its revenue stream.  Moreover, GSX's alternative explanation, that GSX was falsifying class activity to defraud students for marketing purposes, though wrong, would suggest only that various GSX's misstatements were misleading for a different reason.

Defendants also argue that the Complaint fails adequately to allege that GSX overstated its enrollment figures by 70% because, according to Defendants, the data set used by Dr. Knoblock was not representative. Not so. The Complaint clearly alleges that the data set was selected at random over months from 200 classes spanning K-12 across all subjects GSX teaches and across both of GSX's platforms. Remarkably, even if the sample were maximally *unrepresentative*, GSX would still have overstated enrollment by a material amount.

Defendants' arguments that the Complaint fails to plead scienter and loss causation are half-hearted. Defendants effectively ignore key allegations of scienter in this case, that Defendants pointedly and repeatedly denied the fraudulent conduct at issue. Defendants also do not even attempt to explain how GSX's management plausibly could fail to know that over 70% of the Company's core operations were falsified, or fail to be reckless in not knowing. Defendants' arguments that loss causation was inadequately pleaded similarly proceed primarily by ignoring the new information revealed to the market with each loss causation event.

The Complaint pleads an outright fraud of exactly the sort the Securities Exchange Act was passed to prevent. Defendants' motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    GSX and its Business

4

Headquartered in Beijing, GSX is a Chinese education company that purports to offer online courses in various subjects.  ¶¶ 33–34.[2]  Its core business is providing live online courses and tutoring services to K-12 students in China. *Id.* GSX attributes over 80% of its revenues to enrollment in its K-12 programs.  ¶ 64.

**B.    GSX's Enrollment Figures and Revenue Were Largely Fabricated**

Unbeknownst to investors, GSX's enrollment figures—and in turn, its revenue—were largely fabricated.  About 70% of GSX's students were "brushed," or fake. ¶ 3.  GSX employees and independent contractors "purchased" classes with GSX's own money and pretended to be real students. *See, e.g.*, ¶ 299.  GSX reported the fake students in its enrollment figures and the money they spent as real revenues—thus inflating both its enrollment figures and revenues.  *See id.*

In China, brushing is *illegal*, as Defendant Shen herself has admitted. ¶¶ 393; *see* ¶¶ 223, 228, 364.  Thus, Defendants exposed GSX to substantial fines and other penalties.

**1.    Expert Analysis Shows that 70% of GSX's Students Are Fake**

The China-focused research firm Muddy Waters purchased hundreds of GSX classes and obtained detailed information about logins and IP addresses of the students enrolled.  In total, Muddy Waters pulled 463,217 login records from

---

[2] Unless otherwise indicated, paragraph numbers refer to the Complaint.

54,065 purportedly unique users. ¶¶ 69–70. Plaintiffs retained Dr. Craig Knoblock, the executive director of the Information Science Institute at the University of Southern California and a renowned expert in the field of bots and artificial intelligence, to independently evaluate Muddy Waters' data. ¶¶ 65–66. Dr. Knoblock concluded that there were four anomalies in the login data that defy normal human login behavior which could only be explained by the use of bots. ¶¶ 68–69.

*First*, "Same-second, different-week" joiners joined a class at the exact same time—down to the precise second—on the same weekday across at least two different weeks. ¶ 74. Natural human variability as well as variability in the way internet data flows make it extremely unlikely that a person would log in at the *identical second* across two or more weeks. *Id*. Thus, Dr. Knoblock concluded that this type of behavior can only be explained by the use of bots. *Id.* Of the 54,065 purportedly unique users in the dataset, 28,545 users (52.8%) are Same-Second, Different Week Joiners or linked to them. ¶¶ 75–77.

*Second*, 15,529 students in the dataset, or almost one third of the total, logged into classes using the same IP address as the instructor ("Student-with-Teacher IP Joiners"). ¶ 78. Because GSX conducts all of its classes online rather than in physical classrooms, it is unlikely for students to be in the same place and connected to the same network as the instructor, as necessary to share the same IP

6

address. *Id.* The most likely explanation for this unusual phenomenon is that GSX instructors were also logging in as students on their mobile devices or computers using bot software. *Id.*

*Third*, "Burst Joiners" logged on at the same second—in "bursts"—more than five minutes before or after the start of a class. ¶ 80. For example, during one "burst," 104 purportedly unique users logged into a class within a four-second period that began nine minutes and forty seconds before the start of class. ¶ 82. According to Dr. Knoblock, the most likely explanation for this odd behavior is that these users were bots programmed to log in at a designated time. ¶¶ 87–89.

*Fourth*, while students rarely show up to a class, or users log onto a video conference, thirty minutes or more before its start, nearly one in seven of the users in Muddy Waters' database routinely did ("Early Joiners"). ¶¶ 90–91. The most plausible explanation for this bizarre behavior is that these "students" were bots.

Combined, and after accounting for duplicates, more than 70% of the users in Muddy Waters' database exhibited one or more of the anomalies. ¶ 94. Accordingly, Dr. Knoblock concluded that at least 70% of the users purporting to be GSX students logging into their courses were likely fake. ¶¶ 94–96.

### 2. GSX Builds Infrastructure To Support Brushing

GSX built out a vast infrastructure to support brushing. According to CW1, a GSX "Android engineer," and CW2, and engineering manager, both of whom

7

worked out of GSX's Beijing headquarters, almost half of the headquarters is occupied by servers. ¶¶97–104. The confidential witnesses report that GSX used the servers to control phones to imitate students. According to CW1 and CW2 and others, GSX installs software GSX on thousands of cellphones to allow the engineers to control the phones *en masse* to buy classes, login to classes, and imitate student behavior. ¶¶ 97–105.[3]

### 3.    GSX Employees and Contractors Admit to the Fraud

Confidential witnesses confirm that GSX employs widespread brushing. CW2 and CW1 both said that they were tasked with harvesting user information from WeChat, a popular Chinese social media app, ¶¶ 99, 103, and that they used this information to enroll fake students into GSX to buy classes and simulate students. *Id*. ¶¶ 97–105. GSX likewise used third parties for brushing: CW3, a former vendor from a third-party brushing firm, said that GSX hired her to use fake identities to purchase classes, log in to classes, and write positive reviews. ¶ 109. Confidential witnesses state GSX falsified student accounts and course purchases in order to inflate revenue. ¶¶ 106, 114. CW4, a former GSX "Course Consultant" confirmed that GSX paid her and her colleagues to brush the Company's sales and

---

[3] GSX's own advertisements corroborate the accounts of these confidential witnesses. GSX placed ads to recruit engineers to jailbreak phones (i.e., permit installation of unapproved software) and install software called TaiChi. ¶¶ 145–49. According to its website, TaiChi is used to create "hard to detect" "fake devices" and post from "fake locations". ¶ 148.

student enrollment figures.  ¶ 114.  CW5, a former GSX student, said that what she thought were her classmates turned out to be mostly bots, as they would often make identical comments about lessons and instructors under different usernames. ¶¶ 125–29.  Former GSX instructors, including CW6, confirmed that they enrolled fake students.  *See, e.g.*, *¶¶* 114–16, 135–38.

