# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
YANG RENBIN, ROBERT ANGELINE,          :     2:20-cv-04457-ES-CLW
COREY HAYS, AND ALEXANDRE TAZI,        :
Individually and On Behalf of All Others  :     **ECF Case**
Similarly Situated,                    :     **Electronically Filed**
                                                            :
                    Plaintiffs,        :
v.                                                          :
                                                            :
                                                            :
GSX TECHEDU INC., LARRY XIANGDONG  :
CHEN, NAN SHEN, XIN FAN, YIMING HU,    :
MING LIAO, CREDIT SUISSE SECURITIES    :
(USA) LLC, DEUTSCHE BANK SECURITIES, :
INC., BARCLAYS CAPITAL, INC., BOFA      :
SECURITIES, INC., CLSA LIMITED, AND     :
GOLDMAN SACHS (ASIA) L.L.C.,            :
                                                            :
                    Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# REPLY MEMORANDUM OF LAW OF IN FURTHER
# SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
# THE AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................. ii

PRELIMINARY STATEMENT .............................................................1

ARGUMENT ........................................................................................3

I.      PLAINTIFFS FAIL TO PLEAD ANY MISREPRESENTATION ...............3

      A.      GSX's Financial Statements Were Not Misleading.............................3

            1.      The Alleged Conduct Did Not Implicate GSX's Financial Statements ...............................................................3

            2.      Plaintiffs Fail to Establish the Alleged Misconduct ..................6

                  (a)      Plaintiffs Fail to Allege 70% of GSX Users Are Bots .....6

                  (b)      The CWs Lack the Knowledge Attributable to Them......9

      B.      GSX's Other Statements Are Likewise Not Misleading ...................11

II.     PLAINTIFFS FAIL TO PLEAD SCIENTER...............................................14

III.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION .............................15

CONCLUSION ....................................................................................15

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re BofI Holding, Inc. Securities Litigation*,
    977 F.3d 781 (9th Cir. 2020) ........................................................................2

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009)........................................................4

*California Public Employees' Retirement System v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ..................................................................... 3-5

*In re Campbell Soup Co. Securities Litigation*,
    No. 18-14385 (NLH/JS), 2020 WL 7022655 (D.N.J. Nov. 30, 2020).... 5-6, 9

*Chan v. New Oriental Education & Technology Group Inc.*,
    No. 16-9279 (KSH) (CLW), 2019 WL 2865452 (D.N.J. July 3, 2019)......4, 9

*In re Galena Biopharma, Inc. Securities Litigation*,
    No. 17-929, 2019 WL 5957859 (D.N.J. Nov. 12, 2019)................................6

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ...................................................................9, 14

*In re Keyspan Corp. Securities Litigation*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003).................................................... 12-13

*In re Lehman Bros. Securities & ERISA Litigation*,
    No. 09 MD 2017 (LAK), 2013 WL 3989066 (S.D.N.Y. July 31, 2013)......10

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) .....................................................2, 12

*Martin v. GNC Holdings, Inc.*,
    No. 2:15-CV-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017)..............15

*In re Mylan N.V. Securities Litigation*,
    No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)..... 5-6

*National Junior Baseball League v. Pharmanet Development Group Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010)..........................................................9, 14

*In re Nice Systems, Ltd. Securities Litigation*,
    135 F. Supp. 2d 551 (D.N.J. 2001)...................................................................7

*In re Par Pharmaceuticals Securities Litigation*,
    No. 06-CV-3226 (PGS), 2009 WL 3234273 (D.N.J. Sept. 30, 2009) ...........9

*Takata v. Riot Blockchain, Inc.*,
    No. 18-02293, 2020 WL 2079375 (D.N.J. Apr. 30, 2020) ......................6, 10

*Tanaskovic v. Realogy Holdings Corp.*,
    No. 19-15053, 2021 WL 211049 (D.N.J. Jan. 21, 2021) ..............................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................14

*United States v. Hassanshahi*,
    195 F. Supp. 3d 35 (D.D.C. 2016)................................................................11

Defendant GSX respectfully submits this reply memorandum of law in further support of Defendants' joint motion to dismiss the Amended Complaint.[1]

