**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
_____

YANG RENBIN (lead plaintiff),
individually and on behalf of          CIVIL ACTION NUMBER:
all others similarly situated,
ROBERT ANGELINE, COREY HAYS            2:20-cv-04457-ES-JRA
and ALEXANDRE TAZI,

     Plaintiffs,                       ORAL ARGUMENT

     v.                                Pages 1 - 98

GSX TECHEDU INC., LARRY
XIANGDONG CHEN, NAN SHEN,

     Defendants.
_____
          Martin Luther King Building & U.S. Courthouse
          50 Walnut Street
          Newark, New Jersey 07101
          Friday, December 16, 2022
          Commencing at 11:41 a.m.


B E F O R E:              THE HONORABLE ESTHER SALAS,
                          UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

     POMERANTZ LLP
     BY:  AUSTIN P. VAN, ESQUIRE
     600 Third Avenue, 20th Floor
     New York, New York 10016
     Counsel for Plaintiffs



          Mary Jo Monteleone, Official Court Reporter
               maryjomonteleone@gmail.com
                    (973) 580-5262

          Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

*United States District Court*
*District of New Jersey*

**A P P E A R A N C E S: - CONTINUED**

THE ROSEN LAW FIRM, PA
BY:  JING CHEN, ESQUIRE
609 West South Orange Avenue, Suite 2P
South Orange, New Jersey 07079
Counsel for the Movant, Robert Angeline


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY:  ROBERT A. FUMERTON, ESQUIRE
     JUDITH A. FLUMENBAUM, ESQUIRE
One Manhattan West
359 9th Avenue
New York, New York 10001-8602
For the Defendants


ROBINSON MILLER, LLC
BY:  JUSTIN T. QUINN, ESQUIRE
Ironside Newark
110 Edison Place, Suite 302
Newark, New Jersey 07102
Counsel for Defendants

(PROCEEDINGS held in open court before **The Honorable ESTHER SALAS**, United States District Judge, at 11:41 a.m.)

THE COURT:  Good morning, everyone.  My apologies for the delay.  Please be seated.

We're on the record in the matter of *Wu v. GSX Techedu, Inc.*, Civil Action Number 20-04457.  Let me have appearances by counsel.  Let's start with the plaintiff.

MR. VAN:  Good morning, Your Honor, Austin Van from Pomerantz LLP on behalf of lead plaintiffs.  With me is Jing Chen.

MS. CHEN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. QUINN:  And good morning, Your Honor.  Justin Quinn from Robinson Miller.  I'm joined by my colleagues from Skadden, Robert Fumerton, Judith Flumenbaum.

THE COURT:  Good morning to counsel.

MR. FUMERTON:  Good morning, Your Honor.

THE COURT:  All right.  With respect to just a housekeeping matter, I looked at the docket.  The caption of this case is still *Wu v. GSX*, but I understand that with the amended complaint *Wu* is no longer in the case, but we're going to be using this caption for purposes of today until we get it changed on the docket.  Counsel?

MR. VAN:  That sounds fine, Your Honor.

THE COURT:  Okay.  All righty.  We have quite a bit

*United States District Court*
*District of New Jersey*

to get through today.  I'm going to be guiding, more than I usually do, the oral argument because I have very specific questions for counsel.  And I'm going to apologize in advance if, indeed, I have to cut counsel off or I have to redirect counsel.  There are just a lot of questions to get through and I want to just make sure we get through what we need to get through today.

So we are here to discuss defendants' joint motion to dismiss the amended consolidated action complaint.  (Docket Entry Number 82).  The amended complaint asserts violations of Sections 10(b) and Section 20(a) of the Securities Change Act of 1934, 15 United States Code, Section 78j(b), implemented by 17 C.F.R. Section 240.10b-5 and 15 U.S.C., Section 78t(a), respectively.

So we're going to be focusing in on our oral argument really on two of the three contested elements in plaintiffs' Section 10(b) claim, and that's scienter and loss causation. But before we do that, I do have some general questions that I'm going to direct at plaintiffs to start.  We're going to have some general arguments on this, but obviously I think we get into more specifics as we move down the issues during today's oral argument.

Let's start with counsel for the plaintiff.  I need you to explain for me "brushing."  I did my best to Google it, and I believe I have the gist of it from reading all the

papers in this motion and as well as the complaint, but talk to me about brushing.  What exactly is it?  And what are your theories regarding how brushing worked in this particular case.

MR. VAN:  Thank you, Your Honor.

So the way we use the term "brushing," which I believe is the way it is used generally in the industry, is just inflation of student enrollment figures and the automation, the simulation of student activity in these online courses.  So the fake activity and the fake enrollments we collectively refer to as brushing.

Basically just a painting -- you might think -- the character actually is a brush in Chinese.  Kind of painting a happier, rosier picture than actually existed.

THE COURT:  Okay.  Any position from the defendants with respect to brushing and its technical meaning?

MR. FUMERTON:  We certainly dispute that brushing took place here, but we don't dispute the definition, Your Honor.

THE COURT:  Very well.

So now, Counsel, again, for the plaintiff, this question is again directed towards you, sir.

The Court notes that after each alleged corrective disclosure, and, in fact, after all of the alleged fraud had been revealed to the market, the stock price for GSX remains

higher than it was at the initial public offering, second public offering, and when purchased by the plaintiffs.  Given that, what are you alleging is the basis for the actual economic loss suffered by the plaintiffs?

MR. VAN:  Well, so, it's a class period extending from between 2019 up to October 2020.  And there were many purchases made during that period when the stock price was above the price of the secondary offering and then sold at a loss.  And so all of those plaintiffs -- including our plaintiffs -- have losses because they purchased the price when it was an inflated value, higher than it would have been absent these misstatements, and then suffered a decline in the value of the stocks upon the revelation of those misstatements, of the truth of those misstatements.

THE COURT:  So even though it was higher than the actual price at the initial and second, you still say they indeed suffer a loss?

MR. VAN:  Yes, absolutely, Your Honor.

THE COURT:  So one of the things that I was confused about, and I want to hear you -- because when I look at the moving brief by counsel for the defendant, they say on page 9 that "despite the unrelenting short seller attacks and the filings of this lawsuit, that GSX's stock continues to soar," page, again, 9.  They go, "five months after the lawsuit was filed, GSX's soaring stock prices were finally tempered," they

say, "by matters that are unrelated to the plaintiff's claim."

Yet, you, on page 11, are saying the exact opposite and you're basically saying that GSX's valuation continues to plummet.

Can you reconcile the differences between what you're saying, which is at the time of the filing of your papers we see plummeting.  Counsel for the defendant says "soaring." These are in direct contrast to one another and I'm just trying to reconcile how you all are seeing this differently.

MR. VAN:  I'm not sure I can speak to defendants' point.  Our point is that if you go and look at Yahoo finance today, you'll see that it's a penny stock.

THE COURT:  You'll see what?

MR. VAN:  It is currently valued at a penny stock. It's about 300 or $400 million.  It used to be valued about $150 billion.  This completely collapsed.  They collapsed to $33, from about $150 billion, during the class period.  I have no idea why defendants think that it hasn't collapsed.

THE COURT:  Let's hear you on that, Counsel.

MR. FUMERTON:  Your Honor, plaintiffs' case can't get better after they filed the complaint.  So the IPO price in June of 2019 was $10.50 a share.  But when plaintiffs filed their original complaint on April 20th, which is after these multiple short seller attacks, it was $33.59 -- more than triple.  Then when plaintiffs filed the operative complaint

here, the amended complaint, in November 2020, the stock price was over $65 -- more than six times the IPO.

The fact that the stock price has gone down recently, years after this action was filed, has absolutely nothing to do with the allegations of the complaint.

There's been all sorts of regulations directed at online education companies in China, which has basically affected the industry as a whole.

But, Your Honor, the critical thing -- and I'm happy to address loss causation now, if you'd like.

THE COURT:  No.

MR. FUMERTON:  Sure.

THE COURT:  We're going to get into it in painstaking detail in a couple of minutes.

MR. FUMERTON:  Thank you, Your Honor.

THE COURT:  All right.  So let's start then.

We're now going to be moving on to the issue of scienter and these questions, again, are directed starting with counsel for the plaintiff.

Counsel, the amended complaint presents arguments regarding Defendant Chen's motive for engaging in the alleged fraud.  Specifically, the amended complaint alleges that Defendant Chen's company, *Ebetter International Group Limited*, mortgaged its shares in GSX as consideration for a Margin Loan Facility.  (Docket Entry Number 22, Paragraphs 400-402).

However, no argument pertaining to Mr. Chen's motive appears in your opposition brief. (Docket Entry Number 83).

Are you still asking this Court to consider Mr. Chen's motive to commit the alleged fraudulent conduct as support for an inference that Mr. Chen acted with the requisite scienter?

MR. VAN: To be frank with the Court, not seriously.

THE COURT: Counsel, not seriously? What I'm going to try to do here today -- and I'm going to give you an opportunity to respond -- but this is what I'm doing today. The reason that I'm going to be spending the next few hours with you is that we've thrown a lot into this case and a lot that I can see probably shouldn't be in it and some may be, should be. I want this oral argument to serve as an opportunity for us to, like, trim the fat. Okay?

So if there's a opportunity to trim the fat for us, please do. If there is a viable argument, as an officer of the court, then make it.

MR. VAN: Thank you, Your Honor. I appreciate that. I think this is fat that should be trimmed.

THE COURT: Okay. Then we cut right to the chase. We are going to now, as well, go to the issue of the SPO. We're talking about nonparty shareholders' sale of their positions at the time of the SPO, and I'm wondering if this is, as well, is this is some fat that needs to be trimmed.

MR. VAN:  I'm so sorry, I didn't understand the question.

THE COURT:  All right.  Let me put it in another way.

The amended complaint contains arguments regarding the actions of "corporate insiders" in selling their shares of GSX during the second public offering; however, these arguments do not appear, again, in your opposition brief.

Are you still asking the Court to consider the fact that some of GSX's shareholders sold their shares during the second public offering?

MR. VAN:  So, I think it's a minimal contribution.  I think it is additional fat.  It's not valueless, but it is not the central basis of which we are alleging scienter.  It's fat.

THE COURT:  I don't want you to rush and tell me.  Because when I mean cutting fat, I mean it would not be considered when the Court is assessing scienter.  I certainly don't want to put words in your mouth.

When we're talking about Chen, I was certainly a little confused at the arguments that were being -- at least what was stated in the complaint, and I was particularly interested in your position with respect to the defendants' position on page 29 of their moving brief.

I certainly don't want to cut Chen out of this in terms of your argument.  If you think there's something there

that you should be arguing, let's go back to Chen.  And then, of course, we'll talk about nonparty shareholders.  I'm breaking these two up.

MR. VAN:  Okay.  So we absolutely believe Defendant Chen knew that the majority of his company was fake.

THE COURT:  Whether he knew it, I'm just talking about, in specific -- let's go back.  All right?

Just so that we're all on the same page, let's go to 29 of the defendants' brief, and it really starts at the bottom of page 28.  They say, "plaintiffs fail to allege motive and opportunity."

And plaintiff referenced two alleged motives.  The first I want to deal with is Mr. Chen's and the theory that he received a personal line of credit.  And you say that this issue is one that you think can go to scienter.  And, if so, let me hear you on it.

I mean are we still arguing that this Margin Loan Facility and what he was able to secure somehow is related to the fraudulent activity, and if so, how?

MR. VAN:  Yes, it's simply not central.  But I think that taking out personal benefits from this massively fraudulent enterprise do suggest that he had his -- he had a motivation.  There was some benefit accruing to him personally and that does have some weight in the scienter analysis.

I think that the other points on scienter, the

denials of culpability and the core operations differences together independently are so powerful they largely make moot this --

THE COURT:  Again, you're not taking it off the table, right?  In terms of my overall holistic evaluation.

MR. VAN:  No, I don't think so.  I think that a personal benefit accruing to Mr. Chen.

THE COURT:  How is it a personal benefit?  Can you speak directly to the position made on 29 by the defendants in their moving submission?

They say, you allege no facts to suggest that there was anything suspicious about the timing or terms of the loan. You do not allege that the purported fraud had any impact on the value of Mr. Chen's privately held Class B shares that were pledged as collateral for the margin loan, as opposed to the publicly traded ADS, which, in turn, referenced Class A shares; the public shares.

They also fail to allege how the loan was obtained, what collateral was required or how it was valued, what diligence was completed prior to securing the loan or any of the other details regarding the issuance of the loan.

