Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

WU, *et al.*,

                **Plaintiffs,**

        **v.**

GSX TECHEDU INC., *et al.*,

                **Defendants.**

**Civil Action No.: 20-4457 (ES) (JRA)**

**OPINION**

**SALAS, DISTRICT JUDGE**

Plaintiffs bring a putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), implemented by SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Section 10(b)") and 15 U.S.C. § 78j(b) ("Section 20(a)") respectively, against defendants GSX Techedu Inc. ("GSX"), Shannon "Nan" Shen ("Defendant Shen"), and Larry Xiangdong Chen ("Defendant Chen") (collectively, "Defendants").[1]  Before the Court is Defendants' joint motion to dismiss Plaintiffs' Amended Complaint (AC) pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA"). (D.E. No. 82 & D.E. No 82-1 ("Mov. Br.")).  The Court held oral argument on December 16, 2022 (D.E. No. 94 ("Tr.")).  *See* Fed. R. Civ. P. 78(a); L. Civ. R. 78.1(b)(2).  For the reasons expressed herein, the motion is **GRANTED**.

---

[1]     Plaintiffs voluntarily dismissed all claims under Counts Three and Four of the Amended Complaint (D.E. No. 22 ("AC" or "Amended Complaint")) against all defendants. (D.E. No. 73).  Accordingly, all claims against Defendants Xin Fan, Yiming Hu, Ming Liao, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Barclays Capital, Inc., Bank of America Securities, Inc., CLSA Limited, and Goldman Sachs (Asia) LLC have been dismissed. (*Id.*; D.E. No. 83 ("Opp. Br.") at 2 n.1).

I.      **BACKGROUND**

A.  **Factual Background**

This is a putative securities class action brought by investors who purchased stock in GSX between June 6, 2019, and October 20, 2020 (the "Class Period").  (AC at 1).  The lead Plaintiffs are investors Yang Renbin, Robert Angeline, Corey Hays, and Alexandre Tazi.  (*Id*. ¶¶ 12–15). GSX is a Chinese education company that specializes in online coursework and tutoring for students in grades K–12.  (*Id*. ¶ 2).   Defendant Chen is the founder and CEO of GSX (*id*. ¶ 18), and Defendant Shen has been the CFO of GSX since December 2018 (*id*. ¶ 19) (together the "Individual Defendants").

Generally, Plaintiffs allege that GSX fabricated most of its enrollment figures and, thus, committed fraud by inflating its revenue and misstating other financial information throughout the Class Period.  (*Id*. ¶ 3).  Plaintiffs' case rests on the assertion that at least 70% of GSX's students are "bots," that is, fake internet personalities used to boost GSX's enrollment figures.  (*Id*.). Plaintiffs allege that the use of bots and "brushing"[2] to falsify student enrollment figures is pervasive throughout GSX—including by GSX's instructors and tutors (*see, e.g.*, *id*. at ¶¶ 116, 138), GSX's employees (*see, e.g.*, *id*. ¶ 112), third-party companies (*see, e.g.*, *id*. ¶¶ 106, 109), and GSX's subsidiaries (*see, e.g.*, *id*. ¶ 338).  Plaintiffs further allege that because enrollment figures accounted for over 80% of GSX's revenue, at least 50% of GSX's revenue during the Class Period was also falsified.  (*Id*. ¶ 64).  And according to Plaintiffs, GSX's "[u]pper management either knew that their Company was mostly fake, or were so astoundingly reckless in not knowing that their recklessness amounts to scienter."  (*Id*. ¶ 6).  Plaintiffs' allegations are drawn from a number

---

[2]      The Amended Complaint includes the following explanation of brushing: "Bots and fake users are called 'brushing' . . . this can be thought of as a kind of automatic swiping function in an app, with the result that purchases, reviews, likes, comments, or other such fake activities are created."  (AC ¶ 149, n.6).

of sources, including an expert retained by Plaintiffs, interviews with confidential witnesses, reports issued by short-sellers—including Grizzly Research LLC, Citron Research, and Muddy Waters Capital LLC (collectively, the "short-seller reports")—and Defendants' denials of the short-seller reports. (*Id*. at 2 & ¶ 6).

Plaintiffs claim that Defendants made a series of statements that were false or misleading based on the fraudulent scheme outlined above. Specifically, Plaintiffs allege that "GSX repeatedly overstated the size of the growth in its student enrollment figures and its revenues and profits." (*Id*. ¶ 5). Plaintiffs additionally allege that Defendants misstated GSX's teachers' qualifications, its process for hiring instructors and tutors, its related-party transactions, and the reasons for differences in its filings with the United States' Securities Exchange Commission ("SEC") and China's State Administration for Industry and Commerce ("SAIC"), and that Defendants falsely denied the allegations of the short-seller reports. (*See generally id*. ¶¶ 257–336). Plaintiffs cite to 19 different sources containing alleged misstatements, including Defendants' SEC forms as well as statements made by the Individual Defendants on teleconference calls and on the internet during the Class Period to support their securities claims. (*Id*. ¶¶ 257–360). These statements correspond to eleven categories of alleged misrepresentations, which are described in more detail below.[3]

According to Plaintiffs, "[b]ased on its known or reckless misrepresentations about its student enrollment, revenue and profit figures, GSX exploded in market capitalization from around $6 billion to over $30 billion in only 2.5 months." (*Id*. ¶ 7). However, "[a]s the truth about GSX's

---

[3]       In their opposition, Plaintiffs identify eight categories of misrepresentations. (Opp. Br. at 12–13). For purposes of this Opinion, the Court will rely on the eleven categories specifically delineated in the Amended Complaint.

fraud emerged over a series of disclosures . . . GSX's share price has fallen dramatically," resulting in losses to Plaintiffs.  (*Id.*).

### B.  Procedural History

Plaintiffs initiated this action on April 17, 2020.  (D.E. No. 1).  On November 2, 2020, Plaintiffs filed their Amended Complaint, bringing claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  (AC ¶ 1).  On February 7, 2022, Defendants filed the instant motion to dismiss, which was fully briefed.  (*See generally* Mov. Br.; Opp. Br.; D.E. No. 84 ("Reply")).  On December 16, 2022, the Court held oral argument on the motion.  (*See generally* Tr.).  The Court is prepared to rule.

## II.    STANDARDS OF REVIEW

Under Rule 12(b)(6), a complaint may be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The burden is on the moving party to show that the plaintiff has not stated a facially plausible claim.  *See Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).  In evaluating a plaintiff's claims, the Court considers the allegations in the complaint, as well as the documents attached to and specifically relied upon or incorporated therein.  *See Sentinel Tr. Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary

4

judgment." (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)) (internal quotation marks omitted)).

Section 10(b) and 20(a) claims must also meet the heightened pleading requirements of Rule 9(b) and the PSLRA.  Rule 9(b) states that when "alleging fraud . . . a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "In order to satisfy Rule 9(b), a complaint must provide all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue."  *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)) (internal quotation marks omitted).  "Rule 9(b)'s particularity requirement 'is comparable to and effectively subsumed' by the requirements of § 78u–4(b)(1) of the PSLRA."  *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (quoting *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008)).

