## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

YANG RENBIN, ROBERT ANGELINE, COREY HAYS, AND ALEXANDRE TAZI, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

v.

GSX TECHEDU INC., LARRY XIANGDONG CHEN, NAN SHEN, XIN FAN, YIMING HU, MING LIAO, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES, INC., BARCLAYS CAPITAL, INC., BOFA SECURITIES, INC., CLSA LIMITED, AND GOLDMAN SACHS (ASIA) L.L.C.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
: 2:20-cv-04457 (ES) (JRA)
:
: **ECF Case**
: **Electronically Filed**
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## MEMORANDUM OF LAW OF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

Justin T. Quinn (ID #019822010)
**ROBINSON MILLER LLC**
Ironside Newark
110 Edison Place, Suite 302
Newark, New Jersey 07102
Telephone: (973) 690-5400

Scott D. Musoff
Robert A. Fumerton (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
Judith A. Flumenbaum (*pro hac vice* pending)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

*Counsel for Defendants GSX
Techedu Inc., Larry Xiangdong Chen, and
Nan Shen*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ........................................................................5

    A.    GSX's Business ................................................................5

    B.    GSX's Public Offerings ........................................................6

    C.    After GSX's ADS Price Triples, a Short Seller Attacks ......................7

    D.    Another Short Seller Attacks GSX in April 2020, Alleging the Same Misconduct as the Grizzly Report ................................8

    E.    Despite Continuing Short Seller Attacks, GSX's ADS Price Skyrockets from $30.00 to $130.00 ..........................................9

    F.    GSX Completes an Internal Review and SEC Inquiry ........................10

    G.    This Action ..................................................................11

ARGUMENT ........................................................................11

I.    PLAINTIFFS AGAIN FAIL TO PLEAD SCIENTER ..............................11

    A.    Plaintiffs Have Already Admitted Failure to Plead Motive ...............12

    B.    Plaintiffs Still Fail To Plead Recklessness ...............................14

    C.    Plaintiffs' Theory is Not More Cogent Than Competing Inferences of Non-Fraudulent Intent ..........................................17

II.    PLAINTIFFS AGAIN FAIL TO PLEAD LOSS CAUSATION ..................17

    A.    The Majority of the Supposed Corrective Disclosures Do Not Relate to Any Alleged Misstatements, Let Alone Reveal Truth ........18

    B.    Self-Interested Short Seller Reports Did Not Reveal Anything New To The Market ..........................................................19

i

III.    PLAINTIFFS AGAIN FAIL TO PLEAD A MISREPRESENTATION......21

    A.    The Company Disclosed the Precise Risks That Materialized ...........21

    B.    Plaintiffs Fail to Plead the Existence of Widespread Misconduct......22

        1.    The CW Allegations are Not Particularized and Do Not Support Plaintiffs' Claims of Widespread Misconduct............24

        2.    Plaintiffs Fail to Allege Particularized Facts To Show That 70% of GSX Online Users Are Bots ...............................28

        3.    Other Allegations Do Not Support Widespread Misconduct................................................................................33

    C.    Plaintiffs' Remaining Theories of Misrepresentation Fail..................35

        1.    Plaintiffs Fail to Plead That the Alleged Conduct Rendered GSX's Financial and Operational Data Misleading..................................................................................35

        2.    Plaintiffs Fail to Plead That Defendants' Denials of Short Seller Reports Were Misleading ....................................39

CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Adolor Corp. Securities Litigation*,
 616 F. Supp. 2d 551 (E.D. Pa. 2009)..............................................................17

*In re Anadigics, Inc., Securities Litigation*,
 No. 08-5572 (MLC), 2011 WL 4594845 (D.N.J. Sept. 30, 2011),
 *aff'd*, 484 F. App'x 742 (3d Cir. 2012) ........................................................12

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007).......................................................................................5

*California Public Employees' Retirement System v. Chubb Corp.*,
 394 F.3d 126 (3d Cir. 2004) ...................................................................*passim*

*In re Campbell Soup Co. Securities Litigation*,
 No. 1:18-cv-14385-NLH-MJS, 2022 WL 6961796 (D.N.J. Oct. 11,
 2022) ............................................................................................................14

*Chan v. New Oriental Education & Technology Group Inc.*,
 Civ. No. 16-9279 (KSH) (CLW), 2019 WL 2865452 (D.N.J. July 3,
 2019) .................................................................................................23, 25, 26

*In re China Valves Technology Securities Litigation*,
 979 F. Supp. 2d 395 (S.D.N.Y. 2013) ..........................................................38

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*,
 713 F. Supp. 2d 378 (D. Del. 2010),
 *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ........................................................15

*Dura Pharmaceuticals, Inc. v. Broudo*,
 544 U.S. 336 (2005)..................................................................................17, 18

*Galati v. Commerce Bancorp, Inc.*,
 220 F. App'x 97 (3d Cir. 2007)..............................................................38, 39

*In re Galena Biopharma, Inc. Securities Litigation*,
 No. 17-929, 2019 WL 5957859 (D.N.J. Nov. 12, 2019)...................36, 39, 40

*Hershewe v. JOYY Inc.*,
No. 2:20-cv-10611-SB-AFM, 2022 WL 1123208 (C.D. Cal. Mar. 9,
2022) .........................................................................................................33

*In re Hertz Global Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) ....................................................................12

*In re Hertz Global Holdings, Inc. Securities Litigation*,
No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017),
*aff'd sub nom. In re Hertz Global Holdings Inc.*, 905 F.3d 106 (3d Cir.
2018) ........................................................................................................13

*Hull v. Global Digital Solutions, Inc.*,
Civ. Action No. 16-5153(FLW), 2017 WL 6493148 (D.N.J. Dec. 19,
2017) ........................................................................................................20

*Institutional Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ....................................................................16

*In re Intelligroup Securities Litigation*,
527 F. Supp. 2d 262 (D.N.J. 2007)..........................................................18

*In re Keyspan Corp. Securities Litigation*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003).....................................................22

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ....................................................................19

*Martin v. GNC Holdings, Inc.*,
No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017),
*aff'd*, 757 F. App'x 151 (3d Cir. 2018) ....................................................19

*Martinez v. Capital One Financial Corp.*,
No. 15-266 (JLL) (JAD), 2016 WL 3129621 (D.N.J. June 2, 2016),
*aff'd sub nom. Martinez v. Capital One, N.A.*, 672 F. App'x 186 (3d
Cir. 2017)..................................................................................................13

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ...............................................................21

*Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) ...................................23, 27, 32, 34

*National Junior Baseball League v. PharmaNet Development Group Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) .......................................................*passim*

*In re Nice Systems, Ltd. Securities Litigation*,
   135 F. Supp. 2d 551 (D.N.J. 2001) ................................................................31

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) .........................................................................13

*Padgett v. RiT Technologies Ltd.*,
   No. 16-4579 (KM) (JBC), 2019 WL 913154 (D.N.J. Feb. 22, 2019).....16, 19

*PAMCAH-UA Local 675 Pension Fund v. BT Group PLC*,
   No. 20-2106, 2021 U.S. App. LEXIS 23189 (3d Cir. Aug. 5, 2021)............17

*Patel v. Zoompass Holdings, Inc.*,
   No. 17-3831 (JLL), 2018 WL 10154207 (D.N.J. Aug. 8, 2018) ..................22

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ............................................................12, 14, 17

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ...........................................................................5

## STATUTES

15 U.S.C. § 78j(b) ................................................................................................11

15 U.S.C. § 78t(a) ................................................................................................11

## PRELIMINARY STATEMENT

Plaintiffs' Second Amended Class Action Complaint (ECF No. 97) ("SAC") fails to cure any of the multiple independent defects that warranted dismissal of the First Amended Complaint (ECF No. 22) ("FAC"). In a thorough and well-reasoned Opinion, the Court dismissed the FAC for failure to state a claim for securities fraud, holding that Plaintiffs failed to plead scienter, likely failed to plead loss causation and failed to plead falsity for the five categories of alleged misrepresentations that the Court reached. (ECF No. 95 ("Op." or "Opinion").) While the SAC abandons some of Plaintiffs' rejected allegations, it continues to press others—namely, that Defendant Gaotu Techedu Inc. f/k/a GSX Techedu Inc. ("GSX" or the "Company") is "mostly a fake company" (SAC ¶ 4) that used "brushing" to artificially inflate its student enrollment, revenue and related metrics.

Plaintiffs continue to base these claims primarily on self-interested short seller reports and do not plead any new particularized facts that support the supposed fraud. The SAC's limited "new" allegations, which focus on certain additional confidential witnesses ("CWs") and analyst reports, add nothing substantive to the prior CWs and analyst reports that the Court found insufficient. Because Plaintiffs have now tried—and failed—to state a claim multiple times, the SAC should be dismissed in its entirety with prejudice.

