POMERANTZ LLP
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York   10016
Telephone:   (212) 661-1100
Email:         avan@pomlaw.com

*Counsel for Lead Plaintiff*

— additional counsel on signature page —

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YANG RENBIN, ROBERT ANGELINE, COREY HAYS, AND ALEXANDRE TAZI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>GSX TECHEDU INC., LARRY XIANGDONG CHEN, NAN SHEN, XIN FAN, YIMING HU, MING LIAO, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES, INC., BARCLAYS CAPITAL, INC., BOFA SECURITIES, INC., CLSA LIMITED, AND GOLDMAN SACHS (ASIA) L.L.C.,<br><br>Defendants. | **Case No. 2:20-CV-04457-MEF-JRA**<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ........................................................................... iii

TABLE OF AUTHORITIES ............................................................................... iv

I.    PRELIMINARY STATEMENT ...........................................................1

II.   FACTUAL BACKGROUND...................................................................3

    A.    GSX and its Business ...................................................................3

    B.    Evidence that Defendants Overstated GSX's Financials ......................4

        1.    Seventy Percent of GSX's K-12 Students Are Fake .................4

        2.    GSX Built Infrastructure to Support Brushing ........................5

        3.    GSX's Purported Size and Explosive Growth Relative to Peers Is Inexplicable ...............................................................6

    C.    GSX Uses Round-Trip Transactions To Conceal That It Is Not Earning Nearly As Much As It Claims ..............................................7

    D.    Disclosure of GSX's Fraud Caused its Stock Price to Fall, Damaging Investors .......................................................................7

    E.    The Complaint's Additional Scienter Allegations ..............................8

III.  STANDARD ON MOTION TO DISMISS .......................................................9

IV.   ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER ...........................................................................................9

V.    ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION ..........................................................................................18

VI.   ARGUMENT:  PLAINTIFFS PLEAD NUMEROUS MATERIAL MISREPRESENTATIONS ......................................................................23

    A.    The Complaint Adequately Alleges that Defendants Inflated the Company's Revenues and Student Enrollment by Use of Bots and Brushing ....................................................................................23

    B.    Statements from Numerous Confidential Witnesses Corroborate Dr. Knoblock's Analysis ...............................................................27

    C.    The Complaint Extensively Alleges that Defendants Inflated the Company's Revenues by over Fifty Percent ....................................31

D.    Numerous Additional Allegations Concerning the Company's Implausible Economic Growth, Lack of Name-Recognition, Perfectly Linear Enrollment Growth and Red-Flag Job Postings Cement the Conclusion that GSX's Falsified Its Revenue and Enrollments .........34

VII.    CONCLUSION......................................................................................37

Case 2:20-cv-04457-MEF-JRA   Document 108   Filed 07/24/23   Page 4 of 45 PageID: 2905

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **FAC** | (First) Amended Class Action Complaint (Nov. 2, 2020) [Dkt. 22] |
| **Complaint** | Second Amended Class Action Complaint (Apr. 25, 2023) [Dkt. 97] |
| **Class** | (As defined in ¶ 1 of the SAC) |
| **Class Period** | (As defined in ¶ 1 of the SAC) |
| **Company** | GSX Techedu Inc. |
| **Van Decl.** | Declaration of Austin P. Van in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint |
| **Defendants** | GSX Techedu Inc., Larry Xiangdong Chen, Nan Shen, Ming Liao, Xin Fan |
| **Defs.' Mem.** | Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint (June 9, 2023) [Dkt. 105-1] |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **GSX** | GSX Techedu Inc. |
| **Motion** | Motion and Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint (June 9, 2023) |
| **Op. or Opinion** | Opinion and Order on Defendants' Motion to Dismiss the Second Amended Complaint (Feb. 24, 2023) [Dkt. 95] |
| **Plaintiffs** | Yang Renbin, Robert Angeline, Corey Hays, Alexandre Tazi |
| **SAC** | Second Amended Class Action Complaint (Apr. 25, 2023) [Dkt. 97] |
| **SEC** | United States Securities and Exchange Commission |
| **Section 10(b)** | Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) |
| **Section 20(a)** | Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benak ex rel. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
   435 F.3d 396 (3d Cir. 2006) ...................................................................9, 20

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) .........................................................................33

*City of Warren Police & Fire Ret. Sys. V. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ...........................................................................9

*City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*,
   2018 WL 4293143 (N.D. Ga. May 15, 2018).................................................20

*Dudley v. Haub*,
   2013 WL 1845519 (D.N.J. Apr. 30, 2013).....................................................18

*EP Medsystems, Inc. v. EchoCath, Inc.*,
   235 F.3d 865 (3d Cir. 2000) .........................................................................18

*Fan v. StoneMor Partners LP*,
   927 F.3d 710 (3d Cir. 2019) ...........................................................................9

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) .........................................................................26

*Gillon v. Bernstein*,
   218 F. Supp. 3d 285 (D.N.J. 2016)................................................................27

*Hall v. Johnson & Johnson*,
   No. CV 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27,
   2019) .............................................................................................................17

*Hull v. Glob. Digital Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017).....................................................20

*In re Allergan Generic Drug Pricing Sec. Litig.*,
   2019 WL 3562134 (D.N.J. Aug. 6, 2019) ......................................................21

iv

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) ........................................................................21

*In re Celgene Corp. Sec. Litig.*,
    2019 WL 6909463 (D.N.J. Dec. 19, 2019) ........................................................9, 26

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ........................................................20

*In re EQT Corp. Sec. Litig.*,
    504 F. Supp. 3d 474 (W.D. Pa. 2020) ...............................................................10, 11

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ........................................................33

*In re Par Pharm. Sec. Litig.*,
    2009 WL 3234273 (D.N.J. Sept. 30, 2009) ...........................................................28

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ..........................................................20

*Institutional Invs. Grp. V. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) .........................................................................*passim*

*Martin v. GNC Holdings, Inc.*,
    2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x
    151 (3d Cir. 2018) ...................................................................................................22

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ...................................................................................18

*McCullough v. Advest, Inc.*,
    754 F. App'x 109 (3d Cir. 2018) ............................................................................10

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ......................................................................36

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ......................................................................................22

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...................................................................................10

*Odeh v. Immunomedics, Inc.*,
   2020 WL 4381924 (D.N.J. July 31, 2020) .......................................................24

*Phillips v. County Of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ...............................................................................9

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009) ...............................................................21

*Puddu v. 6D Glob. Techs., Inc.*,
   742 F. App'x 553 (2d Cir. 2018) .......................................................................21

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
   248 F. Supp. 3d 428 (S.D.N.Y. 2017) ...............................................................36

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ...........................................................................24

**Statutes**

Securities Exchange Act of 1934..............................................................3, 9, 36, 37

**Rules**

Fed. R. Civ. P. 12(b)(6)...........................................................................................9

**Other Authorities**

SEC Staff Accounting Bulletin 64 Fed. Reg. 45150-01 (Aug. 19,
   1999) No. 99, *codified at* 17 C.F.R. § 211(B) ................................................26

## I.    PRELIMINARY STATEMENT

The Complaint alleges a paradigmatic case of massive, outright securities fraud.  During the Class Period, GSX, an online education company based in China, systematically falsified over 70% of its enrollment and over 50% of the Company's revenues.  The Complaint sets forth in exhaustive detail, based on a thorough independent investigation in the U.S. and China and interviews with numerous confidential witnesses, how GSX has a team of engineers who steal online identities and use them to set up and operate false student accounts to simulate student logins and class activity, and how it uses its own funds to "buy" courses to inflate revenues.  In short, GSX is a Potemkin village.

