**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YANG RENBIN, ROBERT ANGELINE, COREY HAYS, AND ALEXANDRE TAZI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GSX TECHEDU INC., LARRY XIANGDONG CHEN, NAN SHEN, XIN FAN, YIMING HU, MING LIAO, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES, INC., BARCLAYS CAPITAL, INC., BOFA SECURITIES, INC., CLSA LIMITED, AND GOLDMAN SACHS (ASIA) L.L.C., <br><br> Defendants. | Case No. 2:20-CV-04457 (MEF) (JRA) |

**DECLARATION OF AUSTIN P. VAN IN SUPPORT OF LEAD PLAINTIFFS'**
**UNOPPOSED MOTION FOR PRELIMINARY**
**APPROVAL OF CLASS ACTION SETTLEMENT**

I, Austin P. Van, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am a Partner at the firm of Pomerantz LLP, court appointed Lead Counsel for Lead Plaintiff Yang Renbin, and Additional Plaintiffs Corey Hays and Alexandre Tazi (collectively, the "Plaintiffs") and the proposed Settlement Class in this action.  I am duly admitted to practice law in the State of New Jersey and before this Court. I respectfully submit this declaration in support of Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement.  I have personal knowledge of the matters testified to herein.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of the Stipulation and Agreement of Settlement (the "Stipulation") dated June 5, 2025.

3. Attached hereto as **Exhibit A** to the Stipulation is the [Proposed] Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement ("Proposed Preliminary Approval Order").

4. Attached hereto as **Exhibit A-1** to the Proposed Preliminary Approval Order is the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses ("Notice").

5. Attached hereto as **Exhibit A-2** to the Proposed Preliminary Approval Order is the Proof of Claim and Release ("Proof of Claim").

6. Attached hereto as **Exhibit A-3** to the Proposed Preliminary Approval Order is the Summary Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses ("Summary Notice").

7. Attached hereto as **Exhibit B** to the Stipulation is the [Proposed] Final Order and Judgment ("Judgment").

8. Attached as **Exhibit 2** is a true and correct copy of the Declaration of Luiggy Segura on behalf of JND Legal Administration ("JND") in Support of Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement.

9. Attached as **Exhibit 3-1** is a true and correct copy of a preliminary damages report prepared by Plaintiffs' financial expert.

10. Attached as **Exhibit 3-2** is a true and correct copy of a second preliminary damages report prepared by Plaintiffs' financial expert.

11. Attached as **Exhibit 4** is a true and correct copy of a chart of GSX's trading data during the Class Period, prepared by Plaintiff's damages expert. The chart incorporates data

obtained from Bloomberg, SEC filings, and the data source LSEG Data & Analytics, including (a) weekly trading volume, (b) equity outstanding, and (c) float outstanding.  Plaintiffs' expert calculated additional columns using this data, including (d) percentage of weekly volume as a proportion of the float, (e) percentage of weekly volume as a proportion of the number of shares outstanding, and (f) dollar value of the float.

12.    Attached as **Exhibit 5** is a true and correct copy of partial list of analysts from Refinitiv Eikon covering GSX during the Class Period.

13.    Attached hereto as **Exhibit 6** is a true and correct copy of a list prepared by Plaintiffs' damages expert showing information for each day of the Class Period, including: (a) closing stock price; (b) percentage price change from previous close; (c) percentage price change of index including the entire market; and (e) percentage price change of an index of peer companies.  From this information, Plaintiffs' expert created a statistical model attempting to explain changes in GSX's stock price from change in the market and peer indexes, and flagged with "***" any statistically significant changes at a 95% or higher level.

## I.    INTRODUCTION

14.    The proposed Settlement[1] presented to the Court for preliminary approval will resolve all claims against Defendants in exchange for a sizable cash payment of $9,500,000 (the "Settlement Amount") for the benefit of the Settlement Class.

15.    As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents an extremely favorable result for the Settlement Class in light of the significant risks to overcome and remaining in the Action.

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation, attached as Exhibit 1.

16.     The Settlement Amount is extremely favorable as the estimated maximum damages for this case considering the Court's dismissal of several of the loss causation dates is $138.5 million, and the $9.5 million Settlement Amount therefore represents approximately 6.86% of the total maximum damages potentially available in this Action.  *See* Exhibit 3. Furthermore, there is no guarantee Plaintiffs' would be able to successfully bring their case to trial and win the full maximum amount.

17.     Thus, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing at all) after years of additional litigation and delay.

