# Exhibit 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YANG RENBIN, ROBERT ANGELINE, COREY HAYS, AND ALEXANDRE TAZI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>GSX TECHEDU INC., LARRY XIANGDONG CHEN, NAN SHEN, XIN FAN, YIMING HU, MING LIAO, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES, INC., BARCLAYS CAPITAL, INC., BOFA SECURITIES, INC., CLSA LIMITED, AND GOLDMAN SACHS (ASIA) L.L.C.,<br><br>Defendants. | Case No. 2:20-CV-04457 (MEF) (JRA) |

DECLARATION OF ZACHARY NYE, PH.D.

February 3, 2026

## I.    Background and Qualifications

1.    I am a financial economist and Vice President at Stanford Consulting Group, Inc. ("SCG"). Since 1981, SCG has provided economic research and expert testimony for business litigation, and regulatory and legislative proceedings.  All SCG professionals hold master's or doctoral degrees in business, economics, finance or operations research, and certain senior consultants have testified as experts in these fields.  I have an A.B. in Economics from Princeton University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine.  I have co-authored academic research published in peer-reviewed conference proceedings, as well as working papers with finance faculty at various universities.  My research areas include the market efficiency of financial and derivative securities, volatility forecasting, risk management, financial econometrics, valuation and corporate finance. I have previously served as an expert witness in matters involving securities litigation, as well as business and intellectual property valuation.  My curriculum vitae, which includes my academic research, publications in the past ten years, and prior expert testimony in the past four years, is attached hereto as Exhibit 1.

2.    My current hourly rate is $1040.  I have received assistance from individuals at SCG, who worked under my direction; their fees charged for this project are their standard hourly rates. Neither my compensation nor that of any individual at SCG is contingent on the outcome of this litigation.

## II.    Scope of Engagement

3.    Over the course of this litigation, SCG has advised Counsel for Plaintiffs regarding potential recoverable damages from a financial standpoint.  Based upon SCG's prior work on this

- 1 -

matter, I now have been asked by Counsel for Plaintiffs to provide a detailed explanation of how the range of class-wide damages presented in Exhibit 3-1 of the Van Declaration was calculated.[1]

### III.    Event Study and Per-Share Damages Under Section 10(b)

4.      Generally speaking, an investor incurs damages when a security is acquired at a price that is inflated as a result of false or misleading statements or omissions, provided that a later corrective disclosure and/or the materialization of a concealed risk causes the price of that security to decline.[2]  Price inflation in a security can be created by material misrepresentations and/or omissions on or before the date of purchase, which remain uncorrected in whole or in part at the time of purchase.  Material misrepresentations and/or omissions may also "prevent[] preexisting inflation in a stock price from dissipating," thereby "caus[ing] inflation not simply by *adding* it to a stock, but by maintaining it."[3]  Price inflation may be measured on a Class-wide basis by analyzing the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk.[4]  The decline in a security's price in response to such events reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions.

---

[1] The "Van Declaration" refers to the Declaration of Austin P. Van in Support of Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, dated June 6, 2025.

[2] *See, e.g.*, Gold, Kevin L., Eric Korman and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," *Litigation Services Handbook, The Role of the Financial Expert*, 6th ed., Ed. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017, Ch. 27, pp. 12–17.

[3] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  (Emphasis in original.)  Courts have further explained that "'[t]here is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation.'"  *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, ---F.3d---, 2020 WL 1682772, at *10 (2d Cir. Apr. 7, 2020) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 259).

[4] *Supra* note 2.

5.      For the purpose of estimating price inflation present in the American Depositary Shares ("ADSs") of GSX Techedu, Inc. ("GSX" or the "Company") during the Class Period,[5] SCG performed a standard event study of the ADS price reactions that occurred following the alleged corrective events.[6] Economists commonly use an event study in securities litigation to correlate the disclosure of new, material information to security price response. Event studies comprise numerous steps, including: (i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v) interpretation of empirical results.[7] Academic research acknowledges that some variation in approaches to event studies is permitted.[8]

6.      As part of the event study, in order to isolate Company-specific effects that influenced the price of GSX ADSs during the Class Period, SCG performed a regression analysis to measure the

---

[5] It is my understanding that, based on the Court's Opinion and Order, filed June 25, 2024, the operative "Class Period" that formed the basis for settlement negotiations runs from June 6, 2019 to May 15, 2020, inclusive.

[6] Over the course of this litigation, Counsel for Plaintiffs asked SCG to estimate damages using different sets of alleged corrective events. In accordance with the Court's Opinion and Order, filed June 25, 2024, Exhibit 3-1 of the Van Declaration presents SCG's analysis of aggregate damages associated with the ADS price declines allegedly caused by the April 14, 2020 Citron Research report and the May 18, 2020 Muddy Waters report. Exhibit 3-2 of the Van Declaration presents a prior analysis of aggregate damages, which corresponds to a broader set of corrective events that I understand were not expressly sustained by the Court's Opinion and Order, filed June 25, 2024. Counsel for Plaintiffs have asked me to focus my explanation of aggregate damages to those presented in Exhibit 3-1 of the Van Declaration.

