# Exhibit 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YANG RENBIN, ROBERT ANGELINE, COREY HAYS, AND ALEXANDRE TAZI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GSX TECHEDU INC., LARRY XIANGDONG CHEN, NAN SHEN, XIN FAN, YIMING HU, MING LIAO, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES, INC., BARCLAYS CAPITAL, INC., BOFA SECURITIES, INC., CLSA LIMITED, AND GOLDMAN SACHS (ASIA) L.L.C., <br><br> Defendants. | Case No. 2:20-CV-04457 (MEF) (JRA) |

**SUPPLEMENTAL DECLARATION OF AUSTIN P. VAN IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

I, Austin P. Van, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a Partner at the firm of Pomerantz LLP, court appointed Lead Counsel for Lead Plaintiff Yang Renbin, and Additional Plaintiffs Corey Hays and Alexandre Tazi (collectively, the "Plaintiffs") and the proposed Settlement Class in this action.  I am duly admitted to practice law in the State of New Jersey and before this Court. I respectfully submit this declaration in support of Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement.  I have personal knowledge of the matters testified to herein.

**I.      THE FOURTH AND FIFTH *GIRSH* FACTORS FAVOR APPROVAL**

2.      The fourth and fifth *Girsh* factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial

1

against the benefits of an immediate settlement." Here, there are substantial risks to proving both liability and damages that, if litigated, threatened to deprive the Class of any recovery.

3.    Specifically, Defendants made various arguments during mediation regarding falsity, scienter and loss causation that might be accepted by the Court in ruling on Defendants' future motion for summary judgement.

4.    To prove falsity, Plaintiffs likely will have to rely heavily on the testimony of confidential witnesses, but such a basis for proof is risky in this case. Although the Court ultimately permitted some of the alleged misstatements to proceed to discovery, the Court expressed concern that some of Plaintiffs' allegations may have been premised on unreliable sources that may not yield admissible evidence. *See, e.g.*, Opinion at 19 ("[T]he Court is left to speculate whether [CW-3] obtained the information they purport to possess by firsthand knowledge or rumor"); *id*. at 20 (Court did not consider allegations where "the basis of CW-2's knowledge, is, as pled, too little to go on"); *id*. at 24 ("In some instances . . . it is not clear how a particular confidential witness knows something . . . [a]nd one confidential witness was not interviewed by the Plaintiffs").

5.    The Court's concerns about confidential witnesses might well be borne out in discovery, as there is no guarantee that the witnesses will provide testimony at all, given that many are located in China and may not make themselves available for deposition. Certain provision of Chinese law may be interpreted to prohibit assisting parties in U.S. litigation without the express approval of the Supreme People's Court of the PRC. Indeed, in 2023 and 2024, certain government entities in the PRC began conducting well-publicized raids even on well-known, reputable firms, such as Bain & Company, that conduct ordinary due diligence and

2

interviews with subject matter experts. Such legal concerns may well deter some or all confidential witnesses in China from testifying.

6. To date, no confidential witnesses have agreed to have their depositions taken. Likewise, Plaintiffs would not be able to compel testimony from the third-party brushers cited in the Complaint. Other critical witnesses cannot be compelled to testify because they reside in China and no longer work for GSX—soon after the Class Period, GSX laid off more than 80% of its workforce, shrinking from 22,570 employees as of December 31, 2020, to 4,002 employees as of December 31, 2022, so many key witnesses will no longer be associated with GSX.

7. Without such confidential witnesses, proof of falsity may be challenging. Plaintiffs centrally allege that GSX overstated its revenue and support this allegation primarily with allegations from confidential witnesses. Defendants argued that without the benefit of the standards applied at the motion to dismiss stage requiring the Court to make all reasonable inferences in Plaintiffs' favor, Plaintiffs would not be able to rely on any of their confidential sources and, therefore, would not be able to prove the falsity of GSX's statements concerning revenues. Indeed, Defendants have submitted a sworn declaration stating that any allegations that revenue was inflated were false. *See* Shen Declaration (ECF No. 162) at ¶ 3. Discovery may show that Defendants are correct.

8. The other bases on which Plaintiffs intend to rely to prove falsity may also fail to materialize in discovery. Plaintiffs allege that the majority of GSX users were bots based on analysis in the Muddy Waters Report and Plaintiffs' expert's analysis. Defendants attacked the Muddy Waters Report's small sample size and argued that it was not based on a randomized sample. Defendants also disputed the Report's categorization of users who did not exhibit bot behavior as bots nevertheless. Further, Defendants argued that Dr. Knoblock did not conduct

3

analysis independent of the Muddy Waters Report.  There is no guarantee that the findings of the Muddy Waters Report will ultimately be proven, or that Dr. Knoblock's analysis will be accepted.

9.      Moreover, discovery may show that even if Defendants did use bots for advertising purposes, they did not count money "earned" by selling classes to brushers in GSX's revenues.   While Plaintiffs maintain that Defendants' statements would still have been misleading, Defendants could argue that such misstatements were not material.

