**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YANG RENBIN, ROBERT ANGELINE, COREY HAYS, and ALEXANDRE TAZI, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br> v.<br><br>GSX TECHEDU INC., LARRY XIANGDONG CHEN, NAN SHEN, XIN FAN, YIMING HU, MING LIAO, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES, INC., BARCLAYS CAPITAL, INC., BOFA SECURITIES, INC., CLSA LIMITED, and GOLDMAN SACHS (ASIA) L.L.C.,<br><br>     Defendants. | Case No. 2:20-CV-04457 (MEF) (JRA) |

**DECLARATION OF AUSTIN P. VAN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS, AND APPROVAL OF PLAN OF ALLOCATION AND UNOPPOSED MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS FOR PLAINTIFFS**

I, Austin P. Van, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a Partner at the firm of Pomerantz LLP, court appointed Lead Counsel for Lead Plaintiff Yang Renbin, and Additional Plaintiffs Robert Angeline, Corey Hays, and Alexandre Tazi (collectively, the "Plaintiffs") and the proposed Settlement Class in this action. I am duly admitted to practice law in the State of New Jersey and before this Court. I respectfully submit this declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement. I have personal knowledge of the matters in this declaration.

2. I respectfully submit this Declaration ("Van Declaration") in support of the following: (1) Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement,

1

Certification of Settlement, and Approval of Plan of Allocation; and (2) Plaintiffs' Unopposed Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs. The terms of the Settlement are set forth in the Stipulation and Agreement of Settlement dated June 5, 2025 (the "Stipulation") (ECF No 155-3), which was preliminarily approved by this Court on February 19, 2026 (ECF No. 169).

3.      This Declaration sets forth the nature of the claims asserted, the Action's procedural history, and the methods by which the Settlement Class was notified of the Settlement. It also demonstrates the reasons why the Settlement and Plan of Allocation are fair, reasonable, and adequate, and why Counsel's application for attorneys' fees, reimbursement of expenses, and awards for Plaintiffs should be approved.

## I.      INTRODUCTION

4.      The settlement contemplated by the Stipulation ("Settlement") completely resolves the Action, and provides for a payment of nine million and five hundred thousand U.S. dollars ($9,500,000.00) in cash, in exchange for the release of all claims asserted by Plaintiffs against Defendants. While Lead Counsel believes that the allegations in the Second Amended Complaint filed on April 25, 2023 (the "SAC," ECF No. 97) have substantial merit, Lead Counsel respectfully submits that the Settlement represents an excellent result for the Settlement Class.

5.      The Settlement Amount is extremely favorable as the estimated maximum damages for this case considering the Court's dismissal of several of the loss causation dates is $138.5 million, and the $9.5 million Settlement Amount therefore represents approximately 6.86% of the total maximum damages potentially available in this Action. Furthermore, there is no guarantee Plaintiffs' would be able to successfully bring their case to trial and win the full maximum amount.

6.      Plaintiffs and Lead Counsel retained Stanford Consulting Group, Inc., which provides research, analysis, and expert testimony in complex business litigation, particularly securities class actions, to provide advice on potential damages in the Action. *See* ECF No. 165-1 (Declaration of Zachary Nye, Ph.D. dated February 3, 2026).

7.      Stanford Consulting Group, Inc. analyzed several damages scenarios based on the corrective disclosures alleged in the SAC, under multiple common trading models designed to reflect investor behavior. *See* ECF No. 155-10 (preliminary damages report prepared by Plaintiffs' financial expert); ECF No. 155-11 (second preliminary damages report prepared by Plaintiffs' financial expert).

8.      The $9,500,000 Settlement Amount is a highly favorable result that is in line with the median settlement for similar securities class actions. *See* Laarni Bulan & Eric Tam, Securities Class Action Settlements – 2025 Review and Analysis (Cornerstone Research 2026), at 7 (finding a median settlement recovery of 6.5% in securities class actions asserting Section 10(b) claims in 2025)[1]; Edward Flores, et al., Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review, at 28 (Fig. 24) (NERA Jan. 21, 2026) (showing the median settlement value in securities class actions in 2025 was 1.5% of estimated damages, and for cases between 2016–2025, the median settlement value ranged between 1.2% and 2.5% of estimated damages.[2]

9.      Thus, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing at all) after years

---

[1]      https://www.cornerstone.com/wp-content/uploads/2026/02/Securities-Class-Action-Settlements-2025-Review-and-Analysis.pdf.

[2]      https://www.nera.com/insights/publications/2026/recent-trends-in-securities-class-action-litigation--2025-full-y.html?lang=en.

of additional litigation and delay, including motions for summary judgment and class certification, trial, and the likely appeals that would follow.

10.    The Settlement was only achieved after a hard-fought litigation, during which Lead Counsel became well informed of the relative strengths and weaknesses of Plaintiffs' claims in the Action.  In particular, prior to reaching the Settlement nearly five years after this Action was initially filed, Lead Counsel:  (i) conducted a comprehensive legal and factual investigation into the allegedly wrongful acts, which included, among other things, a review and analysis of Defendant GSX's filings with the U.S. Securities and Exchange Commission ("SEC"), public reports concerning GSX, and transcripts of GSX's investor calls; researching case law concerning the elements of the claims asserted, reviewing documents produced by third parties; interviews through investigators with several former employees and other potential witnesses with relevant information, some of whom only spoke Chinese; and consultation with damages and accounting experts; (ii) drafted the Amended Class Action Complaint ("AC"), and the Second Amended Class Action Complaint ("SAC") to address the deficiencies in the AC identified by the Court when it granted Defendants' motion to dismiss the AC; (iii) briefed Defendants' motions to dismiss the AC and SAC; (iv) in large part successfully opposed Defendants' motions to dismiss; (v) drafted and exchanged extensive mediation statements containing detailed analyses of the strengths, risks, and potential issues in the litigation; (vi) participated in a full-day mediation sessions before mediator David Murphy of Phillips ADR and several post-mediation discussions through the mediator; (vii) engaged in negotiations regarding the terms of the proposed Settlement; (viii) prepared the initial draft of the Stipulation and supporting documents; and (ix) worked with Plaintiffs' damages experts to craft the Plan of Allocation.

11. Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of all Settlement Class Members. The Settlement is the result of arm's length negotiations conducted by informed and experienced counsel, in conjunction with a well-respected mediator. Plaintiffs and Lead Counsel believe that the proposed Settlement meets the standards for final approval and is in the best interests of the putative class.