### 4.     There Are No Competitive Advantages that Explain GSX's Explosive Growth Relative to its Competitors

Throughout the Class Period, GSX reported unparalleled growth that, according to a market analyst, "can only be matched by Google in its early days." ¶ 176.  GSX is the only publicly-traded Chinese online education company to consistently report bottom-line profitability in 2019, and its purported revenue growth far outpaced its more well-known competitors such as New Oriental Education and TAL Education at similar stages.[4]  ¶¶ 178–79.

### 5.     Objective Data Show that GSX is a Relatively Unknown Education Provider in China

While GSX claims to be the third-largest provider of online classes to K-12 students in China, actual market data from China do not support this

---

[4] GSX attributed its meteoric rise and unusual popularity to the superior quality of its teachers, all of whom must pass a "really high bar" to get hired.  ¶ 184.  Yet GSX's recruitment process for teachers so is lax that it does not even require candidates to possess requisite teaching credentials as mandated under Chinese law.  ¶ 193.  Indeed, anyone with a WeChat account can apply to become a GSX teacher by filling out some simple biographic information; candidates do not even need to provide proof of teaching experience or credentials.  ¶¶ 185, 190–91.

representation.    Beginning in 2019, China's State Administration for Market Regulation ("SAMR") began administering surveys to online education providers for supervision purposes.    ¶¶ 210–11.    The results from the first SAMR survey show that GSX was not considered large enough to even receive a survey from SAMR.[5]    ¶ 212.    Likewise, a market penetration research study done by China-focused private equity research firm JL Warren Capital shows that for March and May 2020, GSX's K-12 courses had a mere 3% market penetration—well below K-12 offerings from purported peers TAL Education (25%), New Oriental (20%), or even relatively unknown providers such as Zhangmen 1-on-1 (6.3%) and VIPKid (5.9%).    ¶ 214.    Additionally, web analytics show that GSX's website inexplicably receives far fewer visitors, and its app is downloaded far less frequently, than its purported peers'.    ¶¶ 215–18.

### 6.    GSX Hides Its Fraud-Related Expenditures

To keep its expenses low for accounting purposes, GSX hides some of its expenses through alter ego entities.    ¶ 255.    These alter ego entities are almost always owned by GSX or its associates—their offices are actually in GSX's offices, and they have the identical IP addresses as GSX.    ¶¶ 243, 248–49, 252. The sole purpose of these entities is to acquire customers for GSX, and absorb the

---

[5] Similarly, surveys of online education companies done by China Consumer News, Guangming Daily, and iResearch from 2018 to 2020 did not even include GSX.  ¶ 213.

associated expenses (but not the revenue). ¶¶ 244, 250. GSX does not consolidate the financials of any of these alter ego entities into its own financial statements. ¶ 254. This way, GSX hides its brushing expenditures from its own books. *Id.*

### C. Disclosure of GSX's Fraud Caused its Stock Price to Fall, Damaging Investors

Between, April 3, 2020 and October 21, 2020, the market learned of GSX's fraud through a series of corrective disclosures, each of which caused the price of the stock to plummet to account for the fraud. ¶¶ 361–83. These disclosures included research reports revealing newly discovered facts about the fraud, analyst reports downgrading the stock over concerns about its valuation, market reports revealing that GSX's revenues were overstated, among other disclosures. *Id*. Indeed, GSX's valuation has continued to plummet: as of the date of this opposition, the Company is worth less than half the value it held as of the date of the Complaint, closing at $33.29 per share on March 30, 2021.

### III.   STANDARD ON MOTION TO DISMISS

"'Faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.'" *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). The Court "'draw[s] all reasonable inferences in favor of the plaintiff,'" *In re Celgene Corp. Sec. Litig.*,

11

No. CV 18-4772, 2019 WL 6909463, at \*10 (D.N.J. Dec. 19, 2019) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)), and dismissal is proper only "[i]f, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations." *Id.*

## IV.    ARGUMENT:  PLAINTIFFS PLEAD NUMEROUS MATERIAL MISREPRESENTATIONS

Plaintiffs' claim for violations of Section 10(b) has six elements, *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018), yet Defendants argue that only three of these elements have not been pleaded adequately:  a false or misleading statement, scienter and loss causation.  *See* Defs.' Mem. at 12–35.

Broadly, Plaintiffs have pleaded eight categories of misrepresentations:  (1) GSX overstated revenue, profits and other financial metrics; (2) GSX routinely falsified at least 70% of its student enrollments; (3) GSX failed to disclose that its costs of revenues and other expenses included expenses for illegal brushing ; (4) GSX failed to disclose that its purported success was due to these falsifications; (5) GSX misrepresented the qualifications of its teachers (6) GSX failed to disclose that teachers were required to engage in brushing and other falsification to be compensated; (7) GSX failed to disclose certain contractual arrangements to shift costs; and (8) GSX misled investors about the veracity of certain claims made in

12

third-party research reports. ¶¶ 257–360.  Plaintiffs address categories (1)-(4) below in Sections IV(A)-(D), and categories (5)-(8) in Section IV(E).

### A.    The Complaint Extensively Alleges that Defendants Inflated the Company's Revenues by over Fifty Percent

Plaintiffs plead extensive facts that make inescapable the conclusion that GSX falsified at least 70% of its student enrollment, and inflated its revenues and other financial metrics by over fifty percent.  As explained above, Dr. Craig Knoblock, an independent computer science expert retained by Plaintiffs, has confirmed at least 70% of the Company's purported sign-in records do not reflect the activity of human students, but instead that of "bots."  Moreover, several confidential witnesses—all with first-hand knowledge of GSX's student recruitment practices—have explained in detail the means and methods by which GSX falsified and overstated its student enrollments.

Defendants argue that Plaintiffs do not plead any facts to show that the alleged false student enrollments "were included in the enrollment figures reported in GSX's financial statements."  Defs.' Mem. at 14.  Defendants ignore the clear allegations of the Complaint.  *First*, multiple confidential witnesses, who were in a position to know the knowledge ascribed to them, have stated that GSX engaged in this scheme to inflate the Company's *revenues*.  According to CW2, "GSX reported [brushed] enrollments as 'revenues'."  ¶ 106.  CW2 was an engineering manager at GSX's Beijing headquarters and had the job of overseeing extensive

13

bot-controlled brushing activity; as a manager of this activity, she was certainly in a position to know the basic purpose of her job—to generate false revenues through false student enrollments. ¶ 101. CW4 likewise stated that "GSX required Course Consultants *to 'brush' sales* and enrollments." ¶ 114. CW4 was herself a Course Consultant, and so was in a position to know the purpose of her job as a Course Consultant. ¶¶ 135–39.