## PRELIMINARY STATEMENT

In response to the Motion to Dismiss, Plaintiffs abandoned half of their case, conceding they failed to state a Securities Act claim against any defendant.  (Opp. at 2 n.1; Notice of Voluntary Dismissal, ECF No. 69.)[2]  Plaintiffs' remaining Exchange Act claims fare no better.  When Grizzly Research published its report in February 2020 purporting to expose GSX as a fraudulent company, the market was unfazed. Since then, numerous other short sellers—who all acknowledged that they "stand to realize significant gains" from driving down GSX's ADS price and warned that they "make[] no representation, express or implied, as to the accuracy, timeliness, or completeness of" their claims (*see, e.g.*, Ex. I at 1)—also published similar reports. But none of these short sellers succeeded in moving the market, leading *The Wall Street Journal* to call these short sellers' attempts one of 2020's "worst short bets." GSX's ADSs have traded and continue to trade above its IPO price.

Copying the vast majority of their claims almost verbatim from these short-

---

[1]   Capitalized terms not defined herein have the meanings ascribed to them in the Memorandum of Law in Support of Defendants' Joint Motion to Dismiss, ECF No. 67 ("Opening Brief" or "Br."). "Opposition" or "Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss, ECF No. 68.

[2]   Accordingly, GSX is the only remaining served defendant in the case.

seller reports, Plaintiffs ask this Court to credit the same speculative accusations that the market rejected. The Opposition fails to grapple with the pleading deficiencies demonstrated in Defendants' Opening Brief, including the body of case law requiring dismissal of complaints that, like this one, simply parrot the claims of short sellers with "an obvious motive to exaggerate the infirmities of the securities in which they speculate" and whose conclusions must be taken "with a healthy grain of salt." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020), *petition for cert. docketed*, No. 20-1364 (U.S. Mar. 26, 2021). The Complaint should be dismissed on this basis alone and for each of the following independent reasons.

First, Plaintiffs fail to allege any misrepresentation. The Complaint is devoid of any particularized facts demonstrating that GSX engaged in fraud, much less that 50% of its revenues were fraudulent. Plaintiffs' belated representations in an affidavit attached to their brief do not and cannot cure the Complaint's deficiencies. Worse, many of Plaintiffs' arguments contradict the short sellers' theories on which Plaintiffs' Complaint relies. (*Supra* § I.A.2)

Second, the Opposition confirms that Plaintiffs fail to allege scienter. Abandoning any claims of motive, Plaintiffs rely on the core operations doctrine, ignoring the well-established authority that where, as here, Plaintiffs fail to allege

other individualized allegations showing knowledge, the core operations doctrine is not an adequate basis to impute knowledge to senior management or to the Company.

Finally, Plaintiffs fail to plead loss causation.  They cannot dispute that the "revelation" of the alleged fraud when Grizzly Research released its report did not cause any drop in GSX's ADS price, nor do they explain what "new" information was later "revealed" by other short-sellers' reports on the same topics.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO PLEAD ANY MISREPRESENTATION

### A.   GSX's Financial Statements Were Not Misleading

#### 1.   The Alleged Conduct Did Not Implicate GSX's Financial Statements

As shown in the Opening Brief, the fatal defect in the Complaint is that it fails to allege particularized facts showing that 50% of GSX's revenues were falsified, as Plaintiffs contend.  (Br. at 14.)  All but conceding this defect, the Opposition asserts that "[a] more precise specification of this amount is unnecessary, as any amount of overstatement of revenues near or over 50% is manifestly material."  (Opp. at 16.)

Plaintiffs miss the point.  The problem is not materiality, but the lack of factual allegations in the Complaint.   To survive dismissal, Plaintiffs must plead "*particulars* regarding the amount by which [financials] were distorted." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp*., 394 F.3d 126, 153 (3d Cir. 2004) (failure to allege particulars to show 25% of reserves were manipulated warranted dismissal).  This

necessarily requires pleading facts "to support the probability that the source[s]" relied upon to arrive at that 50% estimate "would possess the information they claim to possess." *Id.* at 155.