So I'm just trying to understand what's the value he got?  If you want to explain the difference between the Class A shares and the Class B shares, then that's incumbent upon you to address.  You didn't address it in your opposition

brief.  So it's certainly not my job to figure it out.

This is your opportunity, if, indeed, there is something that goes to scienter, then I need to hear it.  If not, I'll hear you on other arguments.  But please fill in the blanks and address an argument that was, at least from I can see, a pretty valid argument that's laid out on page 29 of the moving submission.

MR. VAN:  As far as defendants' arguments go, I think I agree with the Court that this is among their stronger --

THE COURT:  Say it again.

MR. VAN:  Among the arguments that defendants raised, I think this among their stronger, if I'm being frank with the Court.

I do think that the personal benefit from having a --

(Court reporter clarification.)

THE COURT:  If you want to come to the podium, and speak right into the microphone, I'd greatly appreciate that, Counsel.

MR. VAN:  I do think that the personal benefit from having a personal credit facility with your company is a benefit that ought to be considered in the holistic analysis.  I think that we --

THE COURT:  Don't we have --

MR. VAN:  -- should have had more specificity in the complaint regarding that allegation.

THE COURT:  Obviously, it's not in the complaint now, so I can't consider oral arguments that won't modify, obviously, what's before the Court in the amended complaint, correct?

MR. VAN:  So we don't currently have additional allegations that we can offer the Court.  We certainly could continue our investigation if this moves forward and that's an important point for the Court.

MR. FUMERTON:  Your Honor, just briefly, if I could correct the record.

There's no allegation that there was a line of credit with the company.  The allegation on 400 to 402 was there was a line of credit where he used a stake in the company as collateral.  But, of course, there's no allegation that there were any suspicious terms or that he wouldn't have been able to receive the exact same line of credit but for that collateral.

THE COURT:  Let me just look at Paragraph 403.

I'm going move on to the next issue.  The next issue has to do with the nonparty shareholders.  And again, same question to you, with respect, Counsel.

The amended complaint contains arguments regarding the actions of "corporate insiders" in selling their shares of GSX during the second public offering.  However, these arguments, again, don't appear in your opposition brief.

Are you still asking the Court to consider the fact that some GSX shareholders sold their shares during the Second Public Offering?  If yes, please explain.

MR. VAN:  No, that is not a current component of our scienter arguments.

THE COURT:  Wonderful.  Then you have cut my questions short.  I was going to go down with some other questions, but with that concession, we can move on.

We're going to now move to defendants' direct denials.  And now I'd like to start with defense counsel.

I misspoke.  I meant to say Paragraph 401 earlier, but I don't think it makes a difference either way at this point.

Let's start with defense counsel.  Come to the podium, please.

Everyone, just try, the acoustics sometimes do not cooperate.  I just want to make sure we can all hear you, especially Mary Jo Monteleone, who is taking down a nice transcript for everyone to use at, I'm sure, a later point in time.

Counsel, can you distinguish the present case from *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (Third Circuit 2009) relied on by the plaintiffs for the proposition that direct denials of an alleged fraudulent conduct provides strong evidence of scienter?

MR. FUMERTON:  We can, Your Honor.  In *Avaya*, there were facts alleged demonstrating that the defendants' CFO in that case, by virtue of his position, should have had access to the price discounting that was the subject of the alleged fraud.  That was, essentially, the gravamen of the Third Circuit reversing on certain statements but affirming the denial of statements that were made prior to the denials.

In addition, Your Honor, the Third Circuit relied on the fact that there were blanket denials by the CFO.  That it was the CFO that had to know about price discounting and he was issuing blanket denials.

Here, there are no allegations of blanket denials.  In fact, defendants issued a point-by-point rebuttal to the allegations in the self-interested short-sellers' reports.  That can be found in Exhibit E, as in Edward, and Exhibit J to the Musoff declaration.

We think *Avaya* is distinguishable.  And, Your Honor, even if it's not distinguishable, I think it bears emphasis that many of the challenged statements take place before there was ever a single denial of allegations in the short-seller reports.

The first short-seller attack was in February of 2020.  This class period starts long before that and concerns alleged misstatements that took place long before that.

If Counsel is relying solely on *Avaya* to state a

scienter allegation, then, at a minimum, we submit that those statements prior to the first denial should be dismissed.

THE COURT:  All right.  Well, let's look at this. Wasn't the evidence that the defendant "knew" his denials would be reckless similar to the evidence that we have here, Counsel?

I mean, for example, if we look at what the Third Circuit pointed to, "the specificity and repetition of the analyst questions," and now I'm going to put just "the defendants' position as chief financial officer and the alleged state of defendants' business at the time."

Didn't we have short-seller reports, articles, and actual questions by investors that were being responded to by our CEO and CFO here?

MR. FUMERTON:  Certainly, Your Honor, the questions were being asked.  We're not denying that.  The question is whether are there facts, particularized facts showing that defendants had access to the information that's the subject of those reports.

The gravamen of this alleged fraud is this use of bots to inflate enrollment.  There aren't particularized facts in this complaint to show that any of the individual defendants had access to that information.

The PSLRA and Rule 9(b) require it, Your Honor.  They require particularized facts.  This isn't notice pleading.

And there's not a single factual allegation in this complaint that defendants had access.

They had seven confidential witnesses. They spent pages and pages with their confidential witnesses. Not one of the confidential witnesses testifies that either of these individual defendants ever had any access to this information and that's the critical scienter inquiry. That's why it's a separate element.

THE COURT: But you go into the confidential witnesses a bit in your briefing. And I think plaintiffs' counsel does a good job in sort of sorting out who some of these witnesses are.

MR. FUMERTON: Sure.

THE COURT: I think there are people within -- we have teachers, we have engineers, we have third-party employees that have critical information.

What are you arguing they don't have access to; any evidence that, indeed, the CEO or CFO had actual knowledge of what was going on?

MR. FUMERTON: Or even access to the information, Your Honor. In fact, there's not a single allegation that any of these confidential witnesses ever communicated with any, any of the individual defendants, which brings this case squarely in line with Judge Wolfson's decision in the *National Baseball League* case. There, she relied on the fact that the

confidential witnesses never even spoke to the individual defendants.

That's the exact same thing we have here. Not a single confidential witness ever spoke to one of the individual defendants, or, just as importantly, said, We know they had access to this information. That's the kind of particularized facts that is needed to sustain a claim on scienter grounds.

THE COURT: Well, let me ask you a question, though. We're talking about the allegations here that the Court must look at as true at this point. We've got 70 percent -- they're arguing 70 percent of enrollment was at issue in this particular case. Over 50 percent revenue they're challenging. And that, when you talk about that kind of magnitude of alleged activity, you're saying that the CEO and CFO, it's not a fair assumption to assume that they would have had some indication of what was going on with the company? Assuming, again, we're able to -- we're only at a motion -- an MTD stage here. But this is -- the magnitude supports that it's pretty difficult for me to say that they didn't have access to the information.

MR. FUMERTON: Well, Your Honor, respectfully, Judge Wolfson addressed that same argument, that given the magnitude of the fraud, given that it affected the core operations of a business, how could defendants not have known.

But, again, that's not the law.  You can't apply a "how could they not have known" analysis.  You need particularized facts showing that they had access to it.

Your Honor, we're not here to argue misstatement.  We don't think the complaint ties this inflation of enrollment to revenue at all.  But in any event, it doesn't matter.  The question is, are there specific particularized facts as required by the PSLRA in 9(b) showing that defendants had access to the specific information that they claim is the subject of the fraud.

They cannot just say -- and there's legions of case law on this -- that how could they have missed it, how could they not have known.  It's a big fraud --

THE COURT:  Well, let me -- and again, I apologize because I do have some questions.  I certainly don't mean to be in any way disrespectful to either side when I interrupt you.

But one of the things that I was going to ask counsel for the plaintiff this question, and here is where things get a little muddy or me.  When we look at the amended complaint, we see references of an article from June 2015 accusing GSX of brushing and using bots.  (Docket Entry Number 22 at Paragraph 385).

Again, according to the amended complaint, GSX issued a public statement that "since GSX commenced its operations in

2014, it has been fighting both brushing and falsifying activities." *Id.* at Paragraph 387.  The amended complaint also alleges that GSX's statements discuss purported efforts on locating cheating teachers and account holders who intended to obtain unwarranted bonuses from GSX."

I guess my question is, these guys knew from back, at least we know, 2015, that this company was being at least accused of using bots and brushing.  So now when we see -- fast-forward -- this isn't news to them.  They've had to contend with this, arguably, based on their own statements, years ago.

Now we see allegations from Grizzly, Citron, and Muddy Waters that are reports outright.  Given the three organizations what's being accused of, Counsel, what they knew historically to be potentially an accusation, do you think it was wise for there to be that kind of denial by these guys? Do you think that really made a lot of sense?

MR. FUMERTON:  Well, Your Honor, let's break it down. The 2015 news article and the statements and response to it aren't being challenged.  That's a new article with anonymous sources.

Then you fast-forward to 2019, and you have three self-interested short sellers.  These are public firms that disclose to the market, we have shorted this stock.  We need this stock to crater so we can make money.  These are the most

biased possible people, right, making the allegations.  And they're just parroting the allegations of each other.

Again, there are cases after cases saying you can't just parrot a short-seller attack.  Of course, the short seller is going to claim that there are bots.  Of course the short seller is going to claim that the company is a sham.  That's what they do.  That's their livelihood.  They put on conferences to try to drive stock prices down and then plaintiffs parrot the allegation.

But again, getting back to the scienter -- again, getting back to the allegations, the scienter element, of course, is separate from the misstatement, as Your Honor recognizes.  And even if they have alleged a false statement for the purposes of the motion to dismiss, the scienter allegations need to be particular.

And the Third Circuit in the *GSC* case has held that where you have no allegations of motive -- and plaintiffs have abandoned their allegation of motive -- the strength of the recklessness or conscious misbehavior allegations must be that much stronger.

THE COURT:  Let's not overstate what counsel did.  Counsel did not -- we're talking specifically about Mr. Chen's motive with respect to that particular loan.  We're going to get to other theories and other motives.  Let's not overstate what, indeed, counsel did a few moments ago.

MR. FUMERTON:  Sure, Your Honor.  Unless I missed it, the only allegations of motive in this complaint are Paragraphs 400 and 403.  One was the Chen line of credit, which we understand they are no longer advancing, and the other was the sales by the insiders in the secondary public offering, and that's at 403.

We understand they are not relying on either of those allegations.  There are no other allegations of motive or opportunity in this amended complaint.  So we're in the land of *GSC*, where the Third Circuit says if you have no allegations of motive or opportunity, the allegations, the particularized allegations need to be that much stronger.

Here, we don't have any particularized allegations that any of these defendants had access to this information or didn't sincerely believe the denials when they made them.

THE COURT:  Okay.  Let me hear a response.

MR. VAN:  Thank you.  Maybe just to start where Mr. Fumerton left off.

So, the Supreme Court has made it clear motive is not necessary to plead scienter.  It's good if you have it, but it's fine if you don't.

What we do have is just so compelling that, really, scienter, there's a reason that they've spent half a page of their reply on scienter.  I think they recognize that it's adequately pleaded in this case.

*Avaya* is dispositive and controlling.  The point that seems to be made currently by defendants about *Avaya* is that *Avaya*, according to them, requires showing how the defendants had access to the information.  But the language of *Avaya* obliterates that reading.  It says, "shareholder's failure to identify the precise means by which defendants would have learned of the discounting was not determinative."

Even if he had not known, his denials of the fraud were false, the facts alleged gave rise to a strong inference of recklessness.  That's page 274.  I think it makes it perfectly clear.

Only three things were required in *Avaya* to adequately plead recklessness.  That was:  First, the specific and repeated denials; two, the position of the defendant as CFO in that case -- here, CFO and CEO; and then the alleged state of the business, which is just contrary to what was being denied.

So those three things are all adequately pleaded here, clearly pleaded here.  It doesn't sound like defendants really even dispute that there were specific and repeated denials.  So I don't see how *Avaya* is distinguishable.

THE COURT:  Why don't you go ahead and take some time to tell me how these direct denials of the alleged fraudulent conduct in this case supports an inference of scienter.

MR. VAN:  Sure.  So, we can just walk through the

denials.  There are many of them.  So there are the denials in 2015 -- excuse me, I'm just parched.

THE COURT:  Sure, Counsel.

MR. VAN:  -- that you already mention.