"The PSLRA imposes two exacting and distinct pleading requirements for securities fraud actions."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).  First, a complaint bringing a Section 10(b) or Section 20(a) claim based on either "an untrue statement of a material fact," or an omission of "a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading," must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see also In re Aetna*, 617 F.3d at 277–78.  The Third Circuit has described the required state of mind as one "'embracing [an] intent to deceive, manipulate, or defraud,' either knowingly or recklessly."  *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Avaya*, 564 F.3d at 252) (alteration in original).  The PSLRA thus "unequivocally raised the bar" for pleading scienter.  *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (alteration in original) (citation omitted).

## III.   DISCUSSION

### A.  Section 10(b) Claims

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *see also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 382 (2014) (citing 17 C.F.R. § 240.10b–5 (2013)).  The "imputation [of securities law violations] to an employer is proper based on 'acts committed by one of its agents within his actual or apparent scope of authority.'"  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 496 (3d Cir. 2013) (alteration added) (quoting *In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 243 (3d Cir. 2003)).

"To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove

> (1) a material misrepresentation or omission by the defendant;
> (2) scienter;
> (3) a connection between the misrepresentation or omission and the purchase or sale of a security;
> (4) reliance upon the misrepresentation or omission;
> (5) economic loss; and
> (6) loss causation."

6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013).  Here, the elements in contention are (i) material misrepresentation or omission, (ii) scienter, and (iii) loss causation.

Plaintiffs identify eleven categories of alleged misrepresentations or omissions—or reasons why Defendants' statements were false or misleading (the "alleged misrepresentations")—as follows:

    i.    GSX "failed to disclose that instructors and tutors were required (i) to skim and replicate private user data from social media platforms, and (ii) to assume the identities of those users to purchase and enroll in GSX courses and then sign-in to those online courses, all as conditions precedent to receiving their base salaries and compensation bonuses" (*see, e.g.*, AC ¶¶ 293 & 320);

    ii.    GSX "failed to disclose that it routinely hired instructors and tutors with no in-person interview or demo course" (*id*. ¶ 328);

    iii.    "GSX did not disclose that throughout 2018 and 2019, Beijing Yuntu and all of the [variable interest entity ("VIE")] subsidiaries (*i.e.*, the subsidiaries of BaiJiaHuLian Technology Co., Ltd.) had contractual employment arrangements in which employees of Beijing Yuntu and other subsidiaries of BaiJiaHuLian Technology Co., Ltd., including but not limited to Beijing Youlian Jiazhang Jia, would, pursuant to their contracts with GSX, (a) use software bots to falsify student enrollments in GSX courses and to falsify logins to those online courses, (b) assume the identities of student users to falsify student enrollments by purchasing, enrolling in, and signing in to GSX courses, which caused GSX to overstate its revenues, including gross billings, materially, by at least 70% throughout the Class Period" (*id*. ¶ 338 (alteration added));

    iv.    "[T]he differences between [GSX's] filings with the SAIC and with the SEC cannot be explained by differences between the generally accepted accounting principles of China and the United States" (*id*. ¶ 340 (alteration added));

    v.    "[T]he allegations in Grizzly Research's report, dated June 2, 2020, including the allegations that the company was inflating student enrollments and revenue, were not false . . . [and] GSX does not strictly comply with all relevant legal and regulatory requirements, as its hiring of teachers without any teacher

qualifications violates Chinese law" (*id*. ¶ 354 (alteration added));

vi. "More than half of GSX's revenues and profits, including gross billings, were falsified, throughout the Class Period" (*see, e.g.*, *id*. ¶¶ 277 & 283);

vii. "GSX routinely falsified at least 70% of its student enrollment by (a) using software bots to falsify student enrollments in GSX courses and to falsify logins to those online courses and (b) engaging third parties as well as its instructors and tutors to assume the identities of student users to purchase and enroll in GSX courses and then sign-in to those online courses" (*see, e.g.*, *id*. ¶¶ 271 & 289);

viii. GSX "failed to disclose that its purported revenue increase was due primarily to its falsified student enrollments" (*id*. ¶ 258);

ix. GSX "failed to disclose that its purported success was due primarily to its falsified student enrollments" (*see, e.g.*, *id*. ¶¶ 283, 299 & 314);

x. (i) Muddy Waters's allegations "were not false" (*id*. ¶ 350); (ii) "burst joiners and precise joiners are not at all caused when classes transition from tutors to instructors"(*id*.); (iii) "early joiners are not students who sign in early to participate in tutor's prep sessions" (*id*.); (iv) "the IP overlap rate between students, instructors and tutors in the full dataset for all of the Company's paid classes between January and March 2020 is not only 0.78%"(*id*.); (v) "the job postings for individuals with skills to 'jailbreak' cellphones were not job postings for []engineers . . . and the work sought in the job posting directly concerned 'maintaining bot farms'" (*id*. ¶ 352 (alteration added));

xi. "GSX failed to disclose that a material percentage of its cost of revenues, selling expenses, and research and development expenses, were in fact expenses paid to third-party brushers to assume the identities of student users to purchase and enroll in GSX courses and then sign-in to those online courses, and to write false reviews of the courses" (*see, e.g.*, *id*. ¶¶ 285 & 305).

For the reasons explained below, the Court finds that Plaintiffs have failed to adequately plead the material misrepresentation or omission element of their Section 10(b) claims as to categories (i) through (v) of alleged material misrepresentations, and that Plaintiffs have failed to

8

adequately plead the scienter element as to categories (vi) through (xi) of alleged material misrepresentations.  As such, Plaintiffs' Section 10(b) claims are **DISMISSED**.

### 1.   Material Misrepresentations or Omissions (Categories (i)–(v))

As noted above, a complaint bringing a Section 10(b) or Section 20(a) claim that is based on "an untrue statement of a material fact," or an omission of "a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading," must (i) "specify each statement alleged to have been misleading," (ii) provide "the reason or reasons why the statement is misleading," and (iii) "if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  In other words, in addition to stating with particularly each statement alleged to be misleading, a complaint must plead with particularity facts which, if true, make the statement false or misleading and must also plead with particularity the bases for those "true facts."  *Cal. Pub. Emps.' Ret. Sys. V. Chubb Corp.*, 394 F.3d 126, 145–46 (3d Cir. 2004) ("[W]ith respect to the 'true facts' allegations, which are pled on information and belief, the PSLRA requires Plaintiffs to 'state with particularity all facts on which that belief is formed.'") (citing 15 U.S.C. § 78u-4(b)(1)).

When a plaintiff relies on information from confidential witnesses, the witnesses need not be named as long as they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013).  Moreover, a court should assess "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  *Chubb*, 394 F.3d

at 147.  The court should not be left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor.  *Id*. at 148.  Thus, the complaint should allege facts to support the probability that the source possessed the information alleged.  *Id*. at 155.  This includes by alleging "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information."  *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 290 (D.N.J. 2007) (citing *Chubb*, 394 F.3d at 147).

Here, apart from category (v), as explained below, Plaintiffs have adequately identified the statements alleged to be misleading and provided the reason(s) they are misleading.  In the section titled "Defendants' False and Misleading Statements," Plaintiffs list in chronological order the sources containing alleged misstatements, including GSX's SEC filings and earnings reports and statements made by the Individual Defendants on teleconference calls with investors and in public statements from March 19, 2019 through September 2, 2020.  (AC ¶¶ 257–360).  The Amended Complaint includes "long block quotes in this section containing the alleged misrepresentations" and "identifies who made the statements and when they were made."  *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 538 (D.N.J. 2010); (*see* AC ¶¶ 257–360).  This is sufficient to meet the first requirement of the PSLRA—that each misstatement be identified with particularity.