**First**, Plaintiffs again fail to plead the requisite strong inference of scienter. The SAC largely repeats the scienter allegations from the FAC—even the motive allegations that Plaintiffs abandoned at oral argument (*see* Op. at 24). The Court already rejected Plaintiffs' generic allegations about the magnitude of the alleged fraud, the core operations doctrine, the Individual Defendants' roles as CEO and CFO, and Defendants' denials of any wrongdoing. (*Id.* at 22-30.) These allegations continue to be insufficient in the SAC for the reasons previously identified by the Court, including that Plaintiffs still fail to allege "any specific facts to show that the Individual Defendants would have seen a particular document or report, or had a conversation with someone at GSX, that would alert them to the fraudulent scheme." (*Id.* at 28.)

The SAC tries to bolster these insufficient allegations with four new CWs (SAC ¶¶ 298-318), purported admissions that GSX's CEO and CFO monitored the "marketing budget, sales channels and classes" (*id.* ¶¶ 335-37), and a conclusory assertion that "GSX attempted to cover its tracks" (*id.* ¶¶ 332-34). These do nothing to alter the Court's prior dispositive rulings.

None of the new CWs even claims that GSX engaged in brushing, revenue inflation or any other misconduct—much less that the Individual Defendants knew of or recklessly disregarded such activities. Instead, they merely allege that the Individual Defendants, by virtue of their positions as CEO and CFO, had access to

2

and monitored GSX's marketing expenses, enrollment data, revenue and the like. But there are still "no particularized facts showing how the Individual Defendants knew or should have known that these financial results . . . were false." (Op. at 28.) Even assuming the Individual Defendants did personally monitor GSX's marketing budget, sales channels and classes, Plaintiffs allege no reason they should have suspected anything was amiss. Indeed, as the Court recognized, Plaintiffs' alleged "scheme . . . would be derailed if GSX's executives were alerted to it." (*Id.* at 30.)

The SAC's allegations of a "cover up" similarly make no sense. Plaintiffs claim that "GSX promptly deleted teacher profiles that were exposed as fake." (SAC ¶ 332.) But even if true, that is precisely what a company *should* do. Plaintiffs also allege that "GSX's new signups for June 2020 class soared by 1,000%" after the Grizzly short seller report came out and that "the spike is the result of GSX's attempt to cover its tracks." (*Id.* ¶¶ 333-34.) But they fail to explain how GSX could supposedly cover up its enrollment inflation scheme by further inflating enrollment. At bottom, Plaintiffs' old and new allegations, "individually and holistically," do not give rise to an inference of scienter that is "at least as cogent or compelling [as] the inference of non-fraudulent intent." (Op. at 23-24.)

**Second**, Plaintiffs again fail to plead loss causation. In the FAC, Plaintiffs did not "identif[y] at least one corrective disclosure that revealed to the market each . . . alleged misrepresentation[]" and many of the alleged corrective disclosures

3

were not actually corrective—i.e., they "d[id] not clearly reveal some aspect of the fraudulent scheme to the market." (*Id.* at 30-33.) The SAC alleges no additional corrective disclosures and continues to rely on documents such as GSX's 2019 Form 20-F, a Citi Research report and a Motley Fool article, which the Court already rejected because they "reveal only negative financial information about a company, without connecting those negative financials to the alleged fraud." (Op. at 32; SAC ¶¶ 281-83, 289-90, 295-96.) These remain deficient and independently warrant dismissal. Plaintiffs cannot save their claims by adding conclusory allegations that disclosed expenses were linked to the alleged scheme (SAC ¶ 282) and subsequent short sellers supposedly used "new" analyses to reach the same opinions asserted months earlier by the Grizzly Report (*id.* ¶¶ 285, 287, 291; *see also id.* ¶ 193).

**Third**, Plaintiffs' falsity allegations, which are lifted nearly verbatim from the FAC, again fail to plead a material misstatement or omission. As a threshold matter, Defendants expressly warned of the risk that Plaintiffs claim materialized—*i.e.*, that rogue employees could engage in "fraudulent activities to artificially inflate the popularity of [GSX's] services or course offerings," such as brushing. Regardless, the SAC fails to plead particularized facts supporting Plaintiffs' claim of a widespread, Company-orchestrated brushing scheme. Plaintiffs rely on the same deficient CW allegations the Court already rejected as "unreliable." (Op. at 13-15.) Among other things, Plaintiffs again fail to plead how or when these CWs learned

4

the information attributed to them.  Similarly, Plaintiffs' allegations lifted from short seller reports are too speculative to support a claim, and the SAC itself confirms that the short sellers' conjecture of fraud is implausible.  Finally, the SAC's recycled allegations about certain GSX job posts and other companies' growth rates still have nothing to do with brushing or bots and do not demonstrate fraud.  In any event, even looking past these deficiencies, the SAC again fails to connect the alleged fraud to any of the disclosures that Plaintiffs challenge.

For these reasons, as explained more fully below, the SAC should be dismissed in its entirety, this time with prejudice.

## STATEMENT OF FACTS[1]

### A.    GSX's Business

GSX is a Chinese company that offers online education classes to students in China.  (SAC ¶ 2.)  Throughout the Class Period, GSX's core expertise was in providing K-12 educational and after-school tutoring courses through an online live large-class format.  (*Id.*)  K-12 courses were mainly offered through the Company's

---

[1]  On a motion to dismiss, the Court assumes well-pled factual allegations are true but need not credit conclusory statements or legal conclusions.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).  Exhibits referenced herein are attached to the Certification of Justin T. Quinn, dated June 9, 2023.  All citations and internal quotation marks are omitted, and all emphasis in quotations is added, unless otherwise indicated.

two apps, GSX and Gaotu Ketang.  (*See id.* ¶ 170.)  The Company's revenues depended in large part on recruiting new students and generating paid enrollments.  (*Id.* ¶ 27.)  Revenues generated from K-12 enrollments accounted for over 80% of the Company's total net revenues throughout the Class Period.[2]  (*Id.* ¶ 31.)

## B.    GSX's Public Offerings

On June 6, 2019, GSX conducted an IPO of 19.8 million American Depositary Shares ("ADSs") at $10.50 per share, and filed an accompanying Prospectus and Registration Statement (collectively, "IPO Documents") describing its business and historical financial results.  (*See* Ex. A, IPO Reg. Stmt.)  The IPO Documents warned that GSX has limited control over employee misconduct on its platform, particularly given the frequency of real-time communication between teaching staff and students:

> ***Our brand image, business and results of operations may be adversely impacted by students and employees' misconduct, improper activities and misuse of our platform, many of which are beyond our control.*** We allow teaching staff to engage in real-time communication with our students. Our courses undergo multiple rounds of internal review and pilot testing before being broadly released. . . . However, since we have limited control over the real-time and offline behavior of our students, teaching staff, to the extent any improper behavior is associated with our platforms, our ability to protect our brand image and reputation may be limited.  (Ex. A, IPO Reg. Stmt. at 25 (emphasis in original).)

The Company also specifically warned of the risk of "***fraudulent activities to***

---

[2]    In July 2021, after the close of the Class Period, the Chinese government issued new rules curtailing the business of all for-profit K-12 education companies, prompting changes to GSX's business model.  (SAC ¶ 25 n.2.)

*artificially inflate the popularity of our services or course offerings*," (*id.* at 23), and the ongoing risk that rogue employees could engage in unauthorized activities:

> We are exposed to the risk of other types of employee fraud or other misconduct . . . includ[ing] intentionally failing to comply [with] government regulations, *engaging in unauthorized activities and misrepresentation to our prospective students during marketing activities*, which could harm our reputation. It is not always possible to deter employee misconduct, and the precautions we take to prevent and detect this activity may not be effective in controlling unknown or unmanaged risks or losses, which could harm our business, financial condition and results of operations. (*Id.* at 25.)

Approximately six months after the IPO, GSX conducted an SPO and filed an accompanying Prospectus and Registration Statement containing the same risk disclosures above. (SAC ¶ 345; Ex. B, SPO Reg. Stmt. at 24, 26.) GSX did not issue any new shares. (SAC ¶ 345.) Instead, five of its ten largest pre-IPO shareholders sold their positions into the public market. (*Id.*) The SPO was completed on November 20, 2019, at $14.00 per share. (*Id.*; Ex. B, SPO Reg. Stmt. at Cover Page.) For the remainder of the Class Period, GSX's ADSs never traded below the SPO price. (*See* Ex. C, Stock Chart at 4-10.)

### C.   After GSX's ADS Price Triples, a Short Seller Attacks

In the three months following the SPO, GSX's ADS price tripled to a high of $45.42 on February 24, 2020. (*See* Ex. C, Stock Chart at 4-5.) The day after that peak, short seller Grizzly Research LLC published a report attacking GSX. (SAC ¶ 193; Ex. D, Feb. 25, 2020 Grizzly Rep.) According to Plaintiffs, the 60-page report

"detail[s] the extent to which GSX has brushed its enrollment figures, overstated its revenues, and engaged in undisclosed related-party transactions." (SAC ¶ 193.)