The evidence of this deplorable fraud is ample.  Dr. Craig Knoblock, an expert at USC in computer science, reviewed a sample of student login data taken from over 200 GSX courses over a period of months, and found that the vast majority of user logins exhibit machine-like patterns that can only be explained as resulting from the activity of "bots," software designed to execute routines like course purchases or class logins.  Confidential witnesses confirmed that GSX uses thousands of cell-phone operated bots to falsify student enrollment accounts, revenues and login activity.  Numerous other outward signs suggest GSX is mostly fake:  surveys show virtually no one in China has heard of GSX, wholly unlike its ostensible peers of comparable size; GSX's implausible economic growth is completely inexplicable by comparison to its competitors; GSX's enrollment growth during certain periods is perfectly linear and clearly artificial; GSX openly

issues job postings for engineers who can "jailbreak" phones to install bot software; and a customer survey shows that GSX offers inferior products at premium prices, hardly a formula for explosive growth.  If these allegations are true (they are, and they must be accepted as such for the pupose of this motion), there is simply no question that GSX is a collossally fraudulent enterprise.

Given this paradigmatic statement of securities fraud, it is no wonder that Judge Salas did not even request oral argument on whether the FAC adequately pleaded false and misleading statements—it clearly did.  After oral argument, in dismissing the FAC with leave to amend, Judge Salas found only a single element inadequately pleaded: scienter.  And Judge Salas made clear exactly what allegations she believed were required to overcome this last hurdle:  additional allegations about how Defendants had access to information indicating that GSX was fraudulent.  Four new confidential witnesses, two with extensive direct contact with the Individual Defendants, have confirmed that they prepared and reviewed all the Company's marketing budgets, and that they were responsible for knowing the individual line items of that budget.  Accordingly, Defendants knew, or were severely reckless in not knowing, that the Company was spending heavily on third-party brushing companies.  Likewise, the new confidential witnesses have stated that the Individual Defendants had access to, and were responsible for knowing, where the Company was actually getting its revenues, and so at a minimum were reckless in not knowing that the Company's revenues resulted in large part from round-trip transactions with third-party brushers.  With these additional allegations, there is no question that the inference that Defendants knew their Company was

2

more than half fake is at least as compelling as the inference that this somehow eluded them, and that is all the law requires to plead scienter. Defendants raise no reason to think otherwise.

Judge Salas expressed no concerns about several of Plaintiffs' loss causation dates, nor that Plaintiffs had adequately pleaded that the Company's statements concerning its student enrollments, revenues, and reasons for success were false and misleading. These elements have been adequately pleaded, and Defendants' arguments to the contrary were correctly rejected implicitly by Judge Salas.

The Complaint pleads an outright fraud of exactly the sort the Securities Exchange Act was passed to prevent. Plaintiffs are entitled to have a jury decide whether Defendants committed this fraud. Defendants' motion should be denied.

## II.   FACTUAL BACKGROUND

### A.   GSX and its Business

GSX purports to derive 80% of its revenues from selling online courses and tutoring services to K-12 students in China. ¶¶ 24–25, 31.[1] To U.S. investors, GSX reported amazing growth—from revenues of $59.2 million in 2018 to $304 million in 2019 (4,290% growth) (¶ 135) to $417 million in just the *first half* of 2020. ¶ 191. Yet GSX's growth story was fraudulent: about 70% of its K-12 enrollments derived from round-trip transactions in which GSX *paid* third parties to buy GSX's classes. ¶¶ 184-89. The third parties would then attend classes and spam them with comments praising the teachers, manipulating the real students.

---

[1] Unless otherwise indicated, paragraph numbers refer to the Complaint.

*E.g.*, ¶¶ 75-89.  Not only are the revenues fake, GSX's consumer fraud—called brushing—is illegal in China.  ¶ 182.  Thus, Defendants falsified GSX's revenues and exposed it to substantial fines and other penalties.

### B.    Evidence that Defendants Overstated GSX's Financials

### 1.    Seventy Percent of GSX's K-12 Students Are Fake

China-focused research firm Muddy Waters released a report revealing a portion of GSX's fraud.  To support its report, it purchased hundreds of GSX classes and obtained detailed information about logins and IP addresses of the 54,065 purportedly unique students enrolled.  ¶ 38.  Plaintiffs retained Dr. Craig Knoblock, a renowned expert in bots and artificial intelligence, to independently evaluate Muddy Waters's data.  ¶¶ 33–37.  Dr. Knoblock concluded that there were four anomalies in the login data that evidence the use of bots.  ¶ 36.

*First*, "Same-Second Different-Week Joiners," 5,742 users (10.6% of the dataset), joined a class *at the exact same second* on the same weekday across at least two different weeks, despite human and internet traffic variability.  ¶¶ 36, 43, 45.  Thus, Dr. Knoblock concluded that these users were bots.  *Id.*  Tens of thousands of other users shared IP addresses with, or joined classes at the same second as, Same-Second Different-Week Joiners, bringing the total number of users implicated to 28,545 (52.8%) of the total.  ¶ 45.

*Second*, 15,529 students in the dataset, or almost one third of the total, logged into classes using the same IP address as the instructor ("Student-with-Teacher IP Joiners").  ¶ 46.  To share the same address, students would have to be

4

in the same place and connected to the same network as the instructor—though there would be no reason for that because GSX conducts all its classes *online* rather than in physical classrooms. ¶ 46. Rather, GSX instructors were also logging in as students on their mobile devices or computers using bot software. *Id.*

*Third*, "Burst Joiners" logged on in the same seconds—in "bursts"—that took place *more* than five minutes before or after the start of a class, rather than just as a class was starting. ¶ 48. In one case, 104 purportedly unique users logged into a class within a four-second period beginning nine minutes forty seconds before the start of a class. ¶ 50. According to Dr. Knoblock, these users were likely bots programmed to log in at a designated time. ¶¶ 53-55.

*Fourth*, while students rarely show up to a class thirty minutes or more before its start, nearly one in seven of the users in the data set routinely did ("Early Joiners"). ¶¶ 56-57. The most plausible explanation for this bizarre behavior is that these "students" were bots. ¶¶58-59.

Combined, and after accounting for duplicates, more than 70% of the users in the data set exhibited one or more of these telltale signs that they were bots. ¶ 61. So, Dr. Knoblock concluded that at least 70% of the users purporting to be GSX students logging into their courses were likely fake. ¶¶ 60–61.

### 2. GSX Built Infrastructure to Support Brushing

CW-1, a GSX "Android engineer," and CW-2, an engineering manager, both worked out of GSX's Beijing headquarters. ¶¶ 63, 67. CW-1 reports that the headquarters contains dozens of large rooms each holding thousands of mobile

phones used to impersonate students in its classes. ¶ 65. Indeed, CW-1's *job* was stealing data to create fake student accounts and then programming the phones for mass control so they could be used to impersonate students *en masse*. *Id.* CW-2 corroborates CW-1's account and adds that the servers used to control these bots occupy a cavernous room in GSX's headquarters. ¶¶ 69-70.[2] CW-3, who worked for a third-party brushing firm, said that GSX hired her to use fake identities to purchase classes, log in to classes, and write positive reviews. ¶ 76.

### 3. GSX's Purported Size and Explosive Growth Relative to Peers Is Inexplicable

Metrics confirm that GSX is a bit player. When the Chinese government surveyed education technology customers, it did not even bother with GSX's. ¶ 161. GSX did not make the lists of 7, 12, and 39 market participants identified in various state-sponsored reports. ¶ 162. Private surveys consistently estimated GSX's market penetration in the low single-digit percent, behind purportedly much smaller competitors. ¶ 163. Because it is a web-only provider, online activity metrics should overstate GSX's prominence, but web visit and app download statistics show GSX falling far behind even these smaller competitors. ¶¶ 165-72. None of these statistics are consistent with GSX's claimed size and growth, which an analyst showed is the fastest of any company on the planet since Google's early days. ¶ 132. GSX also has no significant competitive advantage to substantiate its

---

[2] GSX's own advertisements corroborate the accounts of these confidential witnesses. GSX placed ads to recruit engineers to jailbreak phones (i.e., permit installation of unapproved software) and install software called TaiChi. ¶¶ 103–07. According to its website, TaiChi is used to create "hard to detect" "fake devices" and post from "fake locations". ¶ 105.