18.     The Settlement was only achieved after a hard-fought litigation, during which Lead Counsel became well informed of the relative strengths and weaknesses of Plaintiffs' claims in the Action.  In particular, prior to reaching the Settlement nearly five years after this Action was initially filed, Lead Counsel:  (i) conducted a comprehensive legal and factual investigation into the allegedly wrongful acts, which included, among other things, a review and analysis of Defendant GSX's filings with the U.S. Securities and Exchange Commission ("SEC"), public reports concerning GSX, and transcripts of GSX's investor calls; researching case law concerning the elements of the claims asserted, reviewing documents produced by third parties; interviews through investigators with several former employees and other potential witnesses with relevant information; and consultation with damages and accounting experts; (ii) drafted each of: the Amended Class Action Complaint ("AC") and Second Amended Class Action Complaint ("SAC"), to address the deficiencies in the AC identified by the Court when it granted Defendants' motion to dismiss the AC; (iii) briefed Defendants' motions to dismiss the

AC and SAC; (iv) in large part successfully opposed Defendants' motions to dismiss; (v) drafted and exchanged extensive mediation statements containing detailed analyses of the strengths, risks, and potential issues in the litigation; (vi) participated in a full-day mediation sessions before mediator David Murphy of Phillips ADR and several post-mediation discussions through the mediator; (vii) engaged in negotiations regarding the terms of the proposed Settlement; (viii) prepared the initial draft of the Stipulation and supporting documents; and (ix) worked with Plaintiffs' damages experts to craft the Plan of Allocation.

19.      Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of all Settlement Class Members.  The Settlement is the result of arm's length negotiations conducted by informed and experienced counsel, in conjunction with a well-respected mediator.  As discussed in greater detail below, Plaintiffs and Lead Counsel believe that the proposed Settlement meets the standards for preliminary approval and is in the best interests of the putative class.  Accordingly, for all the reasons set forth herein and in the accompanying memorandum of law and declarations, Plaintiff and Lead Counsel respectfully request that the Court grant preliminary approval of the Settlement.  Pursuant to the terms of the Stipulation and Federal Rule of Civil Procedure ("Rule") 23(c)(2)(B)(v), all members of the Class will have an opportunity to opt out or object.

20.      As set forth below, the Settlement easily satisfies the relevant standard for approval under Rule 23(e), because it is a fair, reasonable, and adequate resolution for the Class. In particular, the Settlement balances the objective of securing the highest possible recovery for the Class while recognizing the substantial risks and costs of continued litigation, and the risk

that, as in any complex case, the Class could receive nothing, or a sum far less than the Settlement Amount, after a trial and any lengthy appeals are completed.  Accordingly, Plaintiffs and Lead Counsel believe that the Settlement is in the best interests of the Class and represents a highly favorable result reached as a result of Counsel's best efforts.

21.    In addition, pursuant to the Stipulation, each Class Member will be treated equitably because each Class Member that properly submits a valid Proof of Claim form will receive a pro rata share of the monetary relief based on the terms of the Plan of Allocation.  For all of these reasons, the proposed Settlement satisfies the standards for preliminary approval.

22.    As discussed in greater detail below, the proposed Settlement meets the standards for preliminary approval and is in the best interests of the putative Class.

## II.    SUMMARY OF THE LITIGATION AND SETTLEMENT

### A.    Procedural History of the Litigation

23.    On April 17, 2020, the initial class action complaint was filed in this Court.  ECF No. 1.  On August 6, 2020, the Court appointed Yang Renbin as Lead Plaintiff and approved Pomerantz LLP as Lead Counsel in the Action.  ECF No. 9.

24.    Plaintiffs filed their Amended Class Action Complaint on November 2, 2020 (ECF No. 22), and on April 30, 2021, the Parties filed their Motion to Dismiss briefing (ECF Nos. 67, 68, 70), and on the same day, the Parties filed a Stipulation and Order of Voluntary Partial Dismissal (ECF No. 69), which the Court granted on May 4, 2021 (ECF No. 73), dismissing certain counts and Defendants.  On February 7, 2022, the Parties filed updated Motion to Dismiss briefing (ECF Nos. 82-84), and on February 24, 2023, the Court issued an Opinion and Order granting Defendants' motion to dismiss without prejudice and directing Plaintiffs to file an amended complaint (ECF Nos. 95-96).  Plaintiffs filed their Second Amended Complaint on April 25, 2023.  ECF No. 97.  Defendants filed a motion to dismiss on June 9,

2023 (ECF No. 105), Plaintiffs filed an opposition on July 24, 2023 (ECF No. 108), and Defendants filed a reply in further support of the motion to dismiss (ECF No. 109) on August 23, 2023. On June 25, 2024, the Court issued an Opinion and Order denying the motion to dismiss, except as to certain statements in Part III.C, which it granted. ECF No. 112. On August 9, 2024, Defendants filed an answer to Plaintiffs' Second Amended Complaint. ECF No. 120.