[7] *See, e.g.*, Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 545–590 ("Mitchell and Netter (1994)") at 557, 558.

[8] However, "[w]hile there is no unique structure, the analysis can be viewed as having seven steps." Those steps are event definition, selection criteria, normal and abnormal returns, estimation procedure, testing procedure, empirical results, and interpretation and conclusion. (*See* Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, pp. 150–152.)

relationship between GSX's daily ADS price changes and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) changes in industry-wide factors that would be expected to impact stocks in GSX's particular industry. As is standard practice in securities litigation and academic research, SCG utilized this regression analysis to estimate the price impact, net of market and industry effects, of Company-specific news disclosed on each of the alleged corrective event dates.[9] This regression analysis allowed SCG to explicitly disaggregate the impact of any market and industry factors that may have influenced GSX's ADS price movements on the alleged corrective event dates, thereby isolating the price movements that were due solely to news specific to GSX.

7. According to Plaintiffs' theory of liability, following publication, the Citron Research report caused the price of GSX ADSs to decline on April 14, 2020, while the Muddy Waters report caused the ADSs to decline over the course of May 18–20, 2020.[10] The Company-specific returns (*i.e.*, net of market and industry effects) on these dates, as estimated by SCG's regression analysis, are shown in Table 1 below.[11]

---

[9] *See, e.g.*, Mitchell and Netter (1994).

[10] *See* Second Amended Class Action Complaint for Violations of the Federal Securities Laws, Document 97, filed April 25, 2023 (the "SAC"), ¶¶284–288.

[11] *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal citations omitted, emphasis in original):

> Performing an event study can thus help an expert to determine at least two things. First, assuming that the defendant company fraudulently concealed information, the event study shows how much money the fraud caused shareholders to lose. Identifying residual returns on days when allegedly concealed information reached the market indicates that the supposedly withheld information caused the company's stock price to change. If the release of allegedly withheld information causes a stock price decrease, shareholders who purchased the defendant company's stock after the alleged fraud but before the revelation may have paid a higher price than they would have but for the defendant's fraudulent conduct — known as an "artificial[ly] inflat[ed]" price.

| Table 1 | | | | | |
|---|---|---|---|---|---|
| Alleged Impact Date | Previous Closing Price | Actual Return | Company-Specific Return | Confidence Level | Contribution to Price Inflation |
| 4/14/2020 | $31.40 | -0.64% | -1.77% | 31.44% | $0.56 |
| 5/18/2020 | $35.43 | -7.31% | -10.51% | 98.29% | $3.72 |
| 5/19/2020 | $32.84 | 3.17% | 1.88% | 33.25% | -$0.62 |
| 5/20/2020 | $33.88 | -9.74% | -9.35% | 96.65% | $3.17 |

8.      However, as shown in Table 1, GSX ADSs exhibited a Company-specific price **increase** on May 19, 2020 that is not statistically significant at the 90% confidence level.[12]  Accordingly, in addition to damages "Scenario 1," which estimates price inflation using the Company-specific price changes on all four dates listed in Table 1, "Scenario 2" is based solely on the Company-specific price declines on April 14, 2020 and May 18, 2020.  The logic being that, in an efficient market, security prices should promptly respond to the disclosure of new, value-relevant

---

Second, the event study helps the expert "calculat[e] what the price of [the defendant company's] security would have been had the alleged wrongful conduct not occurred," by estimating the amount of artificial inflation in the company's stock price over time.  Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock.  As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections.  Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.

[12] Academic literature suggests that the 90% confidence level might be most appropriate for statistical inference within the context of a securities litigation event study. (*See, e.g.*, Kaye, David H. and David A. Freedman, 2011, "Reference Guide on Statistics," in Federal Judicial Center, Reference Manual on Scientific Evidence, National Academies Press, 3rd Ed., p. 245. *See also* Rubinfeld, Daniel L., 2011, "Reference Guide on Multiple Regression," in Federal Judicial Center, Reference Manual on Scientific Evidence, National Academies Press, 3rd Ed., p. 321, footnote 48.)

information.[13]  Thus, the presence of a statistically insignificant return on the day following the disclosure of the Muddy Waters report suggests that GSX's ADS price may have fully reflected such information by the close of trading on May 18, 2020.