10.      With respect to scienter, Defendants will continue to argue that Plaintiffs have not shown any facts that Defendants knew or recklessly disregarded the alleged widespread fraud, and that reliance upon the core operations doctrine without additional facts tying Defendants to the fraud does not suffice to prove scienter.  If discovery shows that GSX was not as massively fraudulent an enterprise as alleged, Plaintiffs will have a correspondingly difficult  path to prove scienter.  The Court found the inference of scienter in the case to be "not the strongest one," for statements post-dating the short seller reports.  Opinion at 44.  Defendant Shen filed a sworn declaration with the Court declaring, among other things, that GSX is "not a 'fraudulent' or 'fake' company," that GSX promptly "investigated [short seller] allegations and determined they were meritless," and that "the Audit Committee of GSX's Board of Directors engaged third-party professional advisers to conduct an independent internal review into the short sellers' key allegations" that "did not uncover evidence that would have a material impact on GSX's previously reported financial statements." *See* Shen Declaration (ECF No. 162) at ¶¶ 3, 6, 13.  At summary judgment and trial, Defendants will certainly argue that this testimony, along with the decision by the SEC not to take enforcement actions against GSX after investigating the short sellers' allegations (Shen Declaration ¶ 14), undermine any inference of scienter.

11.    With respect to loss causation and damages, at summary judgment and trial, Defendants' experts will likely argue that some or all of the disclosures at issue caused investors no losses in an effort to truncate the Class Period or eliminate it altogether.  The estimated damages for this case range from $10.4 million to $138.5 million under the two loss causation dates sustained by the Court, but there is no guarantee that losses would ultimately be proven for those dates.[1]  For example, Defendants have argued, as supported by their expert analysis, that one of the corrective disclosures, the April 14, 2020 Citron Report, did not result in a statistically significant price drop and that two days later, the price recovered completely.  If Defendants are correct, it is unlikely that any losses for this corrective disclosure could be recovered.  *See, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021) ("[W]here, for example, a 'modest' drop in the stock price coincides with the disclosure of certain news but then 'recover[s] very shortly after,' the allegation of loss causation may be insufficient.")  Defendants may also argue that GSX's ADS generally rose after the IPO despite the short seller reports and that this rise defeats any argument that Defendants' alleged misrepresentations caused losses.

12.    Given that the testimony of the parties' experts on loss causation and damages would vary substantially, these crucial elements would be resolved at trial, in large part, through a "battle of experts."  Each expert's testimony would rely on complex and highly technical economic arguments.  Such a battle increases the expense as well as the risk of advancing the litigation toward a positive resolution for Plaintiffs and the Class.  Plaintiffs believe their case is

---

[1] The Court's opinion left open the possibility of two other loss causation dates, which it did not specifically rule on.  Op. at 55 n.47 ("the Plaintiffs press certain arguments as to . . . two additional corrective disclosures.  Given the Court's resolution of the other theories of . . . loss causation in the Plaintiffs' favor, those are irrelevant for now and are not taken up.").  Including these dates is highly speculative, but under such an analysis (*see* Exhibit 3-2), the estimated damages could reach $974.7 million.

5

strong but acknowledge, as they must, that there are risks to litigation and ultimate recovery. The Settlement provides a guaranteed result without protracted delay and without the risk of receiving no recovery at all.

13. The risk of no recovery is particularly acute in this case given the obstacles to litigating against, and recovering from, a Chinese company. Here, Plaintiffs face the formidable challenge of obtaining discovery in the People's Republic of China ("PRC"), including understanding and navigating foreign laws regarding discovery and conducting depositions of relevant witnesses in the PRC, if indeed the government permits conducting any discovery there at all. Even if Plaintiffs were successful in obtaining discovery, Plaintiffs would have to grapple with the challenge and expense of working with documents that are likely to be written in Chinese. Even if Plaintiffs were to overcome these discovery challenges and prevail on the merits, including appeals as to all issues, it would be a steep challenge to enforce a US judgment against PRC-based assets. Given all of these challenges along with those discussed in the original memorandum of law, the Settlement should be preliminarily approved because it provides a guaranteed result without protracted delay and without the risk of receiving no recovery at all.

## II. THE CLAIMS ADMINSITRATOR WAS SELECTED AFTER A COMPETITIVE BIDDING PROCESS

14. Lead Counsel selected the claims administrator JND Legal Administration after a competitive bidding process. On May 2, 2025, Lead Counsel sent out requests for proposals to three claims administration companies: (1) JND Legal Administration, 3333 New Hyde Park Road, Suite 314, New Hyde Park, NY 11042; (2) Angeion Group, 1650 Arch Street, Suite 2210, Philadelphia, PA 1910; and (3) Strategic Claims Services, 600 North Jackson Street, Suite 205,

Media, PA 19063.  Lead Counsel received bids from all three claims administration companies by May 14, 2025, and selected JND Legal Administration on May 21, 2025.

15.    JND estimated their settlement administration to cost approximately $258,000, SCS estimated $399,939, and Angeion estimated $76,046, all excluding broker fees.  SCS was rejected because their estimated cost was materially higher than that of JND or Angeion.  While Angeion submitted a lower bid than JND, Plaintiffs found their estimate to be unrealistic—the bid was based on the mailing of 10,000 notices, while JND estimated 30,000 notices would be sent.  Given this difference in assumptions, the two bids were comparable in cost.  Plaintiffs selected JND over Angeion based on their assessment that JND has more experience in large securities class action claims administration than Angeion.  JND's bid included a list of 121 recent securities class action settlements that the company has administered.  JND is an approved vendor for the Federal Trade Commission and the Securities and Exchange Commission, and is currently administering over thirty matters for the FTC and over fifteen matters for the SEC. JND also has received notable industry recognition—National Law Journal named JND the Best Class Action Claims Administrator in the country in 2025.  JND has a larger proprietary mailing list than Angeion for broker-dealers, fund, insurance companies, etc.  JND also is able to provide Chinese language translation services, if necessary.

***

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.  Executed this 3rd day of February 2026 at New York, New York.

/s/ Austin P. Van
Austin P. Van

7