12. The Claims Administrator, JND, a nationally recognized third-party claims administrator, carried out the notice plan under Lead Counsel's supervision. Pursuant to the Preliminary Approval Order, Lead Counsel and JND Legal Administration ("JND"), the Claims Administrator, caused a cumulative total of 32,951 Notice Packets (which were comprised of the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses (the "Notice"), and the Proof of Claim and Release Form ("Proof of Claim"), to be mailed to potential Settlement Class Members, brokers, and other nominees. The Notice, Proof of Claim, the Summary Notice, the Preliminary Approval Order, and the Stipulation were posted online at www.GSXSecuritiesSettlement.com. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received, dated April 28, 2026 ("Segura Decl."). Summary Notice was also published over *PR Newswire* on March 26, 2026, directing potential Class Members to the settlement website. *Id.*

13. Attached hereto as **Exhibit 1** is a true and correct copy of the Segura Decl., which sets forth the efforts undertaken by the Claims Administrator to effectuate the robust notice program to the Settlement Class Members.

14.     Lead Counsel also respectfully requests that the Court approve the Plan of Allocation for the Settlement proceeds, an award of attorneys' fees to Lead Counsel and Additional Counsel The Rosen Law Firm, P.A. ("Rosen"), and The Hao Law Firm ("Hao") (together, "Plaintiffs' Counsel") in the amount of $3,163,500, plus accrued interest, for the 3,164.74 total hours Plaintiffs' Counsel and their professionals have spent litigating this case against Defendants, and reimbursement of expenses in the amount of $248,681.70, as fair and reasonable.  Attached as **Exhibit 2** is a true and correct copy of the Declaration of Austin P. Van in Regarding Fees and Expenses of Lead Counsel Pomerantz LLP ("Pomerantz Decl.").  Attached as **Exhibit 3** is a true and correct copy of the Declaration of Jonathan Horne on Behalf of The Rosen Law Firm, P.A. Concerning Attorneys' Fees and Expenses ("Rosen Decl.").  Counsel at Labaton Keller Sucharow ("Labaton") also provided valuable assistance to Plaintiffs' Counsel for the benefit of the Settlement Class for which they request an award of attorneys' fees and reimbursement of expenses.  Attached as **Exhibit 4** is a true and accurate copy of the Declaration of Thomas G. Hoffman, Jr. Regarding Fees and Expenses of Additional Counsel Labaton Keller Sucharow LLP ("Labaton Decl.).  The fee award constitutes one-third (33.3%) of the Settlement Fund, which is well within the range of attorneys' fees regularly awarded by courts within the Third Circuit, and reasonable in light of the relevant factors, including the quality of the representation, the complexity of the Action, and the Settlement Class's reaction to the fee request.  Plaintiffs' Counsel's lodestar for the aggregate 3,164.74 hours spent prosecuting the case is $2,958,310.55, broken down as Lead Counsel ($2,305,784), Rosen ($532,603.05, and Labaton ($119,923.50).  *See* Pomerantz Decl., Exhibit A; Rosen Decl. ¶ 5; Labaton Decl., Exhibit A  The requested fee results in a multiplier of 1.07, which is also consistent with multipliers of one to four typically applied in common fund cases.  The expenses incurred were

6

reasonable and necessary to prosecute this Action and to reach this favorable result for the Settlement Class. Lead Counsel also respectfully requests an award of $10,000.00 to Lead Plaintiff and the three additional Plaintiffs, $40,000 in total, for their substantial efforts in leading the prosecution of the Action.

## II.    SUMMARY OF PLAINTIFFS' CLAIMS

15.    Plaintiffs' claims are set forth in the SAC, which asserts that Defendants made misrepresentations to investors between June 6, 2019 and October 20, 2020, both dates inclusive ("Settlement Class Period").

16.    Specifically, the SAC alleges that GSX Techedu, Inc. n/k/a Gaotu Techedu Inc. ("GSX") falsifies at least 70% of its student enrollment and revenues through, in part, the sophisticated use of "bots." ¶3.[3] According to the SAC, as GSX is a mostly fake company, GSX misrepresented and overstated to investors the size of the growth in its student enrollment figures and its revenues and profits. ¶5. The SAC further alleges that Individual Defendants and other GSX representatives knew GSX was mostly fake, yet, repeatedly denied that they were engaged in inflating or "brushing" student enrollment figures, among other things. ¶¶6-7. According to the SAC, GSX's misrepresentations caused GSX to explode in market capitalization from about $6 billion to over $30 billion in only 2.5 months, which was drastically out of line with competitors. ¶8. The SAC alleges that as the truth about GSX's fraud emerged over a series of disclosures, GSX's share price fell dramatically, causing Plaintiffs and other investors massive damages. *Id.*

17.    The SAC alleges that Defendants' misstatements and omissions to investors violated Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

---

[3]    All "¶__" references in this "Summary of Plaintiffs' Claims" section are to the SAC.

18.    Defendants have denied and continue to deny each, any, and all allegations of wrongdoing, fault, liability, or damage whatsoever asserted by Plaintiffs. Defendants have also denied, among other things, the allegations that Plaintiffs or the Settlement Class have suffered damages or that Plaintiffs or the Settlement Class were harmed by the conduct alleged in the litigation. Defendants continue to believe the claims asserted against them in the litigation are without merit.

## III.    PROCEDURAL HISTORY OF THE LITIGATION

19.    On April 17, 2020, the initial class action complaint was filed in this Court. ECF No. 1. On August 6, 2020, the Court appointed Yang Renbin as Lead Plaintiff and approved Pomerantz LLP as Lead Counsel in the Action. ECF No. 9.

20.    Plaintiffs filed their Amended Class Action Complaint on November 2, 2020 (ECF No. 22), and on April 30, 2021, the Parties filed their Motion to Dismiss briefing (ECF Nos. 67, 68, 70), and on the same day, the Parties filed a Stipulation and Order of Voluntary Partial Dismissal (ECF No. 69), which the Court granted on May 4, 2021 (ECF No. 73), dismissing certain counts and Defendants. On February 7, 2022, the Parties filed updated Motion to Dismiss briefing (ECF Nos. 82-84), and on February 24, 2023, the Court issued an Opinion and Order granting Defendants' motion to dismiss without prejudice and directing Plaintiffs to file an amended complaint (ECF Nos. 95-96). Plaintiffs filed their Second Amended Complaint on April 25, 2023. ECF No. 97. Defendants filed a motion to dismiss on June 9, 2023 (ECF No. 105), Plaintiffs filed an opposition on July 24, 2023 (ECF No. 108), and Defendants filed a reply in further support of the motion to dismiss (ECF No. 109) on August 23, 2023. On June 25, 2024, the Court issued an Opinion and Order denying the motion to dismiss, except as to certain statements in Part III.C, which it granted. ECF No. 112. On August 9, 2024, Defendants filed an answer to Plaintiffs' Second Amended Complaint. ECF No. 120.