*Second*, multiple confidential witnesses also have stated that GSX hired technicians and third-party brushing companies to create false student accounts, to be operated by bots, and that GSX *gave them funds to pay back* to GSX to enroll these false student accounts in classes. *See* ¶¶ 97–143. The Complaint clearly alleges that GSX used bots to "purchase course enrollments," and also used brushers to "purchase GSX's class" and "buy classes." ¶¶ 103, 106, 109. Moreover, GSX paid third-party brushers in part for completing these deceptive transactions. ¶¶ 106, 109–11. There would be no need to have bots and brushers actually purchase courses, and to lose money paying third-party brushers to actually purchase such courses, if GSX aimed only to create the appearance for other students of full classes, as Defendants suggest; GSX could simply have falsified student activity in its classrooms directly through software without any exchange of money or involvement of GSX's revenue channels.

14

*Finally*, the Complaint makes clear that course fees paid by bots and brushers were paid through the same channels that real students used, ¶¶ 103–11, so these fees would have entered into GSX's ordinary revenue streams. Accordingly, absent some reason to think otherwise (there is none), the Court may reasonably infer that these fees were treated as ordinary revenue.

In any event, Defendants' argument that GSX's brushing was undertaken "only for marketing purposes," Defs.' Mem. at 14, amounts to the extraordinary claim that GSX was engaged in rampant falsification of online students not to defraud investors, but rather to defraud students in its classes. Promoting a business by means of false claims (including through brushing) is illegal in China, as Defendants have admitted. ¶ 393; *see* ¶¶ 223, 228, 364. Accordingly, even if the Court ignored the allegations in the Complaint and accepted as true Defendants' implausible position that GSX engaged in brushing solely for marketing purposes (which the Court cannot do), Defendants' statements explaining the reasons for the Company's success[6], and the Company's statements explaining its costs of revenues and selling expenses[7], would still be misleading for failure to disclose that the Company's revenue increase was due in large part to illegal marketing practices, and for failure to disclose that the Company's expenses

---

[6] ¶¶ 258, 262, 267, 269, 271, 277, 281, 283, 287, 289, 297, 299, 303, 307, 309, 312, 314, 318, 322, 326, 330, 334, 336, 338, 342-44, 348, 350, 352, 354, 356, 360.

[7] ¶¶ 275, 279, 285, 291, 301, 305, 316, 324, 346, 358.

15

included expenses for illegal marketing. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, No. 16 Civ. 7926, 2018 WL 1595985, at \*6 (S.D.N.Y. Mar. 28, 2018) (where "a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices.").

Moreover, contrary to Defendants' repeated suggestion that the Complaint fails to state "the amount by which GSX's financial statements were falsified," Defs.' Mem. at 14–15, the Complaint clearly specifies that the amount by which GSX inflated its revenues was over 50%.[8]   A more precise specification of this amount is unnecessary, as any amount of overstatement of revenues near or over 50% is manifestly material.[9]

---

[8] The AC explicitly ties the Company's inflated revenues to the K-12 online courses and to the brushing schemes. *See* ¶¶ 48–64.  The amount by which the Company inflated revenues follows straightforwardly from the percentage of the Company's reported paid-course enrollments in K-12 online classes, and the percentage of false users found in those classes. *See id.*

[9] Defendants' reliance on *Chubb*, Defs.' Mem. at 14, is misplaced, as the Complaint provides exactly the "particulars" the Third Circuit found missing in that case—whereas plaintiffs in Chubb had failed to allege *any estimate* of the total amount by which defendants' loss reserves were manipulated downwards, the AC provides just such an estimate—revenues were overstated by at least 50%. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 152-53 and n.18 (3d Cir. 2004) ("*estimates* of the actual amount of improperly recognized revenue" sufficient, but no such estimate provided in *Chubb*).  Defendants also cite *In re Galena Biopharma Inc.*, No. CV 17-929, 2019 WL 5957859, at \*15 (D.N.J. Nov. 12, 2019) for the proposition that a complaint must show how much the fraud "impacted . . . earnings," but in that case as well, the complaint failed altogether to plead any estimate of the size of the impact on earnings, so the court was unable to

Defendants suggest that GSX lacked a motive to falsify student enrollments and inflate its revenues by paying employees and third parties to create false student accounts and pay course fees, as GSX had to pay for this brushing activity. Defs.' Mem. at 15, 32. GSX's plan makes perfect sense. As alleged in the Complaint, it is a "fake it 'til you make it" scheme of epic proportions—GSX was inflating its valuation to raise capital that it could then use to grow a genuinely large enterprise. ¶¶ 3–7.

**B.    The Complaint Adequately Alleges that Defendants Inflated the Company's Student Enrollment by Use of Bots and Brushing**

The Amended Complaint's conclusion that at least 70% of participants in GSX's online classes were bots is well supported by the facts alleged, which are based upon Plaintiffs' counsel's extensive independent investigation.[10] Plaintiffs' counsel retained a highly-respected expert in computer "bots," Professor Craig Knoblock, who analyzed sign-in statistics from 463,217 logins from over 200 paid K-12 classes purchased between January and March 2020. ¶ 72. Professor

---

judge that the impact was material; no such problem arises here, where the impact on revenues of the fraud is greater than 50%, and so unquestionably material).

[10] Defendants accuse Plaintiffs' counsel of "outsourcing [their] professional obligations" and making allegations that were not "independently verified." Defs.' Mem. at 28. Even worse, Defendants' counsel suggest that Plaintiffs' counsel has violated its "duty of candor to the Court." *Id.* These accusations are completely baseless and demonstrably false. *See* Affidavit of Terrence W. Scudieri, Jr. (the "Scudieri Aff."). That Defendants have resorted to attacking opposing counsel without any legitimate basis is poor form, and underlines that Defendants lack anything sensible to say in defense of this obvious fraud.

17

Knoblock determined that four distinct, statistically significant anomalies, ¶¶ 73–95, independently and collectively support the conclusion that "more than 70% of GSX user logins are bots rather than human users and are falsified." ¶ 96.