Plaintiffs fail to plead any such facts. The Opposition acknowledges that Plaintiffs' "estimate" that 50% of GSX's revenues were false is based on their claim that 70% of GSX's users are bots (Opp. at 16 n.8–9), which, in turn, is based on (i) Muddy Waters' study of login data from select courses "purchased between January and March 2020" and (ii) Dr. Knoblock's "review[]" of that study.[3]  (AC ¶¶ 67, 72.)  But these sources, by their own terms, explicitly ***exclude*** data before January 2020 and after May 18, 2020.  (*Id.*)  Hence, "the Court cannot rely on [them] to support claims of false revenue reporting for the *entire* Class Period" from "June 6, 2019 through October 20, 2020, inclusive."  (*Id.* at 1); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009); *see also Chan v. New Oriental Educ. & Tech. Grp. Inc.*, No. 16-9279 (KSH) (CLW), 2019 WL 2865452, at *11 (D.N.J. July

---

[3]  The Opposition's reliance on the so-called CW allegations (Opp. at 13–15) is misplaced, as none of the CWs is alleged to have knowledge of GSX's accounting practices or "the amount by which" revenues were misstated. *Chubb*, 394 F.3d at 153.  Moreover, the CW allegations are not particularized (Br. at 21–25; *infra* § I.A.2(b)), and the CWs do not purport to know about certain key allegations the Opposition attributes to them.  For example, despite Plaintiffs' assertions, the Complaint never alleges that brushers paid for classes "through the same channels that real students used."  (Opp. at 15; *see* AC ¶¶ 103–11.)  The CWs are also not alleged to have *direct* knowledge of GSX paying funds to third-parties. (Opp. at 14).  Rather, the short-seller reports show that these statements were *hypothetical* examples not based on first-hand experience.  (Ex. I at 12–13.)

3, 2019).  Similarly, because both sources reviewed only a fraction of GSX's classes (Br. at 18), they cannot be relied upon to show that 70% of *all* GSX users are "bots" and, by extension, that over 50% of all revenues were falsified.  *See In re Campbell Soup Co. Sec. Litig.*, No. 18-14385 (NLH/JS), 2020 WL 7022655, at *6 (D.N.J. Nov. 30, 2020) (that *one* CW's marketing budget was cut by 70% is insufficient to show *entire* marketing budget was cut by 70%).

Furthermore, even within Muddy Waters' limited sample, Plaintiffs fail to allege facts "to support a probability that their sources would possess the information they claim to possess"—namely, that the presence of "bots," even if they were used, had any bearing on GSX's financials.  *Chubb*, 394 F.3d at 152.  The Opposition does not dispute—and thus implicitly concedes, *see Campbell*, 2020 WL 7022655, at *5 n.2 ("Plaintiff has waived its opposition to this argument by failing to respond to it.")—that neither Muddy Waters nor Dr. Knoblock was in a position to know whether the accounts allegedly identified as "bots" paid tuition, or were otherwise reflected in GSX's financial statements.  (*See* Br. at 14.)  Hence, even accepting *arguendo* that 70% of users in Muddy Waters' sample were "bots," Plaintiffs fail to show that any of GSX's revenues or financial statements was falsified.[4]

---

[4]  Plaintiffs argue that even if brushing occurred only "for marketing purposes," that still would render misleading the Company's financial statements and statements touting its success.  (Opp. at 15.)  But the Opening Brief (Br. at 13–15) and Plaintiffs' cases make clear that such statements are inactionable.  *In re*

### 2.     Plaintiffs Fail to Establish the Alleged Misconduct

### (a)   Plaintiffs Fail to Allege 70% of GSX Users Are Bots

Plaintiffs also fail to plead particularized facts to support their central claim that 70% of users are bots.  First, relying on Muddy Waters' study, Plaintiffs argue that it was representative because (i) "Muddy Waters explained the population from which it drew its sample" and (ii) "the Complaint plainly alleges that the sample was 'randomly chosen.'"  (Opp. at 18–19.)  The latter is simply a naked legal conclusion, based solely on Muddy Waters' say-so, that "[t]his Court need not accept."[5]  *In re Campbell Soup*, 2020 WL 7022655, at *6.  Moreover, Muddy Waters' explanations about its sampling methodology show that the sample was highly **un**representative,[6]

---

*Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *5 (S.D.N.Y. Mar. 28, 2018) ("[M]ere statement of historical financial information does not give rise to a duty to disclose illegal conduct that may have contributed to that performance.").    Plaintiffs fail to respond to, and thus concede, Defendants' argument that the Complaint does not allege that GSX's success *was* related to such marketing.  (Br. at 16.)  *See In re Galena Biopharma, Inc. Sec. Litig.*, No. 17-929, 2019 WL 5957859, at *14–15 (D.N.J. Nov. 12, 2019).