In April 2020, Defendant Chen, in an interview with the Chinese media, directly challenged the Muddy Waters to investigate the company.  He said, "If Muddy Waters analyzed our data Muddy Waters will not be so stupid."  This was a confident assertion on the part of the company that it had nothing to hide, that it wasn't engaged in brushing.

THE COURT:  Would you consider that denial unhedged?

MR. VAN:  Yes, I think I would.  Certainly --

THE COURT:  Why.

MR. VAN:  I'm sorry?

THE COURT:  Why would you consider it unhedged denial?

MR. VAN:  Because it's an open invitation to investigate the company, through whatever means, and an assertion that that investigation will be fruitless.  So it's a general request saying, We're an open book, come look at our books.  And the assertion, the confident assertion that nothing bad will be found.  That seems it's an unhedged denial anything in those books is bad.

THE COURT:  Didn't defendants indicate that GSX had looked at the short-seller reports and found errors?  In other

words, the amended complaint alleges that Defendant Chen stated that the Grizzly report showed "a lack of basic accounting knowledge."  That's Docket Entry Number 32 at 335.

I mean he is basically saying they don't know what they're talking about, right?  They lack basic accounting knowledge.

MR. VAN:  I agree.  I absolutely agree with the Court.  And there are even other statements that are similarly clear.  April 9th, on a conference call with investors, there's a statement, the Grizzly short report was full of false allegations.  It was extremely flawed.

April 14th, the Grizzly report was complete nonsense. There's an unhedged denial:  Complete nonsense.

April 15th, GSX released a press release saying, firmly denied the false, ungrounded allegations.  And Chen said, on Chinese Twitter, Weibo, GSX has never tolerated brushing.  That also seems unhedged:  Never tolerated brushing.

THE COURT:  Didn't they also state that they had conducted an independent investigation that revealed no fraud?

I mean this -- I think this particular point came, I believe, from the defendants' moving brief, but it's supported by a September 2nd, 2020, press release announcing the SEC investigation into GSX.

So, I mean, you're talking about an independent

investigation.  Do you think -- and saying that it revealed no fraud.  What do you think of that as a denial?

MR. VAN:  I think that that goes even further than recklessness and actually goes to proving knowledge, to proving scienter.  Because if there actually was an investigation and we accept as true the fact, as it was, that more than half the company was fake, then it's just impossible to see -- unless it was a generally reckless investigation -- how that investigation wouldn't have alerted defendants to the fraud.

THE COURT:  What other denials are you citing to, at least in the amended complaint, that cite?

MR. VAN:  May 6th, Chen stated, "actually brushing in China is illegal."  "So many things mentioned make zero sense."

On May 20th, Chen posted -- regarding Muddy Waters' analysis -- "it's just a pity they didn't understand the business model."  He actually admitted that Muddy Waters did homework for their report and says, "it's a pity they didn't understand the business model."

On June 6th, Defendant Chen stated that this short was a farce.  "A farce."  That's an unhedged denial of a fraud.  June 6th, Paragraph 395.

Those, I think, are the ones that we point to.  They're repeated and specific and unhedged.

THE COURT:  With respect to the 2015 article that you referenced and I addressed with counsel for the defense, can that cut both ways in the sense that if, indeed, there was allegations that were brought against them since their inception in 2015, and that they had looked into this and this was really more about teachers trying to -- and account holders who attempted to obtain bonuses, doesn't that also cut both ways in terms of them saying, we looked into it back then and, you know, it was baseless?

MR. VAN:  Right.

THE COURT:  Assuming that's what -- that's what he said, right?  This was more about teachers trying to collect bonuses that they didn't deserve.  And we had already looked into this and we found it to be baseless.  Doesn't that also support his position, then, that it wasn't true back then, it likely isn't true now?

MR. VAN:  Well, I don't know that it's fair for him just to say it that because, you know, during one period when they went and looked and found, you know, according to him, no fraud, that forever and always the company will be free from fraud.

So I don't think that four years later it was appropriate or anything short of reckless, frankly, for defendants repeatedly and specifically to deny a fraud when they didn't know at that time.  Either they didn't know the

fraud was going on or, more likely, that they were fully aware that the company was largely fraudulent and were making these denials knowing full well.

THE COURT:  What do you say to counsel's argument that, you know, you don't have any confidential witnesses that speak directly to their knowledge, and there's quite a bit of time spent on what your confidential witnesses don't have?

I think in your opposition you did a pretty good job in telling me who everyone was and citing to the amended complaint for support with respect to the allegations.  But can you speak to little bit about, like, these people have no direct knowledge as to what the CEO and CFO knew or didn't know, and, therefore, you really can't cite to whatever you may have obtained from them in the course of your own independent investigation.

MR. VAN:  Well, I think that the purpose of the confidential witnesses and their statements is largely to show falsity of statements.  Not so much for scienter.  I think they're helpful for scienter in showing that this was a massive fraud and how can they possibly not have known that over half of the company was fake.

But we're not using pointed confidential witnesses for specific statements about what Chen and Shen do -- with one exception which I'll get to in a moment -- but that's not necessary.

*Avaya* didn't mention any of that. We just went through exactly what *Avaya* required to show recklessness. And confidential witness statements specifically showing knowledge was not one of them.

Now, there are actually specific allegations of -- they kind of tie, in an individualized way, Defendants Chen and Shen to the fraud. And those are the allegations on Paragraph 398, where we allege that Chen and Shen were directly involved. They had their hands in the task of analyzing teacher performance. And Shen herself stated that the performance reviews were based partly on enrollment figures. And Confidential Witness 2 and 4 both made clear that these instructors were being paid, in part, to brush sales.

So it seems like there's a very good reason, a specific reason to think that Chen and Shen, in this role, this specific role that they had as part of their duties of controlling and analyzing teacher performance, would have known that because most of that performance was based on brushing, brushing was widespread.

THE COURT: Okay. Any response?

MR. FUMERTON: Thank you, Your Honor.

Your Honor, just very briefly, I won't go over why we think *Avaya* is distinguishable again. But, again, to the extent to the Court is relying on *Avaya*, that really only

saves half of the 16 alleged misstatements. So beginning at Paragraph 257 of the amended complaint, there are 16 challenged statements. The first one is on March 19, 2019, going all the way to September 2, 2020.

The first alleged denial of these allegations doesn't take place until April 8th of 2020, which is in Paragraph 329.

So to the extent the Court is applying *Avaya*, it would then have to dismiss the first 8 of the 16 challenged statements. In fact, *Avaya* made that very point in sustaining the dismissal of earlier statements that predated the CFO's denial of the price discounting in this case.

2015 wasn't a denial, Your Honor. If you look at their own allegations in Paragraph 387, they say, two days after the article, GSX published a statement saying that it's been fighting both brushing and falsifying activities.

That's not a denial that it's not taking place. They say they're fighting it. And there's not a peep out of anyone alleged in the complaint until 2020; until the Grizzly report in 2020.

So, to the extent the Court is applying that Third Circuit precedent, we think that mandates, at a minimum, the dismissal of the eight statements that predate the first denial that's being challenged in this case.

THE COURT: Counsel, do you want to respond?

MR. VAN: Please. So, I think there are actually two

independent bases for scienter in this case. One is absolutely the denials for *Avaya*. I don't think there's any real question that that is controlling and applies to, you know, the periods after the first denials began.

But the core operations inference also is independently sufficient. This, admittedly, is rarely applied and for good reason. It's not often the case that you have a case like this where fraud is so outrageously widespread, that it's "absurd to suggest the management was without knowledge of the matter," quote from the Ninth Circuit.

So the Ninth Circuit has applied this doctrine. So has the Second Circuit -- somewhat less clearly -- but absolutely the Ninth Circuit.

The Third Circuit has not squarely addressed the core operations inference. I think that it's unlikely that if it were in this case that it would create a circuit split.

But defendants, all they have to say about the core operations inference is that the core operations inference, while valid, requires, based on some district court cases here, require some additional individualized allegations that lend some plausibility to this core operations inference and grounded in something particularized. And as I just went over with Your Honor, we have that in this case.

THE COURT: We're going to move to that.

MR. VAN: Okay.

THE COURT:  The idea -- and I'll go ahead and just let you stay there.  Let's talk a little bit, this is all the "must have known," right?

MR. VAN:  Yes.

THE COURT:  They must have known, right?

So let's talk little bit about that, Counsel.  And I did cut you off.  Please continue, and then, of course, I have an additional question for you.

MR. VAN:  So that core operations inference together, with some individualized allegations, even under defendants' own standard is sufficient to allege scienter for the period prior to the denials, before the denials even started.

So even if we didn't have *Avaya* at all, we would still have an independent basis, based on the core operations inference and the individualized allegations even under defendants' own reading of the law.

THE COURT:  All right.  So let's talk a little bit about suggesting that Chen -- and am I saying this -- is it Shen, or how do you pronounce it?

MR. VAN:  Shen is my pronunciation.

MS. CHEN:  Shen.

THE COURT:  Shen?

MS. CHEN:  Shen.

THE COURT:  Shen and Chen.

So, are you basically saying that that alone,

understanding the magnitude of what's the allegation in terms of 70 percent fraudulent enrollment, over 50 percent revenue at issue with respect to, in this case, are you saying that the sheer magnitude alone is enough for the Court to now obviously find scienter based on, as you said, core operations?

MR. VAN:  It is.  Under the Ninth Circuit's and the Second Circuit's approach to core operations inference, that, in rare cases like this, is independently sufficient.  That's all you need, under the Ninth Circuit and the Second Circuit.

Now, again, the Third Circuit hasn't squarely addressed this.  But even under defendants' reading of the law in the Third Circuit, which is district court law, the core operations inference is independently enough if you also have some reason to think that the defendants had some individualized allegations suggesting that they had --

THE COURT:  These are my words, not necessarily -- we're looking at the totality of all the allegations at this point, right?  So we're looking at their positions.

Can you just start piecing together for me what, if we're looking at the allegations, and now I'm looking holistically at this whole thing, what do you say, along with the core business operations and their positions within the company and the magnitude of the fraud at issue here, what else would you piece onto that?  The direct denials?  What

else would you be sort of be stacking, if you will?

MR. VAN:  Those four components certainly are, on their own, sufficient.  In addition to that, the allegations I went through earlier, where some part of Defendants Chen and Shen's duties actually involve monitoring teacher performance.  We have the Confidential Witnesses 2 and 4 saying, Look, teacher performance was largely based on how many students they were able to enroll.  Actually, Shen said that.  And CW-2 and 4 said that teachers were assigning contracts requiring them to falsify student enrollments.  Contracts.  This was known within people who were looking at student performance and that's exactly what Chen and Shen were doing.

THE COURT:  Response.  Again, I don't want us to spend too much time on the point that we all know it's very difficult to establish scienter through the must-have-known allegation on its own.  We're really talking about, now, counsel asking the Court to look at the totality of the allegations.  And then, of course, counsel would argue the magnitude of the fraud, the positions of both Defendants Chen and Shen.  When we talk about the direct denials, the direct denials and the timing of those denials.  That when we look at that sort of holistically and in combination, he clearly has crossed what we all agree is a very high threshold when we're talking about scienter.

MR. FUMERTON:  Well, Your Honor, with respect to the

denials, again, would it have been better if we had admitted the fraud?  Would that be less of an inference of scienter?

The fact that you're denying what a short seller puts out there and you issue a point-by-point rebuttal, as we attached to the declaration, we don't think supports scienter all.

But going to the complaint, and again, it's important to go to the specific allegations because I think there's a little bit of paraphrasing going on.  397, 398 say, "defendants were directly involved in teacher performance."

Teacher performance is not bots.  They have a confidential witness that says there may have been some bonus payments.  But there's nothing in this allegation saying defendants were directly involved in enrollment or in enrollment figures, or how enrollment was being increased.

It's teacher performance.  It's looking at teacher evaluations, teacher ratings.  That's the most plausible inference.

But in a world where under the PSLRA, Rule 9(b), and no motive allegations, that's the world where you need the most heightened possible, particularized allegations.  And again, Judge Wolfson in the *National Junior Baseball League* considered and expressly rejected, you can't just assume because a corporate officer is in a certain position and that a fraud affects the core operations of a business, that they

must have known about it.

THE COURT:  Are you saying in Her Honor's case she was dealing with the same type of, well, the same magnitude as we have here?

MR. FUMERTON:  Yes, absolutely.  There's no distinction.  And plaintiffs haven't offered any that the alleged fraud is a lower magnitude here than it was in Judge Wolfson's decision.