As to each alleged misstatement, Plaintiffs "assert[] reasons why the statements made therein were false or misleading."  *Pharmanet*, 720 F. Supp. 2d at 538.  These reasons correspond to the categories of alleged misrepresentations outlined above.  (*See supra*, at 7–8).  Thus, the Court finds that Plaintiffs sufficiently identify the reason or reasons why each statement is misleading—the second requirement of the PSLRA.

However, because "Plaintiffs' claims are brought upon personal knowledge as to their own acts, and upon information and belief as to all other matters" (AC at 2), Plaintiffs must plead with particularity facts supporting their information and belief as to each category of alleged misrepresentations in order to meet the final pleading requirement of the PSLRA.   For the following reasons, Plaintiffs fail to plead with particularity facts to support categories (i) through (iv) of alleged misrepresentations and, accordingly, Plaintiffs' Section 10(b) claims predicated on these categories of alleged misrepresentations are **DISMISSED**.

*Categories (i)–(ii): Hiring Process and Salary for Instructors and Tutors*.   Plaintiffs identify two categories of misrepresentations regarding how GSX hires and compensates its instructors and tutors.[4]

*First*, Plaintiffs allege that Defendant Shen misrepresented the compensation structure for instructors and tutors during earnings calls with investors on November 5, 2019 and February 18, 2020, and in a response letter to the SEC on April 19, 2019.  (AC ¶¶ 264, 293 & 320).   On the calls, Defendant Shen explained that instructors' compensation is composed of a base salary, a performance-based salary, and a share-based compensation, and that tutors' compensation is "tied to the Company's 'traffic distribution' and 'sales conversion' rates."   (*Id*. ¶¶ 292 & 319). According to Plaintiffs, these statements by Defendant Shen were "materially false and misleading because the Company failed to disclose that instructors and tutors were required (i) to skim and replicate private user data from social media platforms, and (ii) to assume the identities of those users to purchase and enroll in GSX courses and then sign-in to those online courses, all as

---

[4]     The Amended Complaint includes the additional allegation that GSX hires "teachers" without any teacher qualifications in violation of Chinese law.  (AC ¶ 354).  Though the Amended Complaint contains a number of sources that lend support to this allegation, the Court will not assess the reliability of those sources because the only alleged misstatement connected to this allegation in the Amended Complaint is GSX's alleged denial of Grizzly Research's follow-up report on June 3, 2020, which the Court finds was not identified with sufficient particularity.  (*See infra* at 21–22).

conditions precedent to receiving their base salaries and compensation bonuses." (*Id*. ¶¶ 293 & 320).

Defendants argue that Plaintiffs have proffered insufficient facts to support this allegation. (Mov. Br. at 26–27). Specifically, Defendants argue that Plaintiffs rely on statements from an unreliable confidential witness—referred to as "CW-4"—as support for this allegation, and that CW-4 "alleged only that she was pressured to make sales, not that management required anyone to create false accounts." (Reply at 13). In response, Plaintiffs argue that the statements of CW-4 "that the company exerted pressure to falsify student enrollments or face termination on 'teachers,' and that '[teachers] whose sales records remained low were fired or demoted'" provide sufficient support for this allegation. (Opp. Br. at 30 (alteration in original)). In the Amended Complaint, the statements of CW-4, as well as two additional confidential witnesses—referred to as CW-2 and CW-6—provide support for the allegation that GSX's teachers were required to harvest private user data from social media platforms and enroll in GSX courses in order to be compensated. (*See* AC ¶ 101, 112, 138). Accordingly, the Court will assess the reliability of these three confidential witnesses and the sufficiency of their allegations as support for this category of alleged misrepresentations. *See Chubb*, 394 F.3d at 147.

CW-2 "is a former GSX . . . engineering manager who worked at GSX's Beijing headquarters beginning in 2015." (AC ¶ 101). According to the Amended Complaint, CW-2 "recalled she entered contracts with certain of the Company's instructors and tutors, pursuant to which GSX agreed to promote their courses with 'ads' and other promotional materials in exchange for the instructors' and tutors' agreements to purchase fake enrollments." (*Id*. ¶ 107). Under this scheme, "no financial consideration was exchanged." (*Id*.).

As explained above, to rely on a confidential witness, a complaint must allege facts demonstrating that the witness was in a position to possess the information alleged.  *Chubb*, 394 F.3d 126 at 147.  This includes by alleging "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information."  *Intelligroup*, 527 F. Supp. 2d at 290.  Here, the Amended Complaint includes only the year in which CW-2 started work at GSX—it does not provide any other allegations regarding the time period in which CW-2 worked at GSX, when CW-2 entered into contracts with instructors or tutors, or why, as an engineering manager, CW-2 was in a position to have been entering contracts on behalf of GSX.  (*See* AC ¶ 101).  And, according to the Amended Complaint, CW-2 started work at GSX in 2015—four years before the start of the class period on June 6, 2019.  (*Id*.)

Additionally, CW-2's quotes in the Amended Complaint seem to be drawn directly from the May 18, 2020 Muddy Waters Report, and the Amended Complaint misconstrues CW-2's statements in that report regarding contracts with teachers.  Though in the Muddy Waters Report CW-2 did allege that GSX engaged in a scheme whereby it contracted with teachers to enroll in courses in exchange for GSX promoting those teachers' courses, CW-2 appears to speak from the perspective of GSX when she states that "I provide RMB 1,000,000[5] and then contract with them [to exchange] for ads," rather than indicate that CW-2 herself entered into these contracts.  (D.E. No. 82-11, Ex. I to Mov. Br. ("Muddy Waters Report") at 12–13 (alterations in original)).  Neither the Muddy Waters Report nor the Amended Complaint provide particularized facts to explain how CW-2 would have learned this information.  Further, CW-2's statements actually contradict the allegation that GSX's instructors and tutors were required to engage in brushing as a condition

---

[5]     RMB appears to refer to Chinese currency.

precedent to compensation because CW-2 alleges that "no financial consideration was exchanged" for brushing.  (AC ¶ 107).  Accordingly, this Court finds that CW-2 is unreliable, and does not support Plaintiffs' belief as to this category of alleged misrepresentations.

CW-4 is a former GSX employee who "worked within GSX's 'Sales and Marketing' department as a 'Course Consultant' for the VIE in Zhengzhou, China from June 2019 through January 2020."  (*Id*. ¶ 112).  According to CW-4, GSX pressured "everyone, from teachers to salespeople to managers" to falsify student enrollments and sales and that "[t]hose whose sales records remained low were fired or demoted." (*Id*. ¶ 116).  In their opposition, Plaintiffs rely solely on CW-4's testimony as support for their allegation that instructors and tutors were required to falsify student enrollments in order to be compensated.  (Opp. Br. at 29–30).  However, the Amended Complaint does not provide sufficient facts to support the probability that CW-4, a course consultant in the Sales and Marketing department of GSX's variable interest entity, would know whether all of GSX's instructors and tutors in all of GSX's brands were pressured to falsify student enrollments. *See Chubb*, 394 F.3d at 150–51 (finding a confidential witness was unreliable in part because the complaint did not explain how a local employee in one area of the business would have knowledge about the company's nationwide statistics in another area).  In fact, most of CW-4's allegations relate to the requirements of course consultants, not instructors or tutors.  (AC ¶ 116).  And CW-4 does not allege that instructors and tutors were required to engage in brushing as a condition precedent to compensation, only that they felt pressured to do so to meet their sales expectations.  (*Id*. ¶¶ 293 & 320).  Thus, CW-4 does not support Plaintiffs' belief as to this category of misrepresentations.