Although the Company initially chose not to provide substantive responses to the Grizzly Report, after a wave of similar short seller attacks against other Chinese companies, GSX held a special investor call on April 9, 2020 to address the Grizzly Report and other issues. (Ex. E, Apr. 9, 2020 Investor Call Tr. at 4.) During the call, GSX's CFO explained that "[a] majority of the data sourced by Grizzly are not accurate, reliable or applicable to our business model" and Grizzly's "methodology in reading the data is extremely flawed." (*Id.* at 5; SAC ¶ 257.)

### D. Another Short Seller Attacks GSX in April 2020, Alleging the Same Misconduct as the Grizzly Report

On April 14, 2020, a second short seller, Citron Research ("Citron"), published another report attacking GSX. (SAC ¶ 284; Ex. F, Apr. 14, 2020 Citron Rep.) The Citron Report alleges the same misconduct as the Grizzly Report, including that GSX overstated its enrollment figures and revenues. (SAC ¶ 285.)

GSX's CEO responded on social media, criticizing the report as "complete nonsense." (SAC ¶ 326.) Referencing allegations of brushed enrollments in 2015 discussed in the Grizzly Report, (*see* Ex. D, Feb. 25, 2020 Grizzly Rep. at 23), he noted that after the 2015 allegations were made, "we punished some of these teachers and institutions, and dealt with some employees who violated our values, but GSX has never condoned brushing." (Ex. G, Chen Weibo Post; *see* SAC ¶ 327.) This

8

statement was consistent with GSX's contemporaneous statements regarding these allegations in June 2015, including that "since GSX commenced its operations in 2014, it has been fighting both brushing and falsifying activities." (SAC ¶ 322.)

The Company also issued a press release that "firmly denied the false and ungrounded allegations raised in a report by Citron Research," and noted "that the report contains numerous errors, unsubstantiated statements, and misinterpretation of information." (SAC ¶ 261; Ex. H, Apr. 15, 2020 Press Release at 1.) Specifically, GSX noted that Citron's allegation of falsified revenue was based on a flawed analysis of just one of the Company's two main apps, excluding from its analysis the Gaotu Ketang app, which "contribut[es] more than a majority of the Company's net revenue from K-12 courses." (Ex. H, Apr. 15, 2020 Press Release at 1.)

Three days after the Citron Report, this Action was commenced. (*See* ECF No. 1.) On that day (April 17, 2020), GSX's ADSs closed at $33.59 per share—more than triple the IPO price. (*See* Ex. C, Stock Chart at 6.)

### E.    Despite Continuing Short Seller Attacks, GSX's ADS Price Skyrockets from $30.00 to $130.00

On May 6, 2020, GSX held its Q1 2020 earnings call, where Company executives again denied the short seller reports, including specifically the allegations of enrollment brushing. (SAC ¶ 329; Ex. I, Q1 2020 Earnings Call Tr. at 14.) Two weeks later, a third short seller, Muddy Waters Capital LLC ("Muddy Waters"), published yet another report attacking GSX. (SAC ¶ 287; Ex. J, May 18, 2020 Muddy

9

Waters Rep.)  The Muddy Waters Report charged the same misconduct as the Grizzly and Citron Reports, including allegations of brushed enrollments.  (*Id.*)  Once again, the Company swiftly responded with a press release that "refuted the false allegations" in the Muddy Waters Report point-by-point.  (Ex. K, May 19, 2020 Press Release.)

Despite these unrelenting short seller attacks and the filing of this lawsuit, GSX's stock continued to soar.  On August 6, 2020, its ADS price reached an all-time high of $131.27—quadrupled its price at the time of the Muddy Waters Report and more than ten times its IPO price of $10.50 per share.  (Ex. C, Stock Chart at 6.)

**F.      GSX Completes an Internal Review and SEC Inquiry**

On September 2, 2020, GSX announced that the SEC had requested certain financial and operating records dating from January 1, 2017.  (SAC ¶ 293.)  The Company stated that it was cooperating with the SEC, and that it had previously "engaged third party professional advisers to conduct an internal independent review into these reports' key allegations."  (Ex. L, Sept. 2, 2020 Press Release at 6.)

On March 1, 2021, the Company announced that its internal review was "substantially complete," and that "[b]ased on the agreed upon scope and procedures performed, the Internal Review did not uncover evidence that would have a material impact on GSX's previously reported financial statements."  (Ex. M, Mar. 1, 2021 Press Release at 1.)  On October 19, 2022—after briefing on Defendants' motion to dismiss the FAC was completed—the SEC notified the Company that it "had

10

concluded its investigation into [the] Company and that, based on the information that the SEC has as of the date of its letter, the SEC did not intend to recommend an enforcement action against [GSX]."  (Ex. N, 2022 Form 20-F at 31, 123.)

### G.    This Action

This Action was initiated on April 17, 2020, three days after the Citron Report. (*See* ECF No. 1.)  On November 2, 2020, Plaintiffs filed the FAC, asserting claims under the Securities Act of 1933—which they later withdrew (ECF No. 68 at 2 n.1)—and Sections 10(b) and 20(a) of the Exchange Act.  15 U.S.C. §§ 78j(b), 78t(a). On February 24, 2023, following oral argument (ECF No. 94), the Court granted Defendants' motion to dismiss the remaining Exchange Act claims without prejudice based on Plaintiffs' failure to plead falsity, scienter and loss causation in various respects.  (ECF No. 95.)  On April 25, 2023, Plaintiffs filed the SAC.  (ECF No. 97.) The SAC abandons Plaintiffs' claims regarding GSX's teacher hiring and qualifications, certain related-party transactions and alleged differences between GSX's U.S. and PRC public filings.  It continues to assert claims that Defendants misrepresented GSX's student enrollments, revenue and related metrics.

### ARGUMENT[3]

## I.    PLAINTIFFS AGAIN FAIL TO PLEAD SCIENTER

The Court should dismiss the SAC because it still fails to "state with

---

[3]    The Court is familiar with the applicable pleading standards, which are set forth in this Court's Opinion and are, therefore, not repeated.  (Op. at 4-6.)

11

particularity facts giving rise to a strong inference" that Defendants acted with scienter. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013). "Scienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud." *In re Anadigics, Inc., Sec. Litig.*, No. CIV.A. 08-5572 (MLC), 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012). A complaint adequately pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 114 (3d Cir. 2018). The SAC largely relies on the same insufficient scienter allegations contained in the FAC and falls far short of meeting this exacting standard.

### A. Plaintiffs Have Already Admitted Failure to Plead Motive

First, the SAC alleges the exact same insufficient motives to commit fraud that Plaintiffs disclaimed during argument before this Court. (*Compare* SAC at ¶¶ 342-45, *with* FAC at ¶¶ 400-03.) In dismissing the FAC, the Court recounted that "Plaintiffs voluntarily withdrew their argument that GSX's shareholders were motivated to commit the alleged fraud in order to artificially inflate GSX's stock price for the SPO and conceded that their argument Defendant Chen was motivated to commit the alleged fraud is weak." (Op. at 24; *see* ECF No. 94 at 15:1-5

12

(withdrawing argument "that some GSX shareholders sold their shares during the" SPO); *id.* at 13:11-25 (admitting the FAC "should have had more specificity" about Defendant Chen's motives).)  But the SAC "rehashes the exact same allegations as the previously dismissed complaint" without adding the specificity Plaintiffs conceded was lacking. *Martinez v. Cap. One Fin. Corp.*, No. 15-266 (JLL) (JAD), 2016 WL 3129621, at *2 (D.N.J. June 2, 2016), *aff'd*, 672 F. App'x 186 (3d Cir. 2017); (*see* ECF No. 94 at 13:11-25).

These allegations remain insufficient.  As before, Plaintiffs do not allege that either Individual Defendant benefited from the SPO, that the non-party "corporate insiders" who sold shares knew of any purported fraud, or that the timing of the SPO supports an inference of scienter, because the alleged fraud began well before the SPO and continued long after. *See Oran v. Stafford*, 226 F.3d 275, 289–90 (3d Cir. 2000); *see also In re Hertz Glob. Holdings, Inc. Sec. Litig.,* No. CV 13-7050, 2017 WL 1536223, at *22 (D.N.J. Apr. 27, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018).

Likewise, the SAC again alleges that "Defendant Chen directly benefitted from the artificially inflated ADS price as a result of the $50 million Margin Loan Facility," (SAC ¶¶ 342-44), but still alleges no facts to suggest there was anything suspicious about the timing or terms of the loan or that "the purported fraud had any impact on the value of Mr. Chen's privately held Class B shares that were pledged as collateral for the margin loan, as opposed to the publicly traded ADS, which, in

13

turn, referenced Class A shares." (ECF. No. 94 at 12:11-25.)