6

growth story.  According to a UBS survey of customers, GSX's offerings are *worse* than their average competitors'—with *lower* customer approval ratings and *less* brand awareness—yet still cost substantially *more*.  ¶ 140.

### C.    GSX Uses Round-Trip Transactions To Conceal That It Is Not Earning Nearly As Much As It Claims

GSX's unbelievable revenues growth was matched by growth of its selling expenses.  By the close of the Class Period, GSX spent 91.0% of its revenues on selling expenses, or a proportion three and seven times higher than its principal competitors TAL Education and New Oriental. ¶ 191.  Though GSX blamed temporary events for each quarterly increase in selling expenses, they grew almost dollar-for-dollar with revenues during the Class Period.  ¶¶ 191-92.

That is because GSX's revenues and its selling expenses were the same money.  GSX paid outside brushing companies to impersonate students.  ¶¶ 185, 188, 189.  Though the brushers took a small commission, they spent the lion's share of the funds on tuition for the classes they purchased.  *Id.*  Though the transactions had no economic substance—GSX was paying itself—GSX recognized the incoming funds as revenues and the outgoing funds as marketing expenses, inflating both entries on its financial statements.  ¶ 189.

### D.    Disclosure of GSX's Fraud Caused its Stock Price to Fall, Damaging Investors

Between April 3, 2020 and October 21, 2020, the market learned of GSX's fraud through a series of corrective disclosures, and the risks it had concealed materialized, each incident causing the price of the stock to plummet.  ¶¶ 281-297.

7

These disclosures included research reports revealing new facts about the fraud, an analyst report downgrading the stock over concerns about its valuation, and market reports revealing that GSX's revenues were overstated, among other disclosures. *Id*. Indeed, GSX's valuation has continued to plummet, closing at $2.89 on June 30, 2023, down from a Class-Period high of $131.27. *See* Van Decl., Ex. A.

### E. The Complaint's Additional Scienter Allegations

The Complaint makes new scienter allegations. It newly alleges that Defendants accounted for brushing expenses through round-trip transactions inflating revenue and marketing expenses. ¶¶ 182-191. It thus shows just how Defendants would learn of the brushing when they were reviewing GSX's finances and contracts. ¶¶ 299-316. And the Complaint newly alleges that Defendants were intimately involved in these activities and would know their statements were false. *Id.* Moreover, the Complaint newly alleges that Defendants made a series of false exculpatory statements to explain away increases in selling expenses. ¶ 192. The Complaint also newly alleges the information available to Defendants, including a "boss dashboard" listing flows of products, number and analysis of students, teacher evaluations, and class arrangements. ¶ 306.

The Complaint newly alleges that Defendants overstated the number of teachers GSX employed, and deleted false profiles when they were accused of fabricating them, showing that the teacher profiles were fake and that Defendants knew it. ¶¶ 179, 181. Indeed, even as GSX reported it had 392 teachers to investors, it told the Chinese government it only had 182. ¶ 178.

8

### III.   STANDARD ON MOTION TO DISMISS

"'Faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.'"  *Institutional Invs. Grp. V. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  The Court "'draw[s] all reasonable inferences in favor of the plaintiff,'" *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *10 (D.N.J. Dec. 19, 2019) (quoting *Phillips v. County Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)), and dismissal is improper if a plaintiff alleges facts showing "a 'reasonable expectation that discovery will reveal evidence' of the necessary elements.'"  *City of Warren Police & Fire Ret. Sys. V. Prudential Fin., Inc.*, 70 F.4th 668, 681 (3d Cir. 2023) (citation omitted).

### IV.   ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER

Scienter may be shown "by a knowing or reckless state of mind." *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (citation omitted).  "A strong inference of scienter is one that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *Avaya*, 564 F.3d at 267 (citation omitted).  "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* (citation omitted).  "The pertinent question is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

9

standard.'"  *Id.*  "[E]xplicit[] deni[als of] the existence of [the alleged fraudulent conduct]" is "powerful evidence of scienter."  *Id.* at 269.

The Complaint's allegations give rise to a strong inference of scienter.  *See* ¶¶ 298-341.  *First*, the Complaint supplies exactly what Judge Salas found wanting in Plaintiffs' original scienter allegations:  an explanation of exactly how Defendants had access to information alerting them that their operation was mostly fake.  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter found where defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *accord In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 497 (W.D. Pa. 2020) (quoting *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018) which adopted the *Novak* formulation).  The Complaint links GSX's brushing to specific financial statement items by alleging that its third-party brushing expenses were included as selling expenses and that its revenues were generated through brushing transactions.  It then shows, using accounts from multiple confidential witnesses, that the Individual Defendants reviewed marketing budgets, monthly revenue reports, and the finance department's "financial management reports," and were responsible for understanding the contents of those documents, including *individual line items* of the marketing budget.  ¶¶ 298-316.  By connecting these line items to illegal brushing, the Complaint shows how Defendants were aware of the Company's massive expenditures on third-party brushing firms, and so were aware of the fraud.  Indeed, these witnesses, some of whom worked personally with the Individual Defendants, have expressly stated that these Defendants were

10

responsible for knowing where the Company's marketing expenses were actually being spent and from where the Company's revenues were actually coming. So Defendants clearly knew that GSX was making massive expenditures on third-party brushing operations, and that its revenues were largely coming from round-trip transactions.

Confidential Witness 8 ("CW-8"), a Financial Manager at GSX who for a time reported directly to Defendant Shen, stated that "all marketing budgets were sent to Shen," and that Shen "was responsible for knowing and understanding the individual line items that made up the marketing budget." ¶¶ 299-300. Likewise, Defendant Shen had access to the Company's revenue sources through "monthly written reports" about income, and she was responsible for knowing "where the Company's revenue was coming from." ¶ 301. CW-8 also made clear that Defendants Shen "had personal access to all material contracts and their terms," which would include GSX's marketing contracts with third-party brushers. ¶ 318.

Confidential Witness 9 ("CW-9") was a Product and Development executive who spoke with Defendant Chen daily. ¶ 304. CW-9 confirmed that Defendants Shen and Chen were responsible for "knowing how much the company spent on marketing," and that Chen was "definitely responsible" for "knowing what the Company's marketing expense were actually being spent on" "in 2019 and 2020." ¶ 305. CW-9 also confirmed that Chen and Shen received the marketing budget and were responsible for understanding the individual line items in it. *Id.* Indeed, CW-9 and her team developed a senior executive dashboard, called "boss

11

dashboard", which showed executives like Chen and Shen teacher evaluations, the number of students GSX had, and exactly where its money was going. ¶ 306.

Confidential Witness 10 ("CW-10"), a Financial Manager, confirmed that Defendant Shen was responsible for knowing what GSX's marketing expenses were actually spent on. ¶ 310. CW-10 stated that Shen was personally involved in preparing GSX's marketing budget. ¶ 308. CW-10 also discussed the company's sources of income at meetings attended by Shen's direct inferior. Confidential Witness 11 ("CW-11"), a marketing manager, stated that he knew Chen understood GSX's sources of revenues from meetings he held with GSX's marketing team, and that GSX created a specialized data system, including course registration numbers and purchase rates, to allow Chen to monitor classes. ¶¶ 313-16.

Indeed, even apart from CWs, Defendant Shen publicly admitted that she paid close attention to gross billings (cash from course sales net of refunds) and their relationship to GSX's sales and marketing expenses. ¶ 317. She therefore had additional reason to know that the cash GSX was receiving was mostly cash GSX had paid to brushers as marketing expenses for round-trip transactions.