25. After the Court denied in part the motion to dismiss, the Parties explored the possibility of a settlement and retained an experienced mediator to assist them, David Murphy of Phillips ADR. In advance of a formal mediation session, the Parties exchanged detailed mediation statements and material. A mediation session was held on November 26, 2024, however a settlement was not reached at that time. After numerous rounds of meeting and conferring regarding discovery and bringing to the Court several discovery disputes, the Parties agreed to renew settlement discussions in an effort to reach a negotiated resolution. Following the exchange of additional mediation material, a formal mediation session with mediator David Murphy was held on April 3, 2025. On April 22, 2025, the mediator made a formal mediator's proposal recommending that the Parties agree to settle the case for $9,500,000. On April 29, 2025, the Parties accepted the mediator's proposal and began negotiating this Stipulation. On June 5, 2025, the Parties executed the Stipulation, setting forth the terms of the agreement in principle.

26. On April 30, 2025, the Parties informed the Court via a Joint Status Update and Motion for Stay (ECF No. 148) that they had reached an agreement resolving the matter in principle. Judge Almonte then stayed all deadlines and proceedings in the case for 30 days (ECF No. 149) and scheduled a status conference for May 22, 2025 (ECF No. 152).

B.    **Summary of Key Aspects of the Proposed Settlement**

1.  **Relief to Settlement Class Members and Release of Claims**

27.    Defendants have agreed to settle the Litigation for $9,500,000, as described more fully in the Stipulation, in return for which Released Plaintiffs' Claims (as defined in the Stipulation) against Defendants and other Released Defendant Parties will be forever dismissed, barred, and released.

2.  **Notice and Settlement Administration**

28.    As explained below and set forth in the proposed Preliminary Approval Order, within 15 business days of the Court's entry of Preliminary Approval, the proposed Notice and Claim Form, substantially in the forms set forth in Exhibits A-1 and A-2 to the Stipulation, will be mailed to each Settlement Class Member identified by records maintained by GSX's transfer agent, as well as to institutional nominees that usually maintain custodial accounts.  A Summary Notice will also be transmitted over the *PR Newswire*.

29.    The Notice describes in plain English the terms of the Settlement, the considerations that led Lead Counsel and Plaintiffs to conclude that the Settlement is fair and adequate, the Plan of Allocation for the distribution of the proceeds of the Settlement, and the maximum attorneys' fees and Litigation Expenses that may be sought, including the proposed compensatory award to Plaintiffs.  The Notice will also set forth the date of the Settlement Hearing, as well as procedures for objecting to the foregoing matters, opting out of the Settlement Class, and submitting claims.  A copy of the Notice, Claim Form and Stipulation will also be posted on a website that the Claims Administrator maintains.

30.    After competitive bidding, Lead Counsel selected JND Legal Administration ("JND" or the "Claims Administrator") to administer the notice and claims.  The Claims

Administrator is well known and experienced in administering securities fraud class action settlements.

### 3. Papers in Support of the Settlement, Award of Lead Counsel Fees and Expenses, and Plaintiffs' Compensatory Award

31.  No later than 35 days prior to the Final Approval Hearing, Lead Counsel will submit papers in support of the Settlement and Plan of Allocation, as well as the request for the awards of attorney fees, expenses, and Plaintiffs' compensatory award.  Those papers will explain why the Settlement should be approved, as well as Lead Counsel's efforts on behalf of the Class (including the time and rates of each attorney and paralegal).

32.  No less than 7 days prior to the Final Approval Hearing, Lead Counsel may submit reply papers in support of the motion for final approval of Settlement, Plan of Allocation, request for an award of attorneys' fees and expenses and request for a compensatory award to Plaintiffs.

### 4. Objections

33.  Any Settlement Class Member who objects to the Settlement or related matters must do so by mail or email 21 days prior to the Hearing, and must send copies of such objections to the Claims Administrator, as well as Lead Counsel and Defendants' Counsel.  Any Settlement Class Member who does not submit a timely written objection to the Stipulation shall be foreclosed from seeking any adjudication or review of the Stipulation by appeal or otherwise.

34.  To ensure the legitimacy of any such objections, the Settlement Class Member must submit documents evidencing transactions in GSX Securities, as well as submit to the jurisdiction of this Court.

### 5. Requests for Exclusion

35.    Any Settlement Class Member who wishes to be excluded must do so by written request, either by mail or email, accompanied by GSX transaction documentation, such that it is received no later than 21 days prior to the Final Approval Hearing.  The opt-out must be sent to Lead Counsel, Defendants' Counsel, and the Claims Administrator (but not the Court).

### 6. Termination of the Settlement

36.    Defendants have the right to withdraw from the Settlement if Settlement Class Members owning a previously negotiated amount of GSX Securities elect to opt out of the Class. The threshold amount is set forth in a separate, confidential Supplemental Agreement Regarding Requests for Exclusion, (the "Supplemental Agreement").  Stipulation ¶ 41.  As is standard in securities class actions, the Supplemental Agreement is kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual settlement.  Pursuant to its terms, the Supplemental Agreement may be submitted to the Court *in camera* or under seal.  The Supplemental Agreement and Stipulation are the only agreements concerning the Settlement entered into by the Parties.  In the event that the Settlement is not approved by the Court, or does not become final due to any appeals or Defendants' withdrawal from the Settlement, the parties will return to their respective positions prior to the Settlement and the litigation will proceed apace.