9.      Consistent with Plaintiffs' allegations, my analysis of per-share damages assumes that artificial inflation in the price of GSX ADSs was introduced on June 6, 2019 (*i.e.*, the start of the Class Period), when the Company first began trading on the New York Stock Exchange following its IPO,[14] and dissipated only when the alleged corrective information came to light.  The following table summarizes the evolution of price inflation throughout the Class Period for each damages scenario.

| Table 2 | | | |
| Artificial Inflation in GSX ADSs | | | |
| From | To | Price Inflation Scenario 1 | Price Inflation Scenario 2 |
|---|---|---|---|
| 6/6/2019 | 4/13/2020 | $6.83 | $4.28 |
| 4/14/2020 | 5/15/2020 | $6.27 | $3.72 |
| 5/18/2020 | 5/18/2020 | $2.55 | $0.00 |
| 5/19/2020 | 5/19/2020 | $3.17 | $0.00 |
| 5/20/2020 | Thereafter | $0.00 | $0.00 |

---

[13] Generally speaking, academic economists consider there to be three forms of market efficiency: "weak" form; "semi-strong" form; and "strong" form market efficiency.  (*See* Elton, E., M. Gruber, S. Brown and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis*, 6th ed., John Wiley and Sons, Inc., 2007, p. 400.)  In "fraud-on-the-market" litigation, several courts reference the semi-strong form of market efficiency, which implies that market prices incorporate all publicly available information.  In academic finance literature, this is referred to as "informational efficiency."  This hypothesis has been empirically validated in numerous studies.  (*See, e.g.*, Fama, Eugene F., 1970 "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, Vol. 25, Issue 2, pp. 383–417.)  The ECMH also has stood up against its critics; while anomalies have occurred in financial markets, they appear to be random and do not allow for trading strategies that would create abnormal profits.  (*See, e.g.*, Fama, Eugene F., 1998, "Market Efficiency, Long-term Returns, and Behavioral Finance," *Journal of Financial Economics*, Vol. 49, pp. 283–306; Malkiel, Burton G., 2003, "The Efficient Market Hypothesis and Its Critics," *Journal of Economic Perspectives,* Vol. 17, pp. 59–82.)

[14] *See* SAC, p. 1.

10.     Furthermore, in accordance with *Dura,* no damages are incurred on ADSs sold before the first alleged corrective event, or on ADSs purchased and sold between two consecutive corrective events.[15]  Per-ADS damages also incorporate the so-called "90-day lookback" provision of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[16]  This provision applies such that losses on shares purchased during the Class Period and held as of the close of the 90-day period subsequent to the Class Period (the "90-Day Lookback Period") cannot exceed the difference between the ADS purchase price and the average price of the ADSs during the 90-Day Lookback Period.  Losses on ADSs purchased during the Class Period and sold during the 90-Day Lookback Period cannot exceed the difference between the ADS purchase price and the rolling average price of the ADSs during the portion of the 90-Day Lookback Period elapsed as of the date of sale.

11.     Generally, for shares purchased during the Class Period, a Class member's per-share damages are equal to the lesser of: (i) the amount of artificial price inflation in the ADS on the date of purchase less the amount of artificial price inflation in the ADS on the date of sale, if sold; or (ii) the amount determined by the 90-day lookback provision.  Specifically, for each GSX ADS purchased during the Class Period, per-ADS damages are determined as follows:

  i.  For each GSX ADS purchased during the Class Period that was sold on or before May 15, 2020 (*i.e.*, the end of the Class Period), per-ADS damages are equal to the price inflation on the date of purchase minus the price inflation on the date of sale, as provided in Table 2 above.

  ii.  For each GSX ADS purchased during the Class Period that was sold during the period May 18, 2020 through August 13, 2020 (*i.e.*, the 90-Day Lookback Period), per-ADS damages are the lesser of:

---

[15] *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*").

[16] 15 U.S.C. § 78u–4(e).

    a.   the price inflation on the date of purchase minus the price inflation on the date of sale, as provided in Table 2 above; or

    b.   the purchase price minus the average price of the ADS during the 90-Day Lookback Period as of the date of sale.

  iii.  For each GSX ADS purchased during the Class Period that was still held as of the close of trading on August 13, 2020, per-share damages are the lesser of:

    a.   the price inflation on the date of purchase, as provided in Table 2 above; or

    b.   the purchase price minus the average price of the ADSs during the 90-Day Lookback Period, which is $65.27.

## IV.    Class-Wide Damages

12.    To estimate aggregate Class-wide damages, the timing and quantity of investor transactions in GSX ADSs during the Class Period were estimated using: (i) the proportional "One-Trader Model"; (ii) the proportional "80/20 Multi-Trader Model"; (iii) the so-called "Institutional Trading Model (FIFO)," which matches share purchases with subsequent sales using the "first-in-first-out" accounting method ("FIFO"); and (iv) the so-called "Institutional Trading Model (LIFO)," which matches share purchases with subsequent sales using the "last-in-first-out" accounting method ("LIFO").

13.    Given that investor trading records are not publicly available, such models are routinely used to estimate aggregate damages for settlement purposes in securities litigation, and SCG has provided numerous analyses of aggregate damages for mediation.  However, trading models are just that—models of reality based on observable financial market data.  Moreover, each of these trading models relies on differing assumptions regarding investor types and their propensities to trade, as well as shareholdings over time.  Thus, when feasible, SCG typically provides a range of aggregate damages estimated from all the models listed above.  As discussed in more detail below, due to the unique economic conditions presented in this case, the range of estimated aggregate damages is relatively wide across the trading models considered, ranging from $10.4 million under

- 8 -

**Scenario 2** using the Institutional Trading Model (FIFO) to $138.5 million under **Scenario 1** using the 80/20 Multi-Trader Model.[17]