8

21.     After the Court denied in part the motion to dismiss, the Parties explored the possibility of a settlement and retained an experienced mediator to assist them, David Murphy of Phillips ADR.  In advance of a formal mediation session, the Parties exchanged detailed mediation statements and material.  A mediation session was held on November 26, 2024, however a settlement was not reached at that time.

22.     The Parties continued to engage in discovery.  On December 13, 2024, the Parties filed a joint letter outlining several discovery disputes.  ECF 130. On March 6, 2025, Defendants filed a motion to strike the SAC. ECF No. 135.  While a briefing schedule had been set, the motion was never fully briefed and the Court never made a ruling on the discovery disputes.

23.     After numerous rounds of meeting and conferring regarding discovery and bringing to the Court several discovery disputes, the Parties agreed to renew settlement discussions in an effort to reach a negotiated resolution.  Following the exchange of additional mediation material, a formal mediation session with mediator David Murphy was held on April 3, 2025.  On April 22, 2025, the mediator made a formal mediator's proposal recommending that the Parties agree to settle the case for $9,500,000.  On April 29, 2025, the Parties accepted the mediator's proposal and began negotiating this Stipulation.  On June 5, 2025, the Parties executed the Stipulation, setting forth the terms of the agreement in principle.

24.     On April 30, 2025, the Parties informed the Court via a Joint Status Update and Motion for Stay (ECF No. 148) that they had reached an agreement resolving the matter in principle.  Judge Almonte then stayed all deadlines and proceedings in the case for 30 days (ECF No. 149) and scheduled a status conference for May 22, 2025 (ECF No. 152).

25.     On June 6, 2025, Plaintiffs filed an unopposed motion for preliminary approval of the Settlement.  (ECF No. 155).  Pursuant to Court Orders and requests for additional

information, Plaintiffs filed supplemental briefing and supporting declarations with new and/or revised exhibits in support of their preliminary approval motion on November 24, 2025 (ECF No. 162); February 3, 2026 (ECF No. 165); and February 12, 2026 (ECF No. 167). On February 19, 2026, the Court issued the Preliminary Approval Order. (ECF No. 169). The Court scheduled the Final Approval Hearing for final approval of the Settlement, attorney's fees and expenses, Plaintiffs' awards, and to hear any objections by Settlement Class Members for June 4, 2026. Preliminary Approval Order at ¶ 5.

## IV.    SETTLEMENT CONSIDERATIONS

26.    Defendants have agreed to settle the Litigation for $9,500,000, as described more fully in the Stipulation, in return for which Released Plaintiffs' Claims (as defined in the Stipulation) against Defendants and other Released Defendant Parties will be forever dismissed, barred, and released.

### A.    Plaintiff and Lead Counsel Have Zealously Represented the Class

27.    Plaintiffs and Lead Counsel have more than adequately represented the Class as required by Rule 23(e)(2)(A) by diligently and zealously prosecuting this Litigation on behalf of the Class, including, among other things, scouring GSX's SEC filings, earnings calls, analyst reports, and other industry reports, retaining multiple investigators to interview former GSX employees with knowledge of facts relevant to Plaintiffs' claims, drafting and filing two amended complaints, opposing two motions to dismiss filed by Defendants, and engaging in extensive settlement negotiations and mediations assisted by a well-respected mediator. Plaintiffs have been active and informed participants in the litigation by regularly communicating with Lead Counsel and Plaintiffs' Counsel, evaluating the Settlement Class's and Defendants' best arguments concerning liability and damages, consulting with Lead Counsel concerning the settlement negotiations, and approving the terms of the Settlement. Only after all

of these complicated steps were the Parties in a position, in their second round of mediation, to reach a settlement.  During the mediation process, the Parties also drafted extensive mediation statements, which illuminated the relative strengths and weaknesses of the Parties' positions and informed Plaintiffs and Lead Counsel.  The Settlement is demonstrably the product of well-informed and vigorous advocacy on behalf of Settlement Class Members.

28.     The proposed Settlement is fair, as it resulted from extensive arm's-length negotiations by experienced counsel, overseen by a highly respected securities litigation mediator, and the Settling Parties had a full understanding of the merits of the case.

29.     Given the extensive investigation, multiple briefings of motions to dismiss, and multiple rounds of mediation, by the time of Settlement, Lead Counsel knew what important facts needed to be gathered and understood what hurdles would need to be overcome to successfully litigate the action.  All of this, combined with Lead Counsel's extensive litigation experience, including extensive experience in securities fraud cases, was more than sufficient to evaluate the relative strengths and weaknesses of the claims and defenses in this case.

**B.      The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations Between Experienced Counsel**

30.     The Settlement was reached through arm's-length negotiation, which included two all-day mediations before the well-respected David Murphy, separated by months of hard-fought litigation.  In advance of those sessions, the Parties exchanged, and provided to the mediator, detailed mediation statements and exhibits that addressed liability and damages issues. During the mediation sessions, both sides had detailed discussions about the merits of Plaintiffs' claims and the defenses to those claims.  The negotiations, though collegial, were adversarial. After the second mediation, the mediator made a formal mediator's proposal recommending that the Parties agree to settle the case for $9,500,000, which the Parties accepted.  Though the claims

11

asserted in the Action have merit and the facts developed to date supports Plaintiffs' claims, the negotiations were informed in part by the expense and length of continued proceedings necessary to prosecute the Action against Defendants through trial and potential appeals, the uncertain outcome and the risk of any litigation, especially in complex actions such as this Action, and the difficulties and delays inherent in such litigation.

31. The Declaration of David M. Murphy of Phillips ADR in Support of Motion for Preliminary Approval of Class Action Settlement ("Murphy Declaration"), dated November 24, 2025 (ECF No. 162-2), is a sworn declaration by the Settlement mediator further evidencing the adequacy of the Settlement. Mr. Murphy is a neutral party with extensive experience in class action settlements like this one. His declaration states that the Settlement was reached by the Parties only after multiple mediation sessions over a period of months, and was negotiated at arm's length, carefully, deliberately, and in good faith to advance the best interests of their clients. Murphy Declaration ¶¶ 6, 9, 11, 14. Murphy also declares that the mediation was adversarial, that the parties contested every liability and damages issue germane to the case, and that the parties were advised by well-prepared, well-informed and zealous counsel. *Id.* at ¶ 15. Murphy states that the Settlement was reached following his making a mediator's proposal, accepted by both parties, that he believed reflected a "fair and reasonable" outcome. *Id.* at ¶ 12.