Plaintiffs' counsel also retained two private investigative firms, including one based in China, whose agents interviewed dozens of witnesses, and collected extensive statements from them plainly detailing the alleged fraud. ¶ 2; *see also* Affidavit of Terrence W. Scudieri, Jr. ¶ 9 (the "Scudieri Aff."). They also independently interviewed witnesses identified by research analysts. Scudieri Aff. ¶¶ 10–11. As explained below, these witnesses strongly corroborate Dr. Knoblock's conclusions based on his data analysis. Finally, additional allegations based on data concerning the company's implausible economic growth (¶¶ 174–83), lack of name-recognition (¶¶ 209–22), perfectly linear enrollment growth (¶¶ 165–73), and red-flag job postings (¶¶ 190–92) cement the conclusion that GSX has dramatically overstated its enrollments and revenue.

Defendants argue first that the data set analyzed by Professor Knoblock, taken from Muddy Waters, was somehow deficient. Defs.' Mem. at 18. Defendants are wrong. Muddy Waters explained the population from which it drew its sample precisely: its sample was drawn "between January and March 2020" from "200 classes" from both Gaotu100.com and Genshuixuie.com that "spanned K-12 grade levels" and spanned "[K-12] subject matter." Moreover, the

18

Complaint plainly alleges that the sample was "randomly chosen."[11]    ¶ 72.

Accordingly, the Complaint adequately alleges that the sample was representative:

it was large and was drawn randomly over an extended period of time from the full

breadth of the Company's course offerings.  *Id.*

In any event, even if, contrary to the clear allegations of the Complaint, the

sample Dr. Knoblock used were maximally biased, and somehow selected 100% of

those classes that contained bot activity, by Defendants' own argument based on

extrapolation from instructor (i.e., class) population, at least 8.4% of students

across all classes are bots, and GSX's revenues would be overstated by at least

6%—still above the generally accepted threshold for a material misrepresentation.

*See* Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150, 45,151, 1999 WL

625156, at \*45,151 (Sec. & Exch. Comm'n Aug. 19, 1999), *codified at* 17 C.F.R.

§ 211(B) (5% threshold for materiality); *see also Ganino v. Citizens Utils. Co.*, 228

F.3d 154, 163 (2d Cir. 2000) (approving SAB No. 99).

---

[11] Even apart from this allegation, that Muddy Waters' samples were random is clear from, among other sources, Muddy Waters' explanation in its May 28, 2020 report of why GSX's own study "fails [the] laugh test"; it fails because Muddy Waters' data set "was only 2.9% of GSX's claimed data set, yet . . . yielded 34.8% of GSX's purported overlap number."  Ex. R to Defs.' Mem. at 3.  Muddy Waters explanation would make no sense if its sample were non-random, so the only "'reasonable inference'" to be drawn from these facts are that Muddy Water's sample was random.  *Celgene*, 2019 WL 6909463, at \*10 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Defendants next argue that Dr. Knoblock was wrong to conclude that 70% of the users in the sample were bots, because, according to Defendants' lawyers own lay analysis, logins that occurred at the same time as a bot or that used the same IP address as alleged bots should not have been included as logins counting as bots. Defs.' Mem. at 19. Defendants' argument is again simply a denial of the factual content of the Complaint. The Complaint properly pleads that, according to a highly qualified expert in information science, logins occurring at the exact same time as a bot or using the exact same IP address as a bot also are likely to be bots rather than humans. A motion to dismiss is not a *Daubert* motion—the Court must accept well pleaded facts as true.[12] *See, e.g.*, *Celgene*, 2019 WL 6909463, at *10.

Finally, Defendants' flippant, repeated accusations that Plaintiffs "did nothing more than rehash [] reports without any independent corroboration" are flatly wrong. To the contrary, Plaintiffs undertook an extensive, months-long, independent investigation of the facts at issue, at a cost of tens of thousands of dollars. Scudieri Aff. ¶¶ 10, 17–19. Plaintiffs hired two private investigative firms, including one in China, to conduct this investigation, interviewed dozens of potential witnesses, and conducted extensive documentary factfinding, in both English and Mandarin Chinese. *Id.* ¶¶ 9–15. Far from "rehashing [] reports

---

[12] In any event, Dr. Knoblock's opinion, even to a layperson, makes perfect sense. Phones, and their unique IP addresses, used by a bot once, are likely to be bot-controlled devices, and perfectly synchronized logins by multiple devices are unlikely to occur frequently by coincidence.

20

without independent corroboration," Plaintiffs contacted the research analysts who formed these reports, independently interviewed the witnesses on which they relied to verify their accounts (or in one case, viewed video of an interview), and obtained additional factual detail. *Id.* ¶¶ 9–12.

Likewise, Defendants baselessly deride Dr. Craig Knoblock, the current Executive Director of the Information Sciences Institute at the University of Southern California, as a "purported 'expert,'" and argue, in blatant contradiction of the allegations in the Amended Complaint, that Dr. Knoblock "blind[ly] accept[ed] Muddy Waters' conclusions." Defs.' Mem. at 20. To the contrary, Dr. Knoblock did not accept as true *any* of the expert conclusions asserted in the reports at issue. ¶¶ 4, 66, 69, 95. Dr. Knoblock properly accepted the *data* reported by Muddy Waters as accurate because there is no reason to believe that Muddy Waters blatantly falsified data and there is good reason to think that they did not—doing so would have subjected them to potential liability for libel, *see, e.g.*, *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 296 (D.N.J. 2016), and even GSX Techedu never claimed that Muddy Waters' *data* was inaccurate. ¶ 388. Critically, Dr. Knoblock's expert *analyses and conclusions* based on that objective data reported by Muddy Waters are entirely his own, and were formed wholly independently, as the Complaint clearly alleges. ¶¶ 4, 66, 67, 69, 95.

21

### C.    Statements from Numerous Confidential Witnesses Corroborate Dr. Knoblock's Analysis

Plaintiffs' extensive independent investigation uncovered numerous confidential witnesses who corroborate Dr. Knoblock's conclusions.  According to CW1, a former GSX engineering manager, GSX's Beijing headquarters consists of dozens of "mobile phone room[s]," each packed with shelved of "many thousands" of mobile devices.  CW1 personally harvested user data from private WeChat accounts, created false student accounts using that user data, and programmed Android mobile devices to use that account to "enroll in GSX's promotional courses [and] log-in to the classes at specified times . . . ."  ¶ 99.  Another former GSX engineering manager, CW2, corroborated the accounts of CW1 and stated that she and other engineers installed software on "thousands of mobile phone devices" that became "bot-controlled devices."  ¶ 103.  This software "caused the bot-controlled devices to purchase course enrollments, sign into and out of classes, create new student accounts, and send messages to other students . . . ."  *Id.*  CW2 and CW3, a third-party brusher, corroborated each other's account that GSX also paid third-party brushing firms to brush its enrollment figures.  ¶¶ 106, 108–11. According to CW2, GSX gives third-party brushers funds to create false student accounts and to pay for course enrollments.  ¶ 106.  According to CW3, she was "regularly paid commissions by GSX to enroll in GSX's courses with fake or assumed identities . . . ."  ¶ 109.  In this role, she "would 'buy classes, write

positive reviews, and join large classes to boost up [GSX]'s head counts' with harvested user data from various social media platforms, including WeChat." She confirmed that her employer's brushing efforts "accounted for approximately 40% of all enrollments in GSX's K–12 courses." *Id.*