[5]   As Plaintiffs point out, Muddy Waters reviewed "only 2.9% of GSX's claimed data set, yet . . . yielded 34.8% of" alleged bots.  (Opp. at 19 n.11.)  This is expected from a non-random sample—an overrepresentation of alleged "bots."  It also renders highly implausible the Opposition's tardy claim that "at least 8.4% of students" were bots.  (Opp. at 19); *see also Takata v. Riot Blockchain, Inc.*, No. 18-02293, 2020 WL 2079375, at *16 (D.N.J. Apr. 30, 2020) ("[C]omplaint may not be amended by the briefs in opposition to a motion to dismiss.")

[6]   For example, Muddy Waters did not disclose whether "paid" courses included not just full-price courses, but also promotional courses that cost only a token amount—*i.e.*, RMB9 ($1.30) (AC ¶ 121); whether courses were evenly

using data sets that, as noted above, cover only a fraction of classes and a portion of the Class Period.  (Br. at 18.)  Courts routinely reject attempts to infer widespread conduct on the basis of cherry-picked samples, "especially without any allegation as to the relative fraction of [defendant's] total business they comprised."  *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577–78 (D.N.J. 2001).

Second, Plaintiffs' own allegations show that that many, if not most, of the users characterized as "bots" did not, in fact, display any alleged "bot" behavior at all.  The Complaint alleges four types of bot behavior, yet inexplicably included other "linked" "additional users who share the same distinct IP address" or "joined classes at the exact same moment."  (AC ¶ 77.)  While the Opposition claims that Dr. Knoblock found that "linked" users "are likely… to be bots" (*id.*), the Complaint alleges nothing of the sort; nor do Plaintiffs cite any facts supporting this inference.[7]

Finally, the Opposition confirms that Dr. Knoblock simply rubber-stamped Muddy Waters' biased conclusions.  Plaintiffs claim that he "accepted the data reported by Muddy Waters as accurate."  (Opp. at 21.)  But they do not allege that

---

distributed across grade levels and subject matters; and whether the sample included logins randomly selected throughout the calendar or academic year.

[7]   Nor does such a conclusion make any sense, much less "perfect sense."  (Opp. at 20 n.12.)  Even assuming *arguendo* that the alleged "bot behaviors" are related to bots, there is no reason to conclude that, in a class of several hundreds of students, so long as one alleged "bot" joined at 12:00:01, *everyone* who joined at 12:00:01 must also be a bot.

he had access to raw data (*i.e.*, login records), without which Dr. Knoblock simply could not have brought his independent judgment to bear to arrive at the conclusions attributed to him.   The Complaint states that Dr. Knoblock "reviewed the *data analyses*" in Muddy Waters' reports (AC ¶ 67), but is silent on what this purported "review" consisted of, what "analyses" were the subject of his review, and how Dr. Knoblock was able to arrive at reliable conclusions when Muddy Waters itself expressly could not.   (Ex. I at 1 (noting that Muddy Waters "makes no representation, express or implied, as to the accuracy, timeliness, or completeness of" its claims).)

Compounding the problem for Plaintiffs, certain of Dr. Knoblock's opinions actually *refute* Plaintiffs' claim.   For example, he opined that "it is ***implausible*** that software engineers would design such automated switching to occur more than five minutes prior to the start of class" or "after the class has begun."   (AC ¶¶ 87–88.)   Yet that is exactly what Plaintiffs allege—that bots ("Burst Joiners") were somehow designed to join "in 'bursts,' more than five minutes before or after the start of class," and that other bots ("Early Joiners") were designed to join "implausibly early."   (*Id.* ¶¶ 80, 90.)   But as noted above, Plaintiffs' own purported expert disagreed—*i.e.*, such joiners were ***unlikely*** to be bots and could well be real students.[8]

---

8   Dr. Knoblock never alleged that "Same-Second, Different-Week Joiners" are likely bots.   Without the benefit of any data, he theorized only that the "probability of such a precise login happening two or more times for a single user in a single course is extremely low."   (AC ¶ 74.)   But he did not state the basis