But piling on supposition after supposition, when there aren't particularized allegations, we think even under a totality analysis, which we agree with, Your Honor, that's what the Second Circuit held in *Avaya*, that that supports that strong, particularized inference, those particularized facts.

THE COURT:  Let me hear you again, why you think, if I look at the totality of the allegations, we don't meet the threshold here.  Why?

MR. FUMERTON:  That there are no specific allegations showing that any of the defendants had access to the information that forms the basis of this claim.

THE COURT:  So when we're talking about motive and opportunity, of which they've walked away from earlier today, right?

MR. FUMERTON:  Correct.

THE COURT:  Now, we're, based on case law, we are now required -- and let me hear you as to now, since we don't have

motive and opportunity, what do they need to prove to the Court at this stage?

MR. FUMERTON:  The *GSC* says the allegations need to be correspondingly greater and they would have to allege facts -- not legal conclusion -- facts showing that these defendants had access to the information that's alleged to have been misstated; these enrollment figures.  And all we have are allegations of confidential witnesses that never talked to them, that never said anything about what information they had.

A CEO has a lot of responsibility in running a company.  To determining whether there are bots or whether enrollment is inflated, again, that's pure conjecture under any pleading standard.

But here we're under particularized facts.  What facts are in the complaint that show that this defendant had access?

But we submit, Your Honor, at a bare minimum, under *Avaya*, the statements before the denials, which are 8 of the 16 statements, before the first challenged denial in April 2020, there's no scienter for those.

I think everyone agrees you can't apply scienter retroactively, right?  So if a denial can form the basis of the scienter allegation, that's for those statements going forward.  It's certainly not for historical statements.  So

we've submitted a minimum, the eight statements made before the first April 8th, 2020, denial should be dismissed from the case.

THE COURT:  Any response before we move on to loss causation?

MR. VAN:  A quick response as to that.

Again, you have an independent basis based on the core operations inference for the period before the denials began, and it's under the Ninth Circuit that's adequate.  Even under the defendants' argument that you have to have some additional individualized allegations together with the core operations inference.  We have that here, based on Paragraphs 319, 107, and 398.

THE COURT:  Hold one second.  319 --

MR. VAN:  Paragraphs 319, 107, and 398.  I guess they looked at 398 just recently.  But those three paragraphs, which show what the Confidential Witnesses 2 and 4 said, which is that teachers were being paid to brush, that they were entering into contracts requiring them to brush enrollments.

Defendant Shen's own statement that she -- that performance was based on the number of enrollments.  Teacher performance was based on the number of enrollments.  That's what they were focused on.

This whole analysis was focused on enrollments and half of those were being falsified.  So that, I think, gets

you there, even under the defendants' own reading of the law, for the period prior to the denials.

THE COURT:  Thank you, Counsel.

All right.  Let's move on to loss causation.  We're going to start with counsel for the plaintiff with some general questions.  Okay?

Counsel, defendants argue that Plaintiffs Hays and Tazi purchased GSX stock after some of the alleged corrective disclosures.  (Docket Entry Number 82-1 at 34).  The Court notes this issue seems more related to the transactional causation element of a Section 10(b) claim.  In other words, to whether the plaintiff relied on the alleged misrepresentation in purchasing GSX stock.

How can the plaintiffs who purchased after -- emphasis on after -- some of the alleged corrective disclosures have relied on misrepresentations which the corrective disclosures revealed to be false?

MR. VAN:  Well, two points.  First, after -- so, there were interim denials --

THE COURT:  Let me put this into context.

MR. VAN:  Sure.

THE COURT:  We have Plaintiff Hays purchased GSX stock on April 13, 2020.  And I believe you're relying on the April 4, 2020, Form 20-F.  Then we've got Plaintiff Tazi purchasing GSX stock on May 20, 2020.  And then, of course, we

see we've got the 4/3/2020 form.  We've got the Citron research, that's 4/14, and we've got Muddy Waters on 5/18/2020.

So, I guess, can you reconcile that we've got these corrective disclosures and yet we've got stocks being purchased after?

MR. VAN:  Yes, Your Honor.  So these, first of all, were all partial disclosures.  The truth was disclosed over a period of time.  And most of those disclosures took the form of increasing the likelihood of the falsity of the misstatements by, you know, revealing additional evidence this was an ongoing fraud.

So even if some part of the fraud was revealed, it's not as if the company came out and just outright admitted the fraud, or the SEC found them liable, or some other dispositive act that kind of revealed once and for all that this was a fraudulent company.  There were partial disclosures over a period of time.

The second point is that there were interim denials. The company, all along, was denying that this was fraud.  And so even if there were disclosures by independent research analysts suggesting this was fraudulent and giving good reason to think as much, the company came out and gave countervailing reasons for investors to continue to believe in their misrepresentations.  So it was an ongoing fraud.

THE COURT:  Wait a minute.  Let me just push back a little.

MR. VAN:  Sure.

THE COURT:  You would agree that part of the plaintiffs' claim is that the market corrected, though, right, for the alleged misrepresentations, by dropping the stock price in response to each corrective disclosure?  So if that's true, didn't the plaintiffs who purchased after some of the alleged corrective disclosures purchase GSX stock at a "fair price" or at least at a less inflated price?

MR. VAN:  Potentially at a less inflated price but not at a fair price.  Again, it's not even clear that it was a less inflated price because after each of these corrective disclosures the company came out and had additional denials which could have increased the price of the stock, again, through misrepresentation.

THE COURT:  I'm having trouble following your argument, so maybe I need to have you repeat it again.

So when we're talking about these partial corrective disclosures, what do you mean by that?  Do you mean that, in essence, I'm not -- I'm to sort of say that these sort of partial disclosures don't trigger a particular point in which we then look at when plaintiffs are purchasing stocks?  Because, I mean these were numerous disclosures, of which we clearly have at least Tazi and Hays purchasing after some of

these disclosures.  So how am I reconciling that?

MR. VAN:  So it's accepted in the circuit and most circuits you can have disclosures over time, partial disclosures of fraud that, together, sum to 100 percent of the disclosure of the fraud.  So, you know, I think you're right that one way of looking at this is that there could be some 20 percent of the fraud exposed upon the first corrective event but 80 percent of it remains concealed.  And then if Hays or Tazi bought after that corrective disclosure, they're still entitled to the additional -- to recover the additional 80 percent inflation.

Now, the specifics of this are really best worked out by experts and expert discovery, which is why I just want to emphasize for the Court loss causation, there are amazing quotes on how loss causation is just not usually resolved on a motion to dismiss.  It's usually not the best way -- reason for dismissing a matter just because it's highly fact intensive.

But, yes, to get -- again, just to make this as clear as I can, you can have a 20 percent disclosure which discloses some part of the fraud that doesn't disclose the entirety of the fraud, and if there's a purchase after that 20 percent disclosure that individual can still have losses because the full revelation of the fraud has not yet occurred.

THE COURT:  I'm going to want to hear a response on

that, and then I have another question.

MR. FUMERTON:  So, Your Honor, it may be true that loss causation is occasionally a factual matter, but under the Supreme Court's decision in *Dura Pharmaceuticals*, plaintiffs have to plead facts demonstrating that new information, new information was revealed to the market that corrected a prior misstatement and had an effect on the stock price.

Your Honor is absolutely right that those two plaintiffs purchased after the corrective disclosure can't recover, but neither can anyone else.  Because if you go to the complaint, there's only seven corrective disclosures, and they're Paragraphs 361 to 383, and each of them followed the February 25, 2020, Grizzly report, which according to plaintiffs' own allegation, quote, detailed the extent, the extent to which GSX has brushed its enrollment figures, overstated its revenue and engaged in undisclosed related transactions.

Your Honor need not take our word for it.  That's their own allegation.

THE COURT:  Yes, I saw your argument on this but we're going to get into it and I have some nuanced arguments about what your "new" means.

I think there's a little bit more in the subsequent reports after Grizzly, Counsel.  I'm not necessarily sure I'm buying that entire argument that you made in your brief.  I'm

just going to let you know.

MR. FUMERTON:  Understood, Your Honor.  But, again, there needs to be factual allegation.

We've heard the claim that, well, there were other short sellers that rehashed the same allegations.  But if you go to the complaint, you can't find what's new about those reports.  What new information is there?

Counsel -- we haven't been citing Ninth Circuit authority, but the Ninth Circuit has held you can't rely on short sellers at all for loss causation because people understand these are self-interested people with a short position that they're trying to cover at a depressed price, so they're doing whatever they can to drive the price down.

But, Your Honor, our central allegation here is that the truth was absolutely already revealed to the market by their own allegation in February of 2020.

We also think, again, stepping back from the minutia here, as Your Honor recognized at the outset, the class that plaintiff -- that counsel represents here, if they had held their shares from the IPO at $10.50 to when he filed the amended complaint -- I don't know if 'sixtuple' is a word -- but they sixfold increased the value of their holdings.  It was over $60.

We're talking about little blips that are caused by facts that are completely unrelated.

One of the corrective disclosures involves a completely different company from GSX.  Not even the same company, just something that happened in the industry.

So, again, under *Dura*, it's a pleading issue, it's not a fact issue, and we don't think they've met that standard.  Thanks.

THE COURT:  All right.  I just want to check with my clerks on one thing.  Let's take a two-minute recess.

THE COURTROOM DEPUTY:  All rise.

(Recess taken from 12:45 p.m. to 12:48 p.m.)

THE COURT:  All right, everyone, please be seated.  Back on the record.

I have another question that goes to another issue for counsel for the plaintiff, so please come to the podium.

Counsel, the amended complaint alleges that, and I'm going to quote here, "GSX did not disclose that throughout 2018 and 2019, Beijing Yuntu and all of the VIE subsidiaries (i.e., the subsidiaries of BaiJiaHuLian Technology Company) had contractual employment arrangements in which employees of Beijing Yuntu and other subsidiaries would, pursuant to their contracts with GSX, (a) use software bots to falsify student enrollments in GSX and to falsify logins to those online courses, (b) assumed the identities of student users to falsify student enrollments by purchasing, enrolling in, and signing in to GSX courses."  (Citing Docket Entry Number 32 at

Paragraph 338).

Here is the question, Counsel. Do any of the alleged corrective disclosures reveal to the market that the "VIE subsidiaries" specifically were contracted to create and maintain bots? And if you're going to say they do, you're going to have to tell me where.

MR. VAN: Right. I believe so. I'm embarrassed to say I don't have this well memorized enough to where I could point you as we're standing here now.

THE COURT: Then ask for some guidance because here is the problem. I honestly think you need to -- it's not clear from what you've argued in your submission. And I think we need to know which corrective disclosures speak to this specifically, which is an allegation in the complaint, 338.

MR. VAN: Right. It will be one of the two dates on which -- it's either Citron or Muddy Waters' report.

THE COURT: Take a moment, look at it. I need you to tell me where within those reports exactly.

While you look, let's go off the record.

(Discussion held off the record.)

THE COURT: We're back on the record. Moment of levity.

MR. VAN: So, it is the Citron report. It's on page 18 and 19 of the April 14, 2020, Citron report.

THE COURT: Where? Can you just tell me where it

specifically addresses the allegations contained in Paragraph 338.

I mean these are pretty specific, right?  Using software bots to falsify student enrollment, falsify logins, assume identities of students, enrolling in, signing in to courses.

MR. VAN:  Right.  I believe what was disclosed here is a partial disclosure that, although -- I believe what was disclosed here the financial arrangement between GSX and these events -- which is -- which we combined with allegations from the confidential witnesses who were saying that third parties were being hired to brush as well.

But I think the relevant disclosure here, the best, I think, we point to is the Citron report.

I think Muddy Waters also, their report also contains statements that there were third parties that were involved in brushing.  So it may be that both --

THE COURT:  Hold on, I want to stop you there.

MR. VAN:  Sure.

THE COURT:  I'm looking at moving brief, page 27, and it says, "plaintiffs fail to allege a single material related party transaction that GSX improperly omitted from its disclosures."  Paragraphs 337 to 338.  "Instead, they claim that GSX failed to disclose certain 'contractual employment arrangements' with its Variable Interest Entities (the VIEs).

But GSX did disclose that contractual arrangements with our VIE and its shareholders were related-party transactions."

So they're saying they did disclose that. I think you're specifically saying, but you didn't disclose what you were doing with them necessarily, and I've already cited to Paragraph 338.

What I'm trying to get you to do now is tell me what we're looking at when we're looking at a corrective disclosure and what it reveals to the public, and to the market -- and, in particular, the market, and that is specifically that they were contracted to create and maintain bots.