Finally, CW-6 was a GSX tutor for "GSX's Gaotu Classroom brand at the Zhengzhou Center from approximately June 15, 2019 through July 31, 2019." (*Id*. ¶ 136).  According to CW-

6, "the tutors routinely assumed alternative identities to purchase promotional courses to inflate enrollment numbers." (*Id*. ¶ 138).  However, though CW-6's allegations support that GSX's tutors were falsifying enrollment figures, CW-6 provides no allegations regarding whether the tutors were required to do so in order to be compensated.  Further, CW-6 was only employed by GSX for a little more than one month in one of GSX's branches.  CW-6 is thus not in a position to know whether all of GSX's instructors and tutors across all of GSX's brands were required to harvest user data from social media sites and use that data to enroll and sign-in to GSX courses in order to be compensated.  *See Chubb*, 394 F.3d at 150–51; *see also Chan v. New Oriental Educ. & Tech. Grp. Inc.*, No. 16-9279, 2019 WL 2865452, at *12 n.7 (D.N.J. July 3, 2019); *Schaffer v. Horizon Pharma PLC*, No. 16-1763, 2018 WL 481883, at *8 (S.D.N.Y. Jan. 18, 2018) ("[B]ecause CW 3 and CW 5 were not Yahoo! Employees for most of the Class Period, the Court cannot rely on their statements to support claims of false revenue reporting for the entire Class Period.") (citation omitted).

The Amended Complaint does not adequately plead facts to support that CW-2, CW-4, or CW-6 were in positions to know about the compensation structure for GSX's instructors and tutors. And those confidential witnesses' statements do not support Plaintiffs' allegations regarding the same.  Accordingly, the Amended Complaint does not plead with particularity sufficient facts to support Plaintiffs' belief that GSX's instructors and tutors were required "(i) to skim and replicate private user data from social media platforms, and (ii) to assume the identities of those users to purchase and enroll in GSX courses and then sign-in to those online courses, all as conditions precedent to receiving their base salaries and compensation bonuses."  (AC ¶¶ 293 & 320). Accordingly, Plaintiffs' Section 10(b) claims predicated on category (i) of alleged misrepresentations are **DISMISSED**.

*Second*, Plaintiffs allege that in GSX's Form 20-F filed with the SEC on April 3, 2020, GSX claimed that "[p]rospective [teaching] candidates must go through [its] rigorous interview process, including resume screening, in-person interviews, and demo courses." (*Id*. ¶ 327 (citing GSX's April 3, 2020 Form 20-F) (alterations in original)). According to Plaintiffs, these statements were "materially false and misleading because the Company failed to disclose that it routinely hired instructors and tutors with no in-person interview or demo course." (*Id*. ¶ 328). Defendants argue that the Amended Complaint contains insufficient facts to support this allegation, and that "the alleged facts all relate to GSX's hiring process for ***tutors***, not instructors." (Mov. Br. at 27 (emphasis in original) (citing AC ¶¶ 185–90, 327–38)). In response, Plaintiffs direct the Court to the "extensive allegations from CW[-]7" as support for their allegation that GSX's statements about its "rigorous interview process" for instructors and tutors were misleading. (Opp. Br. at 30). The Court notes that the Amended Complaint's allegations regarding GSX's Teacher Application Portal also relate to this category of alleged misrepresentations. (AC ¶¶ 190–92). Accordingly, the Court will assess the reliability of these sources and the sufficiency of their allegations as support for this category of alleged misrepresentations.

CW-7 was an "Account Manager" for GSX's VIE in Changsha from August 15, 2016 through March 31, 2019. (*Id*. ¶ 140). CW-7 "has first-hand knowledge of the actual qualifications of GSX's instructors and tutors because she was responsible for recruiting, hiring, and retaining them." (*Id*.). According to CW-7, "successful candidates often had inferior credentials and less experience than unsuccessful candidates, but were selected for their charisma and photogenic features." (*Id*. ¶ 141). Further, when considering applications from GSX's instructors and tutors looking to transfer to a different GSX brand, CW-7 was allegedly advised to consider their

"previous sales records and the rates at which their students renewed purchases" as "important factors." (*Id*. ¶ 142).

CW-7 ended her employment with GSX's VIE prior to the start of the Class Period—June 6, 2019. Her testimony is therefore unreliable as a source of information for GSX's practices during the entire Class Period. *See Chan*, 2019 WL 2865452, at *12 n.7 (finding that, though not dispositive, the fact that a witness worked before the start of the class period "certainly allows the Court to draw inferences about the extent and relevance of their knowledge"). Further, CW-7's allegations do not support Plaintiffs' assertion that instructors and tutors were hired with no in-person interview or demo course. CW-7 says no such thing, and in fact does not speak to the qualifications of the instructors or tutors at all. CW-7 alleges only that she "was directed to make hiring decisions based *more upon* a candidate's charisma and physical appearance and less on his or her academic qualifications and teaching background." (AC ¶ 187 (emphasis added)). She does not indicate that successful candidates had insufficient academic qualifications or teaching experience or were hired without a rigorous interview process. CW-7's testimony therefore does not provide a sufficient basis for Plaintiffs' information and belief as to this category of alleged misrepresentations.

In addition, the Amended Complaint includes allegations that one GSX brand—Genshuixue—hired instructors with no interview through a "Teacher Application Portal." (*Id*. ¶¶ 190–92). According to the Amended Complaint, "any person with a WeChat account can register to be a teacher after completing 'four simple steps,'" which do not include an interview. (*Id*. ¶ 191). However, the Amended Complaint provides no context for this "Teacher Application Portal" other than that it "appears to be live." (*Id*.). There are no facts regarding whether this portal is used for hiring instructors or tutors, is used to hire for regular courses, is used in multiple GSX

brands, is used in conjunction with other hiring methods, or even whether it is actually used at all. Though the Teacher Application Portal *might* support Plaintiffs' belief that GSX hires instructors and tutors without a rigorous interview process if the Amended Complaint included other supporting facts about the portal, the allegations currently before the Court are insufficient to do so.

Though the Amended Complaint also contains extensive allegations regarding the qualifications of GSX's instructors and tutors, these do not speak to the process by which instructors and tutors are hired.  (*Id*. ¶¶ 184–205).  And many of these sources are not persuasive even as support for the allegation that GSX's instructors and tutors are unqualified.  For example, the Amended Complaint alleges that "[o]f the 27 tutors who have a presence on LinkedIn, none appear to have the requisite teaching credentials, although most have experience in sales."  (*Id*. ¶ 203).  But this aligns with Defendant Shen's statement that "tutors' compensation . . . is tied to the Company's 'traffic distribution' and 'sales conversion' rates."  (*Id*. ¶ 292).  And it is not clear how the allegation that GSX has fewer instructors and tutors with profiles on professional networking sites than its competitors supports Plaintiffs' Section 10(b) claims.  (*Id*. ¶¶ 197–205).