### B.    Plaintiffs Still Fail To Plead Recklessness

Because the SAC again fails to plead motive, "the strength of the circumstantial [scienter] allegations must be [even] greater" and "must be supported by detailing, with particularity, 'the who, what, when, where and how' of the events at issue." *Nat'l Jr. Baseball League v. PharmaNet Dev. Grp. Inc.,* 720 F. Supp. 2d 517, 553 (D.N.J. 2010). Here, the Court's holding that Plaintiffs "have not proffered sufficient particularized allegations to support" a strong inference of scienter (Op. at 30) applies equally to the SAC, which still does not allege that either Individual Defendant "would have seen a particular document or report, or had a conversation with someone at GSX, that would alert them to the fraudulent scheme." (Op. at 28.)

Instead, the SAC simply asserts that Defendants Chen and Shen "had job responsibilities that required them" to know "that GSX's revenues, profits and student enrollments were mostly falsified." (SAC ¶ 298.) But the Court already held that "Defendants Chen and Shen's positions with GSX . . . are not sufficient without more particularized circumstantial evidence to support a strong inference of scienter." (Op. at 29); *see also PharmaNet*, 720 F. Supp. 2d at 556; *Rahman*, 736 F.3d at 247. Plaintiffs addition of "new" CWs regurgitating the Individual Defendants' positions and responsibilities (SAC ¶¶ 299-316, 318) do not remedy this fatal deficiency. Put plainly, "[m]ore of less is not more." *In re Campbell Soup*

14

*Co. Sec. Litig.*, No. 1:18-cv-14385 (NLH) (MJS), 2022 WL 6961796, at *11 (D.N.J. Oct. 11, 2022) (dismissing SAC with prejudice where "the principal difference between the FAC and the SAC is that the SAC added the statements of more CWs without elevating the quality and specificity of their statements").

First, none of the "new" CWs alleges that Defendants had access to specific information contradicting their public statements. Even if Defendants tracked key financial and operating data (SAC ¶¶ 335-37), "[t]here are [still] no particularized facts showing how the Individual Defendants knew or should have known that . . . financial results . . . were false," or resulted from fraud. (Op. at 28.) Indeed, Plaintiffs' sources still suggest that "GSX's employees were incentivized to hide their brushing activity from GSX's executives." (Op. at 28–29.) Likewise, monitoring classes would not have alerted Defendants to the presence of supposed brushers that "assume[d] the identities of and conduct[ed] activities as if they were real students." (SAC ¶76; *see also id.* ¶¶ 68-69, 125); *cf. City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 400 (D. Del. 2010) ("[I]t is the covert nature . . . which distinguishes this case from those where an executive-defendant's examination of routine financial data or other internal company information would have informed him of the falsity of his statements."), *aff'd*, 442 F. App'x 672 (3d Cir. 2011). In fact, the "new" CWs do not even *reference* the misconduct alleged. (SAC ¶¶ 299-316.)

15

Second, the "new" CWs were not in a position to know the information attributed to them.  CW-8 and CW-9 are not alleged to have worked at the Company during the Class Period, (SAC ¶¶ 299, 304), and CW-8, CW-10, and CW-11 were local, low-level employees who would not have knowledge of nationwide practices. (*Id.* ¶¶ 299, 308-16; *cf.* Op. at 14 (citing *Cal. Pub. Emps.'Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 150-51 (3d Cir. 2004)).)[4]

Absent allegations demonstrating that Individual Defendants "should have access to the . . . alleged fraud," (Op. at 25), Plaintiffs' conclusory claims that Defendants issued "unqualified" denials of the short seller report (SAC ¶¶ 319-331) add nothing, "even under the purview of [*Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 272 (3d Cir. 2009)]." (Op. at 25.)  Indeed, the Third Circuit in *Avaya* expressly refused "to formulate categorical rules about the sufficiency of different types of allegations in the abstract." *Avaya*, 564 F.3d. at 272.  Defendants' denials do not suggest they knew of any purported scheme, and regardless, remain distinguishable from those in *Avaya* for the reasons previously identified by this Court. (*See* Op. at 25-28.)  Relatedly, Plaintiffs cannot rely on the "core business" doctrine absent "other individualized allegations that [Defendants] had knowledge

---

[4]  Plaintiffs also assert that "GSX's new signups for June 2020 class soared by 1,000%" after the Grizzly Report came out and that "the spike is the result of GSX's attempt to cover its tracks." (*Id.* ¶¶ 333-34.)  But Plaintiffs offer no basis for this allegation so it should not be credited. *See Padgett v. RiT Techs. Ltd.*, No. 16-4579 (KM) (JBC), 2019 WL 913154, at *7-8 (D.N.J. Feb. 22, 2019).

16

of the facts at issue," which are missing here. *PharmaNet*, 720 F. Supp. 2d at 556.

### C.    Plaintiffs' Theory is Not More Cogent Than Competing Inferences of Non-Fraudulent Intent

Finally, Plaintiffs' theory of scienter is not as cogent or compelling as competing, non-fraudulent inferences. The alleged scheme "does not make sense on the facts alleged," *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572 (E.D. Pa. 2009), as faking revenue by fronting enrollment fees plus commissions to brushers would only result in losses. The more compelling inference is that there was no fraud, let alone any fraud of which the Defendants were aware.

In sum, the SAC offers no basis to depart from the Court's prior holding that Plaintiffs fail to plead a strong inference of scienter.[5]

## II.    PLAINTIFFS AGAIN FAIL TO PLEAD LOSS CAUSATION

Plaintiffs' claims independently fail because they still do not plead a causal connection between GSX's alleged misstatements and any purported loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-48 (2005). To plead loss causation,

---

[5]    Although the Court did not previously address scienter with respect to statements concerning GSX's teacher qualifications, those allegations are also insufficient. (SAC ¶ 274.) Plaintiffs' claim that "GSX promptly deleted teacher profiles that were exposed as fake" (*id.* ¶ 332) does not support an inference of scienter—just the opposite. *See, e.g.*, *PAMCAH-UA Loc. 675 Pension Fund v. BT Grp. PLC*, No. 20-2106, 2021 U.S. App. LEXIS 23189, at *6 (3d Cir. Aug. 5, 2021) (plaintiffs' "allegations also support the inference that BT Group intended to detect and prevent fraud"). The single allegation that Defendant Chen monitored teacher performance (SAC ¶ 339) fares no better. *See PharmaNet*, 720 F. Supp. 2d at 556; *see also Rahman*, 736 F.3d at 247.

17

Plaintiffs must show a price decline following a corrective disclosure revealing the "truth" of a prior misstatement to the market. *Id.* But as the Court previously observed, Plaintiffs' "alleged corrective disclosures . . . [are not] sufficiently pled," because they still have not "identified at least one corrective disclosure that revealed" the truth of an alleged misrepresentation "to the market." (Op. at 30.) The SAC alleges no new corrective disclosures and its revised descriptions of its prior insufficient ones cannot establish loss causation.[6]

### A.    The Majority of the Supposed Corrective Disclosures Do Not Relate to Any Alleged Misstatements, Let Alone Reveal Truth

The Court made clear that Plaintiffs' purported partial disclosures "that reveal only negative financial information about a company, without connecting those negative financials to the alleged fraud, cannot serve as corrective disclosures." (Op. at 32); *see In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 325-27 (D.N.J. 2007) (no loss causation where corrective disclosures addressed issues other than the cause of injury alleged). Here, the April 3, 2020 Form 20-F (SAC ¶ 281), August 7, 2020 Citi Research Report (*id.* ¶ 289) and October 21, 2020 Motley Fool article (*id.* ¶ 295) do not even mention a fraudulent scheme, or connect the supposedly disappointing financial results to the alleged fraud. (Op. at 31 ("The Supreme Court in [*Dura*

---

[6]    The SAC no longer alleges that the August 2020 Citron Research tweets, August 10, 2020 Forbes article, October 21, 2020 Credit Suisse report, October 21, 2020 article in DoNews, or the investigation of an entirely separate company support loss causation. (*Compare* FAC ¶¶ 372, 374, 377, 381-2, *with* SAC ¶¶ 295-97.)

*Pharms. Inc.*, *v. Broudo*, 544 U.S. 336 (2005)] has made clear that 'loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.'").)[7] Plaintiffs' unsupported assertion that "[o]nline and mobile marketing costs were the expense GSX employed to . . . conceal brushing" (SAC ¶ 282), does not change this fact. (*See Infra* Section III.B.1); *Padgett v. RiT Techs. Ltd.*, 2019 WL 913154, at *7 (D.N.J. Feb. 22, 2019).

Similarly, the announcement of an SEC investigation did not reveal anything about the alleged misstatements. (SAC ¶ 293.) Plaintiffs' bare assertion that "investors understood this investigation to concern the fraud" (*id.*) adds nothing. *See Martin v. GNC Holdings, Inc.*, No. 2:15-CV-01522, 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017) ("[T]he commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure and investigations, in and of themselves, [do not] reveal to the market that a company's previous statements were false or fraudulent . . ."), *aff'd*, 757 F. App'x 151 (3d Cir. 2018).