*Second*, Defendants repeatedly and explicitly denied that GSX was engaged in brushing, denials that the Third Circuit has found to be "powerful evidence of scienter." *Avaya*, 564 F.3d at 269. On April 8, 2020, after the first Grizzly report, Defendant Chen denied analyses showing that the Company was falsifying student enrollments and revenue when he called upon Muddy Waters to investigate GSX for fraud and expressed confidence that nothing would be found. ¶ 253. On April 9, 2020, during a conference call with investors, Defendant Chen again denied the

12

fraud, stating that GSX "decided not to respond to Grizzly's short report," claiming that it "is full of irrelevant and false allegations and a lack of basic accounting knowledge." ¶¶ 259, 324. On April 10, 2022, Chen again denied that the Company was brushing, stating "There are people who . . . say[] that GSX is brushing. We're a B2C business model, how can we brush?" ¶ 325. A few days later, on April 14, 2020, Defendant Chen again denied the Company's fraud without any qualification in a post to his 1.4 million followers on Sina Weibo, a social media platform similar to Twitter. The post stated that Grizzly's report was "***complete nonsense***," and that it "fabricated the fact that 70% of GSX revenue was fabricated." ¶ 326 (emphasis added). On April 15, 2020, Defendant Chen again wrote on Sina Weibo that "GSX has never tolerated brushing." ¶ 327. On April 15, 2020, GSX issued a press release unequivocally denying the Citron Report's findings: "GSX . . . today firmly denied the false and ungrounded allegations raised in a report by Citron Research dated April 14, 2020 [that GSX was inflating its revenue by up to 70%]." ¶ 328.

Likewise, on May 6, 2020, on GSX's next earnings call, Defendant Shen denied that GSX was brushing, stating, "in China, brushing is illegal." ¶ 329. Defendant Shen then denied the report of a witness in the Citron Report stating, "So many things mentioned in the conversation make zero sense. We highly suspect the content of the phone interview recording is fake." *Id.* Finally, on June 6, 2020, Defendant Chen stated that "this short *farce* should come to an end in the next two months." ¶ 331 (emphasis added). Notably, each of these denials of the fraud were also temporally proximate to the fraudulent activity, just as they were in

13

*Avaya*.  ¶¶ 319-31.  These repeated, specific denials of the fraud are "powerful evidence of scienter" under *Avaya*, 564 F.3d at 269.

Moreover, the Complaint alleges specific instances in which GSX attempted to conceal its brushing activity.  On June 2, 2020 Grizzly reported that GSX's internal student count (which GSX inadvertently made publicly accessible) did not match its externally-reported count.  GSX then inflated its internal enrollments by 1,000%, for course series that were already 70% complete, to ensure the inadvertently released numbers matched external statements.  ¶¶ 333-34.  After being caught advertising teachers with false licenses and duplicate pictures, GSX deleted the profiles rather than correcting them, showing that the teacher profiles were fabricated, not erroneous, and Defendants knew as much.  ¶¶ 174-181.

*Third*, the fraud concerned GSX's core operations, which further supports scienter.  ¶¶ 338-41.  The core of GSX's business is teaching K–12 online classes, so that falsifying its student enrollments necessarily concerned its core operations and its key metrics.  ¶ 338.  Similarly, the magnitude of the fraud supports scienter. *Avaya*, 564 F.3d at 268.  The Complaint alleges that GSX falsified 70% of its K-12 student enrollments and over 50% of its revenues.  Complaint § IV(B).  GSX's management could not have been unaware that more than half of it was fake.

Defendants argue first that the Complaint relies merely on Defendants' Chen and Shen's positions as CEO and CFO to allege scienter, which Judge Salas previously found to be insufficient to allege their scienter.[3]  Defs.' Mem. at 14.

---

[3] To distract from the damning scienter allegations contained in the SAC, Defendants first fixate on the lack of focus in the Complaint on motive allegations in alleging scienter.  Defs' Mem. at 12-13.  The Third Circuit (and the Supreme

Yet the Complaint does not merely allege that Chen and Shen occupied the positions of CEO and CFO, as the FAC arguably did.  Defendants ignore the ample new allegations, from four new confidential witnesses' personal knowledge, that Chen and Shen routinely reviewed documents—a marketing budgets, monthly written revenue reports and the finance department's "financial management reports," —and were responsible for understanding their contents, including line items of the marketing budget.    ¶¶ 299-316.    Likewise, CWs attested that Defendants were responsible for knowing where GSX's marketing expenses were actually being spent and from where GSX's revenues were actually coming.  *Id.*

Next, Defendants argue that these new allegations do not show that Chen and Shen had access to information that would "alert[] them to the fraudulent scheme." Defs.' Mem. at 15; Op. at 28.  Defendants are mistaken.  Because they reviewed the marketing budget line items, they unquestionably knew of GSX's massive expenditures on brushing firms and thus knew of its brushing.  Likewise, as Defendants reviewed monthly revenue reports and were responsible for knowing "where the Company's revenues were actually coming from," they would know that GSX's revenues were largely from round-trip transactions.

---

Court) have made abundantly clear that no motive allegations whatsoever are necessary to allege scienter.  In expressly rejecting the division between motive allegations and other circumstantial allegations as means of alleging scienter, the Third Circuit held, "[m]otive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient. . . . [A]llegations of motive and opportunity are not entitled to a special, independent status." *Avaya*, 564 F.3d at 276-77.

15

Defendants also argue that the additional CWs were not in a position to know the information attributed to them. Defs.' Mem. at 16. In fact, they were. CW-8 reported directly to Defendant Shen for a time, CW-9 interacted daily with Defendant Chen, and CW-11 participated in discussions held by Chen about the Company's financials. ¶¶ 229, 307, 314. CW-10 was personally involved in preparing GSX's marketing budget, and so had a personal basis to know that Shen was likewise involved in this preparation. ¶¶ 308-09. Contrary to Defendants' assertion, CW-9 worked at GSX for part of the Class Period, and there is no reason to believe that CW-8's observations of Defendant Shen's responsibilities and habits in 2021 did not hold for 2020 when her job did not change during that period. ¶¶ 304, 299-303. Contrary to Defendants' assertion, none of the CW's were low-level employees. ¶¶ 299, 301, 308, 310 313-14.

*Finally*, Defendants attempt to distinguish the Third Circuit's controlling opinion in *Avaya*. Defs.' Mem. at 16. With the additional allegations in the Complaint, *Avaya* is now indistinguishable from this case. As Judge Salas noted, *Avaya* found scienter based on (1) "direct denials of the alleged fraudulent scheme"; (2) the "magnitude of the alleged [fraud]"; (3) "centrality of the operating margins" (the subject of the fraud) to the business; (4) that the CFO was "likely 'paying close attention'" to that aspect of the business; and (5) the "temporal proximity" of the denials to the fraud. Op. at 25-26. The Complaint alleges perfectly parallel facts. (1) Defendants repeatedly and directly denied the fraud;[4]

---

[4] Judge Salas found that, while the Individual Defendants' denials of the fraudulent conduct remained indicative of scienter, they were "less" indicative of scienter than in *Avaya* because the Defendants' denials here "included specific reasons why

16

(2) the magnitude of the fraud alleged here is that more than half of the Company was fake; (3) GSX's revenues and marketing expenses were central to GSX's business; (4) Defendant Shen, the CFO here, was paying attention to GSX's revenues and marketing expenses, as multiple CWs have stated; and (5) GSX's denials of the fraud were temporally proximate to the fraud itself, so the denials cannot be explained as ignorance of a long-forgotten business trend. ¶¶ 298-346. *Avaya* is dispositive on scienter.

Defendants also argue that Plaintiffs' theory of fraud is not cogent because "faking revenues by fronting enrollment fees plus commissions to brushers would only result in losses." Defs.' Mem. at 17. Defendants raised this argument before and Judge Salas correctly ignored it. GSX's "fake it 'til you make it" scheme made perfect sense: GSX could inflate its valuation to raise capital and gain fame that it could exploit to grow a genuinely large enterprise. ¶¶ 3, 5, 173, 182-83, 193-94, 342.