### 7. No Admission of Liability

37.    By entering into the Stipulation, the Defendants do not admit liability or wrongdoing and continue to deny that they engaged in any misconduct or violated the law.

III.    **THE REQUIREMENTS OF RULE 23(E) ARE MET**

A.    **Plaintiff and Lead Counsel Have Zealously Represented the Class**

38.    Plaintiffs and Lead Counsel have more than adequately represented the Class as required by Rule 23(e)(2)(A) by diligently and zealously prosecuting this Litigation on behalf of the Class, including, among other things, scouring GSX's SEC filings, earnings calls, analyst reports, and other industry reports, retaining multiple investigators to interview former GSX employees with knowledge of facts relevant to Plaintiffs' claims, drafting and filing two amended complaints, opposing two motions to dismiss filed by Defendants, and engaging in extensive settlement negotiations and mediations assisted by a well-respected mediator. Plaintiffs have been active and informed participants in the litigation by regularly communicating with Lead Counsel, evaluating the Settlement Class's and Defendants' best arguments concerning liability and damages, consulting with Lead Counsel concerning the settlement negotiations, and approving the terms of the Settlement. Only after all of these complicated steps were the Parties in a position to, in their second round of mediation, reach a settlement. During the mediation process, the Parties also drafted extensive mediation statements, which illuminated the relative strengths and weaknesses of the Parties' positions and informed Plaintiffs and Lead Counsel. The Settlement is demonstrably the product of well-informed and vigorous advocacy on behalf of Settlement Class Members.

39.    The proposed Settlement is fair, as it resulted from extensive arm's-length negotiations by experienced counsel, overseen by a highly respected securities litigation mediator, and the Settling Parties had a full understanding of the merits of the case.

40.    Given the extensive investigation, multiple briefings of motions to dismiss, and multiple rounds of mediation, by the time of Settlement, Lead Counsel knew what important facts needed to be gathered and understood what hurdles would need to be overcome to

successfully litigate the action. All of this, combined with Lead Counsel's extensive litigation experience, including extensive experience in securities fraud cases, was more than sufficient to evaluate the relative strengths and weaknesses of the claims and defenses in this case.

**B.    The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations Between Experienced Counsel**

41.    The Settlement was reached through arm's-length negotiation, which included two all-day mediations before the well-respected David Murphy, separated by months of hard-fought litigation. In advance of those sessions, the Parties exchanged, and provided to the mediator, detailed mediation statements and exhibits that addressed liability and damages issues. During the mediation sessions, both sides had detailed discussions about the merits of Plaintiffs' claims and the defenses to those claims. The negotiations, though collegial, were adversarial. After the second mediation, the mediator made a formal mediator's proposal recommending that the Parties agree to settle the case for $9,500,000, which the Parties accepted. Though the claims asserted in the Action have merit and the facts developed to date supports Plaintiffs' claims, the negotiations were informed in part by the expense and length of continued proceedings necessary to prosecute the Action against Defendants through trial and potential appeals, the uncertain outcome and the risk of any litigation, especially in complex actions such as this Action, and the difficulties and delays inherent in such litigation.

42.    In negotiating the Settlement, Plaintiffs had the benefit of attorneys at Pomerantz who are highly experienced in complex litigation and familiar with the issues of the case.

**C.    The Settlement Provides Fair, Reasonable and Adequate Relief to the Class**

43.    Securities class actions are notoriously complex and expensive to litigate because they require extensive investigations, discovery, and the retention of experts to opine on several topics such as market efficiency, loss causation, and damages.

44.    This case was filed over five years ago, and undoubtedly faces many risks.  If the Parties did not agree to settle, Plaintiffs would initially face the risks associated with Defendants' pending motion to strike certain portions of the Second Amended Complaint, and Defendants' potential renewed motions to dismiss.  If Plaintiffs prevailed in defeating Defendants' motion to strike, Plaintiffs would resume the difficult, potentially years-long task of obtaining discovery from a foreign entity based in China.  In addition, most of the depositions would take place in a foreign language, introducing both additional expenses and ambiguity.  Plaintiffs would also potentially have to prove their claims without discovery from third parties in China, including brushers and employees who have since left GSX—the third parties most likely to have evidence of Defendants' wrongdoing.  Moreover, it is likely that many, if not most, of the relevant employees have left GSX in the past five years.

45.    Plaintiffs might not prove their claims.  Defendants suggest that discovery will ultimately not support Plaintiffs' claims, pointing to the SEC's ultimate decision not to pursue claims against GSX and the Department of Justice's indictment of one of the firms that wrote negative articles about GSX.