14.    The One-Trader Model and the 80/20 Multi-Trader Model are both versions of the General Trading Model ("GTM"),[18] which has been advocated by representative authors from Cornerstone Research, an economic consulting firm frequently engaged by defendants in class action securities litigation.[19]  Both of these models "*estimate*[] a statistical model over all non-insider shares not known to have been held through the class period by particular institutions, using all non-insider, non-dealer volume in the process."[20]  Specifically, the One-Trader Model posits that each share purchased during the Class Period has the same chance of being sold on a subsequent day as any other share in the float, and that shares purchased on day $t$ of the Class Period have, on average, a probability of being sold on day $t+1$ equal to the adjusted volume-to-float ratio on day $t+1$.  The 80/20 Multi-Trader Model, on the other hand, posits two active traders (*e.g.*, institutions and individuals) with different shareholdings and propensities to trade.  The so-called "80/20" split between the two sets of traders specifies a large set of "slow" traders (*i.e.*, they hold 80% of shares available, but trade 20% of the volume) and a small set of "fast" traders (*i.e.*, they hold 20% of shares available, but trade 80% of the volume).  "Virtually every securities litigation case in which

---

[17] *See infra* at Table 3.

[18] Barclay, Michael, and Frank C. Torchio. "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation." *Law and Contemporary Problems*, vol. 64, no. 2/3, 2001, pp. 105–136 ("Barclay and Torchio (2001)") at 117.

[19] William H. Beaver, James K. Malernee and Michael C. Keeley, "Stock Trading Behavior and Damage Estimation in Securities Cases," Cornerstone Research working paper, 1993.

[20] Mayer, Marcia Kramer, "Best-Fit Estimation Of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," NERA Economic Consulting working paper, 2000 ("Mayer (2000)"), p. 6.  (Emphasis in original.)

aggregate damages are estimated relies on a version of the GTM for the number of shares damaged and the damage theory for the amount of artificial inflation."[21]

15.    The Institutional Trading Model is a version of the "Multi-Sector, Multi-Trader Model of Investor Behavior," which has been advocated by NERA Economic Consulting, an economic consulting firm frequently engaged by plaintiffs and defendants in class action securities litigation.[22]  Unlike the proportional trading models described above, which estimate the trading behavior of various assumed investor types using observed daily trading volume, the Institutional Trading Model, "in contrast, essentially *counts* damaged volume for a substantial subset of the outstanding shares [*i.e.*, for institutional investors]."[23]   Specifically, the Institutional Trading Model estimates aggregate damages from the reported quarterly shareholdings of institutions, which filed an SEC Form 13-F during the Class Period, under the assumption that increases in institutional holdings represent share purchases and that decreases represent share sales. Non-institutional damages are estimated by analyzing the quarterly changes in shares held by non-institutions (*i.e.*, shares outstanding + short interest - insider holdings - institutional holdings) during the Class Period.  For both institutions and non-institutions, daily shareholdings, purchases and sales are estimated by interpolation using the observed exchange trading volume in GSX ADSs between the reported quarterly positions.  For GSX, 13-F institutions reportedly held between 75% to 100% of the public float (*i.e.*, shares outstanding + short interest - insider holdings) during the Class Period.  Under FIFO, the first-in-first-out accounting method is used for matching sales with

---

[21] Barclay and Torchio (2001) at p. 105.

[22] *See* Mayer (2000).

[23] Mayer (2000), pp. 6, 7.  (Emphasis in original.)

prior purchases. Under LIFO, the last-in-first-out accounting method is used for matching sales with prior purchases.

16.    Table 3 below presents aggregate damages for GSX ADSs purchased during the Class Period as estimated by applying the theory of per-ADS damages (described in §III above) to the daily trading behavior predicted by the One-Trader Model, 80/20 Multi-Trader Model, and the FIFO/LIFO versions of the Institutional Trading Model.[24, 25]

| Table 3: Summary of Aggregate Damages Under Section 10(b) | | | | |
|---|---|---|---|---|
| | **One-Trader Model** | **80/20 Multi-Trader Model** | **Institutional Trading Model (FIFO)** | **Institutional Trading Model (LIFO)** |
| Retained Shares[26] | 44.7 million | 45.7 million | 67.3 million | 67.3 million |
| **Scenario 1: Price Inflation Based on All Four Alleged Impact Dates** | | | | |
| Damages | $130.6 million | $138.5 million | $12.7 million | $17.3 million |
| **Scenario 2: Price Inflation Based Solely on the April 14 and May 18, 2020 Drops** | | | | |
| Damages | $130.6 million | $127.7 million | $10.4 million | $14.3 million |

17.    To understand why the range of estimated damages is relatively wide in this case, it is important to consider the implications of the PSLRA's 90-day lookback provision, which negates damages for the vast majority of ADSs retained beyond the Class Period.  Indeed, as shown in Figure 1 below, in the 90 days following the May 18, 2020 publication of the Muddy Waters report,

---

[24] Trading volume has been reduced by 26% for to correct for the typical level of dealer-intermediated trading.  (*See* Barclay and Torchio (2001) at p. 110.)