32. In negotiating the Settlement, Plaintiffs had the benefit of attorneys at Pomerantz, Rosen, and Labaton who are highly experienced in complex litigation and familiar with the issues of the case.

**C.      The Settlement Provides Fair, Reasonable and Adequate Relief to the Class**

33. Securities class actions are notoriously complex and expensive to litigate because they require extensive investigations, discovery, and the retention of experts to opine on several topics such as market efficiency, loss causation, and damages.

34.    This case was filed over five years ago, and undoubtedly faces many risks.  If the Parties did not agree to settle, Plaintiffs would initially face the risks associated with Defendants' pending motion to strike certain portions of the Second Amended Complaint, and Defendants' potential renewed motions to dismiss.  If Plaintiffs prevailed in defeating Defendants' motion to strike, Plaintiffs would resume the difficult, potentially years-long task of obtaining discovery from a foreign entity based in China.  In addition, most of the depositions would take place in a foreign language, introducing both additional expenses and ambiguity.  Plaintiffs would also potentially have to prove their claims without discovery from third parties in China, including brushers and employees who have since left GSX—the third parties most likely to have evidence of Defendants' wrongdoing.  Moreover, it is likely that many, if not most, of the relevant employees have left GSX in the past five years.

35.    Chinese law makes the taking of depositions of Chinese citizens effectively impossible in China and extremely burdensome outside of China.  Certain provisions of Chinese law may be interpreted as prohibiting depositions of individuals in China without the express approval of the Supreme People's Court of the PRC.  For example, Article 294 (and its predecessor, Article 277, which is identical) of the Chinese Civil Procedure Law makes clear that no foreign individual shall investigate and collect evidence within mainland China without permission:

> Request for and to provide judicial assistance shall be made through channels prescribed by international treaties concluded or acceded to by the People's Republic of China; or in the absence of such a treaty, shall be made through diplomatic channels.
>
> A foreign embassy or consulate to the People's Republic of China may serve process on and investigate and collect evidence from its citizens but shall not violate the laws of the People's Republic of China and shall not take compulsory measures.

> Except for the circumstances in the preceding paragraph, no foreign authority or individual shall, without permission from the competent authorities of the People's Republic of China, serve process or conduct investigation and collection of evidence within the territory of the People's Republic of China.

*Glam and Glitz Nail Design, Inc. v. iGel Beauty, LLC*, 2022 WL 17078947, at *1 (C.D. Cal. Sept. 30, 2022) (quoting an English translation of Article 277).

36.    U.S. State Department guidance confirms that "China does **not** permit attorneys to take depositions in China for use in foreign courts." *Taking Voluntary Depositions of Willing Witnesses*, U.S. Dep't of State Bureau of Consular Affairs China Judicial Assistance Information (2019).[4] "China has indicated that taking depositions, whether voluntary or compelled, and obtaining other evidence in China for use in foreign courts, as a general matter may only be accomplished through requests to its Central Authority under the Hague Evidence Convention," and "[p]articipation in such an activity could result in the arrest, detention or deportation of the American attorneys and other participants." *Id.*

37.    Courts interpreting Article 277 have consistently held that depositions may not be taken within the borders of the PRC without permission and have recently confirmed that this prohibition extends to remote depositions where the witness is testifying in the PRC. *See. e.g.*, *Glam and Glitz*, 2022 WL 17078947, at *4 (granting Defendants' request for a protective order precluding the taking of a Chinese national's deposition until Plaintiff could provide assurance that the witness could sit for a deposition outside mainland China); *Junjiang Ji v. Jling Inc.*, 2019 WL 1441130, at *11 (E.D.N.Y. Mar. 31, 2019) (finding that conducting the plaintiff's trial testimony remotely while he was located in the PRC violated Article 277, which exposed plaintiff and attorneys to legal sanctions).

---

[4]    Available at https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/China.html (emphasis in original).

38. Given these requirements under Chinese law, numerous courts have found that while taking depositions is theoretically possible in the PRC under the Hague Convention, in reality permission for such depositions is highly unlikely to be obtained. *See, e.g.*, *Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487, 498 (N.D. Ill. 2021) ("in more than 30 years under the Consular Convention and 13 years under the Hague Convention, China has granted permission for a deposition on only one occasion") (internal quotation and citation omitted); *Owen v. Elastos Found*, 343 F.R.D. 268, 288 (S.D.N.Y. Jan. 11, 2023) ("As for Elastos's Tencent servers, the only alternative discovery method suggested by defendants is the Hague Convention, which, as defendants must know, is not a viable alternative method of securing discovery in China") (internal quotation and citations omitted); *Jacobs v. Floorco Enters.*, 2020 WL 1290607 at *15 (W.D. Ky. Mar. 18, 2020) ("Floorco has not pointed the Court to any authority suggesting that it is likely any request submitted by Jacobs to take Tu's deposition pursuant to the Hague Convention would be granted, nor was the Court able to find any reliable authority that suggested the same").

39. Accordingly, the only depositions Plaintiffs may hope to take in this case are depositions taken outside of China of Defendants and current GSX employees. Plaintiffs will not be able to compel any former employees of GSX who participated in the alleged fraud to be deposed, nor any of the third-party brushing firms central to this complaint. Given that the events at issue took place seven years ago, and that GSX has since implemented massive layoffs due to its transition from an online education company to a test preparation company, many, if

not all, key witnesses with personal knowledge of the alleged fraud may no longer be employed at GSX and so cannot be compelled to sit for a deposition.[5]

40.    Chinese law, including China's Data Security Law, likewise hinders document discovery from China and makes any document discovery extremely burdensome and slow. Cases show that Chinese laws impose severe and detrimental delays in document production. *See, e.g.*, *In re NIO, Inc. Sec. Litig.*, 19-cv-1424 (NGG) (JRC), (E.D.N.Y. Sept. 18, 2023), Status Report (ECF No. 130) (defendants produced 68 documents in a litigation going on for four years and document production was delayed because of efforts to ensure compliance with China's Data Security Law); *In re NIO, Inc. Sec. Litig.*, 19-cv-1424 (NGG) (JRC), (E.D.N.Y. Oct. 22, 2025), Scheduling Order (ordering PRC counsel hired by U.S. lead counsel to review documents withheld under PRC blocking statutes to determine whether they could be produced and in the interim, no U.S. based counsel could review the documents or receive summaries pursuant to Chinese law).