According to CW4, a former GSX marketing and sales employee, GSX even required their own course consultants "to brush sales and enrollments" in order to meet monthly targets and avoid dismissal. ¶¶ 112, 114, 117. CW6 corroborated CW4's account, and stated that "tutors routinely assumed alternative identities to purchase promotional courses to inflate enrollment numbers." ¶ 138. CW5, a former GSX customer and student, confirmed that GSX enrolled fake students in its classes, as evidenced through falsified student interactions. ¶¶ 122–34.

Defendants argue that the Court should ignore the damning statements of these witnesses because, according to Defendants, the Complaint fails to describe the witnesses with sufficient particularity. Defs.' Mem. at 21. A Complaint need only describe a witness "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Avaya*, 564 F.3d at 261. This particularity requirement may be satisfied, among other ways, by "provid[ing] job titles, years of employment, and job responsibilities." *In re Par Pharm. Sec. Litig.*, No. CV 06-3226, 2009 WL 3234273, at *7 (D.N.J. Sept. 30, 2009).

23

Each of the confidential witnesses referenced in the Complaint meets this requirement in spades. CW1 worked as an "Android Engineer" at "GSX's Beijing headquarters in the 'Sales and Marketing' department'" between "approximately April 10, 2019" and "approximately June 20, 2020," and "was paid directly by GSX to 'brush' course enrollments." ¶¶ 97-98. CW2 worked as an "engineering manager" at "GSX's Beijing headquarters beginning in 2015." ¶ 101. In that role, "CW-2 directly supervised software engineers" and was among the engineers who personally "installed [bot software] on thousands of mobile phone devices." ¶¶ 101, 103. CW3 "was employed by a third-party brushing firm in Beijing from January 1, 2019 through December 31, 2019" and in that role, "she was regularly paid commissions by GSX to enroll in GSX's courses with fake or assumed identities and to write positive reviews." ¶ 109.

CW4 "worked within GSX's 'Sales and Marketing' department as a 'Course Consultant' for the VIE" at "'Zhengzhou Center'" in "Zhengzhou, China from June 2019 through January 2020." ¶¶ 112–13. CW4 explained that her "official job duties" included "assist[ing] GSX's instructors with selling their courses to potential students and 'converting' students enrolled in promotionally priced courses to regular-priced courses." ¶ 112. CW5 "is a former customer and former student of GSX," who, enrolled and attended GSX's "Magnetic Levitation 38000" English vocabulary course in September 2019. ¶¶ 122–23. CW6 is "a former

24

GSX tutor," ¶ 135, who 'worked as a 'tutor' of first-year high school chemistry for GSX's Gaotu Classroom brand at Zhengzhou Center from approximately June 15, 2019 through July 31, 2019." ¶ 136.  In that role, CW6 "worked alongside approximately 40 other first-year high school chemistry tutors." *Id.*[13]

In short, the Complaint alleges exactly the information courts have found sufficient to credit the statements of confidential witnesses.  *See In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *7; *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. CV 16-6509, 2018 WL 3772675, at *12 (D.N.J. Aug. 8, 2018).

Defendants also appear to argue that the Court should wholly ignore the statements of the seven confidential witnesses because according to Defendants, the Complaint fails to allege that Plaintiffs' counsel (and/or their agents) spoke with the CWs or knows who they are.  Defs.' Mem. at 23.  Defendants are wrong—the Complaint clearly claims that the allegations are brought "upon information and belief" that is "based upon," *inter alia*, "an investigation conducted by Plaintiffs' attorneys, including interviews with numerous confidential witnesses ('CWs'), including former GSX employees."  AC at 2. Plaintiffs also independently contacted the witnesses first described in other research reports, including CW1 and CW5, to confirm their prior accounts and to

---

[13] CW7 is a "former GSX employee," who worked as an "'Account Manager' for the VIE in Changsha, from August 2016 through March 31, 2019." ¶ 140.  In that role, CW7 "was responsible for recruiting instructors and tutors across all of GSX's brands." *Id.*

obtain additional details, and viewed and translated video of an interview with

CW2 to verify that this account came from her.[14]  Scudieri Aff. ¶ 11.  Plaintiffs

independently discovered and interviewed all the remaining confidential

witnesses.[15]  Aff. ¶ 10.

> **D.**  **Numerous Additional Allegations Concerning the Company's Implausible Economic Growth, Lack of Name-Recognition, Perfectly Linear Enrollment Growth and Red-Flag Job Postings Cement the Conclusion that GSX's Falsified Its Enrollments and Revenue**

Defendants pass over the AC's powerful supporting allegations that:  (1)

GSX openly published job postings for software engineers to jailbreak phones to

install programs designed to enable illicit software, ¶¶ 144–51, (2) survey data and

Web analytics show that GSX is not widely used, ¶¶ 213–22, (3) GSX wholly

---

[14] To the extent that Defendants mean to argue that Plaintiffs should have interviewed witnesses directly, rather than through their agents, Defendants are inventing rules out of whole cloth—Defendants cite not a single case form this Circuit adopting such a rule, and courts in the Third Circuit routinely credit confidential witnesses without requiring that the witnesses have been interviewed by lawyers.  *Avaya*, 564 F.3d at 263 n.33; *Cognizant*, 2018 WL 3772675, at *12; *Par*, 2009 WL 3234273, at *7.

[15] Defendants also argue that the CWs' statements are contradictory.  Defs.' Mem. at 24.  Certainly not.  CW2's statement that GSX had "few students" when it began in *2015*, ¶ 102, does not contradict the allegations from CW4 and CW6 that GSX's instructors were overworked when they worked there in *2019*.  ¶¶ 115–21, 137–39. Likewise, there is no inconsistency in CW2's statement that GSX paid its teachers to create false accounts that constituted the majority of the students, ¶ 107, and CW4's statement that she was under pressure to convert real customers from promotional courses to regularly-priced courses:  CW4 was under pressure to convert the minority of students—*i.e.*, the real students—from promotional courses to regularly-priced courses.  ¶¶ 115 -21.

lacks name recognition consistent with its claimed size, ¶¶ 209–12, (4) GSX's enrollment growth was perfectly linear during certain periods, ¶¶ 165–68, and (5) that GSX used accounting tricks to conceal its brushing expenses. ¶¶ 223–54.