**(b)      The CWs Lack the Knowledge Attributable to Them**

Like the Complaint, the Opposition stresses the alleged CWs' "job titles, years of employment, and job responsibilities" (Opp. at 23–25), but does not allege "the dates on which the relevant information was acquired" and "facts detailing how the source obtained access to the information." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 538 (D.N.J. 2010).  It is well-established that "*[e]ach source* must meet the pleading requirements; 'the sheer volume of confidential sources cited cannot compensate for . . . inadequacies.'" *Chan*, 2019 WL 2865452, at *9.  "Where these requirements are not met, courts *must* ignore the insufficient[] . . . statements." *Pharmanet*, 720 F. Supp. 2d at 539.[9] Because the Opposition ignores these requirements, all of the CWs' accounts should be disregarded on this basis alone.  (Br. at 22.)  Plaintiffs also ignore that most of the CWs did not occupy positions that would have made them privy to the information attributed to them and that many of the CWs left GSX prior to or early in the Class

---

for this conclusion, or explain what counts as "reasonable," as opposed to "low" and so-called "extremely low," probabilities—each of which is a critical failing, given that nearly 79% of these alleged users only had *one* precise join.  (*Id.* ¶ 76.) Dr. Knoblock offered no opinion regarding "Student-With-Teacher-IP Joiners."

[9]   Plaintiffs' cases are in accord.  *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (complaint properly alleged "the time period during which the CWs acquired the relevant information, and how each CW had access to such information"); *In re Par Pharm. Sec. Litig.*, No. 06-CV-3226 (PGS), 2009 WL 3234273, at *9 (D.N.J. Sept. 30, 2009) (disregarding source that failed to allege "what inventory issues [he] might have known and when").

Period.  (*Id.* at 22–23.)  Plaintiffs have thus conceded these points through silence. *Campbell*, 2020 WL 7022655, at *5.

Moreover, the fact that Plaintiffs' counsel "contacted" certain of the CWs to "confirm" their accounts does not cure the reliability concerns presented by the Complaint.  (Opp. at 25.)  The sufficiency of the Complaint rises and falls on the strength of the allegations therein; "the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Takata*, 2020 WL 2079375, at *16.

In any event, Plaintiffs' belated supplemental allegations are inadequate because they "provide the Court little assurance that the factual contentions have any evidentiary support." *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).  The Opposition does not dispute that the allegations attributed to CW-2, CW-3 and CW-5 were lifted verbatim from short-seller reports.[10]  (Br. at 23.)  If Plaintiffs obtained additional facts to corroborate these CWs' accounts as reported by Muddy Waters (as opposed to simply confirming that these CWs exist), Plaintiffs are silent about what those facts are.  Moreover, the allegations of a number of CWs contradict each other and are at odds with the theory advanced by the short sellers.  For example, whereas the

---

[10]  The Opposition confirms that counsel did not speak "with [CW-2] or even knows who [she is]." *In re Lehman Bros.*, 2013 WL 3989066, at *4.  The publicly available interview contains only an audio recording—which Muddy Waters says was "altered to disguise the identities of the speakers"—of the same statements reproduced in their short-seller report.

short sellers' CWs claimed that GSX *paid* brushers—which the Opposition admits would cause GSX to "*lose money*" (Opp. at 14)—CW-4 and CW-6 allege that they were pressured "to make a *profit*" (AC ¶ 116; *see id.* ¶ 137–38 ).  Plaintiffs also claim that while GSX had "few students" in 2015, teachers were "overworked" by 2019, with CW-4 and CW-6 both alleging that they tutored 200 students each.  (Opp. at 26 n.15; AC ¶¶ 120, 136.)  Hence, even accepting *arguendo* Plaintiffs' theory that GSX was trying to "fake it till you make it," these allegations demonstrate that by the time of GSX's IPO in June 2019, hundreds of students were enrolled, making GSX anything but a "fake" company, defeating Plaintiffs' own theory of the "fraud."