If you're saying the Citron report, okay. You're saying in combination with witnesses. What witnesses? Because I've got to try, at a later point, when I'm trying to unravel all of this -- because I'm going to be reserving at the conclusion of today's proceeding -- I want to know what am I looking at. I'm looking at what report in combination with what witness and what did those witnesses say.

MR. VAN: Confidential Witness 3, I believe, is the confidential witness that said they were --

THE COURT: You're saying, we're relying on the Citron report.

MR. VAN: Right. I think, for loss causation purposes, the real question here, we don't really even have to delve into this, though I'm happy to. I think so long as

there was some corrective disclosure on the date in which the Citron report was released, that qualifies as a loss causation event.  I think there clearly was.

The Citron report had an analysis that was, just had a different basis altogether from the Grizzly report.  Muddy Waters was a third different analysis.  Citron's analysis, I basically went through and looked at unique enrollments and then multiplied those enrollments by the course fees for those enrollments and looked at the total revenue that would come from that and said this is completely off from the revenue that the company is claiming.

And Muddy Waters went through this extensive analysis that we went to Berkeley to find an expert to corroborate. That analysis just looked at automation events.  It looked at the login data and found that there were all these anomalies that can't be explained through human behavior.  It's best explained through the operation of bots.

That analysis is nowhere in the Grizzly report.  And Citron's analysis is also nowhere in the Grizzly report.  So this is new information, the corrective.

But to the point about the VIE, whether or not there's a clear disclosure in the Citron report regarding that particular misstatement, I think that it clearly is a loss causation event because it discloses additional evidence of the broader fraud.

MR. FUMERTON:  Your Honor, I think Your Honor's hit it on the head.  Loss causation needs to be analyzed on an alleged misstatement-by-misstatement basis.

Plaintiff cannot rely on a confidential witness to say that the truth of an alleged misstatement was disclosed to the market.  They have to plead facts in the complaint to show that or they didn't satisfy *Dura* for that specific misstatement.

So I think Your Honor is absolutely right.  If they don't plead facts showing that some aspect of these related party transactions wasn't disclosed, it was revealed to the market, they can't establish loss causation.

We, of course, did disclose, on Exhibit A at 144 in the registration statement, that there were these related party transactions.

To the extent they're trying to allege something was omitted, they have to show facts that that was disclosed later to the market and had an effect on the stock price.

THE COURT:  All right.  We're going to now be turning to each alleged corrective disclosure, taking them one by one.

Mary Jo, how are you?  Good?  Okay.

All right.  So let's start with the GSX Form 20-F, April 3, 2020.  I have, Counsel, questions for the plaintiff.

I'm reading from -- plaintiffs argue that the Form 20-F revealed to the market increased expenditures, and that

"online and mobile marketing costs increased because that is how GSX misleadingly recorded its illegal brushing expenditures."  (Id. at Paragraph 364).

What falsehoods are you alleging, Counsel, are revealed by GSX's disclosure related to its evaluation of its internal control over financial reporting?

MR. VAN:  So, at a minimum the reasons for the company's success were not disclosed.  The company didn't say that we're spending tons of money faking our operations, faking our enrollment and student activity.  And so that's a partial revelation of that falsehood, of that omission.

It's also a partial revelation of the profits because a larger of portion of the company's expenses that were disclosed were actually going to marketing, were actually going to, being spent on these bots.

THE COURT:  Let me unpack that.  You said "marketing."  But what you're saying is that money that was purportedly to be used for marketing was being used for another reason, and that was to, obviously, try to put forward or forward payments with respect to enrollments via bots?

MR. VAN:  I think that's a better way of saying it.  Thank you.

THE COURT:  Okay.  I just want to make sure I understood.

Now, how do these disclosures reveal to the market?

That's what I've got to look at.  How were these disclosures revealed to the market information about this alleged brushing?

Where can I tease that out of in terms of -- now we're looking specifically at the GSX Form 20-F.  Is there anything in there?

MR. VAN:  Yes.  So it's the online and mobile marketing.  It is a partial revelation.  Notice that it doesn't have to be the case that each of these disclosures reveals that there's a fraud in the company.  It has to reveal falsity of their statements, partly.

And you can separate these two things.  You can have a revelation of falsity, for example, of a profit statement, and then separately disclose, days later, that the reason for that discrepancy, the reason profits were less was due to fraudulent activity.

If it were otherwise, it would be a highly problematic rule that I don't know any court endorsing -- that's I think why we have partial disclosures.  If it were otherwise, you can have a company come out and say one day, Our profits are 50 percent less than we had said they were, without giving a reason, and then three days later come and say, By the way, the reason is that it's -- we were making it up, those 50 percent of profits.

The revelation of the fraud comes only from the

second disclosure.  The first disclosure, that profits dropped by 50 percent, doesn't necessarily reveal the reason for the drop was fraud, but the stock price would drop totally to account for a half -- a 50 percent drop in profits.  And then upon the disclosure that the reason for the drop was fraud, there wouldn't be a drop.

You wouldn't have any recovery in the case of this sort of outright fraud if each corrective disclosure had to, in and of itself, reveal that the reason for the drop was fraud.  It's just falsity.

THE COURT:  I guess I'm -- maybe I'm missing something.  I'm going to give you another opportunity because I'm not following you.

MR. VAN:  Sure.

THE COURT:  How do the disclosures related to the increased mobile marketing cost reveal to the market that those costs increased because of brushing expenditures?

MR. VAN:  So, partly, it's understood that -- this was -- actually, after the market had been alerted to the potential fraud, because this was after Muddy Waters -- after the Grizzly report.  So I think that investors heard that online mobile and marketing costs had increased and read the tea leaves and said that is a good indication that what was being claimed previously, that the company was falsifying student activity through the use of online and mobile

activity.

THE COURT:  So how are you alleging investors would have read the tea leaves on that in terms of brushing expenditures?

What within the -- and I'm looking at it right now, the statements.  What within the statement, in the GSX Form 20-F, would allow investors to understand that those increased costs related specifically to brushing expenditures?

You're saying you don't have to --

MR. VAN:  I think it's a combination of the information in the market at the time, which said that -- which were allegations that this company is spending tons of money on online and mobile brushing, together with this revelation that their online and mobile marketing costs had increased.

It's those two things put together.  It's read in the context of the information available in the market suggest that it's a fraud.  And again, it's not even necessary, though, for it to be a partial disclosure that's valid for it to reveal that this is fraudulent.  But it does.  This disclosure does, for the reason I've just described.  I think this statement made in the --

THE COURT:  So you're saying, you're going to tell me now that the Form 20-F is a partial corrective disclosure?

MR. VAN:  It is.

THE COURT:  It is a partial corrective disclosure.  I guess, if it's a partial, then what other corrective disclosure are you arguing, in combination, would allegedly reveal to the market that GSX was including its brushing exposures in advertising and marketing costs or hiding its brushing expenditures in subsidiaries?

I'm not getting that from that one partial disclosure.  So then you're going to have to tell me what other disclosure the market then would have been -- the market then would have been informed of.

MR. VAN:  Absolutely.  And I think it's the latter Citron report and the Muddy Waters' report which came out later that month and the following month.

THE COURT:  Okay.  Let me hear a response.

MR. FUMERTON:  Your Honor, there's absolutely nothing in the April 3rd disclosure by defendants that reveals falsity, partial or otherwise.  It's rank conjecture.

This is a rapidly growing tech company.  Of course costs are going to increase.  And the idea that the market would look at disclosure and say costs are increasing because of use of brushing or bots is just rank conjecture under any pleading standard.  It's not sufficient to allege loss causation.

THE COURT:  Okay.  So understanding what counsel is saying, though, counsel is saying it's a partial disclosure

that, then, when I consider the subsequent reports that speak directly to this issue, the Court can then, I assume, that the market can be understood to have -- the market understood this to be directly tied to the bot activity.

MR. FUMERTON:  Plaintiffs can't do that.

THE COURT:  Why?  Tell me why.

MR. FUMERTON:  Partial disclosure means part of the fraud is revealed to the market which causes the stock price to go down.

They can't say this disclosure didn't reveal any fraud, but the price went down because profits went down.  The company wasn't doing as well.  But later on there's some fraud, so I'm going to work backwards and say the market must have had a time machine and known, months later, the stock price would react negatively to another short-seller report.

Your Honor, this also underscores our entire argument here.  Counsel said, well, the market must have known this was related to the bots because this was already out there.  Well, that's our point.  It's got to be new information.

There's nothing that they can point to concerning the allegations in this complaint that was revealed to the market after the February 25th Grizzly report.

You know what the market did in response to the February 25th Grizzly report?  Absolutely nothing.  That's our point here.  If you go through each of the disclosures, they

either don't reveal anything regarding the alleged fraud, or they're coupled with other information, which, on the face of it, caused the stock price to react.

THE COURT:  Let's keep moving.  We've got a lot to get through.

Next one.  We're going to look at the Citron report April 14, 2020, and the Muddy Waters report May 18, 2020, and May 28, 2020.

Before -- I do have to clarify some dates here, because we were all over the place with some of these dates. So let's first get some clarification.

For purposes of context here, defendants' argument here is that the plaintiffs at this point are citing to the short-seller reports but that these reports cannot serve as corrective disclosures because they did not reveal new information to the market.  Accordingly, to defendants all the information from these reports were already revealed in the Grizzly all right.  (Moving Brief at 33, counsel's additional arguments on the record here today).

Plaintiffs argue that the reports did reveal "extensive new information about the fraud" and followed "GSX's interim denials," so constitute and ultimately constitute corrective disclosures because of that. (Opposition Brief at page 38).

So, counsel for the plaintiff, the Court notes that

Muddy Waters Capital LLC issued two reports -- one on May 18, 2020, and one on May 28, 2020.  Are you alleging that both constitute corrective disclosures?  Because you seem to provide, at least that I can tell, Dr. Knoblock -- at least according to you -- relied on data from May 19th, which is not a correct date -- I think it's May 18th, correct -- and May 28, 2020, Muddy Waters' reports.

You point to May 18, 2020, Muddy Waters' report as a corrective disclosure, but I didn't see you reference the latter report.  So which are we relying on?

If it's both, clarify that for me, and please clarify for me the actual dates because I have dates that go everywhere.  In fact, according to paragraph I think 370, GSX stock fell on May 18th and May 20th, which I don't think correspond to any of the reports at issue in the Muddy Waters reports.

MR. VAN:  Thank you, Your Honor.  We are only relying on one Muddy Waters' report specifically for loss causation, as a loss causation event.

THE COURT:  Which one?

MR. VAN:  The May 18th report.  And that -- the stock price dropped.  It was incorporated into the share price over two different days, over May 18th and May 20th.  That's what our expert tells us.

THE COURT:  For loss causation, you're only relying

on the May 18th?

MR. VAN: And May 20th. It was a two-day drop, based on the disclosures on May 18th.

We're not relying on May 28th when the second Grizzly report came out. And that's only because there was a lot of noise at the time. There were other things in the market that make it impossible to show the statistical significance of that drop.

THE COURT: Similarly, the Citron Research issued two reports on GSX -- one on April 14, 2020, and one on April 30, 2020 -- but the amended complaint only identifies the April 14, 2020, report as a corrective disclosure.

Why is the April 30, 2020, not included?

MR. VAN: It's for the same reason. There was a lot of noise in the market on that day that make isolating the statistical significance of that drop -- making it company specific too difficult. We're just saving everybody some time in expert discovery.

THE COURT: Okay. So we're locking in on only the April 14th, right?

MR. VAN: Yes.

THE COURT: Okay. In your opposition brief you state that these reports revealed "extensive new information about the fraud" to the market. (Docket Entry Number 83 at 38). Can you provide some examples of new information the Citron

report provided to the market that was not already revealed in the Grizzly reports?

MR. VAN:  Absolutely.

THE COURT:  The Grizzly report, singular.

Again, you hear counsel -- and it's Fumerton?

MR. FUMERTON:  Fumerton, yes.

THE COURT:  Fumerton.  You hear Counsel Fumerton talking about like this is a big deal from his advantage point.  That there's nothing new that's revealed.  Everything that was revealed to the market came out in Grizzly.  And guess what happened, nothing happened.  No drop after Grizzly. So he's vehemently arguing that these cannot be corrective disclosures; the Muddy Waters and the Citron cannot be corrective disclosures.

It is incumbent upon you now, on the record, to clarify for me what's new with respect to this extensive information contained in both of these reports.

MR. VAN:  Absolutely, Your Honor.  And I went through it, in part, earlier.