Based on the foregoing, Plaintiffs have not met the pleading standards under the PSLRA for pleading the sources of their belief that GSX hires instructors and tutors without a rigorous interview process.   Plaintiffs' Section 10(b) claims predicated on category (ii) of alleged misrepresentations are **DISMISSED**.

***Category (iii): GSX's Contracts with Subsidiaries***.  Plaintiffs assert that during a conference call with investors on April 9, 2020 and "in response to market reports that questioned whether GSX had engaged in undisclosed related-party transactions," Defendant Shen claimed that GSX had not engaged in any related-party transactions with "Baijia Yuntu" or "BaiJiaHuLian"

but that GSX had engaged in and disclosed a related-party transaction with "Beijing Youlian Jiazhang Jia." (AC ¶ 337). According to Plaintiffs, Defendant Shen's statement was

> materially false and misleading because GSX did not disclose that throughout 2018 and 2019, Beijing Yuntu and all of the VIE subsidiaries (*i.e.*, the subsidiaries of BaiJiaHuLian Technology Co., Ltd.) had contractual employment arrangements in which employees of Beijing Yuntu and other subsidiaries of BaiJiaHuLian Technology Co., Ltd., including but not limited to Beijing Youlian Jiazhang Jia, would, pursuant to their contracts with GSX, (a) use software bots to falsify student enrollments in GSX courses and to falsify logins to those online courses, (b) assume the identities of student users to falsify student enrollments by purchasing, enrolling in, and signing in to GSX courses, which caused GSX to overstate its revenues, including gross billings, materially, by at least 70% throughout the Class Period.

(*Id*. ¶ 338). Defendants argue that "Plaintiffs fail to allege a single material related-party transaction that GSX improperly omitted from its disclosures" and that GSX did disclose related-party transactions with its VIEs. (Mov. Br. at 27). In response, Plaintiffs argue that none of GSX's disclosures on related-party transactions "informed investors that GSX was using these related parties to hide its brushing expenses" as alleged. (Opp. Br. at 30–31 (citing AC ¶ 254)). Defendants counter that the Amended Complaint does not allege any facts "indicating that GSX's alleged 'alter egos' shouldered any of GSX's expenses." (Reply at 13–14).

The Amended Complaint alleges that different companies were hiring employees to work for GSX, and that in this way GSX hid its brushing expenditures. (*See* AC ¶¶ 231–54). Though the Amended Complaint provides some support for the allegation that "shell companies" were hiring employees for GSX, the Amended Complaint does not provide any facts to support that those employees were hired to engage in brushing, or to support the specific allegation that the VIEs were contracted to falsify student enrollment figures through the use of bots and fake identities.

For example, the Amended Complaint alleges that "Youlian" has a fake business address and hires employees to work for GSX at GSX's location.  (*Id*. ¶¶ 242–43).  As support, the Amended Complaint cites to the Citron and Grizzly Reports, which allegedly identified job advertisements from Youlian that listed GSX's address as the location for the jobs.  (*Id*. ¶ 242).  However, the Amended Complaint does not explain how these job postings support that Youlian had a contract with GSX to falsify GSX's student enrollment figures, or how Youlian was hiding GSX's brushing expenses.  Similarly, the Amended Complaint alleges that "[l]ike Youlian, Yuntu contributes to GSX's bottom line by shouldering its employee salaries and other expenses."  (*Id*. ¶ 245).  As support, the Amended Complaint alleges that Yuntu shares an IP address with GSX and does not have its own website (*id*. ¶ 248) and that Yuntu advertised job postings listing the work location as GSX's address (*id*. ¶¶ 249–50).  Again, the Amended Complaint does not explain how these allegations support that Yuntu contracted with GSX to falsify GSX's student enrollment figures, or how Yuntu was hiding GSX's brushing expenses.  Finally, relying on the Citron Report, the Amended Complaint alleges that "Youlian and Yuntu are only two nodes of a vast network of companies owned and controlled by GSX insiders it uses to hide its expenditures."  (*Id*. ¶ 251).  But the Amended Complaint does not connect the "customer acquisition" work allegedly performed by these "shell companies" for GSX to Plaintiffs' allegations that the VIE subsidiaries were contracted to falsify student enrollments by using bots and fake identities.

Accordingly, the Amended Complaint does not plead with particularity facts to support Plaintiffs' belief that the VIE subsidiaries "would, pursuant to their contracts with GSX, (a) use software bots to falsify student enrollments in GSX courses and to falsify logins to those online courses, (b) assume the identities of student users to falsify student enrollments by purchasing, enrolling in, and signing in to GSX courses, which caused GSX to overstate its revenues, including

gross billings, materially, by at least 70% throughout the Class Period." (*Id*. ¶ 338). Thus, Plaintiffs' Section 10(b) claims predicated category (iii) of alleged misrepresentations are **DISMISSED**.

**Category (iv): GSX's Filings with the SAIC and the SEC**. Plaintiffs assert that during a conference call with investors on April 9, 2020, "in response to market reports that questioned the discrepancies between GSX's SAIC filings and its SEC filings," Defendant Shen explained that the discrepancy was due to "a [generally accepted accounting principles] difference between China and [the] U.S. . . . The difference is totally reasonable and legitimate and has nothing to do with operational numbers." (AC ¶ 339 (alterations added)). Plaintiffs allege that this statement was "materially false and misleading because the difference between the Company's filings with the SAIC and with the SEC cannot be explained by differences between the generally accepted accounting principles of China and the United States." (*Id*. ¶ 340).

Defendants argue that Plaintiffs fail to allege why the differences in GSX's filings with the SAIC and the SEC cannot be explained by differences in accounting practices in China and the United States. (Mov. Br. at 27). Plaintiffs do not address this argument. And the Amended Complaint does not identify any facts to support this allegation. Such a conclusory allegation is insufficient even under the pleading requirements of Rule 8, and certainly under the heightened pleading requirements of Rule 9(b) and the PSLRA. Accordingly, Plaintiffs' Section 10(b) claims predicated on category (iv) of alleged misrepresentations are **DISMISSED**.