### B.   Self-Interested Short Seller Reports Did Not Reveal Anything New To The Market

As in the FAC, the SAC's remaining alleged corrective disclosures—the April

---

[7]   For this same reason, Plaintiffs' new unsupported allegations that the 20-F and the Motley Fool article were "materialization[s] of undisclosed risk[s]" (SAC ¶¶282, 296) concerning GSX's financials fails. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 176 (2d Cir. 2005) ("[T]hat is a legal conclusion; missing are the necessary allegations of fact to support [it].").

19

14, 2020 Citron Report (SAC ¶¶ 284-85; Ex. F, Apr. 14, 2020 Citron Rep.), the May

18, 2020 Muddy Waters Report (SAC ¶ 287; Ex. J, May 18, 2020 Muddy Waters

Rep.), and the August 9, 2020 Sylvan Research Report (SAC ¶ 291; Ex. O, Aug. 9,

2020 Sylvan Rep.)—are self-interested short sellers repackaging accusations made

months earlier in the February 25, 2020 Grizzly Report.  (SAC ¶ 193 (alleging

Grizzly "published a report detailing the extent to which GSX has brushed its

enrollment figures, overstated its revenues, and engaged in undisclosed related-party

transactions").)  Plaintiffs still do not claim the Grizzly Report was a corrective

disclosure—presumably because there was no substantive drop in the value of

GSX's ADS after it was published.  (Ex. C, Stock Chart at 5.)

As for the post-Grizzly short seller reports, the SAC's newly added (and

unsupported) claims that these already public opinions were derived from "wholly

new analysis" (*id.* ¶¶ 285, 287) cannot establish loss causation.  These short seller

reports did not "reveal *new* information to the market."  *Hull v. Glob. Digit. Sols.,*

*Inc.*, No. 16-5153 (FLW), 2017 WL 6493148, at *14 (D.N.J. Dec. 19, 2017).  Rather,

as the SAC admits, these short sellers at most provided "further evidence" and

additional "analysis to support the claim" already alleged in the Grizzly Report "that

GSX was mostly a fake enterprise."[8]  (SAC ¶¶ 287, 291.)  *See Meyer v. Greene*, 710

---

[8]  Plaintiffs Angeline, Hays and Tazi should be dismissed entirely because they acquired all ADSs after the publication of the Grizzly Report that revealed the alleged fraud.  (*See* ECF Nos. 6-6, 22-1, 22-2.)  Indeed, Plaintiff Tazi acquired

F.3d 1189, 1198-99 (11th Cir. 2013) ("[R]epackaging of already-public information by an analyst or short seller is simply insufficient to constitute a corrective disclosure.").[9]

In sum, Plaintiffs' non-substantive edits to the FAC loss causation allegations do not remedy the defects previously identified by the Court, which independently warrant dismissal.

## III.   PLAINTIFFS AGAIN FAIL TO PLEAD A MISREPRESENTATION

The SAC's remaining theories of misrepresentation should be dismissed because Plaintiffs rely on the same inadequate sources and still fail to plead any facts, much less particularized facts, that show GSX "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." *Chubb,* 394 F.3d at 143.

### A.   The Company Disclosed the Precise Risks That Materialized

Here, Plaintiffs' claims fail because the Company expressly warned of the relevant risks, *i.e.*, that rogue employees could engage in "brushing" and other "fraudulent activities to artificially inflate the popularity of our services or course

---

all ADSs after the Grizzly, Citron and Muddy Waters Reports and thus did not, and could not, suffer any loss based on the alleged misstatements.  (*Id*.); *see also Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013).

[9]   Moreover, the Sylvan Report simply repackaged information available online. (*See* SAC ¶ 291 (Sylvan "compared the online presence of GSX employees with that of its competitors" and "online professional networking profiles").)

21

offerings." (Ex. A, IPO Reg. Stmt. at 23.) "Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003). Here, both the IPO and SPO Documents explicitly warned that GSX was exposed to the risk of employee fraud or misconduct, including "***fraudulent activities to artificially inflate the popularity of our services or course offerings***," (Ex. A, IPO Reg. Stmt. at 23) and unauthorized marketing activities:

> We are exposed to the risk of other types of employee fraud or other misconduct . . . includ[ing] intentionally failing to comply [with] government regulations, ***engaging in unauthorized activities and misrepresentation to our prospective students during marketing activities***, which could harm our reputation. It is not always possible to deter employee misconduct, and the precautions we take to prevent and detect this activity may not be effective in controlling unknown or unmanaged risks or losses, which could harm our business, financial condition and results of operations. (*Id.* at 25.)

Investors were warned of the precise risk that allegedly materialized, *i.e.*, that employees may engage in fraudulent activities like brushing to "artificially inflate the popularity" of GSX's services. (*Id.* at 23.)

## B.    Plaintiffs Fail to Plead the Existence of Widespread Misconduct

Dismissal is also warranted because Plaintiffs again fail to plead particularized facts sufficient to support their main premise—that the majority of GSX's business was fabricated through "brushing" and bots. (*See* SAC ¶ 3.) *See Patel v. Zoompass Holdings, Inc.*, No. CV 17-3831 (JLL), 2018 WL 10154207, at

22

*7 (D.N.J. Aug. 8, 2018) (no misrepresentation where plaintiffs fail to plead the allegedly omitted underlying scheme).

Here, Plaintiffs do not claim to have any personal knowledge of the widespread misconduct alleged, but instead rely entirely on the same conclusory allegations from CWs and self-interested short sellers as in the FAC. Thus, in assessing these allegations, the Court must examine "the detail provided by the . . . sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Chubb*, 394 F.3d at 147. Allegations "that do not comply with the particularity requirements are disregarded." *Id.* at 145; *see also Nat'l Jr. Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 538 (D.N.J. 2010). "Each source must meet the pleading requirements; the sheer volume of confidential sources cited cannot compensate for . . . inadequacies." *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, No. 16-9279 (KSH) (CLW), 2019 WL 2865452, at *9 (D.N.J. July 3, 2019). "Where these requirements are not met, courts must ignore the insufficiently described witness' statements." *PharmaNet*, 720 F. Supp. 2d at 539. In assessing "factual attributions to short seller reports to satisfy pleading requirements in a securities fraud complaint," courts should exercise "similar caution and care as with respect to attributions to CWs." *Miao v. Fanhua Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y.

23

2020).  Plaintiffs' allegations again fail to meet this standard.

### 1.    The CW Allegations are Not Particularized and Do Not Support Plaintiffs' Claims of Widespread Misconduct

Here, Plaintiffs still rely on the same substantive allegations of CW-1 through CW-7 to support their claim that GSX engaged in widespread "brushing" by using bots, employees, and third-party companies to falsely inflate enrollment figures. (SAC ¶¶ 63-95.)

In dismissing the FAC, this Court held that CW-2, CW-4, CW-6, and CW-7 are "unreliable as a source of information for GSX's practices during the entire Class Period," (Op. at 17), because (i) they had left GSX early in or prior to the Class Period, (*id.* at 12-13, 15, 17), (ii) did not have firsthand knowledge of the facts attributed to them, (*id.* at 13), and (iii) were "low-level, locally-sited former employees," *Chubb*, 394 F.3d at 148-49, who were not in a position to know about company-wide conduct (Op. at 14).  Because the SAC repeats these same deficient CW allegations, they should be disregarded for the same reasons as before.

While the Court did not assess the remaining CWs from the FAC—CW-1, CW-3, and CW-5—these CWs present similar pleading deficiencies, and once again cannot support Plaintiffs' claims. [10]  First, these CWs are not described "with sufficient particularity to support the probability that a person in the position

---

[10]  The Court found that the claims those CWs were meant to support failed for lack of scienter.  (Op. at 22 n.6.)

occupied by the source would possess the information alleged." *Chubb*, 394 F.3d at 146. Plaintiffs do not plead how or when any of the remaining CWs learned the information attributed to them, nor do they allege particularized facts demonstrating that their claims are based on firsthand knowledge. *See Chan*, 2019 WL 2865452, at \*10 (disregarding CWs where complaint failed to allege firsthand knowledge).