---

they believed the alleged fraudulent conduct was not happening." Op. at 26. Some of Defendants' denials alleged in the Complaint were not accompanied by any such reasons—for example, Defendant Chen's statement on April 14, 2020 that that Grizzly's report was "complete nonsense" was unqualified and unhedged in any way. Nevertheless, Defendant's statements giving reasons why GSX was not engaged in fraud are *more* indicative of recklessness, not less, because they show that GSX was made acutely aware that more than half of their enterprise was fake, yet made up excuses and failed to uncover this colossal problem. Moreover, *Avaya* did not emphasize that the denials there were unaccompanied by reasons in finding that they were the "most powerful evidence of scienter" in that case, and the denials in *Hall v. Johnson & Johnson*, 2019 WL 7207491 (D.N.J. Dec. 27, 2019), cited by the District Court, also were accompanied by reasons. In any event, the additional allegations of the Complaint firmly place this case on all fours with *Avaya*, as explained above.

17

## V.    ARGUMENT:  PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION

The loss causation element inquires "whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007).  "The issue of loss causation is usually not resolved on a motion to dismiss."  *Dudley v. Haub*, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013) (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)).

Plaintiffs have adequately pleaded seven loss causation events, which caused GSX's stock price to drop over nine different trading dates.[5]  *See* ¶¶ 281-97.

**April 3, 2020**.  On April 3, 2020, GSX disclosed that its online and mobile marketing costs had increased by 1,367% and had been responsible for much of the previously-reported increase in selling expenses.  ¶ 281.  This was a partial revelation that the Company was spending a massive amount of money on bots and brushing expenses to make itself appear larger than it actually was, and so partially revealed a key aspect of the fraudulent scheme to the market.  ¶ 281.  It was also a materialization of the concealed risk that GSX would ultimately have to account for such expenses.  Defendants' argument that this disclosure was not connected to the alleged fraud is therefore mistaken.  Defs.' Mem. at 18-19.

**April 14, 2020, May 18 & 20, 2020, August 10, 2020**.  On April 14, 2020, Citron Research published a report revealing significant new information

---

[5] As the fraud was not fully reflected in GSX's share price until after the final corrective disclosure, Defendants' footnote argument, Defs.' Mem. at 20, n.8, that Plaintiffs Angeline, Hays and Tazi should be dismissed is meritless.

18

supporting the claim that GSX was mostly fraudulent, including that: (a) a professional brusher had described in detail how GSX employed faked enrollments; and (b) based on tracking over 20% of GSX classes, collecting the number of unique enrollments, calculating course fees for those enrollments, and comparing the resulting total revenue to the Company's reported revenue, GSX had overstated its revenues by 70%.  ¶¶ 284–85.

On May 18, 2020, Muddy Waters published the results of its new, independent investigation.  Using non-public GSX user data files comprising 200 paid K-12 courses across 54,065 unique users between January and March 2020, Muddy Waters analyzed bot activity and concluded based on this wholly novel analysis that "at least 73.2% of GSX's users are bots."  ¶ 287.

On Sunday, August 9, 2020, Sylvan Research published the results of its own investigation revealing further evidence that GSX was mostly a fake enterprise.  ¶ 291.  The report compared GSX employees' online presence to its competitors', and concluded that GSX had far fewer employees, including by inflating the number of its teaching staff one hundredfold in its 1Q2020 6-K.  *Id.* The report also showed that GSX had only hired one online tutor in a 90-day period in which it claimed to have brought on 6,500.  *Id*.

Defendants argue that an unspecified, earlier report by Grizzly already had revealed GSX's fraud, so the Citron and Muddy Waters reports revealed nothing new to the market.  Defs.' Mem. at 19-21.  While the February 25, 2020 Grizzly Report did accuse GSX of fraud, ¶ 193, the Citron and Muddy Waters' reports on April 14 and May 18, 2020, respectively, clearly revealed extensive new evidence

19

of and information about the fraud. *Id.* Such new information readily satisfies the loss causation requirements. *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7-8 (S.D.N.Y. Mar. 23, 2020) (third-party analyst reports can serve as corrective disclosures); *In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (loss causation may be based on stock drop following short seller report, even when its findings are "not attributed to any non-public information" and "derived from an analysis of" published financials); *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *4, 14 (N.D. Ga. May 15, 2018) (loss causation alleged where series of reports, including by short-seller Citron Research, exposed more and more information concerning defendants' alleged fraud). The disclosures also post-dated GSX's interim denials on April 8, 9, 14, 15, May 6, 2020, ¶¶ 388-93. *See Benak ex rel. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006) (company's reassurances "can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns"); *Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *9 (D.N.J. Dec. 19, 2017) (same).

**August 7, 2020**. On August 7, 2020, Citi Research issued a market report downgrading GSX due to concerns with its valuation, partially revealing that GSX's revenues were overstated because it falsified student enrollments. ¶ 289. Defendants argue that the Citi report downgraded GSX for reasons unrelated to the fraud, Defs.' Mem. at 9–10, but they are mistaken:  the report showed that the Company's revenues would be less than anticipated, ¶ 289, and so was a partial

20

revelation that its revenues were fraudulent.  Defendants argue that this news revealed only "negative financial information" about the company without "connecting those negative financials to the alleged fraud."  Defs.' Mem. at 18. Yet the alleged fraud here is the Company was *falsifying its financials*, namely its revenues, so a revelation that the revenues were not as they projected them to be is a partial revelation of the revenue fraud.  If disclosure of lower revenues could not count as a partial disclosure for loss causation, companies could knowingly falsify revenue figures in a public filing, subsequently reveal to the market vastly lower revised revenue figures, suffer collapse in share price, and then a week after that revelation, reveal that the original numbers had been knowingly falsified.  Under Defendants' untenable theory of loss causation, such defendants would wholly escape liability for such *ex hypothesi* fraud because all that was revealed on the day the company's share price collapsed were negative revenue figures.

**September 2 & 3, 2020**.  On September 2, 2020, the SEC announced that it was investigating GSX, and investors clearly understood this investigation to concern allegations of GSX's fraud.  ¶ 293.  Defendants argue, Defs.' Mem. at 19, that an announcement of an investigation cannot serve as a loss causation event lacks basis in law, yet courts routinely accept announcements of investigations as corrective disclosures.  *See, e.g.*, *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828–29 (D.N.J. 2006); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *14 (D.N.J. Aug. 6, 2019); *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 557 (2d Cir. 2018) (SEC complaint adequate basis for loss causation); *Police & Fire Ret. Sys. Of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d

21

210, 230–31 (S.D.N.Y. 2009); *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105–06 (2d Cir. 2022).  Defendants' single case is distinguishable because, unlike here, no additional confirmatory information made clear that the investigation was not baseless.  *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018).

**October 21, 2020**.  On October 21, 2020, The Motley Fool reported that GSX management foresaw a loss of ¥900 million.  ¶ 295.  The report was accurate: GSX reported a Q3 2020 net loss of ¥932 million.  *Id.*  Thus, the source of the report must have been someone at GSX with internal GSX information, and the report was a revelation of that internal information.  GSX's losses resulted from reported Q3 2020 selling expenses of *¥2.1 billion*.  ¶ 296.  The loss was a materialization of a risk of Defendants' concealing that the majority of GSX's revenues were fake, namely that the Company ultimately would have to disclose fake expenses to offset the Company's fake revenues.  As set out above, GSX used fake selling expenses to hide the fact that its revenues were fake and therefore did not generate any cash.  Given that this loss was a materialization of a risk of Defendants' concealing that the majority of GSX's revenues were fake, Defendants' argument that this disclosure was not connected to the fraud is wrong.

Contrary to Defendants' misleading statement in their Motion that Judge Salas ruled against Plaintiffs on loss causation, Defs.' Mem. at 18, she raised no concerns about the April 14, 2020, May 18, 2020, and August 7 and 9, 2020 loss causation dates, and so appears to have tacitly accepted that loss causation was adequately pleaded with respect to those dates.  Moreover, as detailed above, the

22

Complaint provides additional facts for each of the remaining loss causation dates that address any concerns the Court may have about those dates.