46.    Plaintiffs would also have to survive Defendants' motion for summary judgment, prevail at trial, and defend their victory on appeal.  That the documents and witnesses' testimony would all be in Chinese means the parties would have numerous disputes over translation.  Translation would introduce uncertainty, create appellate issues, and substantially lengthen the trial.  Similarly, the jury is unlikely to be familiar with the Chinese tutoring industry or the use of bots in China, making its verdict even less predictable.  These risks and costs support approval.

47.    The recovery is fair, reasonable, and adequate considering the risks of continued litigation, which would require Plaintiffs to prove (and defeat Defendants' counter-arguments

regarding) falsity, materiality, scienter, loss causation, and damages at trial.  For example, Defendants have maintained that their statements with respect to GSX's business and financial operations were not false and misleading because Plaintiffs cannot prove Defendants inflated student enrollment data or revenue.  Defendants have also argued that, even if their statements were false or misleading, Plaintiffs cannot prove the elements of scienter, loss causation, or damages.

48.    Taking into account nearly five years of litigation, the risks and uncertainties of continued litigation, and the significant amount of the recovery, the Settlement here is certainly reasonable and should be preliminarily approved.  See *Girsh*, 521 F.2d at 157.  Indeed, given the complexity of this case, the sophisticated Defendants involved, and the uncertain delay of continued litigation, the $9,500,000.00 Settlement is an outstanding result.  When analyzing the risks of establishing liability and damages at trial, the court should "give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their cause of action." *Huffman v. Prudential Ins. Co. of America*, 2019 WL 1499475, at *4 (E.D. Pa. Apr. 5, 2019).  As such, the Court should find that the relief provided under the Settlement is adequate, given the complexity of the case and the risks.

49.    Because notice has not issued, the second *Girsh* factor, the reaction of the class to the settlement, does not yet apply, and will be addressed at the final approval stage after the Class Members have been given notice of the Settlement and have had an opportunity to be heard.

50.    This Action has progressed to the stage where Plaintiffs are thoroughly aware of the strengths and weaknesses of their claims.  Plaintiffs investigated the underlying claims,

drafted multiple amended complaints, including a viable second amended complaint, have briefed oppositions to two motions to dismiss by Defendants, and consulted with experts. The parties also engaged in an extensive meet and confer process regarding the scope of, and constraints on, Defendants' production of discovery, including discovery from China. Although discovery was not completed, "class counsel were sufficiently well prepared and informed enough to engage in robust settlement negotiations," which is all the third *Girsh* factor requires.

51.     The fourth and fifth *Girsh* factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." Here, there were substantial risks to proving both liability and damages which, if litigated, threatened to deprive the Class of any recovery. Specifically, Defendants made various arguments during mediation regarding falsity and scienter, which might be accepted by the Court in ruling on Defendants' future motion for summary judgement, depriving the Class of any recovery.

52.     Further, with respect to loss causation and damages, at summary judgment and trial, Defendants' experts would have argued against loss causation and damages with respect to each of the disclosure dates at issue, in an effort to truncate the Class Period or eliminate it altogether. The estimated damages for this case ranges from $10.4 million to $138.5 million under the two loss causation dates sustained by the Court, but there is no guarantee that losses would ultimately be proven for those dates.[2] *See* Exhibit 3-1.

---

[2] The Court's opinion left open the possibility of two other loss causation dates, which it did not specifically rule on. Op. at 55 n.47 ("the Plaintiffs press certain arguments as to . . . two additional corrective disclosures. Given the Court's resolution of the other theories of . . . loss causation in the Plaintiffs' favor, those are irrelevant for now and are not taken up."). Including these dates is highly speculative, but under such an analysis (*see* Exhibit 3-2), the estimated damages could reach $974.7 million.

53.    Given that the testimony of the parties' experts on loss causation and damages would vary substantially, these crucial elements would have been resolved at trial, in large part, through a "battle of experts."  Each expert's testimony would rely on complex and highly technical economic arguments.  Such a battle increases the expense as well as the risk of advancing the litigation toward a positive resolution for Plaintiffs and the Class.  Plaintiffs believe their case is strong but acknowledge, as they must, that there are risks to litigation and ultimate recovery.  The Settlement provides a guaranteed result without protracted delay and without the risk of receiving no recovery at all.

54.    The Third Circuit instructs that the sixth *Girsh* factor warrants "only minimal consideration."  In any event, this factor also favors approval.  Defendants have reserved the right to oppose class certification in the absence of a settlement, and Plaintiffs expect that they would do so by, among other things, challenging market efficiency and attempting to prove the absence of price impact.  There could be no assurance that class certification would be granted, or that a certified class could be maintained through trial.

55.    The ability of Defendant to withstand a greater judgement *Girsh* factor is neutral because Plaintiffs did not consider any "financial instability as justification for the settlement's size."