[25] Additional data input and sources include: shares outstanding, closing price, trading volume and short interest as reported by Bloomberg; and institutional and insider holdings as reported by LSEG Data & Analytics.

[26] "Retained Shares" represent the number of GSX ADSs purchased during and held through the Class Period, as estimated by each trading model.  Given the limitations on damages imposed by the PSLRA's 90-day lookback provision discussed *infra* at ¶17, Retained Shares do not necessarily correspond to damaged shares.

GSX's ADS price increased sharply—from $30.58 on May 20, 2020 to a high of $131.27 on

August 6, 2020—resulting in an average ADS price of $65.27 during the 90-Day Lookback

Period.[27]

**Figure 1**

**GSX Techedu (GOTU)**
**Closing Price Vs. 90-Day-Lookback Mean Trading Price**

18.      This average is greater than the ADS price at any point during the Class Period, which

never exceeded $45.42.  Moreover, as of July 7, 2020, the rolling average ADS price during the

90-Day Lookback Period exceeded the Class Period high.  Accordingly, under the PSLRA, there

are no damages for any ADSs purchased during the Class Period and held through market close

on July 6, 2020.[28]  Furthermore, because the rolling average ADS price during the 90-Day

---

[27] Source: Bloomberg.

[28] *See supra* ¶10.

- 12 -

Lookback Period never fell below $30.84, there are also no damages for ADSs purchased prior to January 17, 2020 (*i.e.*, when GSX's ADS price was lower than $30.84) and held through the end of the Class Period.  In sum, in this particular case, there is a very tight window in which an ADS must have been purchased and then sold in order to be eligible for damages under Section 10(b).

19.      As for the trading models, their primary difference is that the proportional trading models (*i.e.*, both the One-Trader Model and 80/20 Multi-Trader Model) primarily estimate share purchases and sales based on observed daily trading volume, while the Institutional Trading Model is based on observed changes in the reported quarterly shareholdings of institutions that filed an SEC Form 13-F during and shortly after the Class Period.  Between January 17, 2020 and July 6, 2020 (*i.e.*, the relevant period in which ADSs could have been damaged), the observed trading volume for GSX's ADSs was approximately 583 million shares.[29]  Hence, both the One-Trader Model and 80/20 Multi-Trader Model estimate that millions of GSX ADSs were purchased and sold during this period and are, therefore, eligible for damages under Section 10(b).  What is apparent from the quarterly shareholdings of reporting 13-F institutions, however, is that, while the vast majority of these institutions did indeed purchase many millions of GSX ADSs during the Class Period, they also appear to have held these ADSs beyond July 7, 2020, thereby negating damages by virtue of the PSLRA's 90-day lookback provision.  Accordingly, the One-Trader Model and 80/20 Multi-Trader Model estimate much greater aggregate damages than the Institutional Trading Model.

20.      That said, a limitation of the Institutional Trading Model is that quarterly changes in reported shareholdings do not fully reflect the extent of intra-quarter trading.  Thus, the Institutional Trading Model is a conservative estimator of aggregate damages.  For example, while

---

[29] Source: Bloomberg.

- 13 -

a 100-share increase in observed quarterly holdings implies that an institution purchased at least 100 shares during the quarter, it is quite possible that the institution actually sold 100 shares and purchased 200 shares during the quarter. Furthermore, reported shareholdings on Form 13F do not reflect changes in holdings across individual sub-funds or portfolios within a particular reporting institution. Accordingly, the Institutional Trading Model's reliance on quarterly changes almost certainly fails to capture the total number of shares that are purchased and sold during a given quarter. However, while the Institutional Trading Model does suffer from downward bias, the fact that it is based on the actual shareholdings of a substantial subset of investors makes it an appealing, albeit conservative, estimator of aggregate damages.

Executed on February 3, 2026, at Redwood City, California.

Zachary Nye, Ph.D.

- 14 -



702 MARSHALL STREET, SUITE 200
REDWOOD CITY, CA  94063
650.298.0200
WWW.SCGINC.COM

# Zachary R. Nye
*Email:* zach@scginc.com

## Education

**Ph.D. – University of California, Irvine**                                    2009
Finance                                                          Irvine, California

- Dissertation: Macro-Augmented Volatility Forecasting.

- Research Interests: Market efficiency of underlying and derivative securities, volatility forecasting, risk management, financial econometrics, valuation and corporate finance.

- Teaching Experience: Corporate Finance, Investments, and Risk Management.

**M.Sc. – London Business School**                                    2004
Finance                                                          London, England

- Earned distinction for Masters Thesis on the informational efficiency of credit-linked notes.

**A.B. – Princeton University**                                    2001
Economics                                                  Princeton, New Jersey

## Employment History

**Vice President**                                    Summer 2015 – present
Stanford Consulting Group, Inc.                        Redwood City, California

The Stanford Consulting Group, Inc. provides economic research and expert testimony for business litigation, as well as regulatory and legislative proceedings.