41.    In short, Chinese law imposes significant hurdles on depositions and document discovery in this Action.  There is a real chance that Plaintiffs may not be able to prove their case because the witnesses with relevant knowledge no longer work at GSX and cannot be compelled to sit for a deposition.  Plaintiffs may have to spend years attempting to obtain even a small number of documents from China.  For these reasons and the others Plaintiffs have articulated in their Motion, Plaintiffs believe this Settlement, with a guarantee of recovery against a backdrop of protracted and costly further litigation with no guarantee of recovery, is an excellent result for Settlement Class Members.

---

[5]    Moreover, any depositions that did take place would involve challenging coordination of schedules and international travel among all parties.

42.    Plaintiffs might not prove their claims.  Defendants suggest that discovery will ultimately not support Plaintiffs' claims, pointing to the SEC's ultimate decision not to pursue claims against GSX and the Department of Justice's indictment of one of the firms that wrote negative articles about GSX.

43.    Plaintiffs would also have to survive Defendants' motion for summary judgment, prevail at trial, and defend their victory on appeal.  That the documents and witnesses' testimony would all be in Chinese means the parties would have numerous disputes over translation.  Translation would introduce uncertainty, create appellate issues, and substantially lengthen the trial.  Similarly, the jury is unlikely to be familiar with the Chinese tutoring industry or the use of bots in China, making its verdict even less predictable.  These risks and costs support approval.

44.    The recovery is fair, reasonable, and adequate considering the risks of continued litigation, which would require Plaintiffs to prove (and defeat Defendants' counter-arguments regarding) falsity, materiality, scienter, loss causation, and damages at trial.  For example, Defendants have maintained that their statements with respect to GSX's business and financial operations were not false and misleading because Plaintiffs cannot prove Defendants inflated student enrollment data or revenue.  Defendants have also argued that, even if their statements were false or misleading, Plaintiffs cannot prove the elements of scienter, loss causation, or damages.

45.    The Defendant Nan Shen in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ("Shen Declaration"), dated November 24, 2025 (ECF No. 162-1), is a sworn declaration by the Defendant Shen further evidencing the adequacy of the Settlement.  Ms. Shen has served as the Chief Financial Officer of the Company during the Class Period and through the present, and she is therefore well versed in the

operations of the Company and the facts of this case. Shen's declaration sets forth detailed evidence that, in Defendants' view, could be used to defeat key elements of Plaintiffs' claims. Shen Declaration ¶¶ 3-15. Notably, Shen declares that GSX is "not a 'fraudulent' or 'fake' company," that the Company "investigated [short seller] allegations and determined they were meritless," and that "the Audit Committee of GSX's Board of Directors engaged third-party professional advisers to conduct an independent internal review into the short sellers' key allegations" that "did not uncover evidence that would have a material impact on GSX's previously reported financial statements." Shen Declaration ¶¶ 3, 6, 13. Shen's declaration also provides a detailed refutation, in Defendants' view, of the key short-seller reports at issue in this case. Shen Declaration ¶¶ 6-13. Shen's declaration supports the adequacy of the Settlement because Defendants could argue that this evidence shows that Plaintiffs are unlikely to be able to prove that Defendants' statements were false or misleading or that Defendants made the alleged misstatements with scienter.

46.     Taking into account nearly six years of litigation, the risks and uncertainties of continued litigation, and the significant amount of the recovery, the Settlement here is certainly reasonable and should be preliminarily approved. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. July 25, 1975). Indeed, given the complexity of this case, the sophisticated Defendants involved, and the uncertain delay of continued litigation, the $9,500,000.00 Settlement is an outstanding result. When analyzing the risks of establishing liability and damages at trial, the court should "give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their cause of action." *Huffman v. Prudential Ins. Co. of Am.*, 2019 WL 1499475, at *4

(E.D. Pa. Apr. 5, 2019).  As such, the Court should find that the relief provided under the Settlement is adequate, given the complexity of the case and the risks.

47.    The second *Girsh* factor, the reaction of the class to the settlement, overwhelmingly favors the Settlement.  To date, no members of the Settlement Class have objected to the Settlement, the Plan of Allocation, the attorneys' fees award, the request for reimbursement of expenses, or the award to Plaintiffs, and no Settlement Class Member has requested exclusion from the Settlement.  Segura Decl. ¶¶ 17-18.

48.    This Action has progressed to the stage where Plaintiffs are thoroughly aware of the strengths and weaknesses of their claims.  Plaintiffs investigated the underlying claims, drafted multiple amended complaints, including a viable second amended complaint, have briefed oppositions to two motions to dismiss by Defendants, benefited from Court analyses in two Orders on motions to dismiss the FAC and SAC, and consulted with experts.  The Parties also engaged in an extensive meet and confer process regarding the scope of, and constraints on, Defendants' production of discovery, including discovery from China.  The parties also filed a joint letter regarding discovery disputes and presented arguments to the Court.  Although discovery was not completed, "class counsel were sufficiently well prepared and informed enough to engage in robust settlement negotiations," which is all the third *Girsh* factor requires.

49.    The fourth and fifth *Girsh* factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."  Here, there were substantial risks to proving both liability and damages which, if litigated, threatened to deprive the Class of any recovery.  Specifically, Defendants made various arguments during mediation regarding falsity and

scienter, which might be accepted by the Court in ruling on Defendants' future motion for summary judgement, depriving the Class of any recovery.

50.    To prove falsity, Plaintiffs likely will have to rely heavily on the testimony of confidential witnesses, but such a basis for proof is risky in this case.  Although the Court ultimately permitted some of the alleged misstatements to proceed to discovery, the Court expressed concern that some of Plaintiffs' allegations may have been premised on unreliable sources that may not yield admissible evidence.  *See, e.g.*, Opinion at 19 ("[T]he Court is left to speculate whether [CW-3] obtained the information they purport to possess by firsthand knowledge or rumor"); *id*. at 20 (Court did not consider allegations where "the basis of CW-2's knowledge, is, as pled, too little to go on"); *id*. at 24 ("In some instances . . . it is not clear how a particular confidential witness knows something . . . [a]nd one confidential witness was not interviewed by the Plaintiffs").