Defendants largely ignore these allegations. Defendants argue that GSX's job posts recruiting engineers to operate cell phone bot software somehow served a legitimate need at GSX for breaking into cell phones to install unauthorized software. Defs.' Mem. at 25–26. As an initial matter, Defendant's argument proceeds primarily by denying that the translation of a term in the Amended Complaint is accurate, but a disputed translation of a technical foreign term is clearly a factual matter that the Court cannot resolve on a motion to dismiss. *See, e.g.*, *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 50 n.9 (D.D.C. 2016) (citing *United States v. Rivera-Rosario*, 300 F.3d 1, 9 (1st Cir. 2002)). In any event, even if the Court accepted *arguendo* Defendants' disputed translation of the term "刷机" as "rooting," Defs.' Mem. at 25, Defendants entirely fail to explain why GSX has a legitimate need "to 'jailbreak' or 'root' a phone," ¶ 147, to install the "Xposed" and "TaiChi" software applications referenced in the job posts. ¶¶ 144–51. Xposed is used to install manufacturer-restricted software, ¶ 147, and TaiChi is used to enable functions like "fake device" and "fake location," functions that have no legitimate use for an online education company. ¶ 148. Indeed, Dr. Knoblock offered expert opinion that the rooting skills sought in these job posts are

27

unrelated to, and unnecessary for, the operations of an online education company.

¶ 150.    Defendants' assertion, without citation, that jailbreaking phones by overriding manufacturer restrictions is necessary to install "teaching software" contradicts these allegations and is implausible on its face.  Defs.' Mem. at 25.

Defendants also argue that comparing the inexplicably explosive growth rate of GSX to the modest growth rate of its closest competitors is somehow unfair.  *Id.* at 26.  Yet Defendants' conclusory assertions that GSX's primary competitors referenced in the Complaint are not primarily online competitors is a factual assertion for which they provide no citation, and it is flatly wrong—it contradicts allegations in the Complaint.  ¶ 175.[16]  Moreover, GSX's growth inexplicably also outpaced that of its online competitors "when they were at similar stages of development" prior to the onset of the COVID-19 pandemic restrictions.  ¶¶ 178–79.  In 2020, "GSX's reported performance lapped that of any of its competitors, without any plausible, legitimate explanation," ¶¶ 175–77, and with "no legitimate competitive advantage that would explain this growth."  ¶¶ 180–83.

As for the Complaints' allegations that survey data and Web analytics show that GSX is not widely used, ¶¶ 213–22, that GSX wholly lacks name recognition

---

[16] Indeed, Paragraph 175 incorporates an article in the *Wall Street Journal* that expressly states, "Online education has been a rapidly growing sector in China, and other education stocks have climbed this year as the coronavirus pandemic helped make a bigger case for remote learning.  GSX's gains, however, have far exceeded those of its peers.")

consistent with its claimed size, ¶¶ 209–12, that GSX's enrollment growth was perfectly linear during certain periods, ¶¶ 165–68, and that GSX used accounting tricks to conceal its brushing expenses, ¶¶ 223–54, Defendants merely argue in a footnote that these allegations "add nothing" because, according to Defendants, they are based on "short-seller claims without any independent investigation." Defs.' Mem. at 26 n.16. Defendants are wrong on both accounts. These additional allegations are damning and should be assessed carefully by the Court. And while these allegations draw in part on reports by research analysts, as explained above, Plaintiffs undertook an extensive independent investigation of these facts. Scudieri Aff. ¶¶ 9–16. Courts routinely permit Plaintiffs to rely on such reports, and have never rejected such reports as a basis for allegations where Plaintiffs undertook independently to investigate them. *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 435 (S.D.N.Y. 2017); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 421–22 (S.D.N.Y. 2014).

      **E.**    **The Complaint Adequately Alleges that Defendants Misrepresented Teacher Compensation, Related Party Transactions and the Veracity of Research Reports**

Defendants contend that "GSX's statements regarding instructor compensation are not misleading," Defs.' Mem. at 26, because, they say, the AC does "not allege facts" to support the claims that "'instructors and tutors were required' to create false accounts 'as conditions precedent to receiving their base

29

salaries and compensation bonuses.'" *Id.* at 27 (quoting ¶¶ 292–93, 319–20).  But Defendants ignore the allegations from CW4 stating that the company exerted pressure to falsify student enrollments or face termination on "teachers," and that "[teachers] whose sales records remained low were fired or demoted." ¶¶ 115-116.

Defendants also contend that Plaintiffs fail "to demonstrate that GSX's statements about its 'rigorous interview process' for instructors were misleading" because, according to Defendants, "the alleged facts all relate to GSX's hiring process for *tutors*, not instructors." Defs.' Mem. at 27 (quoting ¶ 327). Yet, Defendants wholly ignore the extensive allegations from CW7, which relate to *instructors*. ¶ 140. CW7 had "first-hand knowledge of the actual qualifications of GSX's *instructors* and tutors because she was responsible for recruiting, hiring, and retaining them." *Id.*

Similarly, Defendants fail to address any of the detailed allegations addressing the Company's scheme to hide brushing expenditures by moving costs to alter egos. ¶¶ 231–54. Missing the point, Defendants argue that the Company disclosed that it had "contractual arrangements with [its] VIE and its shareholders." Defs.' Mem. at 27. Even if, *arguendo*, GSX disclosed the existence of these contractual arrangements, such disclosures never informed investors that GSX was using these related parties to hide its brushing expenses, as the AC plainly alleges. *See* ¶ 254 ("By pushing its costs onto a web of

30

unconsolidated third parties, GSX hid its brushing expenditures from shareholders.").[17]

## V.    ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER

Scienter may be shown "'by a knowing or reckless state of mind . . . .'" *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (quoting *Avaya*, 564 F.3d at 252 & 267 n.42).  "A 'strong inference' of scienter is one that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* at 2504-05; *see also id.* at 2510 ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Avaya*, 564 F.3d at 267.  "Rather, in conducting the scienter analysis, courts must analyze the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *Id.* (quoting *Tellabs*, 551 U.S. at 323).  "[E]xplicit[] deni[als of] the existence of [the specifically alleged fraudulent conduct]" is "powerful evidence of scienter." *Avaya*, 564 F.3d at 269.

---

[17] Defendants' contention that "GSX's denials of the short-seller reports are not actionable" because such denials were not false, Defs.' Mem. at 27–28, also lacks merit.  As explained above, the AC adequately alleges that the statements in the research reports accusing the Company of falsifying enrollments and revenues were true, so the Company's denials of these reports were misleading.