### B.    GSX's Other Statements Are Likewise Not Misleading

The Complaint's other allegations cast additional doubt on the reliability, coherence, and plausibility of Plaintiffs' claims.  (Br. at 25–28.)  First, the job posts, copied from a short-seller report, contain demonstrable translation errors that are at odds with *Plaintiffs' own* definition.[11]  (AC ¶¶ 144–51; Ex. R at 5–6.)  Those job posts do not refer to "bots," as Muddy Waters misleadingly claimed, but to "rooting."[12]  (Br. at 25-26.)  Like a student who betrays his plagiarism by the typos

---

[11]  Because the *Complaint* defined "brushing" as "刷" (AC ¶ 149 n.6), the error is apparent on the face of the Complaint; it is not a "factual matter" (Opp. at 27). Plaintiffs' one citation to a case outside the Third Circuit does not say otherwise. *United States v. Hassanshahi,* 195 F. Supp. 3d 35, 50 (D.D.C. 2016).

[12]  As the Opening Brief explained, "rooting"—*i.e.*, installing specialized software that were been preinstalled by phone manufacturers—serves legitimate purposes

unwittingly reproduced from the original, Plaintiffs' reproduction of Muddy Waters' errors exposes Plaintiffs' utter "failure to recognize and engage with the dubious reliability of the short-seller reports." *Fanhua*, 442 F. Supp. 3d at 804. These failings "necessarily raise[] doubt as to whether the *other* factual representations [from short-seller reports] can be credited as a reliable basis to establish [] factual falsity." *Id.* Nothing in the Opposition—including the tardy and unparticularized claim of an "independent" investigation[13]—allays these concerns.[14]

Plaintiffs also ignore *contrary* facts from their own sources. For example, Plaintiffs profess ignorance about whether GSX's competitors have physical classrooms (Opp. at 28), but their *own sources* make clear that they do. Thus, Plaintiffs' claim that there is no "legitimate explanation" for GSX's impressive

---

for a company, like GSX, that reaches many of its customers through mobile devices (Br. at 25; AC ¶¶ 2, 85.) Indeed, the public websites for such software, which Muddy Waters cited in its report, list such uses, including WeChat functions, which Plaintiffs admit GSX uses regularly. (Ex. R at 2, 5; AC ¶¶ 123–25.) Dr. Knoblock's claim that GSX has no need for such software adds nothing. As a data scientist, he is not alleged to have any expertise about the pedagogical or technological needs of Chinese online education companies. (AC ¶¶ 65, 150.)

[13]  The Opening Brief did not accuse Plaintiffs' counsel of violating their "duty of candor" to the Court. (Opp. at 17 n.10.) Rather, it noted, as numerous courts have, that allegations lifted directly from short-seller reports are not reliable, as *short sellers* owe no such duty. (Br. at 21.)

[14]  Plaintiffs' allegations that GSX is not widely used—which are all lifted from short-seller reports—can be ignored on this basis, and because Plaintiffs allege no facts indicating that the survey and other data relied upon are complete or accurate, or even what they purported to measure. (AC ¶¶ 197–222.)

performance and growth as compared to its peers fails (*id.*), since, as the Complaint clearly states, "GSX has no physical classrooms" (AC ¶ 68)—a key advantage over its competitors' business model that enables GSX to enjoy substantial cost savings and that gave GSX even more of an upper hand beginning in January 2020 when, due to COVID-19, online instruction became much more predominant.[15]

The Opposition's remaining arguments fail because the allegations in the Complaint do not support what the Opposition claims that they say.  For example, Plaintiffs fail to show that GSX's statements regarding instructors' job descriptions, compensation, and hiring are false.  CW-4 alleged only that she was pressured to make sales, not that management required anyone to create false accounts, as the Opposition claims.  (Opp. at 29-30; *see* AC ¶ 116.)  Similarly, according to the Complaint, CW-7— who left GSX months before the Class Period—never alleged that GSX's interview process was not rigorous, she merely stated that certain criteria were weighed more heavily than others.  (AC ¶¶ 140–42.)  Moreover, Plaintiffs allege no facts in the Complaint indicating that GSX's alleged "alter egos"

---

[15]  Plaintiffs cite New Oriental's Investor FAQ page, which states that it has "1,625 learning centers, including 118 schools . . . in 104 cities across China."  (AC ¶ 198 n.27.)  TAL Education's SEC filings state that it has "109 learning centers" across China.  (TAL SEC Form F-1 at 1, https://bit.ly/3apGnMG.)  *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("[N]aked assertion[s] . . . contradicted by published documents" cannot state a claim).

shouldered any of GSX's expenses.[16]  (Opp. at 30; AC ¶¶ 231–54.)