So the Citron report reveals, for the first time, a claim that revenues were overstated by 70 percent.  That is not in Muddy Waters.  It's based on an analysis that is just completely different from Grizzly's.

The analysis, again, is they took the unique enrollments from 20 percent of GSX classes and then they

multiplied those enrollments by the course fees that were being paid. And the figure that they came up with was a revenue figure, a rough approximation of the revenue the company should be getting and it's nowhere near what the company -- it was much less than the company was claiming. None of that analysis was in the Grizzly report. This was totally new.

Muddy Waters was, likewise, a totally new analysis. And they stated, for the first time, that 70 percent of student enrollments were bots. That wasn't said anywhere else.

For the first time, they're saying that -- this was the first time that there was an analysis done of student login activity, where they went through and identified four separate types of anomalies that can really only be explained by the operation of bots. They're not the sorts of activity that you expect if actual humans were logging into the computer. None of that analysis was in the Grizzly report.

So this was all new. It's not like they were just repeating each other. Both analyses were completely different from the Grizzly report.

And there were these interim denials. Even if they were rehashing, which they absolutely were not, these interim denials basically make it so that there's additional evidence that resets the clock, so to speak, on the misrepresentation,

because those denials were misrepresentations, and then a loss causation disclosing those misrepresentations are false.

But there's plenty of new information here.  These were total new analyses.

THE COURT:  Okay.  Let me hear response by counsel for the defendants.

So the Citron and Muddy reports, Counsel, they at least corroborate what's in Grizzly, and, indeed, as counsel said, there's a different analysis.

You don't think that the allegations that are contained, the more specific allegations within the reports are amplifying or, in essence, creating a new analysis that's more specific to bots and brushing?

MR. FUMERTON:  Your Honor, I think the issue is whether it's a plausible inference to think that the market would view the different analysis as materially altering the mix of information available to it.

Your Honor, I think very helpfully, went through the fact that there's five short-seller reports referenced and only two of them they're claiming are corrective disclosures.  The other three, they're not.  Why?  Because the stock didn't do anything.  It's that arbitrary.

Our point is, if by Paragraph 255 -- we can only go off the allegations of the complaint -- the full extent, which is the quote -- detailed the extent to which GSX has brushed

its enrollment figures, overstated its revenue, and engaged in undisclosed related-party transactions.

If that allegation is out there in the market, is it plausible to think that another short seller saying the same thing, albeit maybe with a different analysis, would impact the stock price when you have a stock going sixfold in increase?

This is a stock going from $10 to $60 and change when he filed the complaint. Is it plausible to conclude that the fact that there were some blips on a short-seller report that was rehashing the same thing, that that demonstrated a falsity or revealed falsity to the market?

I think the short-seller reports don't put out information for their health. The fact that they're not even relying on Muddy Waters and Citron follow-up reports as corrective disclosures shows how arbitrary this is.

They're cherry-picking the ones -- they're cherry-picking the reports that were issued on days where the stock prices happened to move, but we know these allegations, by their own admissions, were out there in February 2020 and the stock did nothing.

THE COURT: How about that, Counsel?

MR. VAN: How about what, in particular? I'm happy to --

THE COURT: Address the fact that after Grizzly we

see absolutely no drop. I think it's important for the Court to understand what, why -- are you cherry-picking Muddy Waters and Citron, and are you sort of -- in essence, counsel is saying that it defies logic when these are -- there's no correlation to drops when these alleged corrective disclosures are issued.

MR. VAN: So --

THE COURT: At least with respect to Grizzly.

MR. VAN: Right. So, I guess I should start with this. Whether there's a statistically significant decline in a stock price is the result of an expert analysis, not just of what's happening in the company itself, but a result of everything else that day that's going on in the market. And often you have days where there are all sorts of other things, even in the same industry, happening that affect the prices of other shares that make it impossible for the expert to parse out exactly what the drop in the price was that's specific to that company.

So it's a problem, really, of proof that we're just kind of avoiding now. We couldn't allege this, that these were corrective disclosures. But I think we did it just to save everybody the hassle of expert discovery of going through that process when we know that there's all that noise in the market on those dates. And there was noise, when Grizzly came out, and when these other two reports came out. They just

happened to be noisy days.

Even if that weren't true, Grizzly was the first report and it really didn't have the guts, the same sort of analysis, the plausibility that the Citron and Muddy Waters' reports had.  They were plausible.

Muddy Waters was the most.  Citron was also very plausible just to the analysis that I just suggested and through Muddy Waters' extensive analysis.

Those are -- that's new information that made vastly more plausible, the proposition that this company was a total fraud.  Investors might not have believed Grizzly, perhaps, but once these two additional reports started coming out, they started to perk up.

Also, I would just like to say something about the standard for loss causation, because it's been perhaps misstated by opposing counsel.

This -- I would like to quote from the Supreme Court in *Dura*.  All that's required is the defendant -- that plaintiffs provide "enough factual content to give the defendant some indication of the loss and the causal connection that the plaintiff has in mind."  That's it.

It's not Rule 9(b); it's Rule 8 notice pleading.  All that's required, the Supreme Court says, is some indication of the loss and the causal connection.  This "should not prove burdensome."

This is an indication of the causal connection that we have in mind, that there are these reports coming out showing fraud.

THE COURT:  So, basically, you're saying, based on *Dura* it's enough that the Citron and Muddy Waters' reports corroborate the Grizzly report, and each other, by the way, for them to serve as corrective disclosures?

MR. VAN:  Absolutely.

THE COURT:  Counsel.

MR. FUMERTON:  Your Honor, if the Grizzly report wasn't plausible, which I just heard, I don't know how we're going off of the denials of that implausible short-seller report to show scienter.

I mean what we heard here is that the Grizzly report wasn't plausible but the subsequent ones were.  Well, okay, if that's the case, then how does the CEO's denial of what's in there a denial for scienter purposes of an implausible report? So I think that argument is irreconcilable with their position on scienter.

But more to the point -- and *Dura*, by the way, does not say that it's an 8(a) pleading standard.  That's an open issue as to the particularity required for loss causation. But, again, it's a question of plausibility.  And even assuming a Rule 8(a) standard, if the full extent of the allegations are detailed in a report, which is Paragraph 255,

that's truth on the market.  That market has that information.

Subsequent reports that may have noise, with a stock that's going to $10 to $60 when he files, it's just not plausible, in our view, to conclude that the revelation of any information or new analyses in there had any effect on the stock price, which is what loss causation is.  Thank you.

THE COURT:  Let's move to the next categories.  I'm going to look at the Citi Research report, August 7, 2020; the Citron Research tweets about Citron report, August 7, 2020; the Sylvan Research report, August 9, 2020; and the Forbes article.

I'd like to, again, actually going to flip it now and talk to defense counsel first.

I'd ask counsel, in your motion to dismiss, you argue that the analyst reports downgrading GSX's stock for reasons unrelated to the alleged fraud are not corrective disclosures (Docket Entry Number 82-1 at 34).

What were the bases provided in the Citi Research report and the Forbes article for downgrading GSX's stock?

MR. FUMERTON:  I think the primary basis was that the valuation was too high, that the stock price had increased too rapidly.

But there are all sorts of reasons, Your Honor, that analysts like Citi downgrade stock.  I mean there is no question that the stock price here had increased rapidly.

Our point is -- and there's lot of cases on this -- that the fact that the stock price -- the stock is downgraded by an analyst, where the analyst doesn't refer to new information -- again to new information about the alleged fraud -- that's not sufficient for a corrective disclosure.

THE COURT:  Didn't those articles indicate that GSX's revenues would be less than anticipated?

MR. FUMERTON:  They did, but not because of alleged fraud.  They cited -- they certainly may have cited short-seller reports, but, again, that's information that's already out there.

Plaintiffs allege this stock was traded in an efficient market.  They have to, if they hope to have a class certified.

So the market is presumed already to have digested that information.  The fact that an analyst points to information that's already out there and downgraded a stock is not new information that can affect the stock price for loss causation purposes.

THE COURT:  All right.  Thank you, Counsel.

I'd like to hear from counsel for the plaintiff now.

Do any of these alleged corrective disclosures -- that's the Citi Research report or the Forbes article -- connect GSX's reduced revenues to the alleged brushing or use of bots?

MR. VAN:  No.  But, Your Honor, that isn't -- respectfully, it's not necessary for loss causation.  And again, you can have partial corrective disclosures.

It would be problematic if the rule were different. If we had a rule where you can disclose one day that the revenues are 50 percent overstated, without giving a reason, and then disclose, three days later, that the reason that they're overstated by 50 percent is fraud, and nevertheless suffer all of the drop on the first day -- because that's the day when it's disclosed the company is half as valuable as it used to be -- and have no drop on the date on which it's disclosed this was a fraud, if those things are not -- are separable, it would be highly problematic.

Then you can have companies just say, look, companies that are completely fraudulent, say, look, our revenues are half of what they are, we're not telling you why, and avoid any liability under the securities laws by only later disclosing that the reason the revenues were double -- were half was fraud.

THE COURT:  See, I'm a little confused.  You're conceding at this point that, right now, you're specifically citing Citi Research report and Forbes article, right?  Those articles, in fact, do not speak directly to the use of bots and brushing, right?

MR. VAN:  That's correct.

THE COURT:  Okay.

MR. VAN:  But they are revelations of falsity.  They are revelations that the company's statements of revenues were too high.  And that's what we are alleging was misrepresented.  We're saying that one of the things the company did was it said, "Our revenues are this," and this is the revelation that the revenues are that.

THE COURT:  If those documents do not relate in any way to the brushing or bot activity, I need to hear you on how they revealed the truth about the alleged misstatements.  Which you claim to be that the enrollment figures and stated revenue were falsified through bots and brushing, right?

We're looking to see whether they reveal the truth.  And I just -- I don't know how you're -- what's that step?  I'm missing a step.

MR. VAN:  It's a partial revelation of truth.  There are two components to the revelation.  One is the revelation of the falsity -- revenues are false, revenues are overstated.

And then there's a second component, on a different date, which says revenues were overstated because of fraud.

They are both partial revelations of falsity.

MR. FUMERTON:  Your Honor, I must correct the record.  There's absolutely nothing in the Citi report saying the revenues are false.  There's nothing alleged to say that and there's nothing in the record to support that.  That's just

not in the case.

THE COURT:  Again, can we stick to what I can use, at this stage, what is permissible for the Court to look at, right?  We're looking at, obviously, what's in the amended complaint, Counsel.  So confine your arguments to what's in the complaint, or what you would say is fair based on case law for what the Court can look outside the complaint.  I need you to -- that's the one thing I need you to do is to, let's stay within the fair boundaries of what I can consider at this point.

MR. VAN:  Thank you, Your Honor, and I meant to do that.  I think that the Citi Research report -- I think counsel admitted a moment ago -- it revealed that the valuation of the company was overstated.

Companies are valued based on some multiple of EBITDA of earnings.  So it was just a revelation that --

THE COURT:  Okay.  So it revealed that it was overstated.

MR. VAN:  Yes, that the valuation was --

THE COURT:  So tell me how you're getting -- you called it a partial revelation of truth, right?  So, now, what's the -- tell me what was the misstatement that you're using?

MR. VAN:  Revenues are X.  And this was a revelation that -- revenues and profits, by the way.  The basis for the

valuation of the company is this -- and this is a partial revelation -- that revelation was wrong, was false.

And there is a later revelation or prior -- there are other revelations that the reason that that was the case was fraud. Or it was bots.

MR. FUMERTON: Your Honor, I think it's critical to be precise here. It's one thing for an analyst to say revenues, historical revenues are wrongly stated. That didn't happen here. There's no allegation of that.

What the analyst is saying is the valuation is too high, i.e., we think the stock is going down -- that's their job -- because of -- don't take our word for it -- Paragraph 371, the potentially adverse impacts that U.S. and Chinese regulatory changes could have on GSX's business. That was the basis for the downgrade.

There's nothing in the report saying revenues were false. They're saying the valuation is overstated. Of course they are. If the valuation wasn't overstated you would never sell stock.

The bare legal conclusion, which is in the complaint, is this disclosure partially revealed -- the bare legal conclusion in 371, which need not be credited by this Court, is this disclosure partially revealed that GSX's revenues and profits were overstated due to its falsification of student enrollments.

There are zero factual allegations from that report to support that conclusion.

MR. VAN:  Again, companies are valued, generally, based on some multiple of earnings.  Those are historical earnings that are used that are calculated forward to figure out, you know, the valuation of the company, times ten or some multiple.