**Category (v): GSX's Denial of the Grizzly Report**. Plaintiffs allege that on June 3, 2020, in refuting the allegations of the Grizzly Report, GSX stated that it "today refuted the false allegations in Grizzly Research's follow up report, dated June 2, 2020," and that "[t]he Company strictly complies with all relevant legal and regulatory requirements." (AC ¶ 353). Plaintiffs have

not provided sufficient information to identify this alleged misstatement. According to Plaintiffs, this statement was false or misleading because "the allegations in Grizzly Research's report, dated June 2, 2020, including the allegations that the company was inflating student enrollments and revenue, were not false . . . [and] GSX does not strictly comply with all relevant legal and regulatory requirements, as its hiring of teachers without any teacher qualifications violates Chinese law." (*Id.* ¶ 354 (alteration added)). However, the Amended Complaint is devoid of any additional facts about this alleged misstatement by GSX, including the context in which the statement was made, who specifically made the statement, or where the statement was published. And the parties do not specifically address this alleged misstatement. Accordingly, Plaintiffs' Section 10(b) claim predicated on category (v) of alleged misrepresentations is **DISMISSED**.[6]

## 2. Scienter (Categories (vi)–(xi))

"To establish liability under Section 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting *Tellabs, Inc.*, 551 U.S. at 319). Scienter may be pled "by alleging facts that 'constitute circumstantial evidence of either reckless or conscious behavior.'" *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014) (quoting *Avaya*, 564 F.3d at 276). "Recklessness is 'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (quoting *Avaya*, 564 F.3d at 267 n.42); *see also Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017). And any "circumstantial evidence must be supported by detailing, with particularity,

---

[6]   As discussed below, Plaintiffs have not adequately pled scienter as to the remaining categories of misrepresentations, categories (vi) through (xi). As such, the Court does not assess the sufficiency of Plaintiffs' facts supporting their information and belief as to these categories of alleged misrepresentations.

'the who, what, when, where and how' of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind." *Pharmanet*, 720 F. Supp. 2d at 553 (citing *In re Burlington*, 114 F.3d at 1422).

The PSLRA provides heightened pleading requirements for the scienter element of a Section 10(b) claim.  Under the PSLRA, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *In re Aetna*, 617 F.3d at 277–78.  Specifically, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs, Inc.*, 551 U.S. at 323.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  In making this determination, the Court must "consider[] all the arguments presented by the Complaint and assess[] scienter holistically."  *OFI Asset Mgmt. v. Cooper Tire and Rubber*, 834 F.3d 481, 493 (3d Cir. 2016).  Thus, scienter may be inferred even if each of the plaintiff's allegations and arguments are insufficient on their own to support a strong inference of scienter, so long as a strong inference of scienter is supported when all of the allegations and arguments are considered together.  *Avaya*, 564 F.3d at 272 (explaining that, following the Supreme Court's decision in *Tellabs*, "we are hesitant to formulate categorical rules about the sufficiency of different types of allegations in the abstract.  Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance").

Assessing the allegations and arguments before it individually and holistically, the Court finds that the inference that Defendants Chen and Shen acted with scienter when making the

statements alleged to be misleading for the reasons outlined in categories (vi) through (xi) of alleged misrepresentations[7] is not at least as cogent or compelling than the inference of non-fraudulent intent.[8]

Plaintiffs point to two specific allegations to support a finding that Defendants Chen and Shen acted with scienter: (i) they directly denied the alleged fraudulent scheme (*id*. ¶ 384); and (ii) the alleged fraud goes to the core of GSX's operations and is of such great magnitude that Defendants Chen and Shen—as CEO and CFO—must have known about the fraud (*id*. ¶¶ 396–99). Defendants argue that Plaintiffs have failed to sufficiently plead a strong inference of scienter. (Mov. Br. at 28). According to Defendants, the alleged fraudulent scheme "would be economically irrational" and the more compelling inference is that "GSX accurately and timely disclosed issues bearing on their internal controls and internal and external investigations, which have not revealed any fraud." (*Id*. at 32). At oral argument Defendants argued that because Plaintiffs voluntarily withdrew their argument that GSX's shareholders were motivated to commit the alleged fraud in order to artificially inflate GSX's stock price for the SPO[9] and conceded that their argument that Defendant Chen was motivated to commit the alleged fraud is weak,[10] Plaintiffs' circumstantial

---

[7]     Because the Court has already dismissed Plaintiffs' Section 10(b) claims predicated on statements alleged to be misleading for the reasons outlined in categories (i) through (v) of alleged misrepresentations, the Court does not address whether Plaintiffs have adequately alleged scienter as to those categories of alleged misrepresentations.

[8]     The scienter allegations in the Amended Complaint are plead as to the Individual Defendants—Chen and Shen. (*See generally*, AC ¶¶ 384–404). As to Defendant GSX, Plaintiffs allege that because Defendants Chen and Shen acted with scienter, their "knowledge or recklessness . . . is [] imputed to [GSX]." (*Id*. ¶ 404 (alterations added)). Because the Court finds that Plaintiffs have not adequately plead that Defendants Chen and Shen acted with scienter, the Court will not address this argument at this time.

[9]     *See* Tr. 15:1–5 ("[The Court:] Are you still asking the Court to consider the fact that some GSX shareholders sold their shares during the Second Public Offering? If yes, please explain. [Plaintiffs' Counsel]: No, that is not a current component of our scienter arguments.").

[10]     *See id*. 13:11–13:25 ("Among the arguments that defendants raised, I think this among their stronger . . . I think that we should have had more specificity in the complaint regarding that allegation.").

evidence of scienter must be correspondingly greater.  (Tr. at 22:16–20).  Plaintiffs countered they must allege only three things to adequately plead scienter under *Avaya*, which they have done.  (*Id.* at 92:20–24).  As detailed below, the Court agrees with Defendants that Plaintiffs must plead with particularity circumstantial evidence supporting an inference of scienter, and that Plaintiffs have failed to do so, even under the purview of *Avaya*. [11]

According to Plaintiffs, in *Avaya* the Third Circuit found that scienter had been adequately pled based on (i) "[t]he specificity and repetition of denials" of the alleged fraudulent scheme by the defendant; (ii) the defendant's "position as CFO"; and (iii) "the alleged state of the business." (Tr. at 92:20–24).  Plaintiffs argue that all three of these factors are pled in this case, and so, under *Avaya*, they have adequately pled scienter.  (*Id.*).  Defendants argue that *Avaya* is distinguishable because unlike in the present case, in *Avaya* "there were facts alleged demonstrating that the defendants' CFO in that case, by virtue of his position, should have access to the price discounting that was the subject of the alleged fraud" and was nonetheless "issuing blanket denials."  (*Id.* at 16:1–11).  The Court agrees with Defendants.

*First*, unlike in *Avaya*, here the Individual Defendants' denials were not unqualified or "unhedged."  *See Avaya*, 564 F.3d at 270.  Rather, the Individual Defendants' denials included specific reasons why they believed the alleged fraudulent conduct was not happening—for example, they indicated that GSX had reviewed the findings of the short-seller reports and found

---

[11]       Defendants relied on *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) for this argument. (*Id.*).  *GSC* predates *Tellabs* and *Avaya*, which changed the legal landscape for alleging scienter.  Pre-*Tellabs* scienter could be alleged either through allegations of motive and opportunity or through circumstantial evidence of intent or recklessness.  *Avaya*, 564 F.3d at 276.  Post-*Tellabs*, scienter is assessed holistically, and "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."  *Tellabs*, 551 U.S. at 325.  Nonetheless, Chief Judge Wolfson's rationale in *Pharmanet*, which post-dates *Tellabs* and *Avaya*, suggests that circumstantial evidence must still be strong and plead with particularity.  *Pharmanet*, 720 F. Supp. at 553 ("[W]here plaintiffs 'choose to establish[] scienter . . . by asserting circumstantial evidence of intent or recklessness, 'the strength of the circumstantial allegations must be [even] greater.'") (citing *Intelligroup*, 527 F. Supp. 2d at 285) (alterations in original).

deficiencies in the data relied upon in the reports, and a GSX SEC filing indicated that GSX had conducted an independent investigation into the reports' allegations. (*See* AC ¶ 335 (alleging that Defendant Chen stated that the Grizzly Report showed "a lack of basic accounting knowledge"); D.E. No. 82-14, Ex. L to Mov. Br. at 11 ("Prior to the SEC contact, the Audit Committee of the Board of Directors of the Company engaged third party professional advisors to conduct an internal independent review into these reports' key allegations.")). These facts make the Individual Defendants' direct denials of the fraudulent conduct less indicative of scienter than in *Avaya*.