For example, Plaintiffs fail to allege why CW-1, an Android engineer in the Sales and Marketing Department, knew that "the Beijing headquarters consists of dozens of 'mobile phone rooms,'" and that "[m]ost devices . . . were programmed with bots that would . . . enroll in GSX's promotional courses, log-in to the classes at specified times, and then write positive reviews." (SAC ¶¶ 64-65.) Plaintiffs do not allege that CW-1 personally saw any "mobile phone rooms," enrolled in classes, or that she had firsthand knowledge of what "most" devices were programmed to do. (*Id*.; *see* Op. at 10 ("The court should not be left to speculate whether the [CWs] obtained the information they purport to possess by firsthand knowledge or rumor.")); *see also Chubb*, 394 F.3d at 152-53 (local senior customer service leader not in a position to know that "the *majority* of Chubb's branch offices were manipulating reserves" (emphasis in original)). With respect to CW-3, Plaintiffs do not even allege what her duties were at the purported third-party "brushing" company where she was employed, let alone explain the basis of her knowledge, including the nature of GSX's alleged contracts with her employer, the GSX

25

personnel involved, or the amount of GSX enrollments brushed by her employer. (SAC ¶¶ 75-78.) Moreover, because CW-3 was never employed by GSX, she was not in any position to know whether or how GSX recorded revenue from alleged "fake enrollments" or commissions to third-party brushers. (*Id.* ¶ 78.)

Second, as in the FAC, the CW allegations present significant reliability concerns. The allegations of CW-3 and CW-5 are pulled from various short seller reports. (*See* Ex. J, May 18, 2020 Muddy Waters Rep. at 11–13; Ex. P, Apr. 30, 2020 Citron Rep. at 3–5; Ex. D, Feb. 25, 2020 Grizzly Rep. at 24–27.) These allegations must be treated with caution due to (i) the short sellers' obvious self-interest, (ii) the multiple layers of hearsay involved, and (iii) Plaintiffs' vague pleading and selective quotation of the CWs' statements quoted in the short sellers' reports. (*See* Ex. P, Apr. 30, 2020 Citron Rep. at 3-5; Ex. D, Feb. 25, 2020 Grizzly Rep. at 24-27.) Indeed, this Court has already rejected such tactics. In dismissing the FAC, the Court stressed that CW-2's allegations "seem to be drawn directly" from the Muddy Waters Report and faulted Plaintiffs for "misconstru[ing] CW-2's statements in that report" to imply that her allegations were based on firsthand knowledge. (Op. at 13; *see* Ex. J, May 18, 2020 Muddy Waters Rep. at 11–13.)

Yet the SAC continues to use the same selective quotations and "blanket statements sweeping all of these [CWs] into . . . fraud activities." *Chan*, 2019 WL 2865452, at *10-11. For example, Plaintiffs' claim that GSX "sent its brushing plans

26

to the third party *each quarter*" (SAC ¶ 78) is not supported by CW-3, who states only that "GSX would send us detailed brushing plans in advance." (Ex. P, Apr. 30, 2020 Citron Rep. at 3.) Plaintiffs' allegation that CW-3's employer, an alleged brushing firm, "accounted for approximately 40% of all enrollments in GSX's K-12 courses" is also contradicted by CW-3's quoted statements in the short seller report. (SAC ¶ 76.) CW-3 stated only that "for *one teacher*," "we generally did about 40%" in 2019.[11] (Ex. P, Apr. 30, 2020 Citron Rep. at 4.) Plaintiffs' repeated mischaracterization of CW accounts—even after such tactics were called out by the Court and Defendants (Op. at 13; *see* ECF No. 67-1 at 24 n.15)—casts doubt on all of the CW allegations. *See Miao*, 442 F. Supp. at 801 (S.D.N.Y. 2020) (there is a "particular need for close scrutiny where a short seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration").

Third, even if Plaintiffs pled sufficient facts to show that the CWs are reliable (they did not), the CWs still do not support Plaintiffs' theory that GSX was engaged in *widespread* misconduct to fake enrollments and boost revenue. CW-1 alleges, at most, that an unspecified number of bots were programmed to "enroll in GSX's

---

[11] In addition to repeating the flawed allegations regarding CW-2 rejected by this Court (Op. at 13), the SAC alleges that "[a]ccording to CW-2, more than half of the office space at GSX's Beijing headquarters is occupied with servers." (SAC ¶ 70.) But the quoted language that follows states only that GSX has *one* room of controlled "machines." (*Id*.)

*promotional* courses" (which are free and do not impact revenue) and to engage in marketing activities. (SAC ¶ 65.) CW-5, a former GSX student, alleges only that identical positive reviews appeared on WeChat—a separate messenger service not operated by GSX—not that any "fake" students enrolled in classes. (SAC ¶¶ 79-89.) Although CW-3 states that her employer purchased GSX classes and wrote positive reviews at unspecified times (SAC ¶ 76), she also states that "brushing has been halted because of COVID."[12] (Ex. P, Apr. 30, 2020 Citron Rep. at 3). And again, Plaintiffs' conclusory claim that CW-3's employer brushed "approximately 40% of all enrollments in GSX's K-12 courses" is flatly contradicted by the short seller report on which they rely. (*Id.* at 4; SAC ¶ 76.) In short, the CW allegations do not support Plaintiffs' claims of widespread brushing.

### 2.   Plaintiffs Fail to Allege Particularized Facts To Show That 70% of GSX Online Users Are Bots

As in the FAC, the SAC's only support for the claim that "more than 70% of GSX user logins are bots" is the May 18, 2020 Muddy Waters Report. (SAC ¶ 60, 62.) But Muddy Waters' claim that certain behaviors are most likely explained by bots is rank speculation and cannot be credited. *See Chubb*, 394 F.3d at 155 ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the

---

[12]   Because China first imposed COVID-19 restrictions in January 2020, this implies that CW-3's employer did not work for GSX for most of the Class Period.

28

PSLRA].").

Muddy Waters purportedly reviewed 200 of GSX's K-12 courses purchased between January and March 2020, a mere fraction of total courses offered during the Class Period.[13]  (Ex. J, May 18, 2020 Muddy Waters Rep. at 2–3.)  The short seller identified four different behaviors or phenomena that it speculated are most likely associated with bots: (1) Same-Second, Different Week Joiners "who join a class at the same time—to the second—on the same day of at least two different weeks" (SAC ¶ 42); (2) Student-with-Teacher-IP Joiners who "use the same IP address a teacher or tutor" (*id.* ¶ 46); (3) Burst Joiners who "routinely join at the same second, in 'bursts,' more than five minutes before or after the start of a class" (*id.* ¶ 48); and (4) Early Joiners who "login to online classes implausibly early."  (*Id.* ¶ 55.)

However, the SAC and documents referenced therein undermine these speculative theories.  As Plaintiffs admit (*id.* ¶ 269), GSX issued a response to the Muddy Waters Report shortly after its publication, which explained that these phenomena were not the result of bots, but were instead caused when tutors switched students between large classes and smaller tutoring sessions:

GSX's business, which focuses on online live large classes, splits a

---

[13]  Muddy Waters claims that it surveyed 200 courses, including 29 instructors and 371 tutors.  (Ex. J, May 18, 2020 Muddy Waters Rep. at 14, 23.)  As of December 31, 2019, GSX had 232 instructors and 3,736 tutors.  (Ex. Q, 2019 Form 20-F, at 35.)  Even assuming that GSX hired no new instructors or tutors between the end of 2019 and May 2020 when Muddy Waters published its report, Muddy Waters' sample represents only approximately 12% of GSX instructors and 9% of tutors.

29

large class with one instructor into smaller groups with multiple tutors. Burst joiners are caused when classes transition from tutors to instructors, which is a typical course procedure. Typically, a tutor offers a prep session before a paid class to warm up students with games and quizzes. When the formal class starts, the tutor will transition all his or her students from the small groups to the instructor's large class, and the instructor takes over. If a tutor fails to do so in time, the system will automatically switch classes for students, usually around the class start times, thus causing large groups of users to join classes at the same time. Precise joiners [*i.e.*, Same-Second, Different Week Joiners] exist for the same reason, especially with respect to K-12 classes, which are typically delivered periodically. Early joiners are students who sign in early to participate in the tutor's prep sessions . . . GSX reproduced the full dataset for all of the Company's paid classes between January and March 2020, and concluded that the IP overlap rate between students, instructors and tutors was only 0.78%, far less than the 28.2% claimed in the report. (Ex. K, May 19, 2020 Press Release at 1.)