## VI.    ARGUMENT:  PLAINTIFFS PLEAD NUMEROUS MATERIAL MISREPRESENTATIONS

Plaintiffs plead that:  (1) GSX overstated revenue, profits and other financial metrics; (2) GSX routinely falsified at least 70% of its K-12 student enrollments; (3) GSX failed to disclose that its costs of revenues and other expenses included expenses for illegal brushing ; (4) GSX failed to disclose that its purported success was due to these falsifications; (5) GSX falsely denied the claims made in third-party research reports.  ¶¶ 195-280.

### A.    The Complaint Adequately Alleges that Defendants Inflated the Company's Revenues and Student Enrollment by Use of Bots and Brushing

The Complaint's claim that at least 70% of participants in GSX's online classes were bots is well supported by the facts alleged, which are based upon Plaintiffs' counsel's extensive independent investigation.  Plaintiffs' counsel retained a highly-respected expert in computer "bots," Dr. Knoblock, who analyzed sign-in statistics from 463,217 logins from over 200 paid K-12 classes purchased between January and March 2020.  ¶ 40.  Dr. Knoblock determined that four distinct anomalies, ¶¶ 42-61, independently and collectively support the conclusion that "more than 70% of GSX user logins are bots rather than human users and are falsified."  ¶ 62.  Defendants' assertion that the expert analyses and careful reasoning of Dr.  Knoblock and Muddy Waters, based on extensive login

23

data, described at length in the complaint, are "rank speculation," Defs.' Mem. at 28, simply misdescribes these analyses.

Plaintiffs' counsel retained two private investigative firms, one based in China, who interviewed many witnesses and collected extensive statements from them plainly detailing the alleged fraud. ¶¶ 4, 347. They also independently interviewed witnesses identified by research analysts. ¶¶ 4, 347-49. As explained below, these witnesses strongly corroborate Dr. Knoblock's conclusions based on his data analysis. Finally, additional allegations based on data concerning the company's implausible economic growth (¶¶ 130-39), lack of name recognition (¶¶ 158-61), perfectly linear enrollment growth (¶¶ 121-24), red-flag job postings (¶¶ 144-45), massive inexplicable selling expenses (¶¶ 182-92), fake teachers (¶¶ 174-81), and that GSX sold subpar products at premium prices (¶ 140), cement the inference that GSX has dramatically overstated its enrollments and revenue.

Defendants argue first that GSX disclosed that it was engaged in fraudulent activities. Defs.' Mem. at 21. In fact, the statements Defendants cite stated only that there was *a risk* that the Company could *fail to prevent* its employees from engaging in fraudulent activity, when at the time GSX was in fact *already engaged* in fraudulent activity *sanctioned by its top executives*. Accordingly, the statements Defendants cite were themselves actionable under the principle that disclosing abstract risks that have already materialized is misleading. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (disclosure hypothetically warning of risk that had already occurred was misleading).

24

Defendants next argue that Plaintiffs somehow have admitted in their allegations concerning Burst Joiners that the Joiners are more likely the result of humans than bots.  Defs.' Mem. at 29-30.  Defendants are confused.  GSX attempted to explain away Burst Joiners as resulting from the Company's practice of automatically switching users from a prep session to a live class.  As Dr. Knoblock explained, that explanation does not make sense, because a program designed to switch students over automatically would not switch students after the class has begun.  Dr. Knoblock's statement is entirely consistent with his finding that Burst Joiners are bots because a bot designed not to switch students over to a live class but rather to falsify student enrollments likely would have some users join after class had begun to mimic the tardiness of some students.

Defendants argue that the data set analyzed by Dr. Knoblock, taken from Muddy Waters, was somehow deficient.  Defs.' Mem. at 31.  Defendants are wrong.  Muddy Waters explained the population from which it drew its sample precisely:  its sample was drawn "between January and March 2020" from "200 classes" from both GSX's platforms that "spanned K-12 grade levels" and spanned "[K-12] subject matter."  ¶ 40.  Moreover, the Complaint plainly alleges that the sample was "randomly chosen."  *Id*.  Accordingly, the Complaint adequately alleges that the sample was representative:  it was large and drawn randomly over an extended period of time from the full breadth of GSX's course offerings.[6]  *Id.*

---

[6] In any event, even if, contrary to the clear allegations of the Complaint, the sample Dr. Knoblock used were maximally biased, and somehow selected 100% of those classes that contained bot activity, based on extrapolation from instructor (i.e., class) population, at least 8.4% of students across all classes are bots, and GSX's revenues would be overstated by at least 6%—still above the generally

Defendants next argue that Dr. Knoblock was wrong to conclude that 70% of the users in the sample were bots, because, according to Defendants' lawyers own lay analysis, "linked users," (i.e., logins that occurred at the same time as a bot or used the same IP address), should not have been included as logins counting as bots. Defs.' Mem. at 32. Defendants' argument simply denies the facts alleged in the SAC, which properly pleads that, according to a highly qualified expert in information science, logins occurring at the exact same time as a bot or using the exact same IP address as a bot also are likely to be bots rather than humans. ¶¶ 36-37, 61. A motion to dismiss is not a *Daubert* motion—the Court must accept well pleaded facts as true.[7] *See, e.g.*, *Celgene*, 2019 WL 6909463, at *10.

Defendants also argue that the Complaint does not contain any "independent factual allegations" to corroborate allegations connected to Muddy Waters' report. Defs.' Mem. at 32-33. Defendants' argument simply ignores the Complaint's voluminous corroborating allegations, including confidential witnesses, market data, job postings, inexplicable growth patterns, and ample other evidence. ¶¶ 63-139. Moreover, the Complaint does not rely on Muddy Waters's conclusions—Plaintiffs' expert Dr. Knoblock conducted an independent analysis of the data.[8]

---

accepted threshold for a material misrepresentation. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150-01 (Aug. 19, 1999), *codified at* 17 C.F.R. § 211(B) (5% threshold for materiality); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163 (2d Cir. 2000) (approving SAB No. 99).

[7] In any event, Dr. Knoblock's opinion, even to a layperson, makes perfect sense. Phones, and their unique IP addresses, used by a bot once, are likely to be bot-controlled devices, and perfectly synchronized logins by multiple devices are unlikely to occur frequently by coincidence.

[8] Dr. Knoblock properly accepted the *data* reported by Muddy Waters as accurate because there is no reason to believe that Muddy Waters blatantly falsified data

26

Dr. Knoblock did not accept *any* of the expert conclusions asserted in the reports at issue as true.  ¶¶ 4, 34, 37, 61.

> **B.**  **Statements from Numerous Confidential Witnesses Corroborate Dr. Knoblock's Analysis**

Plaintiffs' extensive independent investigation found numerous confidential witnesses who corroborate Dr. Knoblock's conclusions.  According to CW-1, GSX's Beijing headquarters contains dozens of "mobile phone room[s]," each packed with "many thousands" of mobile devices.  ¶ 64.  CW-1 personally harvested user data from private WeChat accounts, created false student accounts using that data, and programmed Android mobile devices to use that account to "enroll in GSX's promotional courses [and] log-in to the classes at specified times . . . ."  ¶ 65.  CW-2 corroborated CW-1's account and stated that CW-2 and other engineers installed software on thousands of mobile phone devices that became bot-controlled devices.  ¶ 69.  This software "caused the bot-controlled devices to purchase course enrollments, sign into and out of classes, create new student accounts, and send messages to other students . . . ."  *Id.*  CW-2 and CW-3, a third-party brusher, corroborated each other's account that GSX also paid third-party firms to brush its enrollment figures.  ¶¶ 72-78.  According to CW-2, GSX pays third-party brushers to create false student accounts and buy courses.  ¶ 72.  CW-3 was "regularly paid commissions by GSX to enroll in GSX's courses with fake or

---

and there is good reason to think that they did not—doing so would have subjected them to potential liability for libel, *see, e.g.*, *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 296 (D.N.J. 2016), and even GSX never claimed that Muddy Waters's *data* was inaccurate.

assumed identities . . . ." ¶ 76. In this role, she "would 'buy classes, write positive reviews, and join large classes to boost up [GSX]'s head counts' with harvested user data from various social media platforms, including WeChat." *Id.* She confirmed that her employer's brushing "accounted for approximately 40% of all enrollments in GSX's K–12 courses." *Id.*

CW-6 stated that "tutors routinely assumed alternative identities to purchase promotional courses to inflate enrollment numbers." ¶ 93. CW-5 confirmed that GSX enrolled fake students in its classes, as evidenced by falsified student interactions. ¶¶ 79–89.