56.    As set forth above, the guaranteed recovery of $9.5 million is a significant win for the class given, among other things, the uncertainty of the case moving forward, the pending motion to strike, discovery hurdles, and potential future motions for summary judgement and class certification.  The Settlement Amount represents approximately 6.86% of the $138.5 million total maximum damages potentially available in this Action under the two loss causation

dates sustained by the Court.[3]  *See* Exhibit 3-1.  If Defendants' arguments against these loss

causation dates were accepted by the trier of fact, the maximum recoverable damages could be

drastically reduced or eliminated.  A recovery of 6.86% significantly exceeds the 1.8% median

settlement as a percentage of investor losses in securities class actions settled between 2021 and

2023.  *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action

Litigation: 2023 Full-Year Review* at 26, fig. 22 (NERA Jan. 23, 2024).

**D.    The Proposed Method of Distributing Relief to Settlement Class Members Is Effective and Equitable**

57.    The Settlement calls for all Class Members to be effectively apprised of the

Settlement, the reasons for settling, and the risks and potential benefits of continued litigation.

The Long Notice also informs Class Members how the net proceeds of the Settlement will be

equitably and effectively distributed among Class Members who opt to participate in the

Settlement by returning a valid claim form.  *See* Exhibit A-1 at 12-15.

58.    The Plan of Allocation is fair, reasonable, and adequate because it does not treat

Lead Plaintiffs or any other Class Member preferentially.  The Plan, set out in the Long Notice,

attached as Exhibit A-1 to the Stipulation, explains how the Settlement proceeds will be

distributed among Authorized Claimants.  The Plan provides that each Class Member will

receive a *pro rata* distribution pursuant to the formulas for calculating Recognized Losses.

Plaintiffs and all other Class Members will receive their payment pursuant to the same formula.

---

[3] While including the two other loss causation dates that the Court did not reach, Op. at 55 n.47, would be highly speculative, under such an analysis (*see* Exhibit 3-2), the estimated maximum damages would be $974.7 million.  Under this analysis, the Settlement Amount would represent approximately 0.97% of the total maximum damages available in this Action.

E.     **The Terms of Any Proposed Award of Attorneys' Fees Are Disclosed and Reasonable**

59.     As an initial matter, the reasonableness of attorneys' fees will be decided by the Court after Lead Counsel files a motion, on behalf of all Plaintiffs' Counsel, for attorneys' fees and expenses.  The Settlement does not contemplate any specific award.  Lead Counsel will be compensated out of the Settlement Fund, under the common fund doctrine, and will not be compensated by Defendants.  As set forth in the Notice, Plaintiffs have disclosed that Lead Counsel will apply for an award of attorneys' fees of up to 33.3% of the Settlement Amount, as well as reimbursement in an amount not to exceed $500,000 for expenses incurred in connection with the prosecution and resolution of this Action and compensatory awards to Plaintiffs, *see* Exhibit A-1 at 2, which is typical for similar securities fraud litigations.

F.     **The Parties Have Entered into a Side Agreement Which Has Been Disclosed and Is Also Fair, Reasonable, and Adequate**

60.     As is standard in securities fraud class action settlements, the Parties have a supplemental agreement that provides GSX with the option to terminate the settlement if the number of GSX shares represented by Class Members who opt out of the Settlement equals or exceeds a certain threshold.  Stipulation ¶ 41.  As is also standard practice, while the supplemental agreement is identified in the Stipulation (*id.*), the terms are confidential to avoid creating an incentive for a small group of class members to opt out solely to leverage the threshold to exact an individual settlement.

IV.    **THE COURT SHOULD PRELIMINARILY CERTIFY THE PROPOSED SETTLEMENT CLASS FOR SETTLEMENT PURPOSES**

61.     This Action readily meets Rule 23's requirements for class certification.

62.     Numerosity is satisfied.  The Class far exceeds forty members.  Throughout the Class Period, GSX securities were actively traded on the New York Stock Exchange.  While the

exact number of Class Members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

63.    Commonality is easily satisfied.  As in most securities class actions, the dispute in this Action focused on common issues relating to alleged violations of federal securities laws, misrepresentations and omissions of material fact made to the market as a whole, and scienter. All Class members were injured because of common misrepresentations and omissions, and all assert the same legal claims.

64.    Typicality is also satisfied.  Plaintiffs' claims here are typical because both Plaintiffs and Class Members were injured by the same common course of conduct by Defendants—misrepresentations and omissions regarding GSX's business and financial operations—and all assert violations of the same statutes based upon the same nucleus of facts. Nor is any Plaintiff "subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation."  Thus, Plaintiffs stand in precisely the same position as absent Class members.