Responsibilities include:

- quantifying economic damages (*e.g.*, present value of expected future earnings, price inflation, lost profits, unjust enrichment, reasonable royalties);

- enterprise, project, equity, debt, derivative-security and intellectual-property valuation;

- assessing the informational efficiency of financial securities;

- analyzing fairness opinions related to corporate mergers and acquisitions;

- econometric modeling and analysis;

- marginal cost analysis;

- preparing expert reports and declarations;

- providing deposition and trial testimony; and

- supporting counsel in preparation for cross examination of opposing experts.

**Senior Consultant**                                    Summer 2009 – Summer 2015
Stanford Consulting Group, Inc.                        Redwood City, California

**Associate**                                                          Summer 2004 – Summer 2005
Stanford Consulting Group, Inc.                                        Redwood City, California

**Mortgage Consultant**                                                Fall 2002 – Summer 2003
Woolwich PLC                                                           Oxford, UK

**Trading Desk Specialist**                                            Fall 2001 – Summer 2002
Merrill Lynch, Defined Asset Funds                                     Plainsboro, New Jersey

---

## Academic Research

Nye, Zachary and Mark Washburn, 2013, "Macro-Augmented Volatility Forecasting," *Western Decision Sciences Institute Proceedings*. Paper presented at the WDSI Annual Meeting, Long Beach, California, March 27, 2013. Winner of the 2013 Best Theoretical/Empirical Research Paper Awards.

Nye, Zachary and Philippe Jorion, 2009, "Macro-Augmented Volatility Forecasting," Working Paper, University of California at Irvine.

Nye, Zachary and Timothy C. Johnson, 2005, "Market Efficiency's Hidden Teeth: An Unambiguous Test for Derivative Securities," Working Paper, London Business School.

---

## Testimony

Daniel Borteanu, et al. v. Nikola Corporation, et al., United States District Court, District of Arizona, Case No. 2:20-cv-01797-SPL
        Deposition                    August 8, 2024
        Deposition                    September 18, 2025

Lynn Gambrill, et al. v. CS Disco, Inc., et al., United States District Court, Western District of Texas, Austin Division, Case No. 1:24-cv-00028-DAE
        Deposition                    September 11, 2025

Subhash Patel, et al. v. Koninklijke Philips N.V., et al., United States District Court, Eastern District of New York, Case No. 1:21-cv-04606-ERK-MMH
        Deposition                    April 8, 2025
        Deposition                    September 4, 2025

Charles Larry Crews, Jr., et al. v. Rivian Automotive, Inc., et al., United States District Court, Central District of California, Case No. 2:22-cv-01524-JLS-E
        Deposition                    January 12, 2024
        Deposition                    June 4, 2025

Christopher L. Sayce, et al. v. Forescout Technologies, Inc., et al., United States District Court, Northern District of California, San Francisco Division, Case No. 3:20-cv-00076-SI
        Deposition                    November 20, 2023
        Deposition                    May 23, 2025

Jeremy Jaeger, et al. v. Zillow Group, Inc., et al., United States District Court, Western District of Washington at Seattle, Case No. 2:21-cv-01551-TSZ
        Deposition                    April 16, 2024

In re Talis Biomedical Securities Litigation, United States District Court, Northern District of California, Case No. 3:22-cv-00105-SI
        Deposition                    December 8, 2023

In re Apache Corp. Securities Litigation, United States District Court, Southern District of Texas, Houston Division, Case No. 4:21-cv-00575

| | |
|---|---|
| Deposition | November 8, 2023 |
| Evidentiary Hearing | December 6, 2023 |

Altimeo Asset Management, et al. v. Qihoo 360 Technology Co. Ltd., et al., United States District Court, Southern District of New York, Case No. 1:19-cv-10067-PAE

| | |
|---|---|
| Deposition | November 30, 2023 |

In re Alta Mesa Resources, Inc. Securities Litigation, United States District Court, Southern District of Texas, Houston Division, Case No. 4:19-cv-00957

| | |
|---|---|
| Deposition | November 14, 2023 |

Miriam Edwards, et al. v. McDermott International, Inc., et al., United States District Court, Southern District of Texas, Houston Division, Case No. 4:18-cv-04330

| | |
|---|---|
| Deposition | April 26, 2023 |
| Evidentiary Hearing | September 27, 2023 |

Halman Aldubi Provident and Pension Funds Ltd., et al. v. Teva Pharmaceuticals Industries Limited, et al., United States District Court, Eastern District of Pennsylvania, Case No. 2:20-cv-04660-KSM

| | |
|---|---|
| Deposition | November 4, 2022 |
| Evidentiary Hearing | September 21, 2023 |

John V. Ferris, et al. v. Wynn Resorts Limited, et al., United States District Court, District of Nevada, Case No. 2:18-cv-00479-GMN-DJA

| | |
|---|---|
| Deposition | August 26, 2022 |
| Deposition | January 31, 2023 |