51.    The Court's concerns about confidential witnesses might well be borne out in discovery, as there is no guarantee that the witnesses will provide testimony at all, given that some were reluctant to speak with investigators in the first place and many are located in China and may not make themselves available for deposition.  Certain provision of Chinese law may be interpreted to prohibit assisting parties in U.S. litigation without the express approval of the Supreme People's Court of the PRC.  Indeed, in 2023 and 2024, certain government entities in the PRC began conducting well-publicized raids even on well-known, reputable firms, such as Bain & Company, that conduct ordinary due diligence and interviews with subject matter experts.  Such legal concerns may well deter some or all confidential witnesses in China from testifying.

52.     To date, no confidential witnesses have agreed to have their depositions taken. Likewise, Plaintiffs would not be able to compel testimony from the third-party brushers cited in the Complaint.  Other critical witnesses cannot be compelled to testify because they reside in China and no longer work for GSX—soon after the Class Period, GSX laid off more than 80% of its workforce, shrinking from 22,570 employees as of December 31, 2020, to 4,002 employees as of December 31, 2022, so many key witnesses will no longer be associated with GSX.

53.     Without such confidential witnesses, proof of falsity may be challenging. Plaintiffs centrally allege that GSX overstated its revenue and support this allegation primarily with allegations from confidential witnesses.  Defendants argued that without the benefit of the standards applied at the motion to dismiss stage requiring the Court to make all reasonable inferences in Plaintiffs' favor, Plaintiffs would not be able to rely on any of their confidential sources and, therefore, would not be able to prove the falsity of GSX's statements concerning revenues.  Indeed, Defendants have submitted a sworn declaration stating that any allegations that revenue was inflated were false.  *See* Shen Declaration (ECF No. 162) at ¶ 3.  Discovery may show that Defendants are correct.

54.     The other bases on which Plaintiffs intend to rely to prove falsity may also fail to materialize in discovery.  Plaintiffs allege that the majority of GSX users were bots based on analysis in the Muddy Waters Report and Plaintiffs' expert's analysis.  Defendants attacked the Muddy Waters Report's small sample size and argued that it was not based on a randomized sample.  Defendants also disputed the Report's categorization of users who did not exhibit bot behavior as bots nevertheless.  Further, Defendants argued that Dr. Knoblock did not conduct analysis independent of the Muddy Waters Report.  There is no guarantee that the findings of the

21

Muddy Waters Report will ultimately be proven, or that Dr. Knoblock's analysis will be accepted.

55.    Moreover, discovery may show that even if Defendants did use bots for advertising purposes, they did not count money "earned" by selling classes to brushers in GSX's revenues.    While Plaintiffs maintain that Defendants' statements would still have been misleading, Defendants could argue that such misstatements were not material.

56.    With respect to scienter, Defendants will continue to argue that Plaintiffs have not shown any facts that Defendants knew or recklessly disregarded the alleged widespread fraud, and that reliance upon the core operations doctrine without additional facts tying Defendants to the fraud does not suffice to prove scienter.  If discovery shows that GSX was not as massively fraudulent an enterprise as alleged, Plaintiffs will have a correspondingly difficult  path to prove scienter.  The Court found the inference of scienter in the case to be "not the strongest one," for statements post-dating the short seller reports.  Opinion at 44.  Defendant Shen filed a sworn declaration with the Court declaring, among other things, that GSX is "not a 'fraudulent' or 'fake' company," that GSX promptly "investigated [short seller] allegations and determined they were meritless," and that "the Audit Committee of GSX's Board of Directors engaged third-party professional advisers to conduct an independent internal review into the short sellers' key allegations" that "did not uncover evidence that would have a material impact on GSX's previously reported financial statements." *See* Shen Declaration (ECF No. 162) at ¶¶ 3, 6, 13.  At summary judgment and trial, Defendants will certainly argue that this testimony, along with the decision by the SEC not to take enforcement actions against GSX after investigating the short sellers' allegations (Shen Declaration ¶ 14), undermine any inference of scienter

22

57.     With respect to loss causation and damages, at summary judgment and trial, Defendants' experts will likely argue that some or all of the disclosures at issue caused investors no losses in an effort to truncate the Class Period or eliminate it altogether.  The estimated damages for this case range from $10.4 million to $138.5 million under the two loss causation dates sustained by the Court, but there is no guarantee that losses would ultimately be proven for those dates.[6]  For example, Defendants have argued, as supported by their expert analysis, that one of the corrective disclosures, the April 14, 2020 Citron Report, did not result in a statistically significant price drop and that two days later, the price recovered completely.  If Defendants are correct, it is unlikely that any losses for this corrective disclosure could be recovered.  Defendants may also argue that GSX's ADS generally rose after the IPO despite the short seller reports and that this rise defeats any argument that Defendants' alleged misrepresentations caused losses.

58.     Given that the testimony of the parties' experts on loss causation and damages would vary substantially, these crucial elements would have been resolved at trial, in large part, through a "battle of experts."  Each expert's testimony would rely on complex and highly technical economic arguments.  Such a battle increases the expense as well as the risk of advancing the litigation toward a positive resolution for Plaintiffs and the Class.  Plaintiffs believe their case is strong but acknowledge, as they must, that there are risks to litigation and ultimate recovery.  The Settlement provides a guaranteed result without protracted delay and without the risk of receiving no recovery at all.

---

[6]     The Court's opinion left open the possibility of two other loss causation dates, which it did not specifically rule on.  Op. at 55 n.47 ("the Plaintiffs press certain arguments as to . . . two additional corrective disclosures.  Given the Court's resolution of the other theories of . . . loss causation in the Plaintiffs' favor, those are irrelevant for now and are not taken up.").  Including these dates is highly speculative, but under such an analysis (*see* Exhibit 3-2), the estimated damages could reach $974.7 million.

23

59. The risk of no recovery is particularly acute in this case given the obstacles to litigating against, and recovering from, a Chinese company. Here, Plaintiffs face the formidable challenge of obtaining discovery in the People's Republic of China ("PRC"), including understanding and navigating foreign laws regarding discovery and conducting depositions of relevant witnesses in the PRC, if indeed the government permits conducting any discovery there at all. Even if Plaintiffs were successful in obtaining discovery, Plaintiffs would have to grapple with the challenge and expense of working with documents that are likely to be written in Chinese. Even if Plaintiffs were to overcome these discovery challenges and prevail on the merits, including appeals as to all issues, it would be a steep challenge to enforce a US judgment against PRC-based assets. Given all of these challenges along with those discussed in the original memorandum of law, the Settlement should be preliminarily approved because it provides a guaranteed result without protracted delay and without the risk of receiving no recovery at all.