The allegations in the Complaint give rise to a strong inference of scienter. *See* ¶¶ 384–95. Here, just as in the seminal Third Circuit case, *Avaya*, "the most powerful evidence of scienter is the content and context of [Defendants'] statements themselves." *Avaya*, 564 F.3d at 269. Defendants "did not simply make statements inconsistent with the existence of widespread [falsification of enrollment and revenue]; [they] explicitly denied the existence of such [falsification] in response to repeated questions about pricing by analysts." *Id.*

Specifically, the AC alleges that "on April 8, 2020, Defendant Chen directly repudiated short sellers' initial analyses showing that the Company was falsifying student enrollments and revenue when he called upon Muddy Waters to investigate the Company for fraud." ¶ 388. Then, "[o]n April 9, 2020, during a conference call with investors, Defendant Chen directly denied the fraud," stating unequivocally that GSX "'decided not to respond to Grizzly's short report,'" claiming that it "'is full of irrelevant and false allegations and a lack of basic accounting knowledge.'" ¶ 389 (quoting Defendant Chen). A few days later, on April 14, 2020, the AC alleges that Defendant Chen wrote "to his 1.4 million followers on Sina Weibo, a social media platform similar to Twitter." ¶ 390. In certain of those posts, the AC alleges, "Chen excoriated Grizzly's report as 'complete nonsense,'" stating that it "'fabricated the fact that 70% of GSX revenue was fabricated.'" *Id.* (quoting Defendant Chen). On April 15, 2020, in

32

"responding to short seller reports," ¶ 391, Defendant Chen again allegedly wrote "on his Sina Weibo miniblog" that "'GSX has never tolerated brushing.'" *Id.* (quoting Defendant Chen). The AC alleges that on April 14, 2020, Citron Research issued a report claiming that "GSX Techedu Inc. is overstating its revenue by up to 70%," ¶ 392, and that in response, "[o]n April 15, 2020, GSX issued a press release stating: 'GSX . . . today firmly denied the false and ungrounded allegations raised in a report by Citron Research dated April 14, 2020.'" *Id.* (quoting GSX press release).

Likewise, the AC alleges that, on May 6, 2020, during a call with investors to discuss GSX's Q1 2020 earnings, "Defendant Shen denied at length and in strident terms that GSX used brushing." ¶ 393. Specifically, Defendant Shen allegedly stated, "'Actually, in China, brushing is illegal.'" *Id.* (quoting Defendant Shen). Defendant Shen went on to say, in part, that "'So many things mentioned in the conversation make zero sense. We highly suspect the content of the phone interview recording is fake,'" and challenged to "'provide any piece of evidence like name from our management that involve in brushing or any contract single nature bank receipt of which ID they use to brush [*sic*],'" thus denying all allegations of brushing. *Id.* These repeated, specific denials are "powerful evidence of scienter" under the Third Circuit's scienter paradigm in *Avaya*.

33

Numerous additional allegations cement the conclusion that Defendants acted, at a minimum, with recklessness. The AC alleges that "[t]he core of GSX's business is student enrollment in K–12 online classes," so that the falsification of the "Company's student enrollments" necessarily "concerned the core operations of GSX's business, and the central metrics GSX used to measure its business." ¶ 396. Similarly, the Complaint alleges that the Company falsified 70% or its student enrollments and over 50% of its revenues. ¶ 69. It is impossible to imagine that the management of GSX could have been unaware that more than half of their company was fake. The Complaint also alleges that Chen, and Shen "were directly involved in analyzing teacher performance," ¶ 398, and therefore even had specific bases to know that instructors' student enrollment figures were falsified.

Defendants argue that Plaintiffs have not adequately alleged scienter, Defs.' Mem. at 28–32, but Defendants intentionally attempt to sweep under the rug the most damning allegations of scienter in the Complaint—the Company's specific and repeated denials of the alleged fraud at issue. ¶¶ 384–95. The Third Circuit has left no room for doubt that such allegations are "powerful evidence of scienter." *Avaya*, 564 F.3d at 269. Defendants' single-sentence response to these allegations is that they do not "support . . . the inference that [Defendants] believed the reports' allegations or knew that GSX's financials were false." Defs.' Mem. at 31. But even if Defendants' conclusory assertion were true (it is not), Plaintiffs are

34

not required to show that Defendants believed the analysts' reports or knew GSX's financials to be false (even though they surely did). Rather, Plaintiffs need only show that Defendants, when faced with multiple reports presenting evidence that the Company was massively fraudulent, were at a minimum "reckless" in pointedly and repeatedly denying those reports. *Avaya*, 564 F.3d at 269.

Defendants also argue that Plaintiffs are wrong to rely on the "core business" doctrine and the magnitude of the fraud because, according to Defendants, such allegations, in isolation, may not adequately support a finding of scienter. Defs.' Mem. at 31. The centrality and colossal size of this fraud certainly are sufficient to support a finding of scienter in this case. *S. Ferry LP v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("A plaintiff may adequately allege scienter relying solely on the fact that "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."); *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 27 (2d Cir. 2020) ("We have emphasized that, when the magnitude of the fraud is 'dramatic,' it is possible 'to raise the required inference with regard to a corporate defendant . . . .")*; see also In re Schering-Plough Corp./Enhance Sec. Litig.*, No. CV 08-397, 2009 WL 2855457, at *4 (D.N.J. Sept. 2, 2009) (magnitude of Company's fraud supports scienter). Plaintiffs are unaware of *any* case finding that a complaint alleging that core financial metrics were repeatedly overstated by over 50% failed adequately to

35

allege scienter.  Yet Plaintiffs in no way rely solely on the centrality and magnitude of the fraud to allege scienter.  Rather, Plaintiffs allege that the fact that revenue was part of the core business of GSX, and the fact that the fraud at issue here was a falsification of 70% of the size of the Company, provide strong additional support for the conclusion that Defendants acted recklessly.  ¶¶ 384–404.  *See, e.g.*, *He v. China Zenix Auto Int'l Ltd.*, No. CV 18-15530, 2020 WL 3169506, at *8 (D.N.J. June 12, 2020) ("[C]ourts must analyze the complaint holistically").

Finally, Defendants argue that Plaintiffs' theory of fraud is not cogent because it would be "irrational" for GSX to inflate its revenues in part by paying commissions to third parties to brush its enrollment figures.  Defs.' Mem. at 32. Not so.  GSX's scheme made perfect sense.  As the Complaint clearly alleges, the Company's strategy was "fake it 'til you make it"—GSX paid to inflate its valuation in order to raise capital and gain notoriety that it could then exploit to grow a genuinely large enterprise.  ¶¶ 3, 5, 222, 228, 255–56, 400.