## II.  PLAINTIFFS FAIL TO PLEAD SCIENTER

The Opposition confirms that Plaintiffs disclaim any allegations of motive. (Opp. at 35.)  Hence, the "strength of the circumstantial allegations [of recklessness] must be [even] greater." *Pharmanet*, 720 F. Supp. 2d at 553.  GSX's denials of the short-seller reports cannot establish scienter, since, as explained above, Plaintiffs fail to allege facts showing such denials were false.[17]  (Opp. at 32–35.)  Moreover, Plaintiffs cannot rely on the core operations doctrine or on Defendants' positions because they fail to plead "individualized allegations that [Defendants] had knowledge of the facts at issue." *Pharmanet*, 720 F. Supp. 2d at 556.

Separately, Plaintiffs' economically irrational theory that GSX paid tuition on behalf of the majority of its users in an apparent effort to make a profit eventually ("fake it till you make it") is not more "cogent and compelling" than the non-culpable inference that no fraud occurred. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,

---

[16]  That other entities may have shared the same office address as GSX—mostly during time periods predating the Class Period—does not mean that they are a part of GSX, or that their expenses were borne and should have been reported by GSX.  (AC ¶¶ 231–54.)  These allegations, merely copied from the short-seller reports, also fail for lack of particularity.  (Ex. D at 9–11, 18–19; Ex. Q at 5–19.)

[17]  *Avaya* is inapposite.  (Opp. at 32–35.)  There, the court held that the CFO "might be culpable *as long as what he knew made obvious* the risk that his confident, unhedged denials of unusual discounting" would be misleading. *Avaya, Inc.*, 564 F.3d at 270.  Here, Plaintiffs offer no facts showing what Defendants knew, much less any facts showing that they believed the short sellers' allegations to be true.

551 U.S. 308, 324 (2007).   Even accepting *arguendo* Plaintiffs' theory, the Complaint itself makes clear that by the time of its IPO, GSX tutors were overwhelmed, teaching hundreds of students each.  (AC ¶¶ 120, 136–37.)  Plaintiffs' assertion that GSX was a mostly fake Company throughout the Class Period—*i.e., after* the IPO—thus makes no sense on the facts as alleged in the Complaint.

## III.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION

Plaintiffs do not deny that the February 25, 2020 Grizzly Report, which first revealed the alleged "fraud," did not cause any drop in GSX's ADS price.  (Opp. at 37–38.)  Nor do they dispute that Plaintiffs Angeline, Hays, and Tazi acquired their ADSs *after* the Grizzly Report's release and should be dismissed.  (*Id.* at 34.)  The subsequent events Plaintiffs cite are not corrective disclosures because Plaintiffs do not explain what "new information" they revealed.  (*See id*. at 38.)  Their other claims fail for the reasons explained in the Opening Brief.[18]  (Br. at 32–35.)

## CONCLUSION

For these reasons, the Court should dismiss the Complaint with prejudice.[19]

---

[18] Courts in this Circuit have held that "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure." *Martin v. GNC Holdings, Inc.*, No. 2:15-CV-01522, 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018).

[19] Because Plaintiffs fail to allege a primary violation of Section 10(b), their Section 20(a) claim should be dismissed.  Plaintiffs should not be granted leave to amend, as they fail to proffer any information indicating that further amendment "would cure any of the deficiencies in the" Complaint. *Tanaskovic v. Realogy Holdings Corp.*, No. 19-15053, 2021 WL 211049, at *21 (D.N.J. Jan. 21, 2021).

DATED:       April 30, 2021

Respectfully submitted,

/s/ Scott D. Musoff
Scott D. Musoff
Robert A. Fumerton (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Counsel for Defendant GSX Techedu Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of this Reply Memorandum Of Law In Further Support Of Defendants' Joint Motion To Dismiss The Amended Class Action Complaint was filed electronically with the United States District Court for the District of New Jersey through the Court's ECF System on this date. The Notice of Electronic Filing constitutes service on all parties under Rule 14(b)(1) of this Court's ECF Policies and Procedures listed in Local Civil Rule 5.2.

Dated: April 30, 2021

/s/ Scott D. Musoff
Scott D. Musoff