So, and the report does have some other things in it, but among the things it has, absolutely is the statement that the company was overvalued, which is an indication that Citi thought that the revenues and profits -- the profits, the earnings of the company were overstated.

So this a revelation that, based on nonpublic analysis being made public for the first time, the profits of GSX were overstated, which is something that we allege was false; the company misrepresented.

THE COURT:  All right, let's move on to looking at the Sylvan Research report, specifically.  Counsel for the plaintiff, stay by the podium.

What do you allege was revealed to the market by that report?

MR. VAN:  Right.  So that revealed that the teaching staff was inflated by a hundred times, which was just a partial revelation that the company was a fake enterprise.

THE COURT:  Yes, but the report didn't -- did the

*United States District Court*
*District of New Jersey*

report -- let me ask you this, and, hopefully, you're going to agree with me.

Did the report reveal that GSX instructors are required to engage in brushing in order to be compensated? No, right?

MR. VAN:  I don't believe so.  I believe it was the revelation of inflated staff.

THE COURT:  But that doesn't go to brushing or bots, right?

MR. VAN:  It goes to the company is being a massively fraudulent enterprise, which is just the central allegation of the complaint.

THE COURT:  I'm going to let counsel respond.

But was there a drop in GSX's stock price on August 9, 2020, to correspond with the issuance of that report, the Sylvan Research report?

MR. VAN:  Yes.  I think it was on August 10th, the drop.  But if we allege it was August 9th, then I'm sure that's correct.

I think it might have been that the disclosure was on a Sunday and the stock price dropped the following day.  That may be it.  I think the drop might have been August 10th, but yes, there was a drop.

THE COURT:  Do you believe the drop in GSX stock price on August 10, 2020, was related to the revelations to

the market about GSX's instructors' qualifications rather than response to Citi Research downgrading of GSX's stock?

MR. VAN:  Well, it's possible there is some overhang from the Citi report --

THE COURT:  There was noise about the Citi report, right?

MR. VAN:  Yes.  All right.  It's possible that some part of the drop on August 10th also relates to the Citi report.  But, surely, like the new information that day is the Sylvan Research report, which is yet another report coming out showing that teaching staff was inflated by 100 times.  A strong indication, again, that this company is a total fake.

This is an indication of the loss of the causal connection that the plaintiffs have in mind, which is really all we need to allege.

THE COURT:  Walk me through how the information regarding GSX's instructors' qualifications be a material consideration for investors.  Because are we talking about qualifications with respect to Sylvan?

MR. VAN:  No.  It's the number of teachers. Primarily, that is the importance of what's revealed.

THE COURT:  Can you walk me through Sylvan?  Maybe I'm missing something.

Tell me what the Sylvan Research report specifically revealed to the market that you say may have contributed to

the drop the next day on the 10th -- August 10th.

MR. VAN:  So it revealed that GSX had inflated the number of its teaching staff by 100 times in its Q12020 6-K.

THE COURT:  Say it again.

MR. VAN:  It inflated the number of its teaching staff by 100 times.

THE COURT:  Okay.  So that is the critical information that you --

MR. VAN:  I think so.

THE COURT:  That you think would speak to or inform the market?

MR. VAN:  Massive fraud, yes, absolutely.

THE COURT:  Okay.  Let me hear from counsel.

So we're not talking about qualifications at this point.  You're talking about --

MR. VAN:  I don't think that that's the focus --

THE COURT:  Okay.

MR. VAN:  -- to be honest, of the Sylvan report.

THE COURT:  Okay.

MR. FUMERTON:  Your Honor said it best, that we can only go by what's in the complaint.  And, again, this is just more rank conjecture.

There's no allegation of fraud here based on inflation of teachers.  This is talking about credentials and the staff, the number of staff being increased.

There's no connection between that and the fake enrollment, or the brushing, or the bots that's the gravamen of the complaint.

Again, we have to go by what's in the four corners of the complaint. And counsel is just speculating, Hey, there's something wrong with the company here, therefore, it could be connected to the alleged fraud we're talking about.

The market couldn't have thought that this is a stock going from 10 to $60. No one is thinking this is a sham company. It was $65 when he filed his amended complaint here. Right?

So the idea that it's plausible the market would look at any issue with GSX completely unrelated to the alleged fraud here and conclude, this is all sham, it's all a fraud, it's all related, it's a partial disclosure. That's what we're hearing over and over again. That's not plausible. Those aren't well-pled factual allegations.

THE COURT: Counsel, what about the fact that, in the face of these alleged corrective disclosures, we have an increase sixfold?

MR. VAN: Thank you, Your Honor, for allowing me to address this because it's been bothering me.

The share price looks like a peaked mountain. It went from -- the IPO shot up from like to $150 billion valuation, then fell, collapsed down to $33 a share. It lost

the overwhelming majority of the value during the class period.  It went like this.

The difference between here and -- there was a massive loss involved in this company.  And just to reiterate, it kept on going.  It is currently valued at $300 million.  It was $150 billion corporation.

THE COURT:  Let me ask you, Counsel, while you're up there, without the Sylvan Research report, do you have any other alleged corrective disclosures that reveal to the market that GSX's instructors are either unqualified or required and engaged in brushing, or in any of the bot-related allegations that you've put forth, not only in your papers but on the record here today?  What else, other than the Sylvan Research report?  What else are you citing to?

MR. VAN:  The two -- the Citron and the Muddy Waters.  Do you want me to go find a citation again?  I'm sorry, I don't have them at my fingertips.

THE COURT:  No, no.  You're saying Citron and Muddy Waters.

MR. VAN:  Citron, Muddy Waters, absolutely.

THE COURT:  Mary Jo, are you good?  Let's take a five-minute break.  It's 1:39.  We'll get back at about -- let's say ten minutes.

THE COURTROOM DEPUTY:  All rise.

(Recess taken from 1:39 p.m. to 2:00 p.m.)

THE COURT:  Back from a break.

We're now going to move to the next area, and that is the Credit Suisse market report, that's October 21, 2020.  Let me make sure I covered all the questions.  The Motley Fool Article, October 21, 2020; the DoNews article, October 21st, 2020.

I want to start with counsel for the plaintiff.  And, Counsel, as with the Citi Research report and the Sylvan Research report, and Forbes article, do any alleged corrective disclosures connect -- do any of these, the ones I just referenced, connect GSX's reduced revenues to the alleged brushing or use of bots?

MR. VAN:  Not directly.  The theory here --

THE COURT:  Not even indirectly, I think.

MR. VAN:  So, well, so it's just proximate causation is the question here for loss causation.  And the theory here is -- like the one that we've seen previously -- where the company was basically coming out and revising its numbers. And that was an indication of the falsity of those numbers and that was a partial revelation that, combined with other revelations in the research reports of fraud, together, caused the losses here.

THE COURT:  Do those articles, in fact, provide other reasons for GSX's anticipated reduction in revenue and for the downgrades of GSX stock?

MR. VAN:  Do the DoNews?

THE COURT:  The ones I just cited.  The Credit Suisse, Motley Fool article, DoNews article.

There's other reasons they seem to cite with respect to the anticipated reduction, right?

MR. VAN:  I think all analyst reports come out with a host of analysis and thoughts.  I think critically, though, they were all coming out with the conclusion that the company was overvalued and that its profits and revenues were, in effect, overstated.

THE COURT:  Did the Credit Suisse report, it cited concerns about GSX's products and strategy, right?

The company no longer benefits from organic traffic growth?

MR. VAN:  Yes, yes.

THE COURT:  I think you have to concede they don't relate in any way to the brushing or bot activity, right?

MR. VAN:  Well, no.  So, there, I think, there actually is something of a connection because it's a revelation that organic traffic growth was falsified.

GSX never really benefitted from organic traffic growth, certainly not to the extent that it was claiming it did.

GSX was creating traffic growth through falsifying traffic.  That's what we allege.  This was fake.

So I think there actually is something more of a direct relation, particularly with respect to the Credit Suisse report to the fraud. In addition to the fact they were downgrading because of -- and showing the partial falsity of the statements of the valuation of the company.

THE COURT: Response?

MR. FUMERTON: Thank you, Your Honor.

And this analysis is similar to what -- the analysis of the Citi report. There is a huge difference between an analyst claiming historical revenues were overstated, fraudulently overstated, which is a very serious charge, and we think in the future revenues will be lower because of, among other things, as Your Honor pointed out, increased competition, mistakes that were made, et cetera.

We concede the short-seller reports allege that there was historical overstatement of revenue. They allege that. There is nothing in these analyst reports that comes close to that.

Any analyst report which is predicting how a stock will perform in the future is saying we think it will be valued lower tomorrow than it is today. That's very different from an analyst saying we think historical revenues are overstated, that there's anything fraudulent going on in the company.

THE COURT: Counsel, you can respond.

MR. VAN:  Thank you.

I think that they're closely related.  If a company is -- if there's been all this talk out in the market saying, look, this company is largely fake, and all the investors are looking to any kind of an indication that that bears out in the number of the company, if the company comes out and says, look, our revenues that we were predicting are going to be way less, or if that's revealed through DoNews and Motley Fool, that is going to lend credence to the fraud.  It's going to make investors say, hmm, it's more likely that this really is fraudulent.  Their revenue are much less than they were suggesting.  That was my point.

THE COURT:  Let's move to the announcement of SEC investigations of GSX, September 2, 2020.  I'm going to start with defense counsel.

Counsel, you cite to *Loos v. Immersion Corp.*, 762 F.3d 880 (Ninth Circuit 2014) to support your contention that the announcement of a SEC investigation cannot be a corrective disclosure.

First, wasn't that case later limited by *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1209-10 (Ninth Circuit 2016), where the Ninth Circuit held that the announcement of a SEC investigation "can form the basis for a viable loss causation theory if the complaint also alleges a subsequent corrective disclosure by the defendant"?

MR. FUMERTON:  Yeah, we agree with that.  We absolutely agree with that.  But, again, the subsequent corrective disclosure is the October 21, 2020, Credit Suisse report that we've just discussed.  There are no subsequent disclosures alleged in this complaint relating to the SEC investigation.

What that case holds, and that other cases do, is say, look, there's an announcement of a SEC investigation and then there's some finding by the SEC or a consent decree or a settlement or an admission of wrongdoing later on.  You can tie it back to the first disclosure.  That doesn't exist here.

Where in the complaint is there a subsequent corrective disclosure relating to the SEC investigation?  It doesn't exist because no investigative body has ever found that this company did anything improper, much less the SEC.  And I think that's where the timeline is critical.  The SEC investigation is September 2 and 3, 2020 -- that's Paragraph 379.

The only remaining loss causation allegations, the only subsequent allegations, Your Honor, are in 381, 382 and 383, which are the ones we just covered regarding --

THE COURT:  Do they have to be subsequent, Counsel?  In New Jersey does it go broader?

MR. FUMERTON:  No, absolutely, it can't go before.  The whole point here is that if you announce that the SEC is

investigating and market -- the stock tanks because people think, oh, there's got to be something here, and if the SEC later finds something, you can tie it back.  There's no there there, because the SEC never found anything and there's nothing alleged to the contrary in the complaint.

Again, it's not also the Ninth Circuit authority.  We also cite the *Martin* case, the Western District of Pennsylvania from 2017.  "The commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure."

There has to be a subsequent corrective disclosure.  Here, there's none.  The only one that's subsequent is one we just covered, and that's the Credit Suisse and Motley Fool articles.

THE COURT:  All right.  I think the rub then becomes whether it has to be subsequent.

MR. FUMERTON:  Your Honor, but, I think if you look at the reasoning of the case, the reasoning is if the SEC opens up a can of worms, opens up an investigation, and it's later determined that that investigation finds wrongdoing, you can connect it back.

Here, there's no further disclosure that has anything to do with the SEC announcement, and I think that's where we fall squarely in line with that authority.

THE COURT:  Let me just ask you, doesn't this --

let's talk about what this district recognizes.  We're looking at *Hull v. Global Digital Solutions* specifically.

Looking at our district, and specifically, is there anything in this case that, in conjunction with the SEC investigation, could the plaintiffs then be relying on?

I'm looking for something.  You say that there's nothing.  The only thing that we have -- so you're hanging your hat on the subsequent to the actual revelation of the SEC investigation.

MR. FUMERTON:  With respect to the SEC disclosure, absolutely, Your Honor.  There has to be something subsequent that gives credence to that SEC investigation or the announcement of that investigation.

Here, we just don't hear about it again.  And the reason is because they can't point to anything else.

THE COURT:  Interesting point.

Can I hear from counsel for the plaintiff?