*Second*, even under *Avaya*, the Individual Defendants' direct denials of the alleged fraudulent scheme do not independently support an inference of scienter without particularized circumstantial evidence that the Individual Defendants knew or should have known that those direct denials were false. The Third Circuit in *Avaya* did not state that direct denials of fraudulent conduct *on their own* constitute strong evidence of scienter. Rather, the Third Circuit found that the defendant's direct denials strongly supported scienter in light of the particularized facts alleged in that case, which provided circumstantial evidence supporting how the defendant would have or should have been apprised of the alleged fraudulent scheme and "the risk that his confident, unhedged denials of unusual discounting would mislead investors." *Avaya*, 564 F.3d at 270. As Plaintiffs point out (Tr. 24:1–11), the Third Circuit noted that the plaintiffs' "failure to identify the precise means by which [the defendant] would have learned of the discounting was not determinative." *Avaya*, 564 F.3d at 274. However, the Third Circuit still looked to the particularized facts alleged—including the magnitude of the alleged price discounting; the fact that Avaya's margins "were significantly contracting;" that the CFO was likely "paying close attention" to the margins; and "the temporal proximity of [the defendant's] March denials to the

26

end of the quarter"—in finding that the totality of the evidence supported a strong inference of recklessness.  *Id*. at 271–72.

The district court in *Hall v. Johnson & Johnson* similarly examined the defendants' direct denials in light of circumstantial evidence that the defendants knew or should have known their denials were false.  No. 18-1833, 2019 WL 7207491, at *27 (D.N.J. Dec. 27, 2019).  There, the plaintiffs alleged that the defendants knew that their statements that Johnson & Johnson's talc products were not contaminated with asbestos nor linked to higher risks of cancer were false when made.  *Id*. at *3.  In assessing scienter, the district court reiterated that "a plaintiff must, at least, specifically allege facts constituting strong circumstantial evidence that 'defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'"  *Id*. at *20 (citation omitted).  The district court found that the statements by the defendants that they had been closely following the issue of asbestos contamination in talc products and had reviewed the research regarding it supported an inference that those defendants would have known about the fraud.  *Id*. at *22–25.  The district court also found persuasive evidence that defendants' "repeated, unqualified assurances" were made "in the face of inquiries from the public, and regulatory authorities such as the FDA."  *Id*. at *25.  The district court finally considered that "[t]he internal acknowledgements of potential asbestos contamination in the Talc Products, and the potential association with mesothelioma and ovarian cancer, coupled with the fact that the allegations of fraud relate to a core operation of the Company, collectively, give rise to a strong inference of scienter."  *Id*.  Thus, the district court considered particularized circumstantial evidence which supported how the defendants would have or should have been apprised of the risk that Johnson & Johnson's talc products were contaminated, and that their denials of the same were false.

Unlike in *Avaya* and *Hall*, Plaintiffs here do not allege particularized facts to show how the Individual Defendants would have been made aware of the alleged fraudulent scheme. As Defendants point out, the Amended Complaint does not contain any specific facts to show that the Individual Defendants would have seen a particular document or report, or had a conversation with someone at GSX, that would alert them to the fraudulent scheme. (*See* Tr. at 17:16–19:8). To draw a direct parallel to *Avaya*, the Amended Complaint actually alleges that GSX's financial results at the time the alleged misstatements were made were positive, and that those positive results were themselves misstatements. (*See, e.g.*, AC ¶¶ 298–99; 313–14). There are no particularized facts showing how the Individual Defendants knew or should have known that these financial results, or the Individual Defendants' direct denials of the short-seller reports, were false.

Plaintiffs generally point to Defendants Chen and Shen's positions as CEO and CFO of GSX and the magnitude of the allegations—namely, that the scheme impacted over 70% of GSX's student enrollments and a substantial portion of revenue—as circumstantial evidence that they "must-have-known" that their denials and related statements were misleading. (*Id*. ¶¶ 396–99). The Court finds that this circumstantial evidence is not strong enough to support a strong inference of scienter without more. As Defendants point out, Judge Wolfson considered similar allegations in *Pharmanet* and found them unconvincing. (Tr. at 19:22–20:3). Specifically, Judge Wolfson considered the plaintiff's allegations that the individual defendants must have known about the alleged fraud because of their positions in the company and because the alleged fraud went to the "core business" of the company, invoking the core business doctrine. *Pharmanet*, 720 F. Supp. 2d at 556. In rejecting these bases for alleging scienter, Judge Wolfson explained that "a person's status as a corporate officer, when considered alongside other allegations, can support an inference that this person is familiar with the company's most important operations" but a plaintiff "cannot

rely on this doctrine when it has failed to allege other individualized allegations that [the defendants] had knowledge of the facts at issue." *Id*. The Court finds Judge Wolfson's analysis persuasive and finds that Defendants Chen and Shen's positions with GSX and the alleged magnitude of the fraud are not sufficient without more particularized circumstantial evidence to support a strong inference of scienter.

  Plaintiffs also point to allegations that the Individual Defendants were involved in teacher evaluations as circumstantial evidence that they would have been alerted to the fraudulent scheme. (AC ¶¶ 397–98).   The Court is not convinced.   For this argument Plaintiffs point to three paragraphs in their Amended Complaint which include allegations that GSX's instructors and tutors were compensated based on enrollments in their courses, and that GSX's CEO and senior management team were involved in assessing teacher performance.   (Tr. at 94:22–95:17 (citing AC ¶¶ 107, 319 & 398)).   As these paragraphs demonstrate, Plaintiffs' argument relies on the premises that GSX's instructors and tutors were engaging in brushing, that this would have been evident in the teacher evaluations, and that this evidence would have been significant enough to alert the Individual Defendants that this widespread fraudulent scheme could be true.   But, as explained above, Plaintiffs have not alleged sufficient facts to support their belief that GSX's instructors and tutors were required to engage in brushing.   (*See supra*, at 11–15).   Further, some of Plaintiffs' sources instead suggest that GSX's employees were incentivized to hide their brushing activity from GSX's executives.   For example, CW-4 alleges that course consultants were pressured to meet GSX's targets for converting customers from promotional courses to regular-priced courses and that "for these reason[s], course consultants routinely falsified enrollments and sales."   (AC ¶ 117 (alteration added)).   CW-4's other allegations suggest that GSX's employees were pressured to meet sales demands "because the Company needed 'to make a profit'" and that

"[t]hose whose sales records remained low were fired or demoted." (*Id.* ¶ 116).  A compelling inference is that GSX's employees were engaging in brushing to boost their sales figures, meet these expectations, and retain their jobs—a scheme which would be derailed if GSX's executives were alerted to it.  Accordingly, the Court finds that Plaintiffs' allegation that the Individual Defendants were involved in teacher evaluations does not support a strong inference of scienter.