Although Plaintiffs assert that these behaviors "are best explained as bots rather than human users" (SAC ¶ 37), Plaintiffs also contend that automatic switching between large classes and smaller tutorial sessions *cannot* explain the alleged "bot" behaviors, because "only a very poorly designed automated bot would transition students from a tutorial prep session to a main class after the class has begun," and "it is implausible that software engineers would design such automated switching to occur more than five minutes prior to the start of class, and for it to occur at different times for different tutors." (SAC ¶¶ 53-54.) Thus, Plaintiffs *admit* that the phenomena are more likely the result of human behavior than an automated bot. Similarly, Muddy Waters admits that an unspecified number of Student-with-Teacher-IP Joiners "also logged in from non-teacher/tutor IPs." (Ex. J, May 18,

2020 Muddy Waters Rep. at 7 n.4.)  This indicates that these users logged in from different locations during the review, further undermining Plaintiffs' speculation that these users were "bots."[14]

In any event, Plaintiffs' wholesale reliance on the Muddy Waters Report—copied and pasted from the FAC—is misplaced.  First, Muddy Waters' conclusion is based on a limited review of only a fraction of total courses offered by the Company during the Class Period.  (Ex. J, May 19, 2020 Muddy Waters Rep. at 2-3.)  *See In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577-78 (D.N.J. 2001) (that some customers experienced a product defect, "especially without any allegation as to the relative fraction of [defendant's] total business they comprised, does not equal 'widespread' failure of the product and cannot support a fraud claim").  Muddy Waters did not explain how it selected classes for its survey or provide sufficient information to enable the reader to assess whether its sample was

---

[14]  Plaintiffs argue that GSX's explanation for Early Joiners is implausible because "the login data in Muddy Waters' dataset is . . . for main classes rather than tutorial sessions."  (SAC ¶ 58.)  But they allege no facts to show that the login procedure for tutorial sessions is different than the main class, particularly in courses where switching between large and small groups occurs.  Plaintiffs' allegation that "the probability of . . . a precise login happening two or more times for a single user in a single course is extremely low" adds nothing.  (*Id.* ¶ 42.) The SAC shows that out of 5,742 "Same-Second, Different Week" users, 4,518 had only *one* precise join, *i.e.*, they logged into class at the exact same second only twice during the review.  (*Id.* ¶ 44.)  The remaining 1,224 users who had two or more precise logins make up only 2% of the 54,065 unique users in Muddy Waters' sample.  (*Id.* ¶ 43.)  Plaintiffs fail to show that this rate of 2% is unusual.

31

representative.   Absent such basic information, Plaintiffs ask this Court to take Muddy Waters and Plaintiffs at their word—the definition of conclusory pleading.

Second, the SAC confirms that many, if not most, of the users that Muddy Waters characterized as "bots" did not exhibit any "bot" behavior at all.   For example, although Muddy Waters identified 5,742 users that allegedly exhibited the "Same-Second, Different-Week" behavior, it added to this group 22,803 "linked" users—who merely "joined class at the exact same moment" or "share[d] the same distinct IP address" as a user that exhibited a "bot" behavior and are *not alleged* to have exhibited any "bot" behaviors themselves—nearly quadrupling the number of alleged "Same-Second, Different Week" Joiners to 28,545.   (SAC ¶¶ 43-45.) Plaintiffs fail to explain why "linked" users should be included in this analysis.[15]

Third, the SAC does not contain any "independent factual allegations" to "corroborate [Muddy Waters'] statements." *Miao*, 442 F. Supp. 3d at 801, 803. Although Plaintiffs attempt to "corroborate" Muddy Waters' conclusions by giving them the imprimatur of their purported "expert," Dr. Knoblock, the SAC makes clear

---

[15]   Muddy Waters also included "linked" users in calculating the number of "Student-with-Teacher-IP Joiners," "Burst Joiners," and "Early Joiners."  (SAC ¶¶ 42-62; Ex. J, May 18, 2020 Muddy Waters Rep. at 5-10.)  Thus, tens of thousands of so-called "linked" joiners were included within the 70% of users Muddy Waters determined were "bots."

that he did nothing more than rubber-stamp Muddy Waters' report.[16]  Dr. Knoblock

did not access the underlying data Muddy Waters used in its survey, and instead

"took the facts and data as stated in these reports to be true."  (SAC ¶ 35.)  From

these unchallenged premises, Dr. Knoblock "independently concluded" that over

70% of GSX users were "bots."  (SAC ¶ 4.)  But given that the quality of the analysis

hinges on the quality of the underlying data, the only "independent" analysis

Dr. Knoblock could have done was check Muddy Waters' math.

### 3.    Other Allegations Do Not Support Widespread Misconduct

Again, as in the FAC, the SAC's hodgepodge of other allegations recycled

from various other short seller reports similarly fail to establish the widespread

conduct alleged.  First, Plaintiffs cite two job posts in an attempt to show that GSX

openly recruits engineers to operate "cell phone bot network equipment."  (SAC

¶¶ 101-08.)  But these job posts have nothing to do with bots.  Rather, the translations

that Plaintiffs copy-and-paste from yet another short seller report are verifiably

incorrect—as already identified by Defendants.  (*See* Ex. R, May 28, 2020 Muddy

Waters Rep. at 5–6; ECF No. 67-1 at 25.)  As the SAC itself alleges, the one-

---

[16]  This should come as no surprise.  In *Hershewe v. JOYY Inc.*, the court expressly
rejected the "independent assessment" of short seller reports by Dr. Knoblock.
No. 2:20-CV-10611-SB-AFM, 2022 WL 1123208 (C.D. Cal. Mar. 9, 2022).
There, the court dismissed nearly identical claims to those brought by Plaintiffs
here regarding bots bolstering the number of users on Joyy Inc.'s social media
platform originating from short seller reports.  *Id.*

character Chinese term 刷 refers to "brushing." (SAC ¶ 106 n.7.) But the two-character Chinese term in the job posts, 刷机, refers to "rooting," *i.e.*, modifying a device to permit software installation, as the rooting software described in the post confirms. (*Id.* ¶¶ 101-08.) Modifying a device to permit software installation serves many legitimate purposes, including the installation of specialized teaching softwares used by GSX. Far from showing fraud, Plaintiffs' "reproduc[tion]" of "incorrect facts" "necessarily raises doubt as to whether the other factual representations [copied from] short seller's report[s] . . . can be credited as a reliable basis" to establish falsity. *Miao*, 442 F. Supp. 3d at 804.

Nor is GSX's fast growth rate indicative of widespread fraud. Plaintiffs assert, in conclusory fashion, that GSX's growth rate in 2020 is "not believable" compared with that of its competitors. (SAC ¶¶ 121-24, 130-57.) But this apples-to-oranges comparison ignores that (i) unlike its competitors, GSX is a 100% online platform that does not incur costs associated with maintaining physical learning centers; and (ii) COVID-19 restrictions in 2020 caused an unprecedented spike in demand for online learning, giving GSX an edge over its competition.[17]

---

[17] The SAC's other allegations describing purported "bot" behavior add nothing, as they also recycle short seller claims without any independent investigation and do not describe the methodologies employed or the size of the samples surveyed. (SAC ¶¶ 109-20, 125-29.) The same defect infects Plaintiffs' other references to surveys, website traffic, and other supposed indicia of popularity. (*Id.* ¶¶ 158-173; *Cf.* Op. at 18 ("[I]t is not clear how the allegation that GSX has fewer

### C.    Plaintiffs' Remaining Theories of Misrepresentation Fail

Even if Plaintiffs had adequately pled the widespread conduct that underlies their claims (they did not), all of their theories of misrepresentation once again fail.

### 1.    Plaintiffs Fail to Plead That the Alleged Conduct Rendered GSX's Financial and Operational Data Misleading

Plaintiffs again attempt to argue that various routine disclosures of financial and operational data from 2017 through Q2 2020 were misleading, including reported enrollment figures (SAC ¶¶ 195-96, 200, 206, 216, 218, 224, 234, 239, 251, 257, 263, 267, 279); revenue, profit, and income (*id.* ¶¶ 198, 202, 206, 212, 218, 222, 226, 230, 241, 247, 255, 275); and costs of revenues, selling expenses, and research and development expenses. (*Id.* ¶¶ 204, 208, 214, 220, 228, 232, 243, 249, 265, 277.)  But despite Plaintiffs' non-substantive edits (*see id.* ¶¶ 195-280), the SAC still only alleges (at most) that financial or operational data was distorted by "misleading company practices," which is insufficient to state a securities fraud claim. *PharmaNet*, 720 F. Supp. 2d at 544.[18]

Instead, Plaintiffs must explain "how [the alleged conduct] distorted the

---

instructors and tutors with profiles on professional networking sites than its competitors supports Plaintiffs' Section 10(b) claims.").)

[18]   Notably, many challenged figures were published after the first alleged corrective disclosure, (SAC ¶¶ 247-80), *i.e.*, the February 25, 2020 Grizzly Report which Plaintiffs allege reported that "GSX [] brushed its enrollment figures, overstated its revenue, and engaged in undisclosed related party transactions." (*Id.* ¶ 193.) Plaintiffs fail to explain how such figures misled investors after the purported fraud was "revealed" to the market, nor do they allege what the figures were.

35

disclosed data," *Chubb*, 394 F.3d at 154, "the amount by which [reported data] was distorted," the "data, or source of data, used to arrive at its calculations," *id.* at 153, and, "at a minimum, some particular transactions where [data] were improperly recorded, including the names of the customers, when the transaction occurred, and the approximate amount of the fraudulent transaction." *PharmaNet*, 720 F. Supp. 2d at 544; *see also In re Galena Biopharma, Inc. Sec. Litig.*, No. 17-929, 2019 WL 5957859, at *15 (D.N.J. Nov. 12, 2019). The SAC fails to allege these particulars.