Defendants argue that the Court should ignore the witnesses' damning statements. Defs.' Mem. at 24-28. Defendants first misstate Judge Salas' holding in claiming that she found that CW-2, CW-6 and CW-7 were generally unreliable. Defs.' Mem. at 24. Certainly not: she assessed only that these CWs could not know about GSX's hiring process and compensation structure for instructors and tutors (Op. at 11-16), which Plaintiffs no longer allege GSX misstated. She did not assess whether these CWs could know of GSX's broader fraud in falsifying revenues and student enrollment figures. They could.

A complaint need only describe a witness "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Avaya*, 564 F.3d at 261. This particularity requirement may be satisfied, among other ways, by "provid[ing] job titles, years of employment, and job responsibilities." *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *7 (D.N.J. Sept. 30, 2009).

Each of the confidential witnesses referenced in the Complaint meets this requirement in spades with respect to the information attributed to them. CW-1 worked as an "Android Engineer" at GSX's Beijing headquarters in the "Sales and Marketing department" between approximately April 10, 2019 and approximately June 20, 2020, and was paid directly by GSX to "brush" course enrollments. ¶¶ 63-64. Contrary to Defendants' assertion, Defs.' Mem. at 25, the Complaint shows that CW-1 had access to information that the Beijing headquarters contained dozens of mobile phone rooms and that most devices were programmed with bots *because CW-1 was a mobile phone engineer working at the Beijing headquarters and programming those phones was her job*.

CW-2 worked as an "engineering manager" at GSX's Beijing headquarters beginning in 2015. ¶ 67. In that role, CW-2 directly supervised software engineers and personally installed bot software on thousands of mobile phone devices. ¶¶ 67-70.

CW-3 was employed by a third-party brushing firm in Beijing from January 1, 2019 through December 31, 2019 and in that role was regularly paid commissions by GSX to enroll in its courses with fake or assumed identities and write positive reviews. ¶ 76. Contrary to Defendants' claims, the Complaint alleges that CW-3's duties included buying classes, writing positive reviews, and joining classes, ¶ 76, and this position straightforwardly gave her a basis to know the facts attributed to her.

CW-5 is a former customer and former student of GSX, who enrolled and attended a GSX "English vocabulary course in September 2019. ¶¶ 79–80. CW-6

29

is a former GSX tutor, ¶ 90, tutored first-year high school chemistry for one of GSX's brands at Zhengzhou Center from approximately June 15, 2019 through July 31, 2019. ¶ 91.  In that role, CW-6 worked alongside approximately 40 other high school chemistry tutors. *Id.*

Defendants also argue that the statements of CW-3 and CW-5 should not be credited because, according to Defendants, they "are pulled from various short seller reports." Defs.' Mem. at 26.  Not so.  Plaintiffs independently interviewed each of the confidential witnesses except for CW-2, who gave statements in a recorded video interview with subtitles that a mandarin-speaking attorney for Plaintiffs confirmed are accurate.  ¶¶ 347–49.  Thus, concerns about allegations from short seller reports simply do not apply to this case.  Plaintiffs' independent interview of CW-3 also shows why Defendants' claims that certain statements attributed to CW-3 somehow are not supported by the statements appearing in a short-seller's report ignore is a red herring. ¶ 347.

*Finally*, Defendants argue that if the CWs statements are reliable (they are), they nevertheless are not indicative of widespread, rather than localized, fraud at GSX.  Defs.' Mem. at 27-28.  Defendants ignore the CWs damning statements. CW-1 and CW-2 for example both stated that the Beijing headquarters contained thousands of bot-controlled devices.  ¶¶ 63–70.  CW-3 stated that the third-party brushing firm accounted for about 40% of GSX's student enrollments.[9]

---

[9] Defendants mischaracterize the statements CW-3 made in the Citron Report in claiming that CW-3 stated that the third-party brusher accounted for 40% of the enrollments of only a single rogue teacher.  Defs.' Mem. at 28.  Rather, the Citron Report reads in full: "Q: How about reviews?  A:  Depending on the teachers, we would typically provide 20% to 40% of the positive reviews.  Q:  How many

### C.    The Complaint Extensively Alleges that Defendants Inflated the Company's Revenues by over Fifty Percent

Plaintiffs plead extensive facts that make inescapable the conclusion that GSX falsified at least 70% of its student enrollment, and inflated its revenues and other financial metrics by over fifty percent.  As explained above, Dr. Knoblock has confirmed that at least 70% of the Company's purported sign-in records do not reflect the activity of human students, but instead are "bots."  Moreover, several confidential witnesses—all with first-hand knowledge of GSX's student recruitment practices—have explained in detail the means and methods by which GSX falsified and overstated its student enrollments.

Defendants argue that Plaintiffs do not plead any facts to show that the alleged false revenues and student enrollments impacted GSX's reported revenues and enrollment figures.  Defs.' Mem. at 36.  Defendants ignore the allegations of the Complaint.  *First*, confidential witnesses, who were in a position to know the facts they report, have stated that GSX used this scheme to inflate the Company's *revenues*.  According to CW-2, GSX reported brushed enrollments as "revenues".  ¶ 72.  CW-2 was an engineering manager at GSX's Beijing headquarters and had the job of overseeing extensive bot-controlled brushing activity; she was certainly in a position to know that was *her own job's purpose*.  ¶ 67.

*Second*, multiple confidential witnesses also have stated that GSX hired technicians and third-party brushing companies to create false student accounts, to be operated by bots, and that GSX *gave them funds to pay back* to GSX to enroll

---

student head counts are brushed for one teacher?  A:  Last year we generally did about 40% for them."  Van Decl., Ex. B at 4.

31

these false student accounts in classes. *See* ¶¶ 63–95. The Complaint clearly alleges that GSX used bots to "purchase course enrollments," and also used brushers to "purchase GSX's class" and "buy classes." ¶¶ 69, 72, 76. Moreover, GSX paid third-party brushers in part to complete these deceptive transactions. ¶¶ 72, 76–78. There would be no need to have bots and brushers actually purchase courses, and to lose money paying third-party brushers to actually purchase such courses, if GSX aimed only to create the appearance for other students of full classes. GSX could simply have falsified student activity in its classrooms directly through software without exchanging money or involving GSX's sales channels.[10]

*Third*, GSX's marketing expenses are a far higher percentage of its revenues than its peers. ¶ 191. Moreover, selling expenses increased nearly dollar-for-dollar with revenues, which is exactly what would happen if revenues were merely funds recycled through brushing companies. *Id.*

*Finally*, the Complaint makes clear that course fees paid by bots and brushers were paid through the same channels that real students used, ¶¶ 69–78, so

---

[10] For the same reason, Defendants' argument, Defs.' Mem. at 36-37, that GSX may have created false student accounts in order to falsify student login activity, but for some reason did not include these accounts in its reported enrollment figures, is wholly implausible. There would be no reason for GSX to go to great lengths to create false accounts only to simulate login and course activity—it could simply have simulated that activity internally through software. The more reasonable inference is that GSX paid third-parties to create false student accounts in order to create a paper trail to justify its reported enrollment and revenue figures. Moreover, by paying brushers so they would buy GSX's courses, Defendants went through considerable trouble to create a paper trail for every one of these fake students. If the externally-reported numbers did not reflect these fake students, then the number would not match GSX's paper trail, exposing its fraud to even careless auditors.

these fees would have entered into GSX's ordinary revenue streams. Accordingly, absent some reason to think otherwise (there is none), the Court may reasonably infer that these fees were treated as ordinary revenue.[11]

Contrary to Defendants' repeated suggestion that the Complaint fails to state "the amount by which GSX's financial statements were falsified," Defs.' Mem. at 37, the Complaint clearly specifies that the amount by which GSX inflated its revenues was over 50%.[12] A more precise specification is unnecessary, as any overstatement of revenues near or over 50% is material.[13]

Defendants suggest that GSX lacked a motive to falsify student enrollments

---

[11] In any event, even if GSX's brushing was undertaken only for marketing purposes and did not impact the Company's reported revenues or enrollment figures, then GSX was defrauding students in its classes and was defrauding investors by failing to disclose that practice. Promoting a business by means of false claims (including through brushing) is illegal in China, as Defendants have admitted. ¶ 329; *see* ¶¶ 182-83, 191, 282. Accordingly, Defendants' statements explaining the reasons for the Company's success, and the Company's statements explaining its costs of revenues and selling expenses, would still be misleading for not disclosing that the Company's revenue increase resulted largely from illegal marketing practices, and failing to disclose that the Company's expenses included expenses for illegal marketing. *See, e.g.*, ¶¶ 195-280. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) (statement of reasons for success are misleading if they omit illegal activity).