65.    Both elements of adequacy are also easily satisfied here.  As discussed above, Plaintiffs both "possess the same interest and suffer[ed] the same injury as the class members," and have no conflicts with absent Class members.  Moreover, Plaintiffs have proved their adequacy by zealously advancing the Class's interests.  Plaintiffs have vigorously opposed multiple motions to dismiss from Defendants and negotiated this favorable Settlement that will bring immediate, certain recovery to the Class.

66.    Pomerantz has routinely served as lead counsel in securities class actions in federal courts across the country and has won substantial recoveries for classes represented by

the firm in other securities class actions and complex litigation. *See* ECF No. 7-3. Moreover, the firm is very familiar with the applicable legal issues, and has devoted considerable resources to advancing the Class's interests. Accordingly, the adequacy requirement is met.

67.    This Action also satisfies both the predominance and superiority criteria. Class certification is appropriate when common questions are a significant aspect of a case and can be resolved in a single action. Here, common questions predominate because Defendants' alleged omissions or misrepresentations provide the basis for liability as to all potential class members. Damages will be calculated on a class-wide basis. Thus, as in many securities fraud class actions, the predominance requirement is "readily met."

68.    Many of the Class Members are individuals for whom prosecution of a costly individual action for relatively minor damages is not a realistic or efficient alternative. No Class Member has brought a separate claim, which would likely be consolidated into this Action anyway. And Plaintiffs foresee no difficulties in managing this Class for the purposes of settlement.

69.    Class actions are vastly superior to individual actions with respect to securities fraud claims. Without class actions, defrauded investors whose losses do not run into several millions of dollars would have no practical recourse. Thus, a class action is the superior method of adjudication.

70.    Solely for the purposes of settlement, Defendants do not dispute that the Class should be certified in accordance with Rule 23(b)(3). The Court should preliminarily determine that class treatment is appropriate to permit notice to the Class.

71.    Although a court must be mindful of manageability issues at trial, including whether reliance is satisfied, "[b]ecause settlement eliminates the need for trial, a settlement

class ordinarily need not demonstrate that the fraud-on-the-market presumption applies to its claims in order to satisfy the predominance requirement." Thus, the Court may certify a settlement class without making a finding that GSX's stock trades on an efficient market.

72. In any event, GSX certainly traded on an efficient market. Putative class members who purchased GSX Securities are therefore entitled to a presumption of reliance based on the fraud-on-the-market doctrine recognized in *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).

73. GSX traded on the New York Stock Exchange ("NYSE") during the Class Period, which is one of the most well-developed securities markets in the world.

74. In addition, the market for GSX Securities was efficient because it met the canonical factors set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-86 (D.N.J. 1989). The *Cammer* factors are: (1) large weekly trading volume; (2) a significant number of analyst following the stock; (3) numerous market makers and arbitrageurs; (4) that the company met the market valuation requirements necessary to file a Form S-3 registration statement; and (5) a history of immediate stock price movement in reaction to unexpected corporate events. 711 F. Supp. at 1286-87.

75. *Cammer* **1:** High weekly trading volume indicates market efficiency because it increases the likelihood that new information will be reflected in the price of the company's securities. GSX's stock had an average weekly turnover during the Class Period of about 40% of all GSX shares outstanding and 40% of its float,[4] far above the 2% average that would justify a "strong presumption that the market for the security is . . . efficient." Exhibit 4.

---

[4] The float excludes shares owned by insiders and affiliates.

76.    *Cammer* 2: Analysts make markets more efficient by uncovering and publicizing information about a security.  The Third Circuit has found that coverage from five market analysts supported efficiency.  At least 23 analysts followed GSX during the Class Period.  Exhibit 5.

77.    *Cammer* 3: Market makers and arbitrageurs "ensure completion of the market mechanism" because they "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  The number of market makers is not germane to the Company's stock because its stock traded on the NYSE during the Class Period.  Stocks that trade in an auction market like the NYSE have a single designated market maker (formerly referred to as a specialist) to maintain a competitive and efficient market, as opposed to multiple market makers found on the NASDAQ market.  However, the presence of a designated market maker supports a finding of efficiency.

78.    *Cammer* 4: To be eligible to file a registration statement on SEC Form S-3, a company must (among other things) show that the average market value of its non-affiliate stock exceeded $75 million.  Satisfying this requirement, regardless of actual eligibility to file an S-3, suffices for *Cammer* factor 4.  The public float requirement has been loosened from the time of *Cammer* (decreasing from $150 million to $75 million), but GSX vastly exceeded both levels during the Class Period with a float of $1,646,482,344.68.  Exhibit 4.

79.    *Cammer* 5: Courts have held that if the first four *Cammer* factors are satisfied, then there is no need to evaluate the fifth *Cammer* factor.  *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 6544637, at *3 (D. Del. Nov. 6, 2020) (citing cases); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016) ("Courts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency.").