In re Jernigan Capital, Inc. Securities Litigation, United States District Court, Southern District of New York, Case No. 1:20-cv-09575-JLR

| | |
|---|---|
| Deposition | January 27, 2023 |

Ali Karimi, et al. v. Deutsche Bank AG, et al., United States District Court, Southern District of New York, Case No. 1:22-cv-02854-JSR

| | |
|---|---|
| Deposition | August 12, 2022 |

Teresa Doskocz, et al. v. ALS Lien Services, et al., Superior Court of California, County of Contra Costa, Case No. C17-01486

| | |
|---|---|
| Deposition | April 23, 2018 |
| Deposition | March 8, 2022 |
| Deposition | April 14, 2022 |
| Trial | April 29, 2022 |

Paul Hayden, et al. v. Portola Pharmaceuticals, Inc., et al., United States District Court, Northern District of California, Case No. 3:20-cv-00367-VC

| | |
|---|---|
| Deposition | March 30, 2022 |

United States of America ex rel. Lori Morsell, et al. v. Symantec Corporation, United States District Court for the District of Columbia, Civil Action No. 12-cv-0800 (RC)

| | |
|---|---|
| Deposition | March 13, 2019 |
| Trial | March 22, 2022 |

United States of America ex rel. Tiffany Montcrieff, et al. v. Peripheral Vascular Associates, P.A., United States District Court for the Western District of Texas, San Antonio Division, Civil Action No. SA-17-CV-00317-XR

| | |
|---|---|
| Deposition | July 31, 2020 |
| Trial | February 14, 2022 |

In re Advance Auto Parts, Inc. Securities Litigation, United States District Court, District of Delaware, Case No. 1:18-CV-00212-RGA

| | |
|---|---|
| Deposition | July 14, 2020 |
| Deposition | September 30, 2021 |

In re Allergan PLC Securities Litigation, United States District Court, Southern District of New York, Civil Action No. 18-CV-12089-CM

| | |
|---|---|
| Deposition | May 19, 2020 |
| Deposition | September 27, 2021 |

Gabby Klein, et al. v. Altria Group, Inc., et al., United States District Court, Eastern District of Virginia, Richmond Division, Case No. 3:20-cv-00075-DJN

| | |
|---|---|
| Deposition | August 31, 2021 |

In re Tahoe Resources, Inc. Securities Litigation, United States District Court, District of Nevada, Case No. 2:17-cv-01868-RFB-NJK

| | |
|---|---|
| Deposition | August 4, 2021 |

Hawaii Structural Ironworkers Pension Trust Fund, et al. v. AMC Entertainment Holdings, Inc., et al., United States District Court, Southern District of New York, Case 1:18-cv-00299-AJN-SLC

| | |
|---|---|
| Deposition | July 9, 2020 |
| Deposition | July 28, 2021 |

In re Mylan N.V. Securities Litigation, United States District Court, Southern District of New York, Case No. 1:16-CV-07926 (JPO)

| | |
|---|---|
| Deposition | November 22, 2019 |
| Deposition | July 20, 2021 |

Oregon Laborers Employers Pension Trust Fund, et al. v. Maxar Technologies Inc., et al., United States District Court, District of Colorado, Case No. 1:19-cv-00124-WJM-SKC

| | |
|---|---|
| Deposition | May 28, 2021 |

Roei Azar, et al. v. Yelp, Inc., et al., United States District Court, Northern District of California, Case No. 3:18-cv-00400-EMC

| | |
|---|---|
| Deposition | March 2, 2021 |

Roofers' Pension Fund, et al. v. Joseph C. Papa, et al., United States District Court, District of New Jersey, Civil Action No. 2:16-cv-02805-MCA-LDW

| | |
|---|---|
| Deposition | April 2, 2019 |
| Deposition | January 14, 2021 |

Utah Retirement Systems, et al. v. Healthcare Services Group, Inc., et al., United States District Court, Eastern District of Pennsylvania, Case No. 2:19-cv-01227-ER

| | |
|---|---|
| Deposition | December 10, 2020 |

Matt Karinski, et al. v. Stamps.com, Inc., et al., United States District Court, Central District of California, Case No. 2:19-cv-01828-MWF-SK

| | |
|---|---|
| Deposition | August 14, 2020 |

Alexandre Pelletier, et al. v. Endo International PLC, et al., United States District Court, Eastern District of Pennsylvania, Civil Action No. 2:17-cv-05114-MMB

| | |
|---|---|
| Deposition | July 27, 2020 |

In re Zillow Group, Inc. Securities Litigation, United States District Court, Western District of Washington at Seattle, Case No. 2:17-cv-01387-JCC

| | |
|---|---|
| Deposition | March 10, 2020 |

Joseph Prause, et al. v. TechnipFMC plc, et al., United States District Court, Southern District of Texas, Houston Division, Case No. 4:17-cv-02368
| | |
|---|---|
| Deposition | February 5, 2020 |
| Deposition | March 9, 2020 |

In re Quorum Health Securities Litigation, United States District Court, Middle District of Tennessee, Case No. 3:16-cv-02475
| | |
|---|---|
| Deposition | August 17, 2018 |
| Deposition | January 14, 2020 |