60. The Third Circuit instructs that the sixth *Girsh* factor warrants "only minimal consideration." In any event, this factor also favors approval. Defendants have reserved the right to oppose class certification in the absence of a settlement, and Plaintiffs expect that they would do so by, among other things, challenging market efficiency and attempting to prove the absence of price impact. There could be no assurance that class certification would be granted, or that a certified class could be maintained through trial.

61. The ability of Defendant to withstand a greater judgement *Girsh* factor is neutral because Plaintiffs did not consider any "financial instability as justification for the settlement's size."

24

62.     As set forth above, the guaranteed recovery of $9.5 million is a significant win for the class given, among other things, the uncertainty of the case moving forward, the pending motion to strike, discovery hurdles, and potential future motions for summary judgement and class certification.   The Settlement Amount represents approximately 6.86% of the $138.5 million total maximum damages potentially available in this Action under the two loss causation dates sustained by the Court.[7]  See Declaration of Zachary Nye, Ph.D (ECF No. 165-1), ¶16; ECF No. 155-10 (preliminary damages report prepared by Plaintiffs' financial expert).   If Defendants' arguments against these loss causation dates were accepted by the trier of fact, the maximum recoverable damages could be drastically reduced or eliminated.  A recovery of 6.86% significantly exceeds the 1.8% median settlement as a percentage of investor losses in securities class actions settled between 2021 and 2023.  See Laarni Bulan & Eric Tam, Securities Class Action Settlements – 2025 Review and Analysis (Cornerstone Research 2026), at 7 (finding a median settlement recovery of 6.5% in securities class actions asserting Section 10(b) claims in 2025)[8]; Edward Flores, et al., Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review, at 28 (Fig. 24) (NERA Jan. 21, 2026) (showing the median settlement value in securities class actions in 2025 was 1.5% of estimated damages, and for cases between 2016–2025, the median settlement value ranged between 1.2% and 2.5% of estimated damages.[9]

---

[7]     While including the two other loss causation dates that the Court did not reach, Op. at 55 n.47, would be highly speculative, under such an analysis (see ECF No. 155-11 (second preliminary damages report prepared by Plaintiffs' financial expert)), the estimated maximum damages would be $974.7 million.  Under this analysis, the Settlement Amount would represent approximately 0.97% of the total maximum damages available in this Action.

[8]     https://www.cornerstone.com/wp-content/uploads/2026/02/Securities-Class-Action-Settlements-2025-Review-and-Analysis.pdf.

[9]     https://www.nera.com/insights/publications/2026/recent-trends-in-securities-class-action-litigation--2025-full-y.html?lang=en.

**D.    The Proposed Method of Distributing Relief to Settlement Class Members Is Effective and Equitable**

63.    The Settlement calls for all Class Members to be effectively apprised of the Settlement, the reasons for settling, and the risks and potential benefits of continued litigation. The Long Notice also informs Class Members how the net proceeds of the Settlement will be equitably and effectively distributed among Class Members who opt to participate in the Settlement by returning a valid claim form. *See* ECF No. 165-6 at 12-15.

64.    The Plan of Allocation is fair, reasonable, and adequate because it does not treat Plaintiffs or any other Class Member preferentially.  It was formulated by Lead Counsel and Plaintiffs' damages expert, and is based, in part, on an event study of the ADS price reactions that occurred following the alleged corrective events.  Nye Declaration (ECF No. 165-1), ¶¶ 4-11.  The Plan, set out in the Long Notice, (ECF No. 165-6), explains how the Settlement proceeds will be distributed among Authorized Claimants.  The Plan provides that each Class Member will receive a *pro rata* distribution pursuant to the formulas for calculating Recognized Losses.  Plaintiffs and all other Class Members will receive their payment pursuant to the same formula.

**E.    The Terms of Any Proposed Award of Attorneys' Fees Are Disclosed and Reasonable**

65.    As an initial matter, the reasonableness of attorneys' fees will be decided by the Court after Lead Counsel files a motion, on behalf of all Plaintiffs' Counsel, for attorneys' fees and expenses.  The Settlement does not contemplate any specific award.  Lead Counsel will be compensated out of the Settlement Fund, under the common fund doctrine, and will not be compensated by Defendants.  As set forth in the Notice, Plaintiffs have disclosed that Lead Counsel will apply for an award of attorneys' fees of up to 33.3% of the Settlement Amount, as well as reimbursement in an amount not to exceed $500,000 for expenses incurred in connection

26

with the prosecution and resolution of this Action and compensatory awards to Plaintiffs, *see* Exhibit A-1 at 2, which is typical for similar securities fraud litigations.

**F.      The Parties Have Entered into a Side Agreement Which Has Been Disclosed and Is Also Fair, Reasonable, and Adequate**

66.      As is standard in securities fraud class action settlements, the Parties have a supplemental agreement that provides GSX with the option to terminate the settlement if the number of GSX shares represented by Class Members who opt out of the Settlement equals or exceeds a certain threshold.   Stipulation ¶ 41.   As is also standard practice, while the supplemental agreement is identified in the Stipulation (*id.*), the terms are confidential to avoid creating an incentive for a small group of class members to opt out solely to leverage the threshold to exact an individual settlement.

**V.      PLAN OF ALLOCATION**

67.      The Settlement calls for all Class Members to be effectively apprised of the Settlement, the reasons for settling, and the risks and potential benefits of continued litigation. The Long Notice also informs Class Members how the net proceeds of the Settlement will be equitably and effectively distributed among Class Members who opt to participate in the Settlement by returning a valid claim form.  *See* ECF No. 165-6 at 12-15.

68.      The Plan of Allocation is fair, reasonable, and adequate because it does not treat Lead Plaintiffs or any other Class Member preferentially.  It was formulated by Lead Counsel and Plaintiffs' damages expert, and is based, in part, on an event study of the ADS price reactions that occurred following the alleged corrective events.  Nye Declaration (ECF No. 165-1), ¶¶ 4-11.  The Plan, set out in the Long Notice, (ECF No. 165-6), explains how the Settlement proceeds will be distributed among Authorized Claimants.  The Plan provides that each Class Member will receive a *pro rata* distribution pursuant to the formulas for calculating Recognized

Losses.  Plaintiffs and all other Class Members will receive their payment pursuant to the same formula.