## VI.   ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION

The loss causation element inquires "whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007).  "The issue of loss causation is usually not resolved on a motion to dismiss." *Dudley v. Haub*, No. CV 11-5196, 2013 WL

1845519, at *18 (D.N.J. Apr. 30, 2013) (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)).

Plaintiffs have adequately pleaded seven loss causation events, which caused GSX's stock price to drop over ten different trading dates. *See* ¶¶ 361–83. On April 3, 2020, GSX disclosed that its online and mobile marketing costs had increased, and this was a partial revelation that the company was less valuable because of its fraudulent scheme. ¶¶ 361–62. Defendants argue that investors did not understand these increased costs to result from fraud, Defs.' Mem. at 33, but such a complete revelation is not necessary to plead loss causation. *See In re Allergan Generic Drug Pricing Sec. Litig.*, No. CV 16-9449, 2019 WL 3562134, at *15 (D.N.J. Aug. 6, 2019) ("multiple corrective disclosures" may be pleaded).

On April 14, 2020, Citron Research published a report revealing significant new information supporting the claim that GSX was mostly fraudulent, including detailed descriptions of the process GSX had employed to fake enrollments. ¶¶ 366–67. On May 18, 2020, Muddy Waters published its own report, which also revealed damning new information supporting the claim that GSX was falsifying student enrollments and revenue, including a new analysis of GSX student data files across 54,065 users. ¶ 369. Defendants argue that an unspecified, earlier report by Grizzly already had revealed GSX's fraud, so the Citron and Muddy Waters reports revealed nothing new to the market. Defs.' Mem. at 33. While the

37

February 25, 2020 Grizzly Report did accuse GSX of fraud, ¶ 255, the Citron and Muddy Waters' reports on April 14 and May 18, 2020, respectively, clearly revealed extensive new information about the fraud, *id.* Such new information readily satisfies the loss causation requirements. The disclosures also post-dated GSX's interim denials on April 8, 9, 14, 15, May 6, 2020, ¶¶ 388–93. *See Benak ex rel. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006) (company's reassurances "can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns."); *Hull v. Glob. Digital Sols., Inc.*, No. CV 16-5153, 2017 WL 6493148, at *9 (D.N.J. Dec. 19, 2017) (same).

On August 7, 2020, Citi Research issued a market report downgrading GSX's stock price due to concerns with its valuation, a report that partially revealed that GSX's revenues were overstated due to its falsification of student enrollments. ¶ 371. Defendants argue that the Citi report downgraded GSX for reasons unrelated to the fraud, Defs.' Mem. at 9–10, but they are mistaken—the report revealed that the Company's revenues would be less than anticipated, ¶ 371, so the drop in share price constitutes a depreciation of the stock to a price more reflective of the Company's actual revenues absent fraudulent inflation. *Hull*, 2017 WL 6493148, at *11.

On August 14, 2020, a Chinese company iQiyi announced that it was being investigated by the SEC for fraud, and so revealed that the current SEC is ready and willing to investigate fraud allegations from Chinese entities. ¶ 377. Defendants argue that this revelation of another company's fraud cannot count as a corrective disclosure for GSX, Defs.' Mem. at 35, but Defendants are mistaken. GSX's valuation decreased as a result of the revelation that the SEC was more likely to investigate serious fraud allegations, like those levelled against GSX, ¶ 377, and that revised valuation reflects a foreseeable correction resulting directly from GSX's fraud. *See In re Galena Biopharma, Inc. Sec. Litig.*, No. CV 17-929, 2021 WL 50227, at *7 (D.N.J. Jan. 5, 2021) (citing *McCabe*, 494 F.3d at 426).

On September 2, 2020, the market's fears were realized when the SEC announced that it was investigating GSX, and investors clearly understood this investigation to concern allegations of GSX's fraud. ¶ 379. Defendants' argument, Defs.' Mem. at 35, that an announcement of an investigation cannot serve as a loss causation event is based only on unusual Ninth Circuit precedent; courts in this Circuit and in the Second Circuit routinely accept that announcements of investigations are proper bases for loss causation. *See, e.g.*, *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828–29 (D.N.J. 2006); *Allergan*, 2019 WL 3562134, at *14; *Hull*, 2017 WL 6493148, at *14–*15; *City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230–31 (S.D.N.Y. 2009).

Finally, on October 21, 2020, among other things, DoNews in China reported, apparently based on insider information, that GSX's third quarter 2020 revenue was expected to drop by 9%, and The Motley Fool, a finance journal, reported that "GSX Techedu management "foresees a loss of RMB 900 million in Q3." ¶ 382. Ultimately, GSX did report an astronomical net loss for the third quarter, proving these reports to be accurate. *See* Scudieri Aff. Ex. A (3Q2020 6-K at 5) ("Net loss was ¥932.5 million" at quarter's end). Defendants argue that such reports were merely "negative journalistic characterization," Defs.' Mem. at 34. Defendants are wrong. These were revelations of new facts about GSX's third quarter results, from non-public information, ¶ 382, and the report was a revelation that the Company's actual financial performance would be worse than represented.

## VII.    ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED SECONDARY VIOLATIONS

As Plaintiffs have pleaded primary violations of Section 10b, Defendants' argument for dismissal of Section 20a claims, Defs.' Mem. at 35, fails.

## VIII.    CONCLUSION

For the above reasons, Defendants' motion to dismiss Plaintiffs' claims under Sections 10b and 20a of the Exchange Act should be denied.[18]

---

[18] If, for any reason, the Court dismisses claims under Section 10b or 20a, Plaintiffs respectfully request leave to amend. The amendment would include additional allegations concerning the revenue fraud, scienter, and loss causation.

40

Dated:  March 30, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Austin P. Van*
*/s/ Terrence W. Scudieri, Jr.*
Jeremy A. Lieberman (*pro hac vice application forthcoming*)
Austin P. Van (*pro hac vice*)
Terrence W. Scudieri, Jr.
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
avan@pomlaw.com
tscudieri@pomlaw.com

*Lead Counsel for Lead Plaintiff Yang Renbin, and Additional Plaintiffs Corey Hays and Alexandre Tazi*

Laurence M. Rosen
THE ROSEN LAW FIRM, P.A.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Telephone:  (973) 313-1887
Facsimile:  (973) 833-0399
Email:  lrosen@rosenlegal.com

Jing Chen
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Facsimile:  (212) 202-3827
Email:  jchen@rosenlegal.com

41

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024  Beijing
People's Republic of China
Telephone: +86 137-1805-2888
Email:  jhao@haolaw.cn

*Additional Counsel for Lead Plaintiff
and Additional Plaintiff Robert Angeline*