MR. VAN:  Sure.

THE COURT:  I'm not -- you pretty much can tell, with respect to the oral argument this afternoon, the Credit Suisse report, for me, is not incredibly strong, that market report, October 21, 2020.  If you don't have that, what do you have subsequent to?

MR. VAN:  Subsequent to the SEC?  So the weight of authority in this circuit and the Second Circuit doesn't say

anything like what the Ninth Circuit is saying, that you -- that the SEC announcements of investigations can't be the basis for a loss causation event.  They absolutely can.

THE COURT:  On their own?

MR. VAN:  On their own, yeah.  On their own, they can, in the Second Circuit, and we cite a number of cases that hold basically that.

We're talking about a Ninth Circuit principle here. The weight of authority in this circuit doesn't seem to care about it.  The weight of authority in this district, *Hull* is an excellent case and the reasoning there is solid.

It says the Supreme Court's general principle in *Dura* is that a corrective disclosure need not take a particular form.  That's excellent reasoning.

There's no reason why the announcement of a SEC investigation can't, on its own, be a corrective disclosure.

In any event, there's absolutely no reason that the additional information that this disclosed, beyond the announcement of an investigation, needs to be subsequent.

THE COURT:  That's where we're now having -- this is where we now have the rub.  Because I think in our district the SEC investigation with something else would be enough. Right?  And the something else, we could argue Muddy Waters' report, we can argue Citron, right?

MR. VAN:  Absolutely.

THE COURT: And using that, in connection with something else, in this district, it's not -- I don't think it's a Third Circuit case -- unless you have a Third Circuit case. It's an in-district case, I think. But now I'm hearing, though, that the key is subsequent to the SEC investigation.

MR. VAN: That's a Ninth Circuit concern.

THE COURT: You're saying there is no requirement that it be subsequent to the announcement. That it can be the announcement, in addition with something else?

MR. VAN: Absolutely. Absolutely. And that makes all the sense in the world. And the reason that is the Ninth Circuit was saying, look, if all this ever disclosed that there's an investigation, that's not really a relevant litigation of fraud because an investigation is just an announcement of allegations that aren't really proven. So you need something more to have a complete loss causation story.

But here we have that. Here, we have a revelation of all sorts of various specific reasons why there was a massive, widespread fraud. So the concern the Ninth Circuit had just doesn't apply here. That's consistent with the principle, if that's where you're headed, of saying that SEC investigation can count loss causation events as long as we have something more. And the more here are the Citron and Muddy Waters' reports.

THE COURT:  Do you want to respond?  And I'm going to do something that I wasn't anticipating doing but I think I need to do it.

MR. FUMERTON:  Sure.  Okay.  Your Honor, I'm happy, I hear plaintiff conceded under the Ninth Circuit has to be subsequent.  The only authority we're aware of that addresses the announcement of a SEC investigation is the *Martin* case. It certainly doesn't hold that you can tie it to something before.

Again, we have to step back and look at these allegations as a whole.  When these short-seller reports came out, the stock price was trading in the thirties.  When the SEC investigation was announced, it's in the nineties -- or it's in the eighties, rather, and closes in the high seventies.  So the idea that the market is tying the SEC investigation all the way back to a short-seller report, when the stock was in the thirties, I think is not a plausible connection to draw.

But, again, we would submit the Ninth Circuit is squarely on point, I think as counsel is conceding -- I don't want to overstate that -- and the only case we're aware of that addresses the announcement of an SEC investigation is the *Martin* case.  That's the only case in the Third Circuit we're aware of addressing it.

THE COURT:  Okay.  I think I have enough.

Here is what I'm going to let counsel do right now. I'm going to leave it there, okay?

I have a hard time right now, and I'm having a hard time right now with scienter. I am going -- I honestly think that the plaintiff -- at least what's been alleged -- I really do have to consider the arguments that we've made and the concession that you made with respect to motive and opportunity as it relates to Mr. Chen.

I think counsel effectively used, by saying that by abandoning the motive and opportunity we now have, obviously, the need to plead with specificity, and we may not have that in the amended complaint. And I'm letting you know, I'm going to let you take a moment and address this. Because right now, where I'm at, that's the problem I have here.

And if, indeed, there is an issue with respect to scienter, I tend to agree that the arguments right now that have been forwarded to the Court give me pause with respect to whether the plaintiff has alleged it sufficiently based on the amended complaint.

So you now have a opportunity try to sell me on what's in there. But if it's not in there, I think we know where the rest of this case goes. I'm really struggling with it, Mr. Van.

So I'm going to let both sides sum up here on what -- and again, be very cognizant of what is in the amended

complaint and what's not.  I do not want to hear what's not in it, unless you're then going to say, Judge, give me one last opportunity to amend the complaint, and then I will consider that.

But you're confining yourself in your arguments here and now to what's in the amended complaint and what's fair game for me to consider outside the four corners of that pleading.

MR. VAN:  Absolutely.

So first of all, Your Honor, absolutely, if you choose to dismiss this case -- and we don't feel that's the right course of action, respectfully -- we would certainly welcome a chance to amend.  There's plenty more that can be said.  This case should not be dismissed.  This is an outrageous fraud.

The clearest basis for scienter is their dispositive controlling opinion of *Avaya* that is completely indistinguishable from this case.  It required only three things to show recklessness.  Remember *Avaya*.  It didn't say anything about motive.

Again, the Supreme Court says that you don't need to show motive.  It didn't say anything about specificity.  In fact, it specifically said that shareholders' failure to identify the precise means by which the defendants have learned of discounting was not determinative.

Instead, they said you need only --

THE COURT:  If you're relying on *Avaya*, give me your best case for scienter based on what you've pled.

MR. VAN:  The best case other than *Avaya*?  You mean the best arguments?

THE COURT:  Best arguments.

MR. VAN:  Absolutely.

THE COURT:  You now have to boil down for me, very concisely, what allegations this Court can use.  And again, understanding the heightened pleading here.  All right?

I need to hear it because I honestly think you've got a problem, but maybe you don't.  Sell me on it right now.  What do you got?  What's the best thing?

MR. VAN:  So *Avaya* required only three things to show *Avaya*.  This is on page 270 of *Avaya*.

It says, "Given the specificity and repetition of analyst questions in denials..."

THE COURT:  Go slow enough so we can all follow, especially Mary Jo.

MR. VAN:  Okay.  It required three things:  The specificity and repetition of denials, we have that here.  Specific repeated denials.  Two, the position as CFO.  We have that here.  It was the CFO and the CEO.  And three, the alleged state of the business.  We have that here.

THE COURT:  The alleged what?

MR. VAN:  The alleged state of the business, which was that 50 percent of it was fake.  This is controlling.

It's impossible for me to see how this case doesn't determine the outcome of scienter for the entire period following the beginning of the denials.

THE COURT:  So you then have the allegations in this case, citing to the paragraphs are?  Take me through the three with what you are alleging that's in the complaint right now.

I agree those were identified by *Avaya*.  I'm not disputing that.  Now, I need you to just tell me what do we have in this case?

MR. VAN:  So, for the denials, I think the denials begin on page 388, or around 388, 390, Paragraph 393, 394, 395.  If we walk through each of those denials, they are in there.

The second, the defendants were a CFO and CEO that, I think, is just undisputed.

And the third is just the state of the business as being 50 percent fake.  There's not a paragraph to cite to that, it's the bulk of the complaint.  It's what we're alleging.

So I don't see any way out of this.  This is dispositive.  I think it's the reason why defendants -- defendants even recognize it by putting it in just a footnote.  That was all they had to say about scienter, really, about

*Avaya.*

So, I'm hoping that --

THE COURT:  Again, so you say, even though you walked away from motive and opportunity, *Avaya* is squarely on point. It cites to those three identifiable factors that the Court can look at.

You say, clearly, you have met them in the allegations, and you've met them by the denials and the various denials that we've gone over on the record here today. You've met them by the nature of the defendants' positions, CEO and CFO, squarely on point.  And then, finally, the allegations, the bulk of the allegations all throughout this is that 70 percent of the enrollments were fraudulent, and that we're talking about 50 percent of revenue being, obviously, as well, implicated.

MR. VAN:  Absolutely.  How could they not have known? How could they not have known?  And that's powerful in *Avaya*.

THE COURT:  Do you want to add anything else?

MR. VAN:  Well, just for the period before, you have -- as we argued previously, a separate basis which is equally, in my mind, dispositive.

It's the inference we just had, the core operations inference, which applies to the start of the class period, combined with the specific allegations about the defendants' having had their hands in teacher performance evaluations.

THE COURT:  That paragraph, though, it doesn't speak to a lot.  Is that the 398 paragraph?

MR. FUMERTON:  Yes.

MR. VAN:  So, it's not just that paragraph.  It's the other paragraphs related to what Shen said about how the performance was related to enrollments.  So how well a teacher did was based on how many students --

THE COURT:  But it's not just -- because 398 is bare bones.

MR. VAN:  Right, it's not just 398.

THE COURT:  So you're going to have to tell me what other paragraphs you're relying on for all of this because it can't be 398.

MR. VAN:  Absolutely.  It's in the record previously. I think it's 109 or 107.  I thought I had it here.

319, 107, 398.

THE COURT:  107, 319 and 398.

MR. VAN:  Right.

THE COURT:  Okay.  I'm going to go back and look at those.

MR. VAN:  Thank you, Your Honor.

THE COURT:  Thank you.

Counsel, you've done your job.  You have me at least struggling with when it comes to scienter.

MR. FUMERTON:  Thank you, Your Honor.

How could they not have known, right?  Massive alleged fraud, affects the core business.  CEO, CFO, president.  Every single one of those allegations was present in Judge Wolfson's decision, which post-dated the *Avaya* and the *National Junior Baseball League* case.  Top of the shelf, CEO, CFO, affected the whole business.

THE COURT:  Instructive but not binding on me.

MR. FUMERTON:  Instructive but not binding.

Here is the key thing.  The denial of wrongdoing can't possibly constitute the strong inference of scienter. The most compelling inference that you need under the Third Circuit's *GSC* decision when you've abandoned allegations of motive and opportunity.  That's the critical framework.

The Court has to start with motive and opportunity and then see what's left.  What's left on recklessness.  What specific allegations are there that these defendants didn't believe their denials, that those weren't genuine denials. What are you left with?

398, we hear it over and over again.  397, 319.  That the CEO was involved with analyzing teacher performance. Analyzing teacher performance does not show that he had access to enrollment inflation or bots related to enrollment.

Counsel says there's other allegations out there. They're not in this complaint.  And this Court is bound by this complaint under Rule 9(b) and the PSLRA.  Under the Third

Circuit's binding *GSC* decision, those allegations have to be particularized and they have to be correspondingly greater strength when you have no motive and opportunity, and that's exactly what we have here.

THE COURT:  Why would amendment be futile?

MR. FUMERTON:  Amendment would be futile because the facts don't exist.  If the facts existed, they've already had one opportunity.  They've spoken with seven confidential witnesses and there's not a word from any of those confidential witnesses that they ever spoke to any of these individual defendants or that any of the individual defendants had access to any of the information that's the subject of the alleged fraud.

That's why scienter -- scienter is a critical independent element.  It's a critical element that the Court must analyze, as this Court is well aware, separate and apart from whether there is an alleged misstatement.

THE COURT:  Thank you, Counsel.

MR. FUMERTON:  Thank you, Your Honor.

THE COURT:  Briefly, respond.

MR. VAN:  Briefly.

Once again, there are only those three, three and only three requirements in *Avaya*.  All three, we've gone through them, we've met.

Recklessness has been shown.  *Avaya* obliterates this

*United States District Court*
*District of New Jersey*

requirement that defendants are trying to say that there had to be some additional, specific access to information.

It says, on page 274, "shareholders' failure to identify the precise means by which the defendants have learned of discounting was not determined."

THE COURT:  The time is now 2:27.  I appreciate everybody's arguments here today.  I'm going to keep them in mind and I'm reserving.

MR. FUMERTON:  Thank you very much, Your Honor.

THE COURT:  Happy holidays, everybody.  Off the record.

MR. FUMERTON:  Same to you, Your Honor.

THE COURT:  I just want to say, Counsel, you guys kept me very busy, kept me very busy at a critical point for me personally, but I appreciate each of your efforts.  Thank you.

(Proceedings concluded at 2:27 p.m.)

- - - - - - - - - - - - - - - - - -

FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Mary Jo Monteleone, RMR, CCR, CRCR
Official Court Reporter

12/19/2022
Date

*United States District Court*
*District of New Jersey*