In sum, assessing the allegations of the Amended Complaint holistically, the Court finds that the inference that the Individual Defendants acted with scienter when making the statements alleged to be misleading for the reasons outlined in categories (vi) through (xi) of alleged misrepresentations is not at least as cogent or compelling than the inference of non-fraudulent intent.  Because Plaintiffs have not proffered sufficient particularized allegations to support the inference that Defendants knew or should have known that their statements regarding GSX's revenue, success, and other financial metrics or their denials of the short-seller reports were false or misleading, Plaintiffs' Section 10(b) claims predicated on categories (vi) through (xi) of alleged misrepresentations are **DISMISSED**.

### 3. Loss Causation

Because the Court has dismissed all of the categories of alleged misrepresentations, the Court need not address whether Plaintiffs have sufficiently pled loss causation.  In the interest of streamlining the process for any future amended complaint, the Court notes that it is not convinced (i) that Plaintiffs have identified at least one corrective disclosure that revealed to the market each of the eleven categories of alleged misrepresentations or (ii) that all twelve alleged corrective disclosures are sufficiently pled as such.

Loss causation requires that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss."  *McCabe v. Ernst & Young,*

*LLP*, 494 F.3d 418, 425 (3d Cir. 2007).  "[A]lthough the Third Circuit has not yet addressed the issue, courts of this district have consistently analyzed loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b)." *Hall*, 2019 WL 7207491, at \*27 (citations omitted). Significantly, "so long as the plaintiff alleges that the public disclosure reveals that the defendant company made false claims, and that based on those disclosures, a corresponding drop in stock price occurred, loss causation is adequately pled." *Hull v. Glob. Digit. Sols., Inc.*, No. 16-5153, 2017 WL 6493148, at \*15 (D.N.J. Dec. 19, 2017).  However, allegations will not suffice for purposes of loss causation if there is no "assertion that any wrongdoing was disclosed to the market." *Pharmanet*, 720 F. Supp. 2d at 561 (noting that "where the price of a security declines for reasons unrelated to the fraud, the investor has no right to recovery").  The Supreme Court in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) has made clear that "loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud." *In re Tellium, Inc. Sec. Litig.*, No. 02-5878, 2005 WL 2090254, at \*4 (D.N.J. Aug. 26, 2005); *see also Hull*, 2017 WL 6493148, at \*11 ("Of course, a plaintiff does not meet the loss causation element if he fails to allege that the drop in the value of a security is related to the alleged misrepresentation.") (citation omitted).

First, the Court is not convinced that Plaintiffs have identified at least one corrective disclosure that revealed to the market each of the eleven categories of alleged misrepresentations. For example, the Amended Complaint does not clearly explain which corrective disclosure allegedly revealed to the market that GSX contracted with its VIE subsidiaries for brushing.  (Tr. 50:21–51:12).  And in order to meet the pleading requirement, Plaintiffs must identify at least one corrective disclosure for each category of alleged misrepresentations pled.

Second, the Amended Complaint identifies twelve corrective disclosures,[12] including: (i) GSX's April 3, 2020 Form 20-F (AC ¶ 361); (ii) an April 14, 2020 Citron Report (*id*. ¶ 366); (iii) a May 18, 2020 Muddy Waters Report (*id*. ¶ 369; Tr. 59:17–24); (iv) an August 7, 2020 Citi Research Report (AC ¶ 371); (v) August 7, 2020 Citron Research tweets about the Citron Report (*id*. ¶ 372); (vi) an August 9, 2020 Sylvan Research Report (*id*. ¶ 375); (vii) an August 10, 2020 article in Forbes (*id*. ¶ 374); (viii) an October 21, 2020 Credit Suisse Market Report (*id*. ¶ 381); (ix) an October 21, 2020 article in the Motley Fool (*id*. ¶ 382); (x) an October 21, 2020 article in DoNews (*id*.); (xi) the announcement of an SEC investigation into GSX (*id*. ¶ 379); and (xii) the announcement of an SEC investigation into iQiyi (*id*. ¶377).  But the Court is not convinced that all twelve corrective disclosures are adequately pled as such.  For example, disclosures (i), (iv), (vii), (viii), (ix), and (x) do not clearly reveal some aspect of the fraudulent scheme to the market. Though at oral argument Plaintiffs argued that these constitute partial disclosures (*see, e.g.*, Tr. 53:4–55:25), this theory seems to be in tension with case-law finding that disclosures that reveal only negative financial information about a company, without connecting those negative financials to the alleged fraud, cannot serve as corrective disclosures.  *See Hull*, 2017 WL 6493148 (collecting cases); *Pharmanet*, 720 F. Supp. 2d at 562 ("The purported 'disclosure' in *Tellium II*, like those offered by Plaintiff, served to merely lower revenue expectations, which is not a disclosure of an alleged scheme.") (citing *In re Tellium Sec. Litig*. No. 02-5878, 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005)).  Further, corrective disclosure (xii), the announcement of an SEC investigation into a different Chinese education company, iQiyi, clearly does not relate to GSX's alleged fraudulent conduct.   Because "exposure of the falsity of the fraudulent

---

[12]     Plaintiffs claim they have identified seven corrective disclosures.  (Opp. Br. at 37).  However, the Amended Complaint cites to twelve different events in the section titled "Loss Causation."  (AC ¶¶ 361–83).

representation" is "the critical component," the Court is not convinced that these corrective disclosures are adequately pled as such at this time. *Hull*, 2017 WL 6493148, at *14. In order to meet the pleading requirement, Plaintiffs must show how each alleged corrective disclosure is related to the alleged fraudulent scheme and reveals new information to the market.

## B.  SECTION 20(a) CLAIM

Section 20(a) provides that every person who, directly or indirectly, controls any person liable under Section 10(b) shall also be liable jointly and severally with and to the same extent as such controlled person. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 146 (2011). "Such liability 'is derivative of an underlying violation of Section 10(b) by the controlled person.'" *Rahman*, 736 F.3d at 247 (quoting *Avaya*, 564 F.3d at 252). "While 'a defendant cannot be held liable as both a primary violator and a controlling person, such alternative theories are permissible at the pleadings stage.'" *In re Bradley Pharms. Inc.*, 421 F. Supp. 2d 822, 830 n.1 (citing *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005)).

Plaintiffs bring a Section 20(a) claim against Defendants Chen and Shen.  Because Plaintiffs' Section 20(a) claims are derivative of their Section 10(b) claims, see *Rahman*, 736 F.3d at 247, and because the Court dismisses the Section 10(b) claims, Plaintiffs' Section 20(a) claims against these defendants cannot survive.  Accordingly, Plaintiffs' Section 20(a) claims against Defendants Chen and Shen are **DISMISSED**.

## C.  CONCLUSION

In sum, Plaintiffs have failed to adequately plead a material misrepresentation or omission as to categories (i) through (v) of alleged misrepresentations, and Plaintiffs have failed to adequately plead scienter as to categories (vi) through (xi) of alleged misrepresentations.  For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** and Plaintiffs' Amended

Complaint is **DISMISSED** *without prejudice*.  Plaintiffs may file an amended complaint within 60 days of this decision.  An appropriate Order accompanies this Opinion.

**Dated:** February 24th, 2023

_____
**Esther Salas, U.S.D.J.**