*Enrollment Data.* Plaintiffs again contend that GSX's reported enrollment figures were false because Defendants failed to disclose that "GSX routinely falsified at least 70% of its student enrollment" by creating "fake" accounts to "sign-in to [the Company's] online courses." (SAC ¶¶ 197, 201, 207, 211, 219, 225, 227, 231, 235, 240, 254, 258, 260, 262, 268, 270, 272, 274, 276, 280.) But Plaintiffs fail to explain how the alleged conduct—*i.e.*, "falsif[ied] logins to . . . online courses"—impacted reported enrollment figures. (*Id.*) Nor do Plaintiffs allege facts showing that class log-in records, like those reviewed by Muddy Waters, reflect the same data as reported enrollment data. *See PharmaNet*, 720 F. Supp. 2d at 543 (plaintiff fails to claim that data "included in reported backlog had a material impact on PharmaNet's disclosures—such as, how much revenue supposedly was 'booked'"). Plaintiffs also fail to plead with particularity "the amount by which" enrollment figures were distorted. *Chubb*, 394 F.3d at 153. While they generally allege that

36

"GSX routinely falsified at least 70% of its student enrollment" (SAC ¶ 197), that claim is based on Muddy Waters' review of a fraction of login data from Q1 2020 only. (Ex. J, May 18, 2020 Muddy Waters Rep. at 3, 14.) Even assuming *arguendo* that such login data had any impact on GSX's disclosures, for the reasons discussed above (*supra* Section III.B.2), this analysis from the Muddy Waters Report is insufficient.

***Revenues, Costs of Revenue, & Expenses:*** Plaintiffs simply reword claims from the FAC and allege that "GSX paid third-party brushers, among other things, to purchase courses with GSX's money that GSX then recognized as revenue," and that "GSX accounted for [commissions to third-party brushers] as marketing expenses." (SAC ¶ 183.) But Plaintiffs rely solely on CW-2—whom the Court found "unreliable" (Op. at 14)—and CW-3 (SAC ¶¶ 183-86), who (like CW-2) was not positioned to know about GSX's financial reporting (*supra* Section III.B.1), neither of whom connect the alleged conduct to any relevant financial data.[19]

And again, Plaintiffs fail to adequately plead "the amount by which" revenue was allegedly overstated. *Chubb*, 394 F.3d at 153. Although the SAC again generally pleads that "[m]ore than half of GSX's revenues and profits, including gross billings, were falsified" (*see, e.g.*, SAC ¶ 213) based on Muddy Waters' flawed

---

[19] The Citron Report and JL Warren Capital Report both refer back to CW-3, whose account is copied from short seller reports. (*Compare* SAC ¶¶ 75-78, 188-89 *with* Ex. P, Apr. 30, 2020 Citron Rep. at 3-4 *and* Ex. S, JL Warren Rep. at 2-4.)

37

analysis of log-in data, (*id.* ¶ 32), and that revenues were "overstated[] by at least 70% throughout the Class Period" (*id.* ¶ 203) based on Citron's flawed April 14, 2020 report, (*id.* ¶¶ 96-100), neither supports Plaintiffs' allegation that revenue from 2017 through Q2 2020 were inflated by 50% or 70%.[20]  (*Id.* ¶¶ 40, 97.)  Regardless, both Reports cannot support Plaintiffs' claim even with respect to Q1 2020.[21]  (*See supra* Section III.B.2.)  *See also PharmaNet*, 720 F. Supp. 2d at 544.

Further, "[f]actual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007).  Once again, Plaintiffs do not even allege that GSX's reported costs of revenue and expenses were false.  Rather, they argue that

---

[20]  Critically, as the Company pointed out in its response, Citron only reviewed the Company's total revenues for Q1 2020 from the GSX app, but not the Gaotu Ketang app, which "contribut[es] more than a majority of the Company's net revenue from K-12 courses." (Ex. H, Apr. 15, 2020 Press Release at 1.)  Citron also admitted that its "sample size is too small and not representative," because it selected the "more popular classes" for its review, calculated revenue based on *discounted* course prices rather than the listed price, and because its analysis only captured users who commented in class.  (Ex. F, Apr. 14, 2020 Citron Rep. at 23, 27, 32, 34.)  To the extent Plaintiffs argue that GSX misstated profits, (SAC ¶ 100), they plead no facts to show "that the filing discrepancies were not due to differences in Chinese and U.S. accounting standards." *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 411 (S.D.N.Y. 2013).

[21]  Although Plaintiffs claim CW-2 entered into contracts whereby GSX paid RMB 1 million to third-party brushers to purchase courses later recorded as revenue (SAC ¶ 185), the Court already held that Plaintiffs "misconstrue[] CW-2's statements in [the Muddy Waters] report" to imply that she personally entered into such contracts.  (Op. at 13.)

Defendants failed to disclose that "a material percentage" of the accurately reported figures included payments to third-party brushers. (*See, e.g.*, SAC ¶ 205.) Plaintiffs fail to plead the estimated amount of commissions allegedly recorded as expenses— let alone that costs of revenue or research and development expenses included these alleged payments at all.

***GSX's Source of Success.*** Finally, Plaintiffs again argue that various statements regarding GSX's growth were misleading because "the Company failed to disclose that its purported success was due primarily to its illegally falsified student enrollments and inflated revenues, or, at a minimum, due to its illegal marketing practices." (SAC ¶¶ 196-99, 206-07, 212-13, 218-19, 226-27, 230-31, 236-37, 241-42, 245-48.) This claim fails, because the challenged statements— which generally attributed GSX's "lightspeed growth" to its "live large-class format," "core expertise . . . in online K-12 courses," "superior" and "high quality teaching," and "upgrad[ed] course content" (*id.*)—are inactionable puffery on which no investor would rely. *See Galena Biopharma*, 2019 WL 5957859, at *15 (statements regarding reasons for growth are inactionable puffery); *Galati*, 220 F. App'x at 102 (statements like "dramatic deposit growth" are inactionable puffery).

### 2. Plaintiffs Fail to Plead That Defendants' Denials of Short Seller Reports Were Misleading

Not only does the SAC fail to plead the widespread conduct alleged in the cited short seller reports (*supra* Section III.B), but the SAC confirms that the short

seller reports are based entirely on false assumptions and speculation. (*See supra* Sections III.B.2, III.C.1 n.20.) Accordingly, GSX's accurate denials of false short-seller reports were not misleading.[22] (*See* SAC ¶¶ 259-62, 269-74.) *See also Galena Biopharma*, 2019 WL 5957859, at *10 ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing.").

## CONCLUSION[23]

For these reasons, the Court should dismiss the SAC, this time with prejudice.

---

[22] Plaintiffs' claim—that GSX's denial of the Grizzly Report was false because GSX allegedly does not comply with legal and regulatory requirements, "as its hiring of teachers without any teacher qualifications violates Chinese law" (SAC ¶ 274)—should be dismissed for the same reasons identified by this Court, *i.e.*, the SAC fails to allege "the context in which the statement was made, who specifically made the statement, or where the statement was published." (Op. at 22.) Plaintiffs also fail to establish that GSX violated Chinese teacher qualification requirements, as they do not claim that GSX was subject to any legal or regulatory action relating to such conduct. Plaintiffs cite CW-6 and CW-7, but neither discusses lack of teacher qualifications. (*See* SAC ¶¶ 90-95, 148.) Plaintiffs again provide no context for the alleged "Teacher Application Portal," (*id.* ¶ 144), including when or how it is used, if at all. (*See* Op. at 17-18.) Their claim that unspecified "government records" show GSX had fewer teachers than reported fails not only because the SAC does not specify the allegedly misleading statement and other required particulars, *see Chubb*, 394 F.3d at 144, but because their source reported only the number of teachers for *one* of GSX's two apps, Gaotu Ketang. (SAC ¶ 178; Ex. T, 21st Century Business Herald Article.) Plaintiffs' other allegations fail as they fall outside the Class Period and show, at most, a handful of errors on GSX's website. (SAC ¶¶ 177, 179-81.)

[23] Because Plaintiffs fail to plead a claim under Section 10(b), their claim for control person liability under Section 20(a) also fails. *See Chubb*, 394 F.3d at 159 n.21.

40

DATED:    June 9, 2023

Respectfully submitted,

*/s/ Justin T. Quinn*
Justin T. Quinn (ID #019822010)
**ROBINSON MILLER LLC**
Ironside Newark
110 Edison Place, Suite 302
Newark, New Jersey 07102
(973) 690-5400
jquinn@rwmlegal.com

Scott D. Musoff
Robert A. Fumerton (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
Judith A. Flumenbaum (*pro hac vice*
pending)
**SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com
judy.flumenbaum@skadden.com

*Counsel for Defendants GSX
Techedu Inc., Larry Xiangdong Chen,
and Nan Shen*