[12] The Complaint explicitly ties the Company's inflated revenues to the K-12 online courses and to the brushing schemes. *See* ¶¶ 27-32. The amount by which the Company inflated revenues follows straightforwardly from the percentage of the Company's reported paid-course enrollments in K-12 online classes, and the percentage of false users found in those classes. *See id.*

[13] Defendants' reliance on *Chubb*, Defs.' Mem. at 35-37, is misplaced, as the Complaint provides exactly the "particulars" the Third Circuit found missing in that case. The plaintiffs in *Chubb* had failed to allege *any estimate* of the total amount by which defendants' loss reserves were manipulated downwards, but the Complaint provides just such an estimate: revenues were overstated by at least 50%. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 152-53 and n.18 (3d Cir. 2004) ("*estimates* of the actual amount of improperly recognized revenue" sufficient, but no such estimate provided in *Chubb*) (emphasis added).

and inflate its revenues by paying employees and third parties to create false student accounts and pay course fees, as GSX had to pay for this brushing activity. Defs.' Mem. at 17.  GSX's plan made perfect sense.  As alleged, it was a "fake it 'til you make it" scheme of epic proportions—GSX was inflating its valuation to raise capital that it could then use to grow a genuinely large enterprise.  ¶¶ 3-8.

> **D.    Numerous Additional Allegations Concerning the Company's Implausible Economic Growth, Lack of Name-Recognition, Perfectly Linear Enrollment Growth and Red-Flag Job Postings Cement the Conclusion that GSX's Falsified Its Revenue and Enrollments**

Defendants pass over the Complaint's powerful supporting allegations that: (1) GSX openly published job postings for software engineers to jailbreak phones to install programs designed to enable illicit software, ¶¶ 101–08, (2) survey data and Web analytics show that GSX is not widely used, ¶¶ 162–73, (3) GSX wholly lacks name recognition consistent with its claimed size, ¶¶ 158–61, (4) GSX's enrollment growth was perfectly linear during certain periods, ¶¶121–24, (5) GSX sold a subpar product at premium prices (¶ 140), (6) GSX had massive inexplicable selling expenses (¶¶ 182-92), and (7) GSX faked its teachers (¶¶ 174-81).

Defendants largely ignore these allegations.  Defendants argue that GSX's job posts recruiting engineers to "jailbreak" phones and to operate cell phone bot software somehow serve legitimate needs.  Defs.' Mem. at 33-34.  Setting to one side Defendants' translations, which Plaintiffs dispute, Defendants' story about how GSX has a legitimate need "to 'jailbreak' or 'root' a phone," ¶ 147, to install "TaiChi" software applications referenced in the job posts is implausible.  ¶¶ 101–

34

08.   TaiChi is used to enable functions like "fake device" and "fake location," functions that have no plausible use for an online education company.  ¶ 105. Defendants' assertions that the jobs sought in these posts fit naturally in the ordinary operations of an online education company simply contradicts these allegations in the Complaint.

Defendants also argue that comparing the inexplicably explosive growth rate of GSX to the modest growth rate of its closest competitors is somehow unfair. Defs.' Mem at 34.  Yet Defendants' conclusory assertions that GSX's primary competitors referenced in the Complaint are not primarily online competitors is a factual assertion for which they provide no citation, and it contradicts allegations in the Complaint.  ¶ 131.[14]  Moreover, GSX's growth inexplicably also outpaced that of its online competitors "when they were at similar stages of development" prior to the onset of the COVID-19 pandemic restrictions.  ¶¶ 134–35.  And much of GSX's explosive growth also predated COVID-19: reported revenues grew 4,290% from 2018 to 2019.  ¶ 134.  In 2020, "GSX's reported performance lapped that of any of its competitors, without any plausible, legitimate explanation," ¶¶ 131–33, and with "no legitimate competitive advantage that would explain this growth." ¶¶ 136–39.

As for the Complaints' allegations that survey data and Web analytics show

---

[14] Indeed, ¶ 131 incorporates an article in the *Wall Street Journal* that expressly states, "Online education has been a rapidly growing sector in China, and other education stocks have climbed this year as the coronavirus pandemic helped make a bigger case for remote learning.  GSX's gains, however, have far exceeded those of its peers."

that GSX is not widely used, ¶¶ 162–73, it wholly lacks name recognition consistent with its claimed size, ¶¶ 158–61, its enrollment growth was perfectly linear during certain periods, ¶¶ 121–24, and it used accounting tricks to conceal its brushing expenses, ¶¶ 182–92, Defendants merely argue in a footnote that these allegations "add nothing" because, according to Defendants, they are based on "short-seller claims without any independent investigation."  Defs.' Mem. at 26 n.16.  Defendants are wrong on both counts.  These additional allegations are damning and should be assessed carefully by the Court.  And while these allegations draw in part on reports by research analysts, as explained above, Plaintiffs undertook an extensive independent investigation of these facts.  ¶¶ 347–49.  Courts routinely permit plaintiffs to rely on such reports, and have never rejected such reports as a basis for allegations where plaintiffs independently investigated them.[15,16]  *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 435 (S.D.N.Y. 2017); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 421–22 (S.D.N.Y. 2014).

---

[15] Defendants' contention that GSX's denials of the short-seller reports are not actionable because such denials were not false, Defs.' Mem. at 40 n.22, also lacks merit.  As explained above, the Complaint adequately alleges that the statements in the research reports accusing the Company of falsifying enrollments and revenues were true, so the Company's denials of these reports were misleading.

[16] As Plaintiffs have pleaded primary violations of Section 10(b), Defendants' argument for dismissal of Section 20(a) claims, Defs.' Mem. at 40 n.23, also fails.

## VII.   CONCLUSION

Defendants' motion to dismiss should be denied.[17]

Dated:  July 24, 2023

Respectfully submitted,

POMERANTZ LLP

*/s/ Austin P. Van*
Jeremy A. Lieberman (*pro hac vice application forthcoming*)
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
avan@pomlaw.com

*Lead Counsel for Lead Plaintiff Yang Renbin, and Additional Plaintiffs Corey Hays and Alexandre Tazi*

Laurence M. Rosen
THE ROSEN LAW FIRM, P.A.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Telephone:  (973) 313-1887
Facsimile:  (973) 833-0399
Email:  lrosen@rosenlegal.com

Jing Chen
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, New York 10016

---

[17] If, for any reason, the Court dismisses claims under Section 10(b) or 20(a), Plaintiffs respectfully request leave to amend.  The amendment would include additional allegations concerning the fraud, scienter, and loss causation.

37

Telephone:  (212) 686-1060
Facsimile:  (212) 202-3827
Email:  jchen@rosenlegal.com

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024  Beijing
People's Republic of China
Telephone: +86 137-1805-2888
Email:  jhao@haolaw.cn

*Additional Counsel for Lead Plaintiff
and Additional Plaintiff Robert Angeline*

38