80.    Nevertheless, based on my review of five of the days during the Class Period on which there were statistically-significant returns in GSX stock price with over 98% confidence (*see* Exhibit 6), each of those dates were preceded by the release of GSX-specific news, indicating market efficiency:

a.    On April 3, 2020, GSX filed its 2019 Annual Report on Form 20-F with the SEC for the fiscal year ended December 31, 2019.

b.    On May 18, 2020, Muddy Waters Capital LLC published a report in which they provided wholly new analysis to support the claim that the majority of GSX's operations were falsified: using non-public GSX user and attendance data files comprising 200 paid K-12 courses across 54,065 unique users between January and March 2020, Muddy Waters analyzed non-human automatic bot activity and concluded that "at least 73.2% of GSX's users are bots."

c.    On August 7, 2020, Citi Research issued a market report downgrading GSX's ADSs from "Buy" to "Sell," adjusting the one-year target price to $115 per ADS, citing concerns about GSX's valuation.

d.    On September 2, 2020, GSX announced that the SEC's Division of Enforcement had contacted the Company, requesting it to produce certain financial and operating records dating from January 1, 2017.

e.    On October 21, 2020, Jon Quast of The Motley Fool reported that GSX management foresaw a loss of ¥900 million.

## V.    THE PROPOSED NOTICE PLAN SATISFIES RULE 23(C)(2)(B)

81.    The Parties have negotiated the form of a Notice of Proposed Class Action Settlement (the "Notice") to be disseminated to the Class to notify them of the terms of the Settlement and of their rights in connection therewith, as well as a Summary Notice of Proposed

Class Action Settlement (the "Summary Notice") to be published on a national business newswire. The Notice and Summary Notice have been drafted to comply with the provisions of the Private Securities Litigation Reform Act. *See* 15 U.S.C. § 78u-4(a)(7). The proposed Notice and Summary Notice, attached as Exhibits 1 and 3 to the proposed Preliminary Approval Order, satisfy due process, the federal rules, and the PSLRA.

82. With the Court's permission, the Claims Administrator will commence mailing the Notice to Settlement Class Members identified by GSX's transfer agent within 15 business days of Court entry of the Preliminary Approval Order, and mail the Notice to shareholders identified in requests to nominees as soon thereafter as addresses are received. The Summary Notice will be transmitted by *PR Newswire* within 14 days thereafter.

83. The proposed Notice, which the Claims Administrator will send to potential Settlement Class Members by first class mail, describes in plain English the Settlement's terms, the considerations that led Lead Counsel to conclude it is fair and adequate, the maximum attorneys' fees and expenses that may be sought, the procedures for objecting to the Settlement, requesting exclusion, or submitting a Claim Form, and how to attend the final Settlement Hearing. The Notice provides detailed information concerning (a) the proposed Settlement; (b) the nature, history, and progress of the Action; (c) the date of the Final Approval Hearing; (d) the proposed Plan of Allocation; (e) the fees and expenses to be sought by Class Counsel; (f) the rights of Class Members, including the procedures for filing a Claim Form, requesting exclusion from the Class, or objecting to the Settlement or Plan of Allocation or request for fees and expenses; and (g) how to contact Class Counsel, access the Court's docket, or otherwise learn more about the Action and Settlement.

84.    The proposed Notice Plan is thus "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  The proposed Notice also informs Class Members how to object or exclude themselves from the Settlement and clearly states that all those who do not exclude themselves from the Settlement will be bound by the Settlement and Final Judgment.

85.    Furthermore, the proposed Notice provides for the PSLRA-mandated disclosures, as it:  (1) states the amount of the Settlement on both an aggregate and average per share basis; (2) provides a brief statement explaining the reasons why the Parties are proposing the Settlement; (3) states the amount of attorneys' fees and maximum amount of litigation expenses (both on an aggregate and average per share basis) that Lead Counsel will seek; and (4) provides the names, addresses, and telephone numbers of representatives of the Claims Administrator and Lead Counsel, who will be available to answer questions from Class Members.

86.    The form and manner of providing Notice to the Class Members here satisfy the requirements of due process, Rule 23, and the PSLRA, 15 U.S.C. § 78u-4(a)(7).  The Notice "provide[s] all of the required information concerning the class members' right[s] and obligations under the settlement."

87.    The manner of providing notice here, which includes individual notice by email or mail to all Class Members who can be reasonably identified, represents the best notice practicable under the circumstances and satisfies the requirements of Rule 23.  Thus, the proposed method of notice described above satisfies due process.

## VI.    CONCLUSION

88.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Preliminary Approval Brief, I respectfully submit that the proposed Settlement should be preliminarily approved; the proposed

Settlement Class should be preliminarily certified; the form and manner of giving notice of the proposed Settlement to the Settlement Class Members should be approved; and the Court should enter a preliminary approval order substantially in the form filed herewith.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct. Executed this 6th day of June 2025 at New York, New York.

*/s/ Austin P. Van*
Austin P. Van