In re Snap Inc. Securities Litigation, United States District Court, Central District of California, Western Division, Case No. 2:17-cv-03679-SVW-AGR
| | |
|---|---|
| Deposition | December 13, 2019 |

Jet Capital Master Fund, L.P., et al. v. American Realty Capital Properties, Inc., et al., United States District Court, Southern District of New York, Case No. 1:15-cv-00307-AKH
| | |
|---|---|
| Deposition | July 26, 2019 |

City of Pontiac General Employees' Retirement System, et al. v. Dell Inc., et al., United States District Court, Western District of Texas, Austin Division, Case No. 1:15-cv-00374-LY
| | |
|---|---|
| Deposition | April 19, 2017 |
| Deposition | November 6, 2018 |

Pirnik v. Fiat Chrysler Automobiles N.V., et al., United States District Court, Southern District of New York, Case No. 1:15-CV-07199-JMF
| | |
|---|---|
| Deposition | February 2, 2018 |
| Deposition | September 13, 2018 |

Bradley Cooper, et al. v. Thoratec Corporation, et al., United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-00360-CW
| | |
|---|---|
| Deposition | March 6, 2018 |

L-3 Communications Corporation, et al. v. Serco, Inc., United States District Court for the Eastern District of Virginia, Case No. 1:15-cv-701-GBL-JFA
| | |
|---|---|
| Deposition | October 22, 2015 |
| Deposition | October 18, 2017 |

In re Juno Therapeutics, Inc., United States District Court of Western District of Washington at Seattle, Case No. C16-1069RSM
| | |
|---|---|
| Deposition | October 4, 2017 |

Brad Mauss, et al. v. NuVasive, Inc., et al., United States District Court, Southern District of California, Case No.: 13-cv-02005-JM
| | |
|---|---|
| Deposition | December 20, 2016 |
| Deposition | August 28, 2017 |

In re Akorn, Inc. Securities Litigation, United States District Court, Northern District of Illinois, Eastern Division, Case No. 15-CV-01944
| | |
|---|---|
| Deposition | June 21, 2017 |

In re Ocwen Financial Corporation Securities Litigation, United States District Court, Southern District of Florida, Case 14-81057-CIV-WPD
| | |
|---|---|
| Deposition | September 23, 2016 |
| Deposition | March 28, 2017 |

Stephen Calfo, et al. v. John P. Messina, Sr., et al., United States District Court, Southern District of New York, Civil Action No. 15 Civ. 04010 (LGS)
Deposition                January 5, 2017


In re EZCORP, Inc. Securities Litigation, United States District Court, Southern District of New York, Case No. 14-cv-6834 (ALC)
Deposition                October 14, 2016
Arthur Menaldi, et al. v. Och-Ziff Capital Management Group LLC, et al., United States District Court, Southern District of New York, No. 14-CV-03251-JPO
Deposition                October 3, 2016


Keith Thomas, et al. v. MagnaChip Semiconductor Corp., et al., United States District Court, Northern District of California, Case No. 3:14-cv-01160-JST
Deposition                September 16, 2016


In re Rocket Fuel, Inc. Securities Litigation, United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-03998-PJH
Deposition                September 14, 2016


Barbara Strougo, Individually and on Behalf of All Others Similarly Situated v. Barclays PLC, et al., United States District Court, Southern District of New York, Case No. 14-cv-5797 (SAS)
Deposition                August 11, 2015
Evidentiary Hearing       November 5, 2015
Deposition                June 16, 2016


In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation, United States District Court, District of New Jersey, Case Numbers: 05-cv-5060; 07-cv-4021; 07-cv-4022; 07-cv-4023; 07-cv-4024; 07-cv-4546; 11-cv-6259; and 15-cv-518
Deposition                December 6, 2013
Deposition                October 1, 2015


Richard Thorpe and Darrel Weisheit, Individually and on Behalf of All Others Similarly Situated v. Walter Investment Management Corp., et al., United States District Court, Southern District of Florida,
Case No. 1:14-cv-20880-UU
Deposition                September 16, 2015


City of Austin Police Retirement System, *Individually and on Behalf of All Others Similarly Situated* v. Kinross Gold Corporation, et al., United States District Court, Southern District of New York,
Civil Action No. 1:12-cv-01203-VEC-KNF
Deposition                November 19, 2014


In re El Paso Partners, L.P. Derivative Litigation, Court of Chancery of the State of Delaware, C.A. No. 7141-CS
Deposition                September 24, 2013
Trial                     November 12 and 13, 2014


L-3 Communications Corporation, et al. v. Jaxon Engineering & Maintenance, Inc., et al., United States District Court for the District of Colorado, Civil Action No. 10-cv-02868-MSK-KMT
Deposition                August 7, 2014


Axa Corporate Solutions Assurance, et al. v. Honeywell International, Inc., et al., Superior Court of the State of Arizona in and for the County of Maricopa, No. CV2011-019334
Deposition                February 24, 2014


In re Heckmann Corporation Securities Litigation, United States District Court for the District of Delaware,
Case No. 1:10-cv-00378-LPS-MPT
Deposition                November 9, 2012