## VI.    NOTICE OF THE SETTLEMENT

69.    Following entry of the Preliminary Approval Order, JND mailed or caused to be mailed a total of over 32,951 Notice Packets to potential Settlement Class Members and nominees thus far and effectuated the robust notice program as described, *supra.*

70.    As required by Federal Rule of Civil Procedure 23, due process, and the PSLRA, 15 U.S.C. §78u-4(f)(7), the Notice: (a) described the nature of the Action; (b) included the definition of the Settlement Class; (c) set forth the Settlement Class's claims; (d) described the Settlement terms; (e) described the Plan of Allocation; (f) disclosed that Lead Counsel intends to seek attorneys' on behalf of Plaintiffs' Counsel of up to one third (33.3%) of the Settlement Fund, plus interest, plus reimbursement of expenses of up to $500,000, and an award to Plaintiffs of $10,000 each ($40,000 in total); (g) advised Settlement Class Members of the right to exclude themselves from the Settlement Class and the binding effect of not doing so; (h) provided the deadline and procedure for filing a proof of claim, opting out of the Settlement, or opposing the Settlement, Plan of Allocation, award of attorneys' fees, reimbursement of expenses, or award to Plaintiffs; (i) provided information on how access the Court docket; (j) provided the date, time, and place of the Final Approval Hearing; (k) summarized the reasons why the Settling Parties are proposing the Settlement; (l) provided the names, addresses, and telephone numbers of representatives of the Claims Administrator and Lead Counsel, who will be available to answer questions from Class Members; (m) provided instructions to securities brokers and other nominee holders for forwarding the Notice to those persons for whom the nominees held shares in street name; and (n) stated the binding effect of a judgment on Settlement Class Members.

71.     The form and manner of providing Notice to the Settlement Class Members here satisfy the requirements of due process, Rule 23, and the PSLRA, 15 U.S.C. § 78u-4(a)(7).  The Notice "provide[s] all of the required information concerning the class members' right[s] and obligations under the settlement."

## VII.    PLAINTIFFS' COUNSEL'S EFFORTS ON BEHALF OF THE CLASS

72.     Lead Counsel is one of the oldest and most experienced plaintiff-side litigation firms in the U.S., with extensive experience in securities class-action litigation.  Additional Plaintiffs' Counsel, Rosen, and Labaton, are highly respected and skilled attorneys in securities litigation and have successfully litigated a multitude of securities class actions, for the benefit of classes nationwide.

73.     As Lead Counsel, Pomerantz was responsible for the conduct and oversight of this Action, which it and Plaintiffs' Counsel zealously prosecuted on behalf of Plaintiffs and the Settlement Class.  An overview of the tasks performed by Pomerantz with the valuable service of all the additional Plaintiffs' counsel include, *inter alia*, the following:

    a.  Strategic analysis and case investigation, including, without limitation, having conducted factual research, oversaw the investigator team, consulted with experts, researched applicable laws, and assessed potential claims;

    b.  Preparing and filing briefing in connection with motion for appointment of lead plaintiff;

    c.  Retaining and working with investigators to locate and interview confidential witnesses;

    d.  Reviewing and analyzing GSX's Class Period SEC filings, annual reports, press releases, quarterly earnings calls and industry and investment conference transcripts, and other public statements;

    e.  Collecting and reviewing a comprehensive compilation of analyst reports and major financial news service reports on GSX;

    f.  Reviewing and analyzing stock trading data relating to GSX;

g.  Working with a damages expert, including retaining and consulting with the expert and analyzing and exchanging write-ups at various phases of the litigation and during the mediation and settlement process;

h.  Drafting the detailed amended complaints;

i.  Preparing and filing briefing in connection with oppositions to Defendants' motion to dismiss the First Amended Complaint ("FAC");

j.  Conducting additional research and investigations to bolster the allegations for the Second Amended Complaint ("SAC");

k.  Preparing and filing briefing in connection with the successful opposition to Defendants' motion to dismiss the SAC;

l.  Engaging in initial discovery, including conducting conferences with Defendants' counsel, filing a motion for a protective order, and drafting portions of the Parties' joint letter to the Court outlining several discovery disputes;

m.  Researching and drafting briefing in opposition to Defendants' motion to strike Plaintiffs' Second Amended Complaint;

n.  Conducting both mediation and resolution-related efforts, including, without limitation, drafting and revising a mediation statement and compilation of related exhibits, making all presentations to mediators and all offers and counter-offers within the mediation framework, engaging in numerous telephonic and resolution-oriented discussions and negotiations with Defendants' counsel, and drafting and revising all settlement-related documents and court papers;

o.  Negotiating, drafting, revising, and finalizing the MOU;

p.  Negotiating, drafting, revising, and finalizing the Stipulation and its exhibits;

q.  Preparing the motion papers and related documents necessary to provide notice of the Settlement to Settlement Class Members;

r.  Obtaining preliminary approval of the Settlement, and thereafter, worked with the Claims Administrator to effectuate notice and oversee the administration process; and

s.  Preparing the motion papers and related documents necessary to obtain final approval of the Settlement. *Id.*

74.  Lead Counsel will also prepare for and appear at the final approval hearing on the Settlement and will continue to oversee administration of the Settlement.

## VIII.   COMPENSATORY AWARDS TO PLAINTIFFS SHOULD BE GRANTED

75.      Each Plaintiff at all times adequately represented the Settlement Class.  They devoted substantial time and effort to prosecuting this litigation, including time spent reviewing pleadings, motions, and other documents; communicating with counsel concerning the status of the case, discussing settlement authority with counsel, and staying apprised of developments, including settlement discussions.   The contributions each Plaintiff made on behalf of the Settlement Class, including an estimation of the time spent on the case, are set forth in their declarations in support of the proposed Settlement, and award of attorneys' fees and reimbursement of expenses, and compensatory awards to Plaintiffs.  Attached as **Exhibit 5** is a true and correct copy of the Declaration of Yang Renbin in Support of (1) Final Approval of Proposed Settlement; and (2) Award of Attorneys' Fees and Expenses, and Awards for Plaintiffs. Attached as **Exhibit 6** is a true and correct copy of the Declaration of Robert F. Angeline in Support of Motions for (1) Final Approval of Proposed Settlement; and (2) Award of Attorneys' Fees and Expenses, and Awards for Plaintiffs.  Attached as **Exhibit 7** is a true and correct copy of the Declaration of Corey Hays in Support of (1) Final Approval of Proposed Settlement; and (2) Award of Attorneys' Fees and Expenses, and Awards for Plaintiffs.  Attached as **Exhibit 8** is a true and correct copy of the Declaration of Alexandre Tazi in Support of (1) Final Approval of Proposed Settlement; and (2) Award of Attorneys' Fees and Expenses, and Awards for Plaintiffs.

76.      Given the important contributions and their time and effort expended by Plaintiffs, the requested award is warranted and should be approved.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.  Executed this 30th day of April 2026 at New York, New York.

/s/ Austin P. Van
